IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

HELEN WINTERS, through her Power of    )
Attorney Carol Winters,                )
                                       )
                Plaintiff,             )
     vs.                               )
                                       )
CHUGIAK SENIOR CITIZENS, INC.,         )
                                       )
                Defendant.             )
_____)

Case No. 3:06-CV-00083-TMB

VOLUME II

VIDEOTAPED DEPOSITION OF CAROL WINTERS

September 22, 2006

APPEARANCES:

     FOR THE PLAINTIFF:          MR. JAMES J. DAVIS, JR.
                                 MS. BARBARA BRINK
                                 Alaska Legal Services
                                 Corporation
                                 1016 West Sixth Avenue
                                 Suite 200
                                 Anchorage, Alaska 99501
                                 (907) 272-9431

     FOR THE DEFENDANT:          MS. DONNA M. MEYERS
                                 Delaney Wiles Inc.
                                 1007 West Third Avenue
                                 Suite 400
                                 Anchorage, Alaska 99501
                                 (907) 279-3581

     ALSO PRESENT:               MARLA NELSON

**Page 147**

```
 1            TABLE OF CONTENTS
 2     Direct Examination Continued by Ms. Meyers    148
 3   EXHIBITS MARKED:
 4    K - Lease Agreement                            148
 5   EXHIBITS PROFFERED FROM WINTERS, VOL I:
 6    G - Ltr. from Ms. Winters to Nursing Staff, 9/22/04   151
 7    I - Amended Complaint for Injunctive and Declaratory
          Relief and for Damages                     209
 8
     J - Rebuttal to Eviction Notice                 225
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 148**

```
 1            P R O C E E D I N G S
 2         (Anchorage, Alaska - 9/22/2006)
 3       REPORTER:  On record.  My name is Joseph Kolasinski,
 4   notary public in and for the state of Alaska and court reporter
 5   for Computer Matrix Court Reporters whose business address is
 6   310 K Street, Suite 200, Anchorage, Alaska.  This is the
 7   continued video tape deposition of Carol Winters, taken
 8   pursuant to notice by the defendant.  The case in the United
 9   States District Court for the District of Alaska, Helen
10   Winters, through her power of attorney Carol Winters versus
11   Chugiak Senior Citizens, Inc.  Case number 3:06-CV-00083-TMB.
12   It is the 22nd day of September, 2006.  The time is
13   approximately 1:09 p.m.  We are at the offices of Delaney
14   Wiles, 1007 West Third Avenue, Suite 400, Anchorage, Alaska.
15       All the parties are present from the last deposition are
16   present at this deposition.  And Exhibit K has been marked and
17   counsel, you -- Ms. Winters, I'll just remind you, you're still
18   under oath.  And counsel, you may continue.
19       MS. MEYERS:  Thank you.
20         (Deposition Exhibit K marked)
21            CAROL LYNN WINTERS
22   previously sworn, testified as follows on:
23       DIRECT EXAMINATION CONTINUED
24   BY MS. MEYERS:
25   Q   Ms. Winters, I'll try to pick up where we left off from
```

**Page 149**

```
 1   last time and try not to duplicate anything but I'll
 2   apologize ahead of time if I just inadvertently ask you a
 3   question that I asked beforehand, okay?
 4 A   Sure.
 5 Q   All right.  At the start of this -- or right before the
 6   deposition started we marked an exhibit, it's labeled
 7   Exhibit K.  I'd like you to take a look at this exhibit
 8   and tell me if you recognize it.
 9 A   Yes.
10 Q   Okay.  The title of that document appears to be -- well,
11   it appears to be a lease agreement.  Would you agree with
12   that?
13 A   Correct.
14 Q   Okay.  And did you review this document before your mother
15   was admitted to Chugiak Assisted Living program in
16   September
17 A   It appears that it's signed on September 24th, which would
18   be four days after she was admitted.
19 Q   Okay.  Well, did you receive a copy of this document
20   before she was actually admitted on September the
21 A   I don't think so.
22 Q   Okay.  You don't think so.  You're not sure or you don't
23   believe you received it?
24 A   I don't recall receiving any document before she was
25   admitted.  I remember that I sat down with Lynn one day
```

**Page 150**

```
 1   and we went over a lot of documents together that I
 2   signed.
 3 Q   Okay.  And when was that that you went over a lot of
 4   documents with Lynn?
 5 A   That would have been probably a few days after she was
 6   admitted.
 7 Q   Okay.  Are you claiming that you didn't receive any
 8   documents from Chugiak before she was
 9 A   I don't think so.  No, I don't -- unless my memory is
10   failing me, but I don't think so.  I think it was all done
11   after -- after she was there.
12 Q   If you had received any documents before she was admitted,
13   is that something that you would have made a note of in
14   any kind of journal or kept a record of?
15       MR. DAVIS:  Calls for speculation.  I'll object.
16 Q   You can answer.
17 A   I don't believe I would have made -- no, probably not.
18 Q   Okay.  Do you have a file that you actually keep of
19   documents relating to your mother's admission to Chugiak?
20 A   No.
21 Q   Okay.  Do you have a file that you keep on your mother,
22   just with her important papers?
23 A   Yes.
24 Q   Okay.  And how far back does that file date?
25 A   I started that file only after we began the litigation
```

Computer Matrix Court Reporters

PH -  907-243-0668
FAX - 907-243-1473

EXHIBIT　G
Page 2 of 29

jpk@gci.net
sahile@gci.net

CAROL WINTERS                  9/22/2006                WINTERS v. CHUGIAK SR. CITZ.
                                                        3:-06-CV-00083-TMB

3  (Pages 151 to 154)

Page 151

1    process.
2  Q  Okay.  So before the litigation process, you didn't keep
3     any file on your mother?
4  A  I'm sure I kept copies of records but they may have been
5     in different places in the house.
6  Q  Okay.  Well, at the time that you received this lease
7     agreement, did you read it?
8  A  I generally read every document before signing it.
9  Q  Okay.  Did you consider this an important agreement?
10  A  It looks like an important agreement.
11  Q  Okay.  And do you recall if you asked Lynn Moser or anyone
12     else in the administration about the document, what it
13     meant, or anything that was included in it?
14  A  I believe Lynn was with me and I may have -- I -- I don't
15     recall but she probably went over each document with me
16     -- with me a little bit.
17  Q  Okay.  And my question is, do you recall having any
18     questions about what the lease agreement meant at the time
19     that you read it?
20  A  I don't recall that.
21  Q  I'm going to show you a document that we had previously
22     marked as an exhibit.  It's marked as Exhibit G and the
23     document numbers are 30362 through 30364.
24              (Exhibit G proffered)
25     (Pause)

Page 152

1  Q  Now that your attorney has had a chance to look at that
2     exhibit, do you recognize this document?
3     MR. DAVIS:  Counsel, can you give the witness a chance to
4  look at the exhibit herself?
5     MS. MEYERS:  She can take whatever time she needs to look
6  at it.
7     (Pause)
8  Q  And Ms. Winters, whenever you've had enough time to look
9     it over, could you let me know?
10     (Pause)
11  A  Yes.
12  Q  Yes, you recognize the document?
13  A  Correct.
14  Q  Okay.  What is it, please?
15  A  It's a letter to Chugiak Senior Center Assisted Living
16     providing information from a personal perspective and
17     knowledge of my mother's needs so that they could
18     administer services to her appropriately.
19  Q  Okay.  And who pro -- do you know who provided that or who
20     authored the letter?
21  A  Yes, I did.
22  Q  Okay.  And do you know when you provided that to Chugiak
23     Senior Center?
24  A  Either that day or the day after.
25  Q  Okay.  And that day being what?

Page 153

1  A  I'm sorry, I didn't hear you.
2  Q  That day being what day?
3  A  The 22nd of September or shortly after that.  This is not
4     something I would have kept.
5  Q  Okay.  So this letter is -- it appears to be -- the first
6     page is a letter that's signed by you, correct?
7  A  Yes.
8  Q  Oh, by the way, going back to Exhibit K, the lease
9     agreement, did you sign that lease agreement?
10  A  Yes.
11  Q  Okay.  So that's your signature on there?
12  A  Uh-huh.  (Affirmative)
13  Q  All right.
14  A  Yes.
15  Q  Okay.  On Ex -- with Exhibit G, the first page is --
16     appears to be a letter dated September the 22nd, 2004,
17     addressed to Dear Nursing Staff, Chugiak Assisted Living.
18     And there's a signature on that first page.  Is that your
19     signature?
20  A  Uh-huh, yes.
21  Q  And the pages that follow that, there's a caption at the
22     top that says care needs for Helen Winters, Room 234.  Do
23     you see that?
24  A  Uh-huh, yes.
25  Q  Is that correct?

Page 154

1  A  Uh-huh.  (Affirmative)
2  Q  Okay.  All right.  Does this read -- this -- does this
3     document at all indicate to you the date that your mother
4     was admitted to Chugiak?
5  A  No.
6  Q  Okay.  Was she admitted to Chugiak before or after you
7     wrote this letter?
8  A  Before.
9  Q  Okay.  And in this letter, is -- were you trying to be as
10     accurate and as thorough as possible in terms of conveying
11     your mother's needs to Chugiak?
12  A  I -- my intent was to provide a general picture.
13  Q  In this document that you provided to Chugiak, is there
14     anywhere in this document that you discussed her dietary
15     needs?
16  A  I addressed her allergy to milk.
17  Q  Okay.  It's my understanding that your mother -- either
18     you or your mother or both claim that she cannot eat beef
19     or pork.  Is that correct?
20  A  The question was what?  The beginning of that?
21  Q  Either -- what -- let me ask you this, what sort of
22     dietary needs does your mother have?
23  A  She does not eat beef or pork.  And she doesn't drink
24     regular milk.  It needs to be lactose free.  And she has a
25     sensitive digestive tract so -- because of ulcers and

CAROL WINTERS                    9/22/2006            WINTERS v. CHUGIAK SR. CITZ.
                                                      3:-06-CV-00083-TMB

4 (Pages 155 to 158)

| Page 155 | Page 157 |
|---|---|

Page 155

1    intestinal problems, she needs -- some things bother her.
2    Like spicy foods might bother her or like oily foods.
3  Q  Okay. And why can't she eat pork or beef?
4  A  Well, she had not ingested that type of meat in her diet
5    for maybe 20 or more years because the physician way back
6    recommended pork was very salty and beef had high
7    cholesterol.
8  Q  Okay. Is this information that you communicated to
9    Chugiak, anyone at Chugiak, before you mother was
10   admitted?
11 A  Absolutely.
12 Q  Okay. And to whom did you give that information?
13 A  Lynn Moser.
14 Q  Okay. Did you provide it to anyone else before she was
15   admitted?
16 A  Lynn Moser only.
17 Q  Okay. Have you ever provided any documentation to
18   Chugiak, either before her admission or say -- let's say
19   within the first three months after her admission, that
20   she could not digest.....
21 A  Not in writing.
22 Q  .....pork or beef?
23 A  No.
24 Q  Please let me finish the question, then it will make for
25   a.....

Page 156

1  A  Oh, I'm sorry.
2  Q  .....cleaner transcript. Okay. And your answer is?
3  A  Say the question again, I'm sorry.
4  Q  Okay. Prior to your mother's admission or within the
5    first three months of her admission, did you ever provide
6    any documentation to anyone at Chugiak that your mother
7    could not digest beef or pork? And that she couldn't eat
8    it?
9  A  Verbally but not in writing.
10 Q  When she was admitted, do you ever recall if you asked
11   anyone, either Lynn Moser or anyone else in administration
12   during the admission process whether they could
13   accommodate special dietary needs?
14 A  Yes.
15 Q  Okay. And who did you ask that of?
16 A  Lynn Moser.
17 Q  And Lynn Moser only?
18 A  I'm sorry?
19 Q  And Lynn Moser only?
20 A  Yes. Yes.
21 Q  Okay. I'm going to switch gears here a little bit but
22   have you ever assisted your mother in putting on or taking
23   off her TED hose?
24 A  Probably a couple of times. Yes. Yes, I have.
25 Q  Okay.

Page 157

1  A  Uh-huh.
2  Q  When was the last time you recall doing that?
3  A  Oh gee, probably just a few weeks ago.
4  Q  And did she have any complaints about the way you assisted
5    her with her TED hose?
6  A  Unh-unh, no.
7  Q  No. Are you aware that she has complained about certain
8    staff members, the way the put on or take off her.....
9  A  Yes.
10 Q  .....TED hose?
11 A  Yes.
12 Q  Okay. And what's your understanding of that complaint?
13 A  That -- she has said that they either hurt her putting on
14   the TED hose or they do it roughly and that results in
15   pain.
16 Q  Have you ever witnessed any of the staff members putting
17   on and taking off her TED hose?
18 A  No, not personally.
19 Q  Okay. Have you seen -- well, since your -- the beginning
20   of your deposition, the long term -- do you understand
21   that the long term care ombudsman has issued a report
22   that's dated August the 30th.....
23 A  Yes.
24 Q  .....of this year? Okay. When did you first receive a
25   copy of that report?

Page 158

1  A  A copy. Shortly after he wrote it, I believe. I don't
2    know the date, but whatever date he wrote it, I think I --
3    no, maybe I received it after Chugiak because he didn't
4    have my home address. So he had to call me and get my
5    home address.
6  Q  So the copy -- the first copy that you saw was one that
7    was mailed to you?
8  A  Yes.
9  Q  Okay. Had you seen any prior drafts of his report?
10 A  No.
11 Q  Did you provide a copy of the report to anyone?
12 A  Like -- what do you mean?
13 Q  Anyone. Did you share a copy of -- did you actually make
14   a copy and provide a copy to anyone?
15 A  I don't think so because everybody I know had been mailed
16   one, so I don't think I would have had that need to do
17   that. No, I don't think so.
18 Q  Have you actually reviewed the long term care ombudsman's
19   report?
20 A  Yes.
21 Q  Okay. Have you formed any opinions about whether you
22   disagree or agree with anything in his report?
23 A  Yes.
24 Q  Okay. And what are those opinions?
25 A  I thought it was very comprehensive, well written,

CAROL WINTERS                 9/22/2006            WINTERS v. CHUGIAK SR. CITZ.
                                                  3:-06-CV-00083-TMB

Page 159

1    detailed, and extremely accurate.
2  Q  Okay. You said extremely accurate, do you have a sense of
3    the events that -- do you recall now the events that he
4    described in the report relating to the staff?
5  A  Probably. Yeah, most of them.
6  Q  Okay. The events that he described in the report, are
7    there any of those -- are any of those events, events that
8    you actually witnessed yourself?
9  A  Well, certainly the doors being open in the summer and
10   aides smoking on the deck and by the entrances.
11 Q  Anything else?
12 A  Just respect. I've seen that aides' faces or in their
13   tone of voice and I think last time I told you about the
14   aide Angel who yelled at my mother. So that's about it.
15 Q  All right. You did describe the one incident involving
16   Angel. And what I would like to know is, these complaints
17   of abuse that are alleged either in the long term care
18   ombudsman's report or in the complaint, which of these
19   alleged events did you actually witness with your own
20   eyes, other than the incident that you described with
21   Angel?
22   MR. DAVIS: I'm going to object. It's a compound
23   question. If you want to ask this witness about particular
24   events, incidents, you can do so. Asking that question
25   involves multiple if not over 20 different events in the

Page 160

1    complaint and the report and it's an unfair question. I'll
2    object.
3  Q  I'll ask the question a different way, Ms. Winters. What
4    events of alleged abuse have you actually witnessed, other
5    than the incident that you claim occurred with Angel?
6  A  Other than the two I described last time, I can't think of
7    any right now.
8  Q  Okay. I recall the incident that you described with Angel
9    and what was the second?
10 A  And Rhonda -- Rhonda when we first moved in.
11 Q  Okay. With the Depends?
12 A  No, when she just looked like she rolled her eyes when mom
13   was asking for help.
14 Q  Has -- so those are the only two events that you claim
15   you've actually witnessed?
16 A  Yes.
17 Q  Okay.
18 A  I -- as far as I can recall right now.
19 Q  Okay. Well, if you had witnessed any other alleged
20   incidents of abuse, would you recall them?
21   MR. DAVIS: I'll object to that question. It's
22   unintelligible as phrased.
23 Q  If you had actually witnessed any alleged -- what you
24   considered abuse, would that be important to you?
25 A  Yes, uh-huh.

Page 161

1  Q  Okay. And if it was important to you, would you recall
2    actually witnessing those events?
3  A  Well, I think like anybody, when you're just popped a
4    question, sometimes you don't recall and you may recall
5    later.
6  Q  Okay.
7  A  There were times aides were in my mom's room that I didn't
8    feel they were nice to her. They were just not nice.
9  Q  Okay. How were they not nice?
10 A  Oh, she would say something and smile and be friendly and
11   they wouldn't smile. Terri Wilde in particular. I --
12   when she comes in and I'm there, she's very straight faced
13   and mom will make small talk and she won't answer her or
14   she just won't smile, won't smile.
15 Q  And do you consider not smiling and not responding to be
16   abuse?
17 A  I think that not being pleasant can create an atmosphere
18   where the resident can feel anxious, unwanted. Yes. It's
19   -- there are many degrees of abuse and that would fall on
20   the lower end but that's one, very mild but yes. And
21   highly inappropriate.
22 Q  And when you had observed this alleged not being nice.....
23 A  Let's say disrespectful.
24 Q  Okay.
25 A  Mainly disrespectful.

Page 162

1  Q  Well, when you observed the aides not being -- or were --
2    that they were being disrespectful, did you actually --
3    did you say anything to anyone in administration about it?
4  A  No.
5  Q  Why not?
6  A  Well, because of the litigation and so forth. It's just
7    so many things, one after another.
8  Q  Okay. So you said in litigation. Are you saying that
9    these events happened after the litigation began?
10 A  This is recently. Uh-huh.
11 Q  Okay. Can you be more specific about when it occurred?
12 A  Three weeks ago.
13 Q  And who else was in the room?
14 A  I'm sorry, I didn't hear you.
15 Q  Who else was in the room? You mentioned Terri Wilde.....
16 A  My mother. My mother.
17 Q  Was there a second aide there too?
18 A  No.
19 Q  Was this the evening shift of night shift or do you know?
20 A  I think it was late afternoon.
21 Q  Well, since the litigation began, have you made any
22   complaints about the way your mother is treated? I mean,
23   but complaints to administration about the way your mother
24   has been treated?
25 A  Yes.

EXHIBIT _____ 6 _____
Page __5__ of __29__

Page 163

1  Q  Okay. So the fact that there's been litigation hasn't
2     stopped you from making complaints when you thought your
3     mother wasn't being treated.....
4  A  Well, if it's.....
5  Q  .....properly?
6  A  .....to a greater degree than disrespect, I have reported
7     that.
8  Q  Okay. And have you made -- since your last deposition,
9     have you made any complaints to the long term care
10    ombudsman about the way your mother is being treated?
11 A  Yes.
12 Q  Okay. And what are -- what's the nature of those
13    complaints?
14 A  The aides on the night shift -- it was going on for days
15    -- didn't want -- did not want to arrange her pillows,
16    mom's pillows under her neck and legs. And they said to
17    her, the last -- the day before I reported -- made an
18    official report that they did not want to work with her
19    anymore.
20 Q  Were you present when these aides allegedly made those
21    statements?
22 A  No.
23 Q  Okay. So this is information that you learned from your
24    mother?
25 A  Correct.

Page 164

1  Q  Anyone else besides your mother?
2  A  No.
3  Q  Okay. And do you have an understanding of whether the
4     aides were just refusing to arrange the pillows or just
5     that they didn't want to arrange the pillows -- they
6     allegedly didn't want to arrange the pillows as many times
7     as your mother wanted them arranged?
8  A  I just thought of another aide though. Annette. I have
9     seen her face and attitude and how she treats me. And
10    also Terri, the older woman with the curly hair. I think
11    she's about 60 years-old. That now comes to mind. I have
12    seen their expressions with my mother and they have
13    treated me the same way.
14 Q  Okay. What have you seen in their expressions toward your
15    mother? Can you explain what it is you've actually
16    observed that you think is.....
17 A  They.....
18 Q  .....disrespectful?
19 A  It's just the same like Terri, just deadpan look, will not
20    respond, will not smile. Annette gave me a look and also
21    Terri a look personally that -- you know, that old
22    expression, if looks could kill? I got those coming into
23    the center.
24 Q  And when did this happen?
25 A  Shortly after the TV report, media exposure.

Page 165

1  Q  And so these looks of a deadpan look, not smiling, either
2     by Annette or Terri, are you claiming that these are
3     instances of abuse towards your mother?
4  A  I wouldn't consider that necessarily abuse if it was one
5     time. I think -- I think that if a lot of the aides were
6     being non-responsive for a long period of time,
7     absolutely. Absolutely.
8  Q  Okay. And I'm just trying to understand what your
9     definition of abuse is. Have you seen a lot of the aides
10    being -- having deadpan looks or not smiling or not
11    responsible for a long period of time?
12 A  I mean, instances, yes. Especially recently. Especially
13    recently because of the media exposure, I believe.
14 Q  Okay. Did you instigate the media exposure?
15 A  I'm sorry, I didn't hear.
16 Q  Did you contact the media about the case?
17 A  No.
18 Q  Okay. You've never done that directly?
19 A  No.
20 Q  Now so are you claiming that there has been sustained
21    disrespect either through the aides' facial expression or
22    not responding that you would now consider that abuse?
23 A  This is not the abuse I reported to the ombudsman, no.
24    It's a totally different nature.
25 Q  Okay. And that's what I would like to understand more

Page 166

1     clearly. What are you claiming is abuse?
2  A  Well, not assisting my mother arrange the pillows in her
3     neck when she can't is neglectful and can cause her great
4     pain during the night. I sat on her couch and tried to do
5     it myself and I have two good arms and hands, I couldn't
6     do it. And she can't -- she's very disabled. She can't
7     arrange those pillows. So she has a stiff neck, that --
8     that's wrong.
9  Q  Okay. Why -- I don't understand why you could not arrange
10    the pillows for her.
11 A  Well, I -- I laid on my back on the couch. It -- it's
12    just -- it's hard to get them in the right place, to reach
13    back in that position and position them. And she has two
14    that need to be like together, one under the -- I couldn't
15    do it. It was very difficult, so I can't imagine that my
16    mother with a bad arm could do it.
17 Q  Okay. And do you -- have you ever observed the aides
18    arrange the pillows for your mother?
19 A  Only when she first moved in.
20 Q  Okay. And do you recall who the aides were?
21 A  I'm sorry?
22 Q  Do you recall who the aides were?
23 A  Rhonda and Eliria.
24 Q  Okay. Did you have any complaints about them arranging
25    the pillows at that time?

EXHIBIT     6
Page   6   of   29

CAROL WINTERS                    9/22/2006              WINTERS v. CHUGIAK SR. CITZ.
                                                        3:-06-CV-00083-TMB

Page 167

1 A   Well, they just made faces doing it. They didn't like
2     doing it but they did it. They got it done.
3 Q   Okay. And do you know if -- well, when you say they made
4     faces, what sort of faces did they make?
5 A   I don't know. Just rolling their eyes. Rhonda would roll
6     her eyes. I saw that a couple of times. I don't know,
7     they just -- Eliria, I didn't see Eliria making a face
8     actually. It was mostly Rhonda.
9 Q   Okay. And this happened when your mother was initially
10    admitted?
11 A  Uh-huh. The first two days, yeah.
12 Q  First two days.
13 A  Because I was there. I was staying with her.
14 Q  All right. And did you say anything to the administration
15    about it?
16 A  Yeah, I did.
17 Q  Who did you talk to?
18 A  Linda Hendrickson.
19 Q  And do you recall, was this in person or was it by
20    telephone?
21 A  No, it was in person.
22 Q  Okay. Do you recall Ms. Hendrickson's response?
23 A  I think she said she was surpri -- surprised because she
24    felt Rhonda was one of the better aides.
25 Q  Okay. All right. And do you consider -- did you consider

Page 168

1     that abuse by Rhonda?
2 A   Well, it's not something you would expect. If you put
3     your 90 year-old mother in an assisted living, you
4     wouldn't expect that kind of treatment. I wouldn't
5     consider that necessarily in an abuse category but it's
6     certainly inappropriate kind of treatment.
7 Q   Okay. What do you -- as I understand your testimony, you
8     don't believe that there was any physical abuse that has
9     occurred to your mother at Chugiak by any staff member, is
10    that correct?
11 A  Well, I has said that previously but I -- I think I will
12    change that after thinking about it. I definitely think
13    there was.
14 Q  Okay. Well, tell me what physical abuse you are
15    contending was.....
16 A  For hurting her.....
17 Q  .....inflicted on your mother?
18 A  .....hurting her legs putting the TED hose on. This is
19    repeated day after day after day. It couldn't possibly be
20    done over and over if it wasn't intentional.
21 Q  What evidence do you have that day after day after her
22    TED hose were being put on her to cause pain? Is that
23    your claim, first of all?
24 A  Correct.
25 Q  Okay.

Page 169

1 A   Mom -- mom would tell me. Mom would tell me that -- and
2     again, like I stated before, my mom and I are very close.
3     I've talked to her four or five times a day for many
4     years, since I moved her here. She's an extremely honest
5     person in her right mind. She doesn't fabricate,
6     exaggerate or lie. I trust what my mother says. We have
7     the same opinions about most things and most people.
8 Q   Did your -- has your mother ever complained, when you put
9     her TED hose on, complained that it hurt?
10 A  Unh-unh. (Negative)
11 Q  Okay. Other than the aides, who else do you know would
12    put on or take off her TED hose?
13 A  Oh boy. Who would?
14 Q  Yes.
15 A  I mean in the assisted living, I guess nobody except her.
16    I guess the aides -- or I mean, only the aides.
17 Q  Okay.
18 A  Right.
19 Q  Does she also have a podiatrist that comes to see her?
20 A  Yeah.
21 Q  And is that Dr. Kleca?
22 A  Correct.
23 Q  Okay. And do you know if Dr. Kleca assists her with her
24    TED hose, either putting them on or taking.....
25 A  I would.....

Page 170

1 Q   .....them off?
2 A   .....imagine she would.
3 Q   Okay.
4 A   Yeah.
5 Q   Has your mother ever complained about feeling any pain as
6     a result of Dr. Kleca putting her TED hose on or off?
7 A   Not that I'm aware of, no.
8 Q   Have you ever talked to Dr. Kleca about whether she had
9     any complaints about -- whether your mother had any
10    complaints about the way Dr. Kleca put on or took off the
11    hose?
12 A  Unh-unh. (Negative) Not a problem. No.
13 Q  Okay. Do you know if the nurses at Chugiak have ever
14    assisted in putting on and off her TED hose?
15 A  She never mentioned that to me, so I don't know. They
16    could have.
17 Q  Okay. Have you ever talked to the nurses about it?
18 A  I don't think so.
19 Q  Have anyone -- and I mean a third party, not including
20    your mother -- but has anyone told you that they've
21    actually witnessed your mother being abused at Chugiak by
22    the aides there?
23 A  No, I don't thi -- I don't believe so.
24 Q  Now you have clarified your early testimony or changed it
25    to say that you believe now that your mother has been

---

Page 171

1    physically abused at Chugiak and you mentioned the TED
2    hose.  Is there any other allegation of physical abuse?
3  A    Well, mom did say that when Sheila and Terri were giving
4    her a shower that they were very rough with her.  That
5    Sheila was, actually, may -- yes, Sheila was very rough
6    with her.  Terri was standing by the side.  And I'm trying
7    to think of other.....
8  Q    Okay.  Well, let's just -- let me just ask some questions
9    about this one.  Did your mother describe how she thought
10    Sheila was being rough with her?
11 A    Well, she said they were hurting her back.
12 Q    Okay.  Did she tell you what they were doing at the time?
13 A    I think just wash on her back, rubbing her too hard.
14 Q    Okay.  Do you know -- do you recall when this allegedly
15    occurred?
16 A    I'm sorry, when what?
17 Q    When did this allegedly occur?
18 A    That must have been summer of '05.  Summer of '05.
19 Q    Okay.  And it's your understanding that Terri was present
20    at the time?
21 A    Uh-huh, yes.
22 Q    Do you know, was Terri in the bathroom with them, are do
23    you know?
24 A    What?
25 Q    Was Terri also in the bathroom with them or do you know?

---

Page 172

1  A    I believe so.  Yeah.
2  Q    Okay.  And this information you obtained solely from your
3    mother?
4  A    Correct.
5  Q    Okay.
6  A    Correct.
7  Q    Did you make any complaint to Chugiak about this alleged
8    abuse?
9  A    Well, my mother -- yes, my mother called me immediately
10    after that and was extremely upset.  And she told me what
11    went on.  She said that Sheila was very nasty to her, hurt
12    her, wanted her to go faster, didn't want to wash her
13    hair, didn't want to blow dry or fix her hair, and got
14    really angry with her when she asked that her towels be
15    hung in a certain fashion.  Terri said -- I mean, not
16    Terri, Sheila said, don't tell me what to do, I know how
17    to do my job.  Then mom said that when she went to sit down on the -- she
18    Then mom said that when she went to sit down on the -- she
19    had to go to the toilet, they were putting her down and
20    she started losing her balance.  She started losing her
21    balance and she -- I guess she went like that (indicating)
22    and she -- this came out in the end.  She didn't tell me --
23    she just said she was losing her balance and she grabbed
24    Terri.  And then she called me and told me that whole
25    thing and I said, mom, you need to report this.  And she

---

Page 173

1    said, oh yes, I'm going to report this.  And I -- I told
2    her to call immediately, leave Marla a message.  She said
3    I will.  And then I called and left Marla a message on
4    that.
5  Q    And when did this occur?
6  A    Summer of '05.  I think June or July.
7  Q    Did you make any notes or records of what your mother told
8    you.....
9  A    I.....
10 Q    .....about this alleged incident?
11 A    Some time -- it was kind of hit and miss.  You have to
12    remember, I never thought a litigation would come up,
13    never had any intention.  I always thought things would be
14    worked out, so I wasn't really keeping things organized.
15    Possibly, but I don't know.  I don't know.  I didn't look
16    at my records before I came here today.
17 Q    Okay.  You said that you didn't think litigation would
18    come up.  Within about a month after your mother moved
19    into Chugiak, were you approached by Laurie Dugaorian, the
20    nurse, and Laurie had made a suggestion about your mother
21    moving to a different facility?
22 A    Well, she said my mother belonged in a nursing home.
23    That's what she said.
24 Q    Okay.  And do you recall -- did you ever talk to Linda
25    Hendrickson about that conversation with Laurie.....

---

Page 174

1  A    Yes.
2  Q    .....Dugaorian?
3  A    Yes, yes.
4  Q    Okay.  Do you recall that -- being angry about the
5    conversation with Laurie Dugaorian?
6  A    Upset, probably, yeah.
7  Q    Okay.  Did you threaten litigation at that point?
8  A    No, I don't think so.  Threaten litigation?  I don't
9    remember saying that.  If I did, I don't remember it.
10 Q    Okay.  So you're not denying that you said something about
11    litigation?
12 A    If I was upset, possibly I -- I may -- I may have said
13    something like, if you don't shake things up, maybe -- I
14    don't know, but I don't remember.  I don't recall saying
15    that, really.  Could -- could have.
16 Q    Do you recall telling Linda Hendrickson or anyone else in
17    administration that if they try to move your mother out of
18    Chugiak, that you would sue?
19    MR. DAVIS:  Ever?
20 Q    Well, let's use a time frame.  Within a couple of months
21    after your mother's admission, do you.....
22 A    I don't recall.....
23 Q    .....recall threatening litigation?
24 A    I honestly don't recall saying that, no.
25 Q    All right.  We were talking about the allegations of

---

Computer Matrix Court Reporters        PH -  907-243-0668                    jpk@gci.net
                                       FAX - 907-243-1473    EXHIBIT   6     sahile@gci.net
                                                             Page ___8___ of _29_

Page 175

1    physical abuse and the last one you mentioned involved
2    Sheila. Any other claims of physical abuse?
3  A   We're talking purely physical, correct?
4  Q   Correct.
5  A   Okay. Oh, there was the event where Steven hurt my mom
6    turning her at night, which in that case, she did not
7    believe that was intentional, nor do I. But it was just
8    because of his lack of experience.
9  Q   So are you claiming that was physical abuse or not?
10  A   Well, no. I guess it wouldn't be abuse. He just didn't
11    know how to turn her.
12  Q   Okay. Any other allegations of physical abuse?
13  A   Terri Forsythe also reportedly, according to my mother,
14    hurt her putting on her stockings. It was sort of like
15    the tame -- same time frame. Same time frame, yeah.
16  Q   What was the time frame?
17  A   Just that was -- there was a period of a couple of weeks
18    where that was going on. It seemed Terri and -- by Lisa.
19  Q   Okay. Did you ever -- when your mother would complain to
20    you about the way the aides were putting on her TED hose,
21    did you ever think about going to Chugiak to observe the
22    aides put on the TED hose?
23  A   Hopeless. I just feel hopeless. I doesn't matter how
24    many calls I have left about so many things over so many
25    months and there's never -- nothing ever was done, so I

Page 176

1    just kind of gave up.
2  Q   But you never thought about going over there yourself to
3    see whether they were putting the TED hose on too quickly?
4  A   Well, they put them on really early in the morning. They
5    start work at 7:30, so they get her up I think about 7:30,
6    so it really wouldn't work.
7  Q   Could you have taken off time from work to go over there
8    to observe?
9  A   No.
10  Q   At any time during the course of your mother's admission
11    at Chugiak, you couldn't have taken out time to go over
12    there to observe how they were putting on the TED hose?
13  A   Well, I guess my thinking was I advised my mother often to
14    tell them -- I said, mom, well tell them. And she would
15    say yes, I do tell them it hurts, it hurts. And I -- I've
16    told her to instruct them. Because you have to -- well,
17    they're tight and you have to pull them at the ankle
18    before you work them up. And I told her to tell them
19    that. And she -- she told me, they don't want to listen,
20    they don't want to listen. So I believe I left more than
21    one call for Marla on that. That was not the first time.
22    I left a number of calls about the TED hose. A couple of
23    calls at least. And I thought she would take care of it.
24    It just kept going on.
25  Q   Okay. Do you know what kind of training -- had -- did you

Page 177

1    ever ask what kind of training the aides have in putting
2    on and off TED hose?
3  A   I -- I didn't hear you.
4  Q   Did you ever inquire about the type of training that the
5    aides had putting on and off TED hose?
6  A   No, but I had the feeling that they were intentionally
7    trying to hurt her so really, if I were -- I -- I just
8    -- I do believe especially after reading the ombudsman's
9    report that they were intentionally trying to hurt her.
10    It does -- it's not a matter of do they know how to do it,
11    it's a matter of they were purposely doing it, okay.
12  Q   Before you read the ombudsman's report, did you have the
13    opinion that they were purposely trying to hurt your
14    mother putting on and off the TED hose?
15  A   I suspected that but I was convinced after reading the
16    ombudsman's report.
17  Q   What is it about the ombudsman's report that convinced
18    you?
19  A   Well, his description of the aide Lisa and he related that
20    Lisa, it was obvious, did not like my mother and that she
21    admitted that the group of them were trying to get my
22    mother to put on her own TED hose. What better way than
23    to hurt her, to make it uncomfortable so she'd want to put
24    them on by herself. It just makes sense.
25  Q   To the best of your -- well, you read the ombudsman's

Page 178

1    report, and is it your understanding -- or do you believe
2    that Lisa told him that she didn't like your mother or was
3    that his impression?
4  A   I don't know if those were his words exact -- I mean, if
5    -- I'm not sure she said that. I think it was like he
6    inferred that. But in the very beginning when mom was
7    admitted, Lisa didn't want to do my mom's hair either.
8    That was a problem from the beginning. She didn't even
9    want to comb my mom's hair. And I went to Lynn Moser with
10    that complaint. And she didn't want to comb her hair.
11    And mom had her -- just got out of her, you know, her
12    splint. She can't -- couldn't raise her arm.
13  Q   Did you talk to the occupational.....
14  A   Mom would think she taunted her. Mom said Lisa -- Lisa
15    taunted her.
16  Q   How did she taunt her?
17  A   Huh?
18  Q   What did your mother say about -- did she describe how she
19    believed Lisa taunted her?
20  A   Just wouldn't do things for her that she wanted. Just
21    refused to do them.
22  Q   And that was what your mother meant by taunting?
23  A   I'm not sure. There must have been -- I don't know
24    right now. I don't know.
25  Q   Okay.

Computer Matrix Court Reporters      PH -  907-243-0668                jpk@gci.net
                                     FAX - 907-243-1473   EXHIBIT  6    sahile@gci.net
                                                          Page  9  of 29

CAROL WINTERS                    9/22/2006                    WINTERS v. CHUGIAK SR. CITZ.
3:-06-CV-00083-TMB

Page 179

1   A   I can't remember.
2   Q   Did you ever talk to the physical therapist about whether
3       it was good for your mother to try to use her arm to comb
4       her hair?
5   A   I can't remember. That's so long ago. Gosh. That's a
6       couple of years ago. I don't remember.
7   Q   Did you ever talk to the physical therapist about whether
8       your mother was capable of putting on and off her own TED
9       hose?
10  A   I don't recall that conversation. But I do know that
11      later I talked -- when there -- this problem was going on,
12      I took mom to the knee doctor to get something from him to
13      stop this harassment and he did write a statement that mom
14      could not put on her TED hose by herself and needed to be
15      helped.
16  Q   And who was her knee doctor?
17  A   Schaab, Peter Schaab.
18  Q   Okay. And after you received that note from Dr. Schaab,
19      did the aides encourage your mother to put on her TED
20      hose?
21  A   Gosh, I can't remember, you know, exactly. I can't
22      remember. I mean, I think it got be -- I think they
23      stopped asking her to do it herself. It was -- it was a
24      big deal with Terri and Lisa. Teresa and Lisa. Not only
25      the TED hose but about putting on her shoes and tying her

Page 180

1       shoes. They wanted mom to put on her shoes and tie her
2       shoes. Well, my mother has gained 40 pounds since she
3       went to Chugiak Senior Center. She's really big in the
4       middle because she doesn't walk and the food. She can't
5       bend over. When she does, her back hurts. She gets out
6       of breath and she gets vertigo. And her shoulder hurts
7       her. And they're for -- trying to force her to put on her
8       shoes after she tells them over and over and over, I can't
9       do it, I can't do it. Almost like they're intentionally
10      harassing my mother.
11  Q   Did you ever talk to the physical therapist about whether
12      it was good for her to try to tie her shoes or to put them
13      on?
14  A   You know, I can't remember that.
15  Q   Okay.
16  A   Honestly, I -- I honestly can't remember.
17  Q   And do you.....
18  A   We may have had that conversation, I just don't remember.
19  Q   Okay. Do you recognize or do you have an idea -- well,
20      did you ever see anything in the record or did you ever
21      talk to anyone in administration about the fact that your
22      mother had been seen putting on and off her own TED hose?
23  A   Now say that again. My hearing problem.....
24  Q   Okay.
25  A   .....repeat it please.

Page 181

1   Q   Did you ever talk to anyone in administration or review
2       any of your mother's records that show your mother was
3       capable of putting on and off her TED hose at any time
4       while she was at Chugiak?
5   A   No, I've never seen anything like that. No.
6   Q   What about tying her shoes? Did you -- I mean, if the
7       aides were trying to encourage your mother to do something
8       that they had seen her do before safely, do you consider
9       that harassment?
10      MR. DAVIS:  Calls for speculation. I'll object.
11  Q   You can answer the question.
12  A   It was told to me by certain of the staff at Chugiak -- I
13      can't remember who exactly -- that they offered this to me
14      that she -- they -- she was trying to be encouraged to be
15      independent. And that's fine. I mean, of course that's
16      good. But what mom was reporting to me went far beyond
17      that, okay. It went beyond that. It's one thing to
18      encourage someone, they also kept, in my opinion, what --
19      what is -- would be really, truly taunting her -- and
20      that's my word -- in the same manner, was pulling up her
21      diapers when the doctor clearly said she could never stand
22      unassisted. It was the same type of pattern. There's a
23      difference between saying to someone, well, Helen, let's
24      try this today. Let's try it. Let's try a little more
25      each day and then if someone says they can't do it, well,

Page 182

1       do you want to try? And that would be encouragement,
2       which would be fine. As opposed to simply forcing them or
3       not doing it. And that's what mom met up with, especially
4       with pulling up her diapers when she was standing on the
5       -- on the toilet. My mother's knees give out. They just
6       give out. That's why she's there. I was with her when
7       she fell one day because her knee just went out and she
8       just went right over. Mom's doctor said she should never
9       stand alone, okay. So she's always on the toilet when she
10      -- she has pull-ons, pull-ups. The doctor said she always
11      needs to put her hand on the bar by the toilet. And the
12      aides would over and over try to get her to let go of the
13      bar. Helen, you can do it. And then Rhonda for sure --
14      and I don't -- I have to think about who else -- would
15      come to her room and they would let her stand there, she
16      would tell me. They would just let her stand there and
17      would refuse to pull up her diapers. Refuse to pull up
18      her diapers and let her stand there trying to get her to
19      make an effort. And she said, I can't, I can't. If I --
20      if I do, Carol, I'm going to let go and I'm going to fall,
21      I'm going to fall. I can't do that. They want me to, you
22      know, they're pushing, they're pushing, they're pushing
23      her all the time, all the time, all the time. I would
24      hear this day after day after day after day after day.
25      Harassment supreme.

Computer Matrix Court Reporters        PH -  907-243-0668        EXHIBIT ___6___        jpk@gci.net
                                       FAX - 907-243-1473        Page _10_ of _29_        sahile@gci.net

CAROL WINTERS                    9/22/2006              WINTERS v. CHUGIAK SR. CITZ.
                                                        3:-06-CV-00083-TMB

Page 183

1  Q  And when did you hear this day after day?
2  A  Huh?
3  Q  What time period did you hear this day after day?
4  A  Oh gosh, I even heard it a couple of months ago, starting
5     the same thing again. I have to think of who that one
6     was. I mean, it's just -- it's just -- never ends. Never
7     ends. I don't know, these people are, you know, as a
8     group, they're just -- it seems like they are
9     intentionally doing this to either make her sick of the
10    place so she'll want to leave Chugiak or they have very
11    little understanding that this woman can't do it.
12 Q  Did the physical therapist ever recommend to the aides or
13    tell the aides that your mother was capable of holding
14    onto the bar and pulling up her undergarment, her Depends?
15 A  You know, I -- there was something -- I'm not sure this is
16    what you're getting at, but there was one time, maybe six
17    or eight months ago, when wrong instructions were given by
18    the doctor. A therapist came over. I called Dr. Jones to
19    get a prescription for therapy only for my mom's shoulder.
20    And somehow that was misconstrued through Dr. Jones'
21    medical assistant. And what came back to the therapist
22    that was sent out was that it was -- a prescription came
23    from Dr. Jones for like a -- I think it was like general
24    assessment, general evaluation. Which is not what I
25    requested. And then this therapist came out, a male

Page 184

1     therapist, and he -- he was a young guy and he did this
2     whole assessment and he came up with something like that,
3     I believe. And when I found out what he did, I -- I
4     called and re -- talked to his supervisor. Because I
5     found out that a prescription was written wrong. He was
6     looking at her ambulation and everything and gave some
7     directives that should not have been given. He's not her
8     knee doctor. He should not have written that. I believe
9     the answer to your question is he did and he should not
10    have written that. That was incorrect. And so I had him
11    taken off the case immediately.
12 Q  And are you referring to the physical therapist.....
13 A  Correct.
14 Q  .....is that correct?
15 A  And then I got the correct prescription from Dr. Jones and
16    a new therapist and everything went fine. And immediately
17    when I -- I read that that's what they were doing, I
18    posted something in the bathroom and said this person is
19    no longer on the case. This was incorrect.
20 Q  Do you recall when this occurred?
21 A  I'm sorry?
22 Q  Do you recall the incident, when the incident occurred
23    with the physical therapy?
24 A  Oh gosh, eight -- eight, nine months ago. Something like
25    that.

Page 185

1  Q  Was it in 2006?
2  A  It could have been. I'm not sure.
3  Q  If the aides were following instructions by physical
4     therapists to encourage your mother to do certain things,
5     would you consider that physical abuse?
6  A  Well, of course not. Of course not. I think this went on
7     before that. I think -- I think this went on before that.
8  Q  And in terms of your distinction between encouragement and
9     harassment, can you clarify.....
10 A  Well, if you have.....
11 Q  .....what the difference is.....
12 A  .....a 90 year-old.....
13 Q  .....in your mind?
14 A  .....lady falling apart who has severe osteoporosis, is
15    hunched over and can't straighten out and she -- her legs
16    are bowed out, I mean, you know, it wouldn't take much
17    more than a wind to knock her over and she's over there
18    saying I can't do it, I can't do it every day, you would
19    think that, you know, if they kept it up, that to me would
20    be harassment.
21 Q  Okay. Are you aware of the aides reporting that your
22    mother actually has been observed walking around in her
23    room or.....
24 A  I'm aware of that.....
25 Q  .....ambulating.....

Page 186

1  A  .....yes.
2  Q  Okay.
3  A  From reading the notes. Uh-huh.
4  Q  Okay. Do you believe that?
5  A  She told me a couple of times that she got up, yes.
6  Q  Okay. And did she tell you that she asked the aides not
7     to report it?
8  A  Yes.
9  Q  And did she tell you why she asked them not to report it?
10 A  I told her, mom, don't tell them that because they're
11    going to write it down anyway, so -- but, you know,
12    because I have all the notes. Yeah, she just doesn't want
13    it in her record. But mom got up for good reason a few
14    times. She shouldn't. That's poor judgment on my mom's
15    part. She should not be getting up on her own.
16    Absolutely not. One time she needed water and they
17    weren't answering so she got herself up and she -- what
18    she does is she leaned on the couch and then leaned on the
19    counter the whole way around to the sink. And leaned
20    back. So she wasn't walking unassisted. She told me
21    about that.
22 Q  Did she also -- did you also read in the notes that when
23    she has gotten up on her own, that the aides have actually
24    told her that she shouldn't do that?
25 A  I believe I read that, yeah.

EXHIBIT 6
Page 11 of 29

Page 187

```
 1  Q   Yeah.  And did you also read in the notes that the aides
 2      told her that if she needed something she should use the
 3      call light?
 4  A   Well, of course, but often times they didn't come quickly.
 5  Q   According to your mother?
 6  A   Yes.
 7  Q   Okay.
 8  A   She said she would not have gotten up had they come.
 9  Q   Have you ever been in your mother's room where she would
10      use the call lights and the aides did not come to her
11      assistance?
12  A   No.
13  Q   And do you know of any other person who has witnessed,
14      been in the room with your mother, and she called for
15      assistance and didn't receive it?
16      (No audible response)
17  Q   That's a no?
18  A   No.
19      MS. MEYERS:  Yeah.  Can we take a break?  It's been about
20  an hour.
21      REPORTER:  Off record.
22      (Off record)
23      (On record)
24      REPORTER:  On record.
25  Q   Ms. Winters, I was asking you some questions about the
```

Page 188

```
 1      -- your allegations or your mother's allegations or being
 2      either handled roughly or abusively by the staff.  Are you
 3      claiming on behalf of your mother that there has been any
 4      kind of conspiracy amongst the aides to be rough or
 5      abusive towards your mother?
 6  A   I think that's a good possibility.
 7  Q   Okay.  And what are you basing this possibility of a
 8      conspiracy on?  What facts?
 9  A   I know somebody who works on staff and told me that they
10      believe that was going on.
11  Q   Who do you know that told you they believed it?
12  A   Someone who worked there before.
13  Q   Okay.  And who is that individual?
14  A   Karen Gomez.
15  Q   And what did Ms. Gomez tell you specifically?
16  A   That they would gang up on my mom and picked on her in
17      staff meetings.
18  Q   Well, did she describe what she meant by gang up on your
19      mother?  I mean, if you say that to someone they might
20      think physically but what did Karen Gomez say about what
21      occurred at the staff meetings concerning your mother?
22  A   I -- I would have to say that was like the extent of it,
23      of those statements.
24  Q   Okay.  And this belief that you have that there's some
25      con.....
```

Page 189

```
 1  A   And she said that they were not -- on the night shift, she
 2      started on the night shift.  She said that that was just a
 3      -- people were working there that should not be working
 4      there.  I know she said that.  That they really didn't
 5      care about the people and she was very unimpressed with
 6      the professionalism of the night staff.
 7  Q   Okay.  Did she say who she believed didn't -- shouldn't
 8      have been working there?
 9  A   I don't think she mentioned a name.  Or I can't remember
10      it.
11  Q   Okay.  Did she ever tell you that she -- did Ms. Gomez
12      ever tell you that she observed anyone being rough with
13      your mother or abusive toward your mother?
14  A   No.
15  Q   Okay.  And you said that Ms. Gomez said that there
16      shouldn't have been people working there because they
17      didn't care about the elderly.  Did she give you anything
18      -- any specific examples?
19  A   No.
20  Q   Okay.  Did she say whether any of those individuals
21      actually provided care to your mother?
22  A   No.
23  Q   Who do you believe is part of this alleged conspiracy?
24  A   Teresa Forsythe.
25  Q   Anyone else?
```

Page 190

```
 1  A   Oh, you mean a group of them who is part of the whole?
 2  Q   Well, what's your understanding -- what's your idea of a
 3      conspiracy?
 4  A   Well, it could range anywhere from a planned conspiracy
 5      and strategy to be nasty to her to get her out, to provoke
 6      her to say things to get her out, to have reason to evict
 7      her; or on the other spec -- on the other side of the
 8      spectrum, it could be as mild as a group of aides just not
 9      appreciating her and liking her, okay.  So it could run
10      the spectrum.
11  Q   Okay.
12  A   It could run the spectrum.  I don't know.
13  Q   All right.  So you.....
14  A   It could be -- I know that someone intimate with the
15      situation described it as a bunch of bullies.
16  Q   Okay.  You've described conduct, so my next question is
17      who do you think is part of this con -- this alleged
18      conspiracy?
19  A   Again, I'm not saying for sure it was a planned
20      conspiracy, although it could be, but it would be Tom,
21      Lisa, Teresa Forsythe, and let's see, there's anyone --
22      the old ones that are still there like Alice, Terri -- not
23      Terri Wilde but Terri -- the older woman, I don't know her
24      last name.  And what I -- what I mean is, I'm sure they
25      talk about her.  It seems like new aides will come in and
```

Page 191

1     mom will like them a lot and it seems like they like her,
2     and then in a few days, they're acting like the other
3     ones.
4  Q  You said you have someone on the inside, or something to
5     that effect. Who are you referring to? You said this
6     person on the inside described -- then you said, like a
7     bunch of bullies.
8  A  Oh, I -- that comment came from the care coordinator.
9  Q  And.....
10 A  That's her perception.
11 Q  Okay. She has not -- to your knowledge, has she ever
12    witnessed any alleged either.....
13 A  I don't think so.
14 Q  .....physical, verbal or mental abuse?
15 A  I don't think so.
16 Q  Okay.
17 A  I can't speak for her though.
18 Q  Has she ever told you that she witnessed any verbal,
19    mental, or physical abuse of your mother at Chugiak?
20 A  I don't think so.
21 Q  You said that the new aides seemed to get along with your
22    mother and your mother seems to like them. Did it ever
23    occur to you that your mother might be a difficult person
24    to provide care to?
25 A  Well, my answer to that would be just because someone is

Page 192

1     difficult -- and I'm not saying she is, but if there was a
2     difficult resident, certainly it should be dealt with in a
3     different manner and in a professional manner that what it
4     has been.
5  Q  Is she a difficult person or can she be a difficult
6     person?
7  A  Mom can get loud and I think because of her hearing, her
8     hearing is so bad, she never did that before she lost her
9     hearing while she was in Chugiak. It just happened, I
10    think six months after she moved in. She was never loud
11    like that before but that loud voice could be irritating.
12    But she doesn't know she's doing it.
13 Q  Okay. Have you ever told her that she's doing it?
14 A  Absolutely.
15 Q  Okay. And what was her response?
16 A  She just says, I think I'm talking quietly. I said, well
17    mom, lower your voice more. You know, just lower your
18    voice. I can't do that. I don't know, she just seems
19    incapable of doing it and I don't know why but her voice
20    can get really loud. And it seems like she has a -- a wax
21    buildup at times. When it's worse than others, sometimes
22    she doesn't talk as loudly as others.
23 Q  Have you ever discussed this with her doctor?
24 A  Yeah. I mean, I've taken her in to get her wax -- earwax
25    clear -- cleared out a number of times. And I've talked

Page 193

1     to the audiologist and they say it's very common for
2     people who don't hear well to talk too loud. It's very
3     common. It's a common complaint from the family members
4     of people who are very hard of hearing.
5  Q  Well, you said her -- when she talks loudly it can be in
6     an irritating voice. Does she -- is she also repetitive?
7  A  She can be, yeah.
8  Q  Okay. And have you ever known your mother to also say
9     things that could be interpreted as demeaning or berating?
10 A  Like what?
11 Q  Well, you've read some of the progress notes on your
12    mother, right?
13 A  The progress notes I feel completely incriminate Chugiak
14    Senior Center. Their un-professionalism and the fact that
15    they have -- making a concerted effort to make her look
16    bad. I mean, I truly feel that's one of our best -- what
17    would you call it -- pieces of evidence.
18 Q  You've read the progress notes, right?
19 A  I think they're laughable. I think they're hideous. I'm
20    a professional. I write case notes all the time. I -- I
21    mean, they could be just -- they -- you can tear them
22    apart. They're just ridiculous. They're laughable.
23    They're -- I'm glad they were written that way. I'm glad
24    because in court if the -- when the jury reads these
25    notes, or the judge, they're going to realize what effort

Page 194

1     has put into trying to make my mom look bad and get rid of
2     her by the Chugiak staff.
3  Q  What do you think the purpose is of the progress notes?
4  A  Well, the purpose of a true progress note is to depict the
5     resident's or patient's status, mental and physical,
6     social, familial, whatever, in an accurate manner so as to
7     be able to convey that information to other treaters on
8     the team or professionals coming in, to solve whatever
9     problems exist. They need to be accurate and positive in
10    nature and all-encompassing.
11 Q  Okay. If your mother is showing agitation and an high
12    level of anxiety and saying things along those lines, do
13    you think that that's important to document in progress
14    notes?
15 A  Absolutely. But mother's high anxiety of course is due to
16    the fact that she's had a lot of very incompetent
17    individuals deal with her in inappropriate, unprofessional
18    ways and this has created like a snowball effect of
19    anxiety and anger on her part, which was created by them
20    and by the, you know, service, the type of service she's
21    been getting.
22 Q  Do you think that the administration has investigated any
23    of the complaints that either you or your mother have made
24    about treatment by the staff?
25 A  I didn't get that. Did they investigate what?

Case 3:06-cv-00083-TMB     Document 80-9     Filed 10/09/2006     Page 14 of 29

CAROL WINTERS
9/22/2006
WINTERS v. CHUGIAK SR. CITZ.
3:-06-CV-00083-TMB

14 (Pages 195 to 198)

## Page 195

1  Q  Do you think that the invest -- has administration ever
2     told you that they've investigated complaints of abuse or
3     disrespect by you or your mother?
4  A  I have never received any feedback from anything, no. I
5     must say that Marla Nelson has always been very nice to
6     me, very pleasant. I've never had any complaints with her
7     demeanor but yet I can say on the other hand that I never
8     get feedback as to what's going on.
9  Q  Okay. You're saying you never received any verbal
10    feedback as to what they did in response to your.....
11 A  I believe.....
12 Q  Please let me finish.....
13 A  .....Marla has told my.....
14 Q  .....my question.
15 A  The program.....
16 Q  It's not a good idea, Ms. Winters, for us to talk over
17    each other. So just let me finish the question and it
18    will make for a cleaner record, okay?
19 A  Sure. Uh-huh.
20 Q  Are you saying that Ms. Nelson or -- no one from
21    administration has gotten back to you to report the
22    results of their investigation?
23 A  That's right. That's right. That's right.
24 Q  Okay. Do you.....
25 A  Unless it's -- I might be missing something, just -- you

## Page 196

1     know, under stress, but I right now can't recall anything.
2     Like -- yeah. Like.....
3  Q  Okay. Nothing in verbal -- nothing verbal or in writing?
4  A  Don't get -- no, I don't get an answer. I make the
5     complaints and I know that they're looking into it but I
6     don't get like what was found out, what was -- what's
7     being done to correct it, no.
8  Q  Did you ever follow-up and ask, like for example, go to
9     Ms. Nelson and say, you know, I made this complaint, what
10    have you done in response to it?
11 A  Well, no because my mother tells me that when Marla comes
12    in to see her, when she'll leave a message on her voice
13    mail, that Marla will pleasantly, you know, listen to
14    everything and tell -- and that -- my mom says this,
15    she'll say Marla tells her that she is unable to tell her
16    what action she's going to take. And we -- my mother and
17    I assume that Marla is saying that because of
18    confidentiality and that's the policy of the Chugiak
19    Senior Center.
20 Q  Has your mother ever told you that Ms. Nelson would let
21    her know, I talked to the aides about this and they denied
22    being mean to you or being rough with you? Has your
23    mother ever reported that?
24 A  I don't recall that, no. I'm not saying she hasn't done
25    it; my mother never reported that to me.

## Page 197

1  Q  Did you ask your mother what Marla -- what the results
2     were.....
3  A  Yeah, I.....
4  Q  .....of Marla's investigation?
5  A  .....usually ask mother. I usually ask her what Marla
6     said and she'll say, well, she came and she listened to
7     me and heard me out and said she would take care of it.
8     That's what Marla usually tells mom, she would take care
9     of it. But then I didn't get -- don't get the follow-up
10    on that.
11 Q  Well, why didn't you call Ms. Nelson or anyone and ask
12    what happened as a result of my complaint or my mother's
13    complaint?
14 A  Well, because a couple of times it just results -- a
15    couple of times it resulted in a meeting where they ask
16    her to leave. The complaint my mother and I both made
17    about Sheila being rough in the shower resulted in a
18    meeting that -- when mom, they were trying to get rid
19    of her. And that -- there was another incidence where we
20    were telling the truth about mom never using the word
21    trailer trash and yet there was another meeting that
22    followed immediately we -- that -- immed -- followed
23    immediately where they wanted her to leave. You know,
24    asked us if we would leave. That she'd be better off in a
25    smaller facility is what they said, but basically wanting

## Page 198

1     us to leave. You know, there's a point where you give up.
2     There's a point where you give up.
3  Q  Okay. Other than the -- you've mentioned I think like
4     three incidents.....
5  A  I'm sorry, I didn't get that.
6  Q  You've mentioned like three incidents that you -- where
7     you claim you observed firsthand inappropriate treatment
8     by the staff. You mentioned Rhonda, Angel, and I think
9     there was a third person. Do you recall that testimony?
10 A  Correct.
11 Q  Okay.
12 A  Uh-huh.
13 Q  Other than what you claim you witnessed, is it fair to say
14    that you're just believing whatever your mother tells you
15    about these episodes, these alleged incidents?
16 A  This is correct.
17 Q  Okay. And that these other allegations of abuse result
18    from the fact that you just don't believe what the aides
19    are saying about the care they provided to your mother?
20    MR. DAVIS: I'm going to object. There's no testimony of
21 what the aides are saying and it's a vague and ambiguous
22 question phrased like that.
23 Q  Are you aware that the aides are denying that they have
24    abused your mother?
25 A  I -- say it again.

Computer Matrix Court Reporters
PH -  907-243-0668
FAX - 907-243-1473

EXHIBIT  6
Page 14 of 29

jpk@gci.net
sahile@gci.net

## Page 199

1 Q Are you aware that the aides deny abusing your mother?

2 A No, I'm not aware of anything. No.

3 Q Well, are you -- do you think that the aides have admitted

4 that they're abusing your mother?

5 A Well, I think most abusers would deny it, I mean, in any

6 situation probably. But the progress notes are written in

7 such a manner to me or anyone who would be someone in the

8 pro -- you know, professional field that it's just really

9 convincing that they were all in -- all out to get her.

10 It's truly convincing to anyone reading those progress

11 notes.

12 Q So the.....

13 A They report incidents after incidents. Like even when she

14 has legitimate complaints they're reporting it as if she's

15 a complainer. I don't have them in front of me but I -- I

16 went through every single note and made my comments on

17 every single note. I don't have them in front of me. My

18 mother, you know, like complaining that Helen sprays water

19 all over the shower today. You know, like making her look

20 bad when gee, well yeah, she's 90 years-old and has a bad

21 hand or -- you know, Helen's demanding to go to the

22 bathroom. Well gee, my mother almost had a bowel

23 movement. I mean, shouldn't someone ask to go to the

24 bathroom when they have to? Just ridiculous things they

25 are. But again, my mother, I will tell you, my mother,

## Page 200

1 she's not -- she doesn't have Alzheimer's. She might have

2 mild cognitive decline related to her age but she doesn't

3 have dementia, severe dementia. Mi -- even mild dementia.

4 And my mother is one of the most honest, truthful people

5 I've met in my entire life. My mother's pastime until she

6 came into assisted living was praying the rosary, she's a

7 devote Catholic, two or three -- two or three rosaries in

8 the morning, two or three in the evening -- and saying

9 masses for people. This is my mother's pastime. My

10 mother has never had a cigarette, never had an alcoholic

11 drink, certainly was a virgin when she got married. I

12 mean, my mother went out of her way to help people all of

13 her life. My mother does not use foul language. I might,

14 but my mother doesn't. I mean, this is the kind of

15 character we're talking about. My mother -- there's not a

16 part of my mother that I don't know is what I'm saying.

17 So any of these allegations that the aides have written

18 are really simply untrue. This is not my mother.

19 Q Okay. So everything in the progress notes that's

20 unflattering towards your mother is just false? Is that

21 your testimony?

22 A I'd have to read -- they'd have to be in front of me. I'm

23 not going to make a blanket comment like that. I found

24 them, very objectionable, inaccurate. The tone was

25 get Helen. The tone was let's get Helen.

## Page 201

1 Q Okay.

2 A Let's get Helen.

3 Q But no one ever said that in the progress notes, let's get

4 Helen, right?

5 A And see that kind of attitude would have to be coming from

6 either someone high up or a team leader or the group of

7 them together.

8 Q Okay. Are you claiming that someone high up is sort of

9 creating this atmosphere or tone of get Helen?

10 A I wouldn't use those words.....

11 Q Well.....

12 A .....if they were but I think that -- I can only say that

13 I worked in many facilities in my life, that if the top

14 administration makes it clear that -- for example, in my

15 agency, I work for the State of Alaska, and my

16 administration is into customer service. Respecting

17 everyone who walks through the door. I work with -- I've

18 had four murderers on my caseload. I've had rapists. But

19 you know what, we treat people with respect and dignity.

20 And you know what, it's made very clear to us that if we

21 don't (indicating - snap) you're out.

22 Q Okay. You said.....

23 A And I -- and I do think that an attitude does come from

24 the top and filters down.

25 Q Right. Who are you claim -- are you claiming that anyone

## Page 202

1 in administration has treated your mother abusively,

2 either physically, verbally, or mentally?

3 A I'm sorry, I just didn't get it.

4 Q Are you.....

5 A I have a new hearing aid today. I -- let me take it out.

6 I don't think it's even working good. Okay.

7 Q Are you claiming that anyone in administration is creating

8 this culture where -- culture of abuse, either physical,

9 mental, or verbally towards your mother?

10 A I think that looking at the progress notes, if someone was

11 doing their duty, after reading one or two of those

12 progress notes, they would have had a meeting and said

13 okay, let's do something about this. Let's -- let's solve

14 this problem. Let's call in Helen. Let's have a staff

15 conference with Carol. Let's have a family meeting.

16 Let's have group meeting. And let's get it out on the

17 table. Let's talk about our approaches. Maybe we can get

18 Carol in, she knows her mother better than anyone else and

19 let's ask her, you know, how -- how should we work with

20 Helen. Nothing like that was ever done.

21 Q Okay. You're claiming there was never a care conference

22 with you to address the issues that Helen complained of?

23 A The purpose of the two meetings, the only -- there were

24 only two group meetings -- truly was to ask -- invite us

25 to leave the facility.

Computer Matrix Court Reporters

PH - 907-243-0668
FAX - 907-243-1473

EXHIBIT 6
Page 15 of 29

jpk@gci.net
sahile@gci.net

## Page 203

1  Q  What's.....
2  A  It wasn't to dialogue about correcting the situation.
3  Q  And why do you say it wasn't to dialogue about correcting
4     the situation?
5  A  Because it wasn't. Linda Hendrickson denied everything
6     and just stood her ground and defended her staff and
7     -- oh, actually her comment was, in the summer of '05, we
8     can't afford to -- I can't afford to lose my staff. I
9     can't afford to lose my staff.
10 Q  Well.....
11 A  Putting staff priority over my mother. No, there was --
12    there was no, you know.....
13 Q  Well, isn't it true that at those care conferences you
14    just denied that -- you took the opposite position and
15    that was that your mother was completely right and that
16    the staff was wrong?
17 A  I can -- I'm sorry, say that again. I didn't hear what
18    you.....
19 Q  At the care conferences that you're referring to, isn't it
20    true that you took the opposite position and you took the
21    position that the staff was wrong and that it was their
22    fault and that your mother was not at fault for anything?
23 A  I don't believe my mother was at fault at anything and I
24    still don't. Absolutely not.
25 Q  Okay. Did you.....

## Page 204

1  A  My mother, you know.....
2  Q  So you took that position at the care conferences?
3  A  Well, I know I said I would -- well, I'm not -- no, I -- I
4     gave in the sense that I said -- I would talk to mom about
5     if she has a problem with staff, don't tell them. She was
6     in a habit of telling staff, well you shouldn't be working
7     here if you don't like it. I said, mom, don't do that,
8     instead go to Marla. You know, take it to Marla. Take it
9     to the program manager. Yes, I -- I've -- I was trying to
10    work both ends, yes. And telling mom to try to lower her
11    voice and -- yes.
12 Q  Okay. And did your mother heed your advice?
13 A  Yeah, for a long time she called Marla instead of talking
14    to the staff, yeah. She would call Marla.
15 Q  Now who -- was the care coordinator also present during
16    these care conferences?
17 A  She was in the summer of '05. Yeah, she was at the appeal
18    for the eviction. Yeah, uh-huh.
19    MS. MEYERS: Okay. We need to take a break. Off record.
20    REPORTER: This concludes the first video tape in the
21    video taped deposition of Carol Winters. The time is 2:49.
22 The date is the 22nd of September, 2006. Off record.
23    (Off record)
24    (On record)
25    REPORTER: On record. This is the second video tape in

## Page 205

1  the video taped deposition of Carol Winters. The time is 2:51.
2  The date is the 22nd of September, 2006. Counsel, you may
3  continue.
4     MS. MEYERS: Thank you.
5  Q  Ms. Winters, I want to go back to your comment about the
6     administration. Are you claiming that there are any
7     particular individuals in administration who are out to
8     get your mother?
9  A  I can't say that for a fact but it would appear from the
10    many times they encouraged me to move her to a smaller
11    facility that they probably would appreciate if she was
12    out of the facility.
13 Q  Okay. And who are those individuals you're referring to?
14 A  Linda Hendrickson. Linda would be the one and that came
15    from Lynn Moser, too. I don't believe Marla had ever
16    stated that.
17 Q  And are you saying that because.....
18 A  And Jan Freels. Jan Freels.
19 Q  And you're -- are you saying that because those
20    individuals have encouraged you to move your mother to a
21    smaller facility that somehow they're out to get your
22    mother?
23 A  Well, I'm saying they would rather not deal with my
24    mother. They would rather she leave the facility, yes.
25 Q  Okay. Has anyone of those individuals ever told you that

## Page 206

1  they thought it would be in your mother's best
2  interest.....
3  A  Oh, of course. That's what they say.
4  Q  .....to go to another facility?
5  A  Yes.
6  Q  Okay. And they ever explained to you why they thought it
7     would be better for your mother to be at a smaller.....
8  A  Yes.
9  Q  .....facility? And what have they told you?
10 A  Their main point is that she would get more attention.
11    Get more attention. She needs more attention.
12 Q  Do you think your mother needs more attention?
13 A  No.
14 Q  Do you think that your mother's level of needs have
15    increased since she's been at Chugiak?
16 A  She's -- they decreased. Her needs have decreased.
17 Q  Okay. How have they decreased?
18 A  When she came there she was in a -- a splint for probably
19    a month or so. So she couldn't use her right arm at all.
20    And then it was slow progression to where she can use her
21    arm quite a bit now. So that has improved tremendously.
22    And she took much more time in her, like showering.
23    Showering was primarily because of that. And now the
24    time she takes is much less.
25 Q  How much time does it take to give her a shower?

CAROL WINTERS                    9/22/2006              WINTERS v. CHUGIAK SR. CITZ.
                                                        3:-06-CV-00083-TMB

Page 207

1  A  Oh gee, I don't know. I don't -- I'm not with her.
2  Q  Okay. Was your mother more ambulatory when she first
3     entered.....
4  A  No.
5  Q  .....Chugiak?
6  A  No.
7  Q  Was she using a walker at all?
8  A  I can't remember. Maybe a little bit. No, I don't think
9     so. I think -- I think she was in a wheelchair for the
10    most part.
11 Q  She's been in a wheelchair the whole time?
12 A  I think when she came in, yeah.
13 Q  And did that change?
14 A  Yeah, now she can -- yeah, when her arm healed, she can
15    use the walker.
16 Q  Does she use the walker now?
17 A  Yes. To go from the chair to the bathroom and back. But
18    she can't go further than that in her walker. Just from
19    -- yeah, that little distance.
20 Q  Okay.
21 A  Maybe 15, 20 feet.
22 Q  Has your mother ever been diagnosed with dementia?
23 A  With what?
24 Q  Dementia.
25 A  She was given that diagnosis by the inter -- one time by

Page 208

1     the internal medicine doctor at the Anchorage Medical
2     Surgical Clinic.
3  Q  And who was the doctor?
4  A  Mild -- it was mild dementia. Boy, who was that? That
5     was a Russian doctor. I can't remember her name.
6  Q  Did you disagree with that diagnosis?
7  A  Oh, it depends. I think that was stretching it but she
8     based that only on one visit with her and she asked her
9     some questions about memory and mom couldn't remember.
10    And that's what she based that on. So I don't think
11    that's a good label actually.
12 Q  Were you present at the time that.....
13 A  Yeah.
14 Q  .....this doctor diagnosed her?
15 A  I was, yeah.
16 Q  Does your mother have severe generalized anxiety disorder?
17 A  No. No. No.
18 Q  Does she have generalized anxiety disorder at all?
19 A  She -- she had that, in my opinion, she developed that a
20    couple of years after she came here, after she underwent
21    the stress of many surgeries and procedures.
22 Q  And before she was admitted to Chugiak?
23 A  Well, I would say my mother, all of her life, has been
24    definitely more anxious than me. She's -- she's a
25    worrier, I'm not. She worries, frets. You know, Carol,

Page 209

1     call me when you get in and all this. But I wouldn't say
2     to the point where she needed medication. Just worries a
3     lot and she always has been that -- has been that way.
4  Q  Has a physician ever prescribed medication for her
5     generalized anxiety disorder?
6  A  One time. Not before she came here but after her surgery.
7     I think Dr. Bate -- Bateman, the internist Bateman did.
8  Q  And was that before she was admitted to Chugiak?
9  A  Yeah.
10 Q  I'm sorry?
11 A  Yeah, uh-huh.
12 Q  Okay. I'm going to show you what's been marked as Exhibit
13    J.
14              (Exhibit J proffered)
15    (Pause)
16 Q  And if you can let me know when you've had a chance to
17    review that.
18 A  I'm sorry.
19 Q  Could you let me know when you've had a chance to review
20    it?
21 A  Okay.
22    (Pause)
23    MS. MEYERS: Let's go off record.
24    REPORTER: Off record.
25    (Off record)

Page 210

1     (On record)
2     REPORTER: On record.
3  Q  Ms. Winters, have you had enough time to review Exhibit J?
4  A  Yes.
5  Q  Okay. And do you recognize that document?
6  A  Yes.
7  Q  What is it?
8  A  It's a rebuttal that I wrote to the eviction notice that
9     my mother received.
10 Q  Okay. I'd like to direct your attention to page 4 of
11    Exhibit J. In the first paragraph, about midway down. It
12    states, quote, the high level of anxiety which the Chugiak
13    staff calls agitation is not in my professional opinion
14    associated with Alzheimer's or dementia. It is rather a
15    severe generalized anxiety disorder caused by severe pain
16    and loss of physical function. Did I read that correctly?
17 A  Yes.
18 Q  And can you explain what you meant when you said that it
19    is rather a severe generalized anxiety disorder? What are
20    you referring to?
21 A  Well, I think that was in response to -- I wrote that in
22    response to -- I believe it was in the eviction notice,
23    Jan Freels had written that she believed my mother may be
24    having Alzheimer's or dementia. So that was in response
25    to that comment.

EXHIBIT 6
Page 17 of 29

---

**Page 211**

1  Q    Okay.  And by that com -- the comment that you made, are
2       you saying that your mother has severe generalized anxiety
3       disorder?
4  A    Yes.  At that time she -- I would say definitely after all
5       that time and -- yes.  Yes, at that time she did.
6  Q    And are you claiming now that she does not have severe
7       generalized anxiety disorder?
8  A    That she does what now?
9  Q    Yeah.  Does she have it now?  Does she have severe
10      generalized anxiety disorder?
11 A    She has generalized anxiety disorder.  Maybe it's a little
12      better.  It was severe at the -- this time with they're
13      wanting her to leave and the eviction notice, that she
14      still has generalized anxiety disorder.
15 Q    Okay.  When was it severe generalized anxiety disorder?
16      Can you describe the time period?
17 A    Well, I think it was -- she was anxious when she went in
18      but it became progressively worse just as months went by
19      with all of the problems with the staff.
20 Q    Are you claiming that the staff caused her to have severe
21      generalized anxiety disorder?
22 A    It certainly exacerbated the condition.  Certainly.
23 Q    Do you think that if your mother were in a different
24      location that her anxiety level might be less?
25      MR. DAVIS: Calls for speculation.  I object.

---

**Page 212**

1  Q    Can you answer the question?
2  A    If she wasn't treated in the manner she was treated, yes,
3       I do think it would be less.
4  Q    Do you know if your -- has your mother expressed feelings
5       of loneliness to you recently?
6  A    No, not loneliness.
7  Q    Okay.  Is -- in the next sentence on the same page of
8       Exhibit J it says most individuals with severe chronic
9       pain and disability have ongoing depression and anxiety.
10      Are you saying there that your mother has severe chronic
11      pain and disability?
12 A    Yes.
13 Q    Are you saying that she has ongoing depression and
14      anxiety?
15 A    Yes.  Yes, that's what's stated.
16 Q    Okay.  Now going back to a comment that you made about
17      Linda Hendrickson when we were talking about Linda
18      Hendrickson, have you read in the ombudsman's report
19      statements about there being a possible conflict of
20      interest.....
21 A    Yes.
22 Q    .....for Linda Hendrickson?
23 A    Yes.
24 Q    And do you have an opinion on that?
25 A    Yes.

---

**Page 213**

1  Q    Okay.  And is that part of this lawsuit?
2  A    What do -- I.....
3  Q    Well, is that an allegation.....
4  A    Part of the lawsuit?
5  Q    .....that you're making in this lawsuit, that she has some
6       conflict of interest that somehow affects your mother?
7  A    Gosh, I would defer to my attorney on that.  I don't know.
8       Is that part of the lawsuit?
9       MR. DAVIS: That's your answer.
10 Q    I'm asking for your opinion.
11      MR. DAVIS: And her statement as it calls for a legal
12 conclusion.  The lawsuit's right in front of the witness.  If
13 you want to show the witness, she can see what the allegations
14 are.
15      MS. MEYERS: I will show her.  I'm just suggesting that --
16 I'm not asking for her attorney's interpretation, I'm just
17 asking.....
18 Q    Do you have any understanding of whether you're making any
19      claim in this lawsuit about Linda Hendrickson having a
20      conflict of interest?
21 A    I honestly don't know if it's part of the lawsuit.  I know
22      that the ombudsman stated that in his report.
23 Q    Okay.  Do you think that there's a conflict of interest?
24 A    Yes.
25 Q    Okay.  What's the basis for that opinion?

---

**Page 214**

1  A    Well, there are a couple of aspects you could look at.  It
2       just depends, I guess.  I don't know her operation, okay.
3       I don't -- I'm not that familiar with it intimately but
4       again, I don't really know.  It would depend on how much
5       involvement she has with each facility and I'm not really
6       aware of how much she has.  I don't know.
7  Q    Okay.  And by operation, you mean the assisted living
8       facility that she has.....
9  A    Yeah, in Wasilla.
10 Q    .....Wickersham?
11 A    Right.  Uh-huh.  I don't know.
12 Q    Okay.  You don't know who manages Wickersham, correct?
13 A    Well, word -- I think her -- where did I read that?  Was
14      it in the -- I read somewhere that she said she doesn't
15      manage it, she said her daughter does.  I read that
16      somewhere.
17 Q    Okay.  Have you ever been to Wickersham?
18 A    No.
19 Q    Looking at page 5 of Exhibit J in the second paragraph
20      -- do you see the paragraph?  There's some bold type
21      there.  Could you read the bold type in the second
22      paragraph?
23 A    It says granted mom will get very upset and raise her
24      voice but this is the extent of it and she does this only
25      when provoked.

---

Page 215

1  Q  Okay. So when your mother gets upset, would you agree
2     that her voice -- that she tends to raise her voice
3     because.....
4  A  Yes.
5  Q  .....she's upset?
6  A  Yes, she does. Uh-huh.
7  Q  Going to this -- the allegations in this rebuttal, can you
8     identify which of these allegations you claim you actually
9     witnessed? These allegations of abuse, that you actually
10    witnessed.
11 A  Well, I've heard Duffy -- Duffy certainly yelled at me.
12    And I've heard Carmela talking against staff and
13    residents.....
14 Q  Do.....
15 A  .....when she visited mom.
16 Q  And do those allegations relate to your claims of -- that
17    your mother is being abused by the staff?
18 A  Oh well, I guess -- no, I was just thinking that these are
19    two people who certainly create unrest in the facility and
20    it looks like they've been living there a long time and
21    they're not being asked to leave, that's all
22 Q  Okay. Could you continue to look through your rebuttal
23    and tell me which one -- which allegations of abuse
24    towards your mother that you've actually witnessed
25    yourself?

Page 216

1  A  Okay. You mean -- okay, the ones listed. Only the one
2     with Angel. That's -- and whenever I was there and Tom
3     came in, he wasn't really friendly even though I tried to
4     small talk with him. He didn't smile and he just wasn't
5     friendly.
6  Q  Okay. And are you claiming that that was.....
7  A  But that's not.....
8  Q  .....abuse?
9  A  .....abuse. You know, I'm just saying he wasn't friendly.
10 Q  Okay. And looking at the allegation regarding Angel on
11    page 9.....
12 A  Uh-huh.
13 Q  .....in the last paragraph you claim that Angel was
14    yelling at your mother and that you heard this. Do you
15    have any recollection of what you heard?
16 A  I believe she was -- mom was saying, you know, put them
17    here or -- they were talking about her diapers I imagine.
18    Put them here. And she was saying, no they were fine or
19    something like that. It was about the diapers.
20 Q  Okay. Was your mother yelling?
21 A  I don't think mom was yelling. I didn't recall her
22    yelling at that time.
23 Q  Could you hear both Angel and your mother from where you
24    were standing?
25 A  Yeah, I was just outside the door.

Page 217

1  Q  Anything else in this rebuttal that you claim you
2     personally witnessed?
3  A  No, just Connie the resident did talk to me about Michelle
4     coming to her. I mean, she did tell me that herself and
5     was very upset and left a message for Marla that there was
6     a breach of confidentiality.
7  Q  Do you know whether or not your mother had discussed with
8     Connie that incident?
9  A  Absolutely not. My mother is really secretive. She
10    didn't want anyone in the facility ever to know anything.
11    Oh we didn't even know -- we didn't even know that was
12    coming. Couldn't have. That's proof right there. Until
13    we met in the meeting, mom and I never imagined they were
14    going to ask us to leave.
15 Q  Until what meeting?
16 A  That was the June '05 meeting with Linda Hendrickson, the
17    ombudsman, Kathy Huskey. That was the meeting where I
18    think it was Marla that brought out that the staff said
19    mom was -- called someone trailer trash and that right
20    before then Michelle went to Connie and said that they had
21    decided to get rid of mom. That the -- and we didn't even
22    know that so nothing we said. So apparently Michelle
23    overheard administration talking about it.
24 Q  Did you receive a copy of the eviction notice in the mail?
25 A  Boy, I can't even remember. I don't -- I -- I don't think

Page 218

1     so. I think just my mother got one.
2  Q  So you're claiming that prior to Connie making this
3     statement to me -- to you rather, you didn't have any
4     notice at all that your mother.....
5  A  Oh, this is a different -- no, this is.....
6  Q  Okay.
7  A  .....a separate incident. This happened in the summer.
8     This isn't the January eviction.
9  Q  All right. So tell me.....
10 A  This is a separate -- they -- in other words, they were
11    planning to get rid of her, apparently, in summer of '05.
12    That's what Michelle told Connie and we knew nothing about
13    it. They didn't give us an eviction notice then, they
14    just tried to get me to move mom at that time. They were
15    encouraging me with the words like, well, this would be
16    better for your mother. You know, we care about your
17    mother's safety and that sort of thing.
18 Q  Okay. And when they told you that, did you believe that
19    they cared about her safety?
20 A  Absolutely not. Absolutely not.
21 Q  Okay. So.....
22 A  If they cared about her safety, they wouldn't be letting
23    open doors for bears to come in. People smoking in front
24    of the entrance. Not giving her the proper diet and
25    allowing the staff to treat her with disrespect.

CAROL WINTERS                          9/22/2006                    WINTERS v. CHUGIAK SR. CITZ.
                                                                    3:-06-CV-00083-TMB

Page 219

1      Absolutely impossible.
2   Q  So tell me -- so no matter what the administration said
3      about the reasons why they wanted to move your mother, you
4      didn't believe the reasons?
5      MR. DAVIS:  I'll object to that.....
6   Q  Is that fair?
7      MR. DAVIS:  .....question, to its form.
8   A  There's been no sincere effort by this -- by the
9      administration.  No, really, really sincere effort to
10     solver problems where you look someone in the eye and you
11     say, Carol, do you want your mom to stay here?  Okay,
12     Helen, do you want to stay here?  Let's make it work.
13     Let's talk about these problems.  Nothing like that.
14  Q  Okay.  What do you think?  Do you think that -- what do
15     you think would solve the problems that your mother is --
16     then that your mother and you are complaining about?
17  A  It's so simple.  It's just so simple.  None of this had to
18     take place.  So simple.  Like I wanted to do and I offered
19     to do, to come in there a few times and just talk to the
20     staff about my mom's personality, how she was raised, what
21     made her into what she is, her chronic pain, her severe
22     hearing problem.  And the fact that all she needs ever
23     when she's upset is to someone to be like the nurse Mary.
24     They have a great nurse right now.  I saw her with my mom.
25     Perfect.  She gets close to mom.  She puts her hand on my

Page 220

1      mom's shoulder and she'll look at my mom in the eyes and
2      she'll smile.  And she calms mom down just by doing that.
3      And she'll say -- and she'll explain the procedures.  You
4      know, she'll just explain things to her.  It's that simple
5      with my mother.  It's just that simple.  To be kind,
6      reassuring, smile, supportive.  Honestly.....
7   Q  So.....
8   A  .....that works when I do it.  It's just that simple.
9   Q  So is your mother -- your mother needs to be calmed?
10  A  No, that's out of context.  I mean -- well -- well, I mean
11     yeah, if she was ever, let's say excited, about anything
12     -- no, you're not going to take that out of context.  Not
13     that my mother is, you know, raging all the time or
14     anything.  But what I'm saying is, if mom gets upset or
15     has anxiety, all you have to do is talk to her in a
16     respectful manner and smile, and that's what I put on my
17     document of September 22nd, right after she was admitted.
18     That's why I wrote that, so people would understand how to
19     deal with my mother, because she's anxious.  She's just an
20     anxious, frail woman.  Her nervous system is shot.  She
21     had a lot of illnesses.  And that's how you should deal
22     with all elderly people, not just my mother.  All elderly
23     people.
24  Q  Does she have unprovoked anxiety?
25  A  Basically respect and dignity.  So fundamental to an

Page 221

1      operation of an assisted living.
2   Q  Does she have unprovoked anxiety?
3   A  Well, she's -- yes, I think she's always anxious to some
4      degree because of chronic pain, yes.
5   Q  All right.  So you believe that the center -- correct me
6      if I'm wrong -- can accommodate your mother by just having
7      you come in and give a -- explain your mother's character
8      and tell them -- tell the staff what they need to do?
9   A  Yeah, like -- well, it might take a couple of times before
10     -- you know, we need to look at the -- the types of aides.
11     They don't -- most of them don't have a lot of training,
12     it's usually on the job.  Maybe they don't have a high
13     level of education.  And maybe some of them, for example,
14     may take offense to being told what to do.  Well, mom at
15     her age has a tendency to repeat.  They need to
16     understand, she's not doing it to put them down.  She
17     might say, well do this now, do that now, do this now.  I
18     mean, it's understand that, you know.  It's not like she's
19     telling them they have a bad memory, it's just that she
20     repeats.  And yeah, they needs some in-service training.
21     And it would be good for anybody that's having a problem
22     with a resident who have the family come in and share.....
23  Q  What.....
24  A  .....share their experience with that family member.
25  Q  What do you know about the training at Chugiak?

Page 222

1   A  I'm sorry, I didn't hear.
2   Q  What do you know about the training at Chugiak?
3   A  What I know I guess I got from the ombudsman and Kathy
4      Huskey, what they got from a meeting with Jan Freels a
5      long time ago.  I got it secondhand.
6   Q  Okay.  Have you ever asked to sit down with either Marla
7      Nelson, or Jan, or Linda Hendrickson, and to talk about
8      the training that the staff actually receives?
9   A  Well, a couple of times I offered to, I think probably on
10     voice mail, to come in and do -- talk to -- offered, I
11     think on Marla's voice mail, to come in and meet with the
12     family but I never got a.....
13  Q  Okay.
14  A  .....response so.....
15  Q  Those.....
16  A  .....I kind of dropped it.
17  Q  .....were messages that you left offering to come in
18     yourself.....
19  A  Uh-huh.
20  Q  .....but I'm asking, did you ever sit down and find -- to
21     find out what kind of training is provided to staff?
22  A  No, I haven't.  No.
23  Q  All right.  Since your last deposition, have you done
24     anything more to find any alternative housing for your
25     mother?

EXHIBIT    6
Page  20  of  29

CAROL WINTERS                    9/22/2006              WINTERS v. CHUGIAK SR. CITZ.
                                                        3:-06-CV-00083-TMB

Page 223

1  A  Since when?
2  Q  Since your last deposition.
3  A  No.
4  Q  Okay. Do you plan to?
5  A  No.
6  Q  All right.
7  A  My mother really -- we've had this discussion. I've had
8     this discussion with my mother and she doesn't want to
9     leave. She really doesn't want to leave.
10 Q  Okay. At your last deposition I asked you whether your
11    mother thought she owned Chugiak or some interest in it.
12    Do you remember that question?
13 A  Yeah, I do.
14 Q  Okay. And I believe that you said that that's your
15    language.
16 A  Yeah.
17 Q  That's something you would say.
18 A  She doesn't think in those terms.
19 Q  Okay. And why do you think you own Chugiak or an interest
20    in it?
21 A  Well, I'm a tax paying citizen. I pay a lot taxes on my
22    home in Eagle River and I work in Eagle River. It belongs
23    to me, to the community. I mean, I -- I feel a part of
24    Eagle River, that small community. I know that all the
25    management lives in Wasil -- Wasilla. This -- you know,

Page 224

1     maybe they feel that way more about Wasilla. People tend
2     to feel that way about their local communities. But I
3     live and work in Eagle River.
4  Q  When you were seeking admission to Chugiak for your
5     mother, did anyone ever represent to you or did you rely
6     on any written materials that your mother could stay there
7     indefinitely?
8  A  I -- I didn't get that. When what?
9  Q  Okay. When you admitted your mother to Chugiak.....
10 A  Uh-huh.
11 Q  .....did you have any -- well, did anyone ever tell you
12    that your mother could stay at Chugiak indefinitely?
13 A  I think it was inferred or told in one of my session with
14    Jan Freels in the beginning. I think somehow I recall
15    someone saying that if mom progressed to a point where she
16    could -- they could no longer care for her, you know, like
17    needed more intensive nursing that -- yeah, I think that
18    was told to me at one point.
19 Q  Okay. So you were told before she was actually admitted
20    that she could possibly have to trans.....
21 A  No, I think.....
22 Q  ....transition.
23 A  .....that was after. I think that was after.
24 Q  How soon after?
25 A  Yes. I can't remember. I really don't.

Page 225

1  Q  Okay.
2  A  In one of the meetings.
3  Q  Would you say early on?
4  A  Yeah, probably.
5  Q  You were told that there was a possibility at some point
6     in time she would have to transition to another facility?
7  A  I think so, yeah. I think so.
8  Q  And you believe that that was by Jan Freels?
9  A  I think so, yeah.
10 Q  Did you ever read any marketing or advertisements
11    regarding Chugiak that led you to believe that your mother
12    could stay there and age in place?
13 A  I didn't think she could stay there indefinitely. I
14    always thought personally that if she ever needed a
15    nursing home, skilled nursing, or -- that we -- we'd have
16    to move her. I had just assumed that.
17 Q  Okay. So there were no guarantees made to you that she
18    could stay there indefinitely?
19 A  No.
20 Q  All right. I'd like for you to look at Exhibit I, which
21    is the amended complaint. And again, if you would let me
22    know once you've had a chance to review that. Let's go
23    off record.
24           (Exhibit I proffered)
25    REPORTER: Off record.

Page 226

1     (Off record)
2     (On record)
3     REPORTER: On record.
4  Q  Ms. Winters, have you had an opportunity to review Exhibit
5     I?
6  A  Yes.
7  Q  Okay. And do you -- have you ever seen this document
8     before?
9  A  Yes.
10 Q  Okay. I'd like you to take a look at paragraph 14 on page
11    4. Do you see that?
12 A  Yes.
13 Q  Okay. The first part of that says, plaintiff is informed
14    and believes that defendant has a poor or non-existent
15    training process for new staff. Do you see that?
16 A  Uh-huh. (Affirmative)
17 Q  Okay.
18 A  Yes.
19 Q  And is that your belief?
20 A  Yes.
21 Q  Okay. And what do you base that on? What's the
22    factual.....
23 A  Well, how they treat my mother.
24 Q  Okay. Anything else?
25 A  Either their -- either or -- I mean, either the training

EXHIBIT        6
Page  21  of  29

Page 227

1    is insufficient or there's poor supervision. One or the
2    other. But to get away with what they do, something is at
3    fault.
4  Q  Okay. Then it goes on to say, has high turnover,
5    referring to the defendant, right?
6  A  (Nods affirmatively)
7  Q  What's the factual basis for -- do you believe that
8    Chugiak has a high turnover?
9  A  Yeah, just from the last -- my mother's been there two
10   years a few days ago. She's been there two years now and
11   the staff continuously changes.
12 Q  Okay. Is defendant's turnover rate higher than other
13   rates for assisted living facilities?
14 A  I -- I'm not an expert on that. I don't know.
15 Q  Okay. It goes on to say exercises inadequate oversight of
16   staff. And again, what's the factual basis -- if you
17   believe that, what's the factual basis for that claim,
18   that defendant exercises an inadequate oversight of staff?
19 A  Well, there is nobody supervising two shifts. You have
20   Marla during the day, nobody there physically -- I mean,
21   they have -- I don't know, they may have access to her
22   phone number for emergencies but the night staff has, you
23   know, routinely just treated her very poorly. And I just
24   think if there was a supervisor, it would probably be
25   less. Someone who was involved. And I think they have

Page 228

1    what's called a lead worker or something but.....
2  Q  Okay. So your claim is that they should have an onsite
3    supervisor for all staff -- or for all shifts?
4  A  Well, that would be ideal. I don't know if that's
5    practical with the budget but that would an ideal
6    situation in any facility.
7  Q  Okay. Do you know if other assisted living facilities
8    have just a manager on staff.....
9  A  I.....
10 Q  .....for all shifts?
11 A  .....don't. I don't know that.
12 Q  The same paragraph says -- well, the second sentence in
13   paragraph 14 says plaintiff contends that defendant has
14   allowed a culture of indifference or abuse to develop at
15   CSC, especially with regard to elders who insist on having
16   their persons and rights respected. Do you see that?
17 A  Yes.
18 Q  Okay. Do you agree with that?
19 A  Absolutely.
20 Q  And what is the factual basis for that claim?
21 A  It's not possible for the people to -- people that have --
22   have done -- and especially Teresa Forsythe, you know, one
23   of the main abusers -- to -- to allow staff to peg my
24   mother as undesirable person in the dining room out loud
25   in front of other residents. To reprimand her in front of

Page 229

1    other residents in the dining room. To treat my mother in
2    the way they have. It would not be possible if they were
3    supervised correctly and had the correct training. Just
4    not possible.
5  Q  Are you claiming at all that other residents have been
6    abused or their rights have not been respected?
7  A  I don't know that for a fact. I have no idea. They may
8    or not have been. I do not know that but it's irrelevant
9    because my mother has been.
10 Q  Okay. I'm just trying to find out what you're claiming
11   and I'm just asking, are you claiming that there is
12   evidence of other elders being abused or.....
13 A  I don't know that.
14 Q  .....disrespected?
15 A  I don't -- never got into that.
16 Q  Okay. Has anyone ever come to you, you know, like a third
17   party, and say that their relative or their friend or they
18   know of someone who's been -- who is an elder and has been
19   abused or disrespected at Chugiak by staff?
20 A  Say that -- say that again.
21 Q  Okay. Has anyone ever come to you or told you that their
22   relative or friend has been abused at Chugiak or
23   disrespected by staff at Chugiak?
24 A  Yes.
25 Q  Okay. And who?

Page 230

1  A  A woman named Madonna -- I don't know her last name
2    actually -- who had a mother there maybe three or four
3    years ago who is almost starved to death so -- so they
4    say. I don't know. That's.....
5  Q  Okay. And did you -- this person Madonna, have you had a
6    discussion with her recently about.....
7  A  No.
8  Q  .....Chugiak Senior Center?
9  A  I never saw -- I -- I haven't seen her for three or four
10   years. Haven't talked with her since then.
11 Q  All right. You say you haven't talked with her for three
12   or four years. This is 2003. Do you think you talked to
13   her in 2000 -- and this is 2006. Do you think you talked
14   to her in 2003 or 2002?
15 A  It could be something like that. I saw her in the
16   greenhouse, yeah.
17 Q  So this was before you.....
18 A  But just passing. Not -- not a lengthy conver.....
19 Q  And this.....
20 A  .....sation.
21 Q  And this conversation occurred before you admitted your
22   mother to Chugiak?
23 A  Yeah.
24 Q  Looking at paragraph 19 of this complaint, do you see that
25   on page 5 of 12?

Page 231

1  A   Sorry, which one was that?
2  Q   Page -- it's paragraph 19.
3  A   Okay.
4  Q   The first sentence says, plaintiff does not want
5      alternative housing and there is no equivalent alternative
6      housing available to her. Do you agree with that
7      statement?
8  A   Uh-huh, yes.
9  Q   Okay. And so -- and why do you have that opinion?
10 A   Well, that's -- the date of this, we'd have to look at the
11     date this was written. So on the date it was written,
12     there was nothing available. There was no equivalent
13     alternative housing available to her and one time
14     something came available that might have been -- come
15     close, that one home on Crestview Lane.
16 Q   Okay. Do you still believe that there's no alternative
17     housing available to her now?
18 A   Well, my mother chooses, she has a right to stay where she
19     wants, you know. She -- right. Because I checked with
20     Kathy a little while ago. Kathy Huskey.
21 Q   Okay.
22 A   And we checked into that house again, it's not available.
23 Q   Was that the only place that you checked into?
24 A   Oh no, I told you last time I checked into I think four or
25     five assisted living in my neighborhood.

Page 232

1  Q   Okay. But since your last deposition, have you checked
2      into any other alternative housing?
3  A   Well, Kathy called me. Kathy called me and she told me
4      she's checked and there's nothing. Not even the one that
5      I liked.
6  Q   And where did she tell you checked?
7  A   About a week ago.
8  Q   Where did she check? Did she tell you where she checked?
9  A   Everything here. I cannot have my mother in Anchorage. I
10     have a problem with driving. I have had two glaucoma
11     surgeries and since then I have great sensitivity to light
12     and I have a problem with night driving and I get blinded
13     in the snow. So it's -- going to Anchorage is just not
14     possible for me.
15 Q   Okay. Is there any.....
16 A   It would really limit my visits to my mother.
17 Q   Are you saying that Kathy said she checked in every place,
18     every assisted living facility.....
19 A   In here locally. Not in Anchorage. Not.....
20 Q   Right.
21 A   .....in Anchorage.
22 Q   In -- what's locally? Chugiak, Eagle River?
23 A   Yeah, yeah.
24 Q   Okay.
25 A   And Wasilla is too far too. That's farther actually.

Page 233

1  Q   In paragraph 19 of the complaint, it also says that it
2      would be extremely detrimental to plaintiff's health, both
3      emotional and physical, to require her to move. Do you
4      see that clause?
5  A   Yes.
6  Q   Do you think that in terms of Chugiak's decision to ask
7      your mother to leave, that -- well, let me rephrase the
8      question. If Chugiak is taking into consideration how
9      your mother's presence might affect the care that's
10     provided to other residents, do you think that that's
11     something that Chugiak is entitled to consider?
12     MR. DAVIS: I'll object to the form of the question.
13 Q   Do you understand the question?
14 A   I don't honestly. No.
15 Q   Okay.
16 A   I didn't get that.
17 Q   If Chugiak is tak -- in its decision to ask your mother to
18     leave is taking into consideration the impact on other
19     residents, do you think that that's something Chugiak is
20     entitled to consider?
21     MR. DAVIS: Same objection.
22 Q   You can answer.
23 A   Well, my mother stays in her room all day. She doesn't
24     even go to the dining room now, so she can't be impacting
25     anyone negatively. She doesn't go out of her room. But

Page 234

1      apart from my mother, certainly I would think that. You
2      know, whatever facility makes that decision, of course
3      that -- if they wanted to make that decision on a certain
4      resident.
5  Q   Do you know how much care or time is needed to provide
6      services to your mother, how much that comp -- how that
7      compares to the care that's provided to other residents or
8      the amount of time. And let me rephrase that because that
9      was kind of a long question and rather compound.
10 A   Right. Well, I know that there are a lot of ambulatory
11     residents there, I see them all the time, that probably
12     requires very little care. And I think in most assisted
13     living homes, you kind of balance one another out. I
14     mean, if you have five people ambulatory that don't need
15     anything, then you might have five heavy care, that should
16     balance one another out. Then you have some in the
17     middle. My mother does not require a lot of care. My
18     mother doesn't require a lot of care. Taking her to the
19     bathroom. She goes to the bathroom every couple hours and
20     needs assistance there but, you know, how long does that
21     take?
22 Q   Yeah, she needs assistance every time she goes to the
23     bathroom, correct?
24 A   Yeah, she needs to be -- someone to put the strap around
25     her and be there.

### Page 235

1  Q  Have you read in the records that her showers can take up
2     to an hour or more?
3  A  No, I haven't read that.
4  Q  Okay.  If your mother is getting up on her own and, you
5     know, unassisted by staff, do you think that that puts her
6     at risk?
7  A  If she does what?
8  Q  If she gets up on her own, whether it's to get water or
9     something else.....
10 A  Well, she.....
11 Q  .....that's she's at risk?
12 A  .....stopped that.  I got on her about that.  She stopped
13    that completely.
14 Q  Okay.  And when did this stop?
15 A  A long time ago.  Maybe a year ago.  Maybe a little less
16    than that.  But she did slide on the floor.  I forgot to
17    tell you about that one.  She did slide on the floor from
18    her couch at night because the aides did not fix her
19    pillows under her knees.  That's something they don't like
20    to do and she tried to do it herself.  She didn't get up,
21    she just kind of sat up to get them and she slid on the
22    floor.  That was another thing I forgot to mention.
23 Q  Okay.  So are you saying that the aides are at fault
24    because your mother slid on the floor?
25 A  Yes.

### Page 236

1  Q  Okay.  And when did this happen?
2  A  She didn't hurt herself fortunately though.  She didn't
3     hurt herself that time.
4  Q  And when did this occur?
5  A  Oh, five or six month -- maybe four or five months ago.
6     And it is in the records because I saw it.
7  Q  Okay.  And why do you think it's because the aides didn't
8     put the pillows under her knees properly?
9  A  Well, they -- it's a constant argument with some of them.
10    They don't like to do it.  And that Carol -- not Carol --
11    Annette, Terri on the night shift, those were the ones who
12    didn't like to -- they just don't like to do it.  Because
13    what she'll -- she needs three pillows under her legs and
14    she'll say, I want them this way, I want them this way.
15    And if -- and if they're not exactly like she wants them
16    changed, shifted.  And the process doesn't take longer
17    than 30 seconds and yet they don't want -- they just don't
18    want to do it.
19 Q  Did your mother tell you that that's the reason why she
20    slid off the couches, because the aides didn't position
21    the pillows correctly?
22 A  Well, because I asked her how that happened and she
23    said well the pillows weren't right so I got up to move
24    them, move the pillows.  That's what she told me.
25 Q  Okay.  Do you know what the ratio is, staff to residents

### Page 237

1     at Chugiak?
2  A  I didn't hear that.
3  Q  Do you know what the ratio, the staff to resident ratio is
4     at Chugiak?
5  A  I don't really.  Maybe one to five or one to seven.  I'm
6     not sure.
7  Q  The complaint alleges that Chugiak has a pattern and
8     practice of evicting or threatening with eviction CSC
9     residents who are demanding.  Do you recall seeing that in
10    the complaint?
11 A  What?  What's the second part?
12 Q  Do you recall.....
13 A  Yes.  It's in here, yes.  Yes, yes.
14 Q  Okay.  And is that your opinion?
15 A  Uh-huh, yeah.
16 Q  And what is that opinion based on?
17 A  The ombudsman's statement to me.  Ombudsman's report
18    or.....
19 Q  Did he give you any specific examples of -- that
20    constitute this pattern of practice?
21 A  He said that he got that information when he interviewed
22    Jan Freels.
23 Q  You don't have any -- other than talking to the ombudsman,
24    you don't have any other independent knowledge of the --
25    of Chugiak.....

### Page 238

1  A  Well.....
2  Q  .....asking residents to -- just a minute, please.
3  A  Oh.
4  Q  Asking residents to leave or evicting them or threatening
5     eviction?
6  A  Yeah, in a way.  Indirectly.  I knew of one man who told
7     me that and another resident who told me that.  So two
8     residents and my mom told me about another resident.
9  Q  Who was.....
10 A  So three since I had her there.
11 Q  Okay.  So three res -- so you're saying that you know of
12    three residents who have been threatened with eviction or
13    have been asked to leave?
14 A  Two were asked to leave and one was evicted, yeah.
15 Q  Okay.  And who are these residents?
16 A  One was Connie, one was her boyfriend, and I can't
17    remember his name, but he's dead now.  And I believe the
18    other one was, I think Delores or -- I think it was
19    Delores but I'm not positive.
20 Q  Okay.  Are you saying that Connie told you this
21    information or Connie was a resident who was asked to
22    leave?
23 A  No, Connie -- Connie and her boyfriend at different times
24    for different reasons were asked to leave.
25 Q  Okay.  Did -- and who gave you this information?

CAROL WINTERS                    9/22/2006              WINTERS v. CHUGIAK SR. CITZ.
                                                        3:-06-CV-00083-TMB

Page 239

1 A  Connie and the other -- her boyfriend, when he was living.
2 Q  Okay. Did they tell you the reasons they were asked to
3    leave?
4 A  Yeah, they -- they did. Yeah.
5 Q  Okay. What's your understanding of why they were asked to
6    leave, if this occurred?
7 A  Connie couldn't pay her rent. She said she couldn't pay
8    the rent. But then when they did the evic -- they did her
9    -- they sent her an eviction letter but they sent it to
10   her daughter, not her, and then her care worker got
11   involved, her care coordinator, and they worked out a way
12   to get money for her -- this is coming from Connie. They
13   worked out a way to get her rent paid, so she stayed
14   there.
15 Q  Okay. And then the boyfriend?
16 A  I believe it was a similar situation involving back --
17   back rent.
18 Q  Okay. But the allegation is that CSC has a pattern and
19   practice of evicting or threatening with eviction CSC
20   residents who are demanding. Do you know or have you been
21   told of any residents who are demanding and who were asked
22   to leave or who were threatened with eviction?
23 A  Oh, I think my mother for one, because of my complaints
24   and demands.
25 Q  Anyone else?

Page 240

1 A  Not right off, no.
2 Q  Okay. And so the other -- the third resident that you're
3    referring to, who is that?
4 A  It was a woman.....
5 Q  And I think you said Delores might be her name.
6 A  I think so. It was a woman who came and only stayed a
7    short time, maybe a month or so, was asked to leave and I
8    don't know what's behind that.
9 Q  Okay. One of the claims in the complaint is that CSC has
10   violated the Assisted Living Homes Act. Do you recall
11   that claim?
12 A  The assisted living what?
13 Q  The Assisted Living Homes Act.
14 A  What page is that?
15 Q  And I can refer you to -- on page 6.....
16 A  Uh-huh.
17 Q  .....count Roman numeral I.
18 A  Okay. Page 6?
19 Q  Yes.
20 A  Okay.
21 Q  All right. What's the factual basis for your claim that
22   CSC has violated the act?
23   MR. DAVIS: I'll object.
24 A  Say it ag.....
25   MR. DAVIS: It calls for a legal conclusion. The witness

Page 241

1    can talk about facts but not the law.
2 A  I didn't.....
3 Q  Do you have.....
4 A  .....hear you.
5 Q  Do you -- basically do you have -- is that your opinion?
6    You think CSC has violated the living homes act?
7    MR. DAVIS: Same objection.
8 A  Yeah.
9 Q  And what's your understanding of the facts that lead you
10   to believe that Chugiak has violated the act?
11   MR. DAVIS: Same objection.
12 Q  You can answer, if you can.
13 A  Well, they had no grounds for termination and they failed
14   to treat her, my mother, with respect and dignity. And I
15   believe they tried to retaliate against me for my
16   complaints.
17 Q  Okay. Are you alleging any damages on your behalf in this
18   lawsuit?
19 A  I'm not hearing. Say -- I'm sorry.
20 Q  Are you alleging any claims or any damages on your behalf
21   in this lawsuit?
22 A  No.
23 Q  The next count is count Roman numeral II, violation of the
24   Alaska Human Rights Act. Do you have any -- what are the
25   ba -- what are the facts that you allege show a violation

Page 242

1    of the Alaska Human Rights Act?
2    MR. DAVIS: Same objection.
3 A  I'm not sure which falls under which, honestly. My
4    attorneys, you know, have more knowledge of that than I
5    do.
6 Q  Okay. Looking at page 7, count Roman numeral II,
7    paragraph 26, do you see that?
8 A  27?
9 Q  Paragraph 26.
10 A  Uh-huh. (Affirmative)
11 Q  All right. It reads, defendants threatened eviction of
12   plaintiffs violates the Alaska Human Rights Act, AS
13   18.80.200 et sec [sic], and that plaintiff has a right to
14   be free from discrimination. Are you claiming that your
15   mother has been discriminated against?
16 A  I'd say definitely in terms of her dis -- hearing
17   disability. Absolutely.
18 Q  And are you claiming -- so you're claiming that the hearing
19   is the disability that she's being discriminated on the
20   basis of?
21 A  Oh, there might be more than that. Again, my attorneys
22   would know about this. But the one that comes to mind is
23   her hearing because people misinterpret her loud voice as
24   being intentionally threatening, like she's trying to be
25   nasty and it's not. That's just -- she just has -- her

Page 243

1    tonal quality has gone downhill since she became hard of
2    hearing. She has a rough, low, loud voice and she never
3    sounded like that before. And that's a result of her
4    hearing problem and I believe people -- staff really
5    misinterpret that and get on her for it and she doesn't
6    mean to come across that way.
7  Q  Okay. Are you making any claim that the staff is
8    intentionally treating her differently because she has
9    this hearing disability?
10 A  Yeah. Yeah, they are. Yeah. Uh-huh.
11 Q  Is it your claim that the staff doesn't want to have an
12   individual there who has a hearing disability of the
13   extent that your mother has?
14 A  Well, Terri Wilde came to me one time and told me she was
15   having -- she was butting heads with my mother because she
16   talks to her and she can't understand and my mom yells
17   back and she sounded really frustrated. So I tried to
18   explain how to deal with a person, just briefly as I was
19   going home, how to deal with mom. She just needs to talk
20   more clearly and look at her and so forth.
21 Q  Okay. So is Terri -- so Terri Wilde is one of the aides
22   that you believe is abusive towards your mother or
23   disrespectful?
24 A  I don't think Terri Wilde is abusive. I -- does -- she
25   doesn't strike me as an abuser, actually. She's not one

Page 244

1    of the group that I feel were intentionally abusive.
2    She's -- she's fine except she just has been very cold
3    recently since the media.
4  Q  What if any accommodations have you requested of Chugiak
5    to account for your mother's hearing disability?
6    MR. DAVIS: I'll object. It calls for a legal conclusion.
7  Q  Can you answer the question?
8  A  I've told Marla in different conversations that mom talks
9    loudly because of her hearing and it's not intentional.
10   And again, I offered a few times to come in and nobody
11   took a -- they -- took me up on that. But because of the
12   strained relationship over the months, you know, I pull
13   back and I'm not really offering too much anymore.
14   So.....
15 Q  Okay. Do you know if Ms. Nelson has talked to the staff
16   about your mother's hearing problems?
17 A  Well, I -- I feel that most of the staff -- not all of
18   them, but a lot of them really don't like me because of
19   the lawsuit. I mean, I clearly get that message. So I
20   don't think I'd be comfortable at this time.
21 Q  My question was though.....
22 A  Oh.
23 Q  .....do you think Ms. Nelson has talked to the staff about
24   your mother's hearing disability?
25 A  Oh gee, I -- I would hope that she has and I would think

Page 245

1    that she would have. I don't know that for a fact but I
2    would think she may have.
3  Q  Okay. Have you asked her? Have you followed up and said,
4    Ms. Nelson, you know, have you explained to the staff my
5    mother's having a.....
6  A  I don't think I said it in those.....
7  Q  .....that she has this hearing problem?
8  A  .....terms. I guess I would assume that she would have
9    relayed that information. I just assumed she would.
10 Q  Do you recall that there was a period of time when Kathy
11   Huskey, the care coordinator, had raised the idea of
12   having a psychological evaluation done of your mother?
13 A  Yeah, I remember that.
14 Q  Okay. And were you in agreement with that at the time?
15 A  Yeah.
16 Q  Okay.
17 A  Yeah. And she wanted it though -- there was a
18   misinterpretation on Chugiak's part because she called me
19   and she was upset about this. She said that the reason
20   she wanted that, not to prove that something was
21   wrong with mom, she wanted to prove the opposite, that
22   nothing was wrong with her. And that was misinterpreted
23   somehow in the documents.
24 Q  Well, how is it misinterpreted if the document said that
25   she suggested a psychological evaluation? I mean, it was

Page 246

1    just.....
2  A  Yeah, it as after the meeting that we had in the summer of
3    '06 when they were claim -- some of the aides claimed mom
4    said someone was trailer trash. And it was after that
5    meeting. And Kathy thought it would be good to get a
6    psych or a neuro-psych to show that mom -- no, there was
7    nothing wrong with mom. And you can ask her that when you
8    do your depo with her. But it was somehow misinterpreted
9    that she was -- she thought something was wrong with mom,
10   but that's not what she meant.
11 Q  Was.....
12 A  And we were okay with that too. And anyone can evaluate
13   mom. I don't care at all because you're not going to find
14   anything really wrong with her.
15 Q  Did you ever -- when she suggested that or after she
16   suggested it, did you take any affirmative steps to have
17   the psychological evaluation done?
18 A  Well, no I didn't because mom said she absolutely did not
19   want to see a psychologist or psychiatrist. So I can't
20   force her to do that.
21 Q  Okay. And if I understood you correctly just a minute
22   ago, you said that you don't believe anything is going to
23   be found so anyone could do that and.....
24 A  Well, but I don't know if you could get mom there. That's
25   the point. I mean, I don't -- I don't believe you could



EXHIBIT     6
Page 26 of 29

### Page 247

1   -- she would -- she doesn't -- she's 90 years-old. She --
2   you know, in our generation, it's more accepting to have
3   -- you treat -- people take Prozac or Effexor or whatever.
4   It's very -- anxi -- anti-anxiety agents. And it's common
5   and acceptable now. Or ADD, ADHD. But back in her
6   generation, there's a real stigma attached to the word
7   psychiatrist or psychologist.
8   Q   So if it wasn't a question of her having to go to the
9       psychologist or psychiatrist but the psychiatrist or
10      psychologist coming to her, do you think she would refuse?
11  A   I don't think she'd like it.
12  Q   Is.....
13  A   Unless she thought there was some benefit for me in our
14      case. And there might be. I mean, there really might be
15      to prove that she doesn't -- not have any true psychiatric
16      disorder. There might be.
17  Q   If she did have a psychiatric or a psychological disorder,
18      you said you know your mother very well, and if medication
19      were prescribed for that disorder, do you know if your
20      mother would take it?
21      MR. DAVIS: Object to the form of the question.
22  A   Well, she's had bad experiences with it. I can see where
23      possibly she'd be open to something for her nerves or
24      anxiety but based on the track record, she'd probably, you
25      know, wind up not taking it because she's tried it a few

### Page 248

1   times and it never agrees with her.
2   Q   In fact, do you recall at one care conference that Ms.
3       Nelson suggested that medication for your mother's
4       generalized anxiety disorder might minimize or alleviate
5       her -- your mother's agitation? Do you recall that?
6   A   That's been recommended by a number of people, yeah.
7       Uh-huh.
8   Q   By a number of people? Who else then?
9   A   Oh, the care coordinator, my mom's care coordinator.
10      Possibly Jan Freels. It's come up.
11  Q   Okay. Do you recall if any of the nurses recommended it?
12  A   A nurse?
13  Q   Yeah.
14  A   Oh, let's see. I'm -- I'm not sure. I'm not sure.
15      Possibly Carol, maybe it was.....
16  Q   Carol Wilkins?
17  A   Yeah.
18  Q   Okay. Looking at the complaint again, the third count on
19      page 7 alleges a violation of the Alaska Uniform
20      Residential Landlord-Tenant Act. Do you see that? It's
21      page 7.
22  A   Page 7.
23  Q   Seven.
24  A   Okay.
25  Q   All right. Do you have any understanding of the factual

### Page 249

1   basis for that claim?
2       MR. DAVIS: I'll object. It calls for a legal conclusion.
3   Q   If you don't have an opinion, you don't. I mean, it's up
4       to you.
5   A   No.
6   Q   Okay. The next claim is breach of contract claim starting
7       on page 8. Do you have any understanding of the factual
8       basis for this claim?
9       MR. DAVIS: Same objection.
10  A   No.
11  Q   Okay. And same question with respect to the next claim,
12      which is a violation of the Americans with Disabilities
13      Act. It's count V.....
14      MR. DAVIS: Same objection.
15  Q   .....starting on page 8. Do you see that?
16  A   Yeah, I don't know.
17  Q   Okay. And the next -- you said you don't know, correct?
18  A   Yes, that's correct.
19  Q   All right. Going to the next claim is the -- alleges a
20      violation of the -- of Section 504 of the Rehabilitation
21      Act of 1973, starting on page 9. Do you see that?
22      MR. DAVIS: Same objection.
23  A   Uh-huh. (Affirmative)
24  Q   Okay. Do you have any understanding of the factual basis
25      for that claim?

### Page 250

1   A   No.
2   Q   Same question with respect to count Roman numeral VII on
3       page 9, violation of the Fair -- which alleges violation
4       of the Fair Housing Act of 1988.
5   A   Unh-unh, no.
6   Q   You don't -- so my question is, if I can get that out, do
7       you have an understanding of the factual basis for that
8       claim?
9       MR. DAVIS: Same objection.
10  A   No, I'm trusting my attorneys on this, on the legal.....
11  Q   Okay. Looking at page 10 of the complaint, count Roman
12      numeral VIII alleges intentional infliction of emotional
13      distress. What are you claiming that Chugiak did that
14      amounted to intentional infliction of emotional distress?
15      MR. DAVIS: Same objection.
16  A   Well, they had a letter in the file from mom's doctor, Dr.
17      Jones, that I gave to them in the summer of '05, right
18      after the meeting we had, that group meeting -- I got it
19      from Dr. Jones -- that clearly stated to move mom would
20      cause her most likely physical and mental harm. And they
21      disregarded that, gave her the eviction notice, and gave
22      it to her, which almost gave her a heart attack.
23  Q   So that's the basis for this claim?
24      MR. DAVIS: Same objection.
25  Q   Who did -- you said you gave this letter to Chugiak in the


EXHIBIT G
Page 27 of 29

Page 251

1    summer of '05.
2  A   Yes.
3  Q   Who did you give it to?
4  A   It was -- it was someone at the front desk. I was walking
5      out. Someone sitting at the front desk. It may have been
6      -- I think it was that woman who was there before the
7      present woman that had the birds. I can't remember her
8      name but the woman who was a clerk there before the
9      present clerk. And I put in an envelope and gave it to
10     her, asked her to give -- give it to the nurses for the
11     file.
12 Q   Okay. Did you ever talk to the nurses, I mean shortly
13     after, not since the litigation, but had -- did you ever
14     talk to any of the nurses to find out whether they ever
15     received this letter?
16 A   No, I just assumed it would be done.
17 Q   Okay. And did you ever call the nurses during that time
18     period to talk to them about this letter and the contents
19     of it?
20 A   (Nods negatively)
21     REPORTER: Is that a no?
22 A   No. No. Sorry.
23 Q   Are there -- are you claiming that -- well, are you
24     claiming that by giving your mother the eviction letter,
25     after having received -- allegedly receiving this letter

Page 252

1    from Dr. Jones, that that was an extreme and outrageous
2    act?
3  A   Yes.
4  Q   Okay. Are you claiming that there were any other extreme
5      or outrageous acts by Chugiak?
6  A   That was the worst one. Well, just being negligent and
7      not trying to resolve the ongoing issues, ongoing issues
8      that mom was complaining about of the aides being nasty to
9      her. They -- they created an environment in the dining
10     room that made people not like her. Obviously they talked
11     to one another about private things. I think that's still
12     going on now based on things I've heard lately from
13     people, that it seems like the aides share information
14     with residents and their families. Lack of
15     confidentiality.
16 Q   You said based on things that you've heard lately. What
17     are you referring to?
18 A   Oh, like the article that was written in the Chugiak --
19     Alaska Star rather, the Chugiak local paper, the last one
20     that came out yesterday. An editorial. Just saying
21     things that are intimate about my mother, that how would
22     -- how would they have known that or things -- one of the
23     resident's daughters said to me, they accosted me on my
24     way out a couple of weeks ago after the news media,
25     talking about my mother and her level of care and all

Page 253

1    that. Well, how do they know about my mother's level or
2    care if no one talked to them about it? I don't talk to
3    anyone about my mother's level of care.
4  Q   Well, prior to -- you said that you were accosted by a
5      family member of a resident.
6  A   Uh-huh, yeah.
7  Q   Prior to that, had you given any interviews to the media?
8  A   One, yeah, when we went to court.
9  Q   Did you discuss the level of -- your mother's level of
10     care?
11 A   Yeah, I guess -- I guess I did, yeah. I guess I did.
12 Q   All right. Any other acts or allegations that you're
13     claiming were extreme and outrageous?
14     MR. DAVIS: Objection. Form of the question.
15 A   I think we -- we -- we covered a lot of them in the last
16     two sessions. Most of them.
17 Q   Okay. What damages are you claiming your mother has
18     suffered as a result of the actions by Chugiak Senior
19     Center?
20     MR. DAVIS: Objection. Calls for a legal conclusion.
21 A   Well, she suffered definitely an increase of her anxiety
22     and fear, anxiety, fear, which she shouldn't have at her
23     age. She feels lack of security, not knowing. You know,
24     just hurt that people don't want her there and want to
25     throw her out. Her blood pressure med -- medicine was

Page 254

1    increased twice. Her blood pressure has been really high
2    the last few weeks related to all that is going on. I
3    again and he's increased her medication again.
4    just took her to the doctor, her blood pressure was up
5  Q   Okay. Is that it?
6  A   (Nods affirmatively)
7  Q   Are you claiming that CSC has caused your mother's blood
8      pressure to increase?
9  A   Absolutely. Absolutely.
10 Q   Okay.
11 A   Beyond a doubt.
12 Q   Are you claiming that your mother has incurred medical
13     expenses as a result of Chugiak's conduct?
14 A   Well, she's on Medicaid, so it's not really a medical
15     expense.
16 Q   Are you claiming that you have -- or that she has incurred
17     any out of pocket expenses as a result of Chugiak's
18     conduct?
19     (No audible response)
20 Q   Is that a no?
21 A   No, no. It's all emotional and no. She's covered by
22     Medicaid.
23 Q   Okay.
24 A   Medicare.
25 Q   Have you asked your mother if she maintains a diary or any



CAROL WINTERS                    9/22/2006              WINTERS v. CHUGIAK SR. CITZ.
                                                        3:-06-CV-00083-TMB

29 (Pages 255 to 257)

Page 255

1    notes regarding any of the alleged incidents arising from
2    this lawsuit?
3  A    My mother can't -- she can't -- she has macular
4    degeneration and how it's affecting her is she can't see
5    printed matter well.  So she rarely reads now and no, she
6    doesn't take notes.  It's hard for.  She tries not to.
7  Q    Okay.  Other than the complaint that you've made to the
8    long term care ombudsman recently, since your last
9    deposition, have you filed any complaints against Chugiak
10   with any other agencies since your deposition?
11 A    No.
12   MS. MEYERS:  Okay.  Can we just take a quick break?  I'm
13   almost done.  I'm going to check my notes.  Off record.
14   REPORTER:  Off record.
15   (Off record)
16   (On record)
17   REPORTER:  On record.
18   MS. MEYERS:  I have no further questions.
19   MR. DAVIS:  I have none.
20   REPORTER:  Then this concludes the video tape deposition
21 of Carol Winters at 4:18 on the 22nd day of September, 2006.
22 Off record.
23   (Off record)
24            (END OF PROCEEDINGS)
25

Page 256

1            C E R T I F I C A T E
2  UNITED STATES OF AMERICA       )
                                  )ss
3  STATE OF ALASKA                )
4    I, Joseph P. Kolasinski, Notary Public in and for the
5  state of Alaska, residing in Anchorage in said state, do hereby
6  certify that the deponent in the foregoing matter was duly
7  sworn to testify to the truth, and nothing but the truth;
8  That said testimony was taken at the time and place therein
9  stated;
10     That the testimony of said witness was recorded
11 electronically and thereafter transcribed under my direction
12 and reduced to print;
13     That the foregoing is a full, complete, and true record of
14 said testimony.
15     I further certify that I am not a relative, nor employee,
16 nor attorney, nor of counsel of any of the parties to the
17 foregoing matter, nor in any way interested in the outcome of
18 the matter therein named.
19     IN WITNESS WHEREOF I have hereunto set my hand and affixed
20 my seal this 30th day of September 2006.
21
22
                    _____
23                  Joseph P. Kolasinski, Notary Public
                    in and for the State of Alaska.
                    My Commission Expires:  03/12/2008
24
25

Page 257

1            WITNESS CERTIFICATE
2  RE:      WINTERS v. CHUGIAK SENIOR CITIZENS, INC.,
   CASE NUMBER:  3:06-CV-00083-TMB
3  DEPOSITION OF:  CAROL WINTERS, VOLUME II
   DATE TAKEN:    SEPTEMBER 22, 2006
4
      I hereby certify that I have read the foregoing deposition
5  and accept it as true and correct, with the following
   exceptions:
6
   Page    Line          Description
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
   If additional paper is needed, please sign and date each sheet.
23
                    _____
24                  CAROL WINTERS        DATE
25