Donna M. Meyers
Clay A. Young
Delaney Wiles, Inc.
1007 W. 3rd Avenue, Suite 400
Anchorage, Alaska 99501
PHONE: 907-279-3581
FAX: 907-277-1331
dmm@delaneywiles.com
cay@delaneywiles.com

Attorneys for Defendant
Chugiak Senior Citizens, Inc.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| HELEN WINTERS, through her Power of Attorney Carol Winters,<br><br>          Plaintiff,<br><br>     v.<br><br>CHUGIAK SENIOR CITIZENS, INC.,<br><br>          Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No. 3:06-cv-00083-TMB |

### DEFENDANT CHUGIAK SENIOR CITIZENS, INC.'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT NO. 2 RE: COUNTS II, V, VI, AND VII

### I.    INTRODUCTION

This motion seeks dismissal of Counts II, V, VI, and VII in plaintiff's Amended Complaint. CSC incorporates the Statement of Facts and Standards for Summary Judgment contained in its Motion for Summary Judgment as to Count I herein, and respectfully refers the Court to them.

## II.    ARGUMENT

### A.    Summary Judgment is Warranted on Plaintiff's Discrimination Claims Asserted in Counts II, V, VI, and VII.

Plaintiff has asserted discrimination claims under the Alaska Human Rights Act (Count II), the Americans With Disabilities Act (ADA) (Count V), § 504 of the Rehabilitation Act of 1973 (RA) (Count VI), and the Fair Housing Act of 1988 (FHA) (Count VII).  In each instance, plaintiff alleges she has a right to be free from discrimination in the lease or rental of property due to a physical or mental disability.[1]

### 1.    The ADA, RA, Alaska Human Rights Act  and Fair Housing Act.

Plaintiff's discrimination claims under the ADA, RA and Alaska Human Rights Act are considered together since they all contain essentially the same elements and are analyzed similarly.  *See Duffy v. Riveland,* 98 F.3d 447, 455 (9th Cir. 1996) (declaring the purpose and effect of the ADA is to extend the anti-discrimination policy of the RA to public entities, regardless of the receipt of federal financial assistance, and that relevant factors established in analyzing RA claims apply to ADA claims); *Matthews v. Jefferson,* 29 F. Supp. 2d 525, 532 (W.D. Ark. 1998) (declaring ADA has no federal funding requirement, but it is otherwise similar in substance to the RA and cases interpreting either are applicable and interchangeable); *Armstrong v. Wilson,* 942 F. Supp. 1252, 1258 (N.D. Cal. 1996),

---

[1]    Dkt. No. 1, Exh. C (Amended Complaint, Counts II, V, VI, and VII).

DEFENDANT CHUGIAK SENIOR CITIZENS, INC.'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT NO. 2 RE:  COUNTS II, V, VI, AND VII
*Winters v. CSC*, Case No. 3:06-cv-00083-TMB                                    Page 2 of 28

*aff'd.* 124 F.3d 1019, *cert. denied* 118 S.Ct. 2340 (1998) (declaring ADA is to be interpreted in the same manner as the RA).

Similarly, the Alaska Supreme Court has looked to federal decisional law in interpreting the provisions of the Alaska Human Rights Act (AS 18.80.200-.295).[2] There are very few Alaska cases addressing AS 18.80.240, and none are on point. However, in other areas of Alaska's anti-discrimination statutes, the Alaska courts have looked to federal decisional law.  *See Thomas v. Anchorage Telephone Utility,* 741 P.2d 618, 622 (Alaska 1987) (declaring that in interpreting this  area of Alaska law, the court has examined the parallel body of federal employment discrimination law); *Alaska State Commission for Human Rights v. Yellow Cab,* 611 P.2d 487, 490 (Alaska 1980) (declaring that in considering the parameters of its anti-discrimination statute, the Alaska courts have examined the relevant federal Title VII decisions for guidance); *Wondzell v. Alaska Wood Products, Inc.,* 583 P.2d 860, 863-64 (Alaska 1978) (declaring the court has previously noted the similarity between AS 18.80.200 et seq. and Title VII of the 1964 Act, therefore, the court must review the decisional law under the federal statute and read a duty of reasonable accommodation into the Alaska statute).

---

[2]    The relevant section is found at AS 18.80.240(2) which provides in pertinent part:

> It is unlawful for the owner, lessee, manager, or other person having the right to sell, lease, or rent real property . . . (2) to discriminate against a person because of sex, marital status, changes in marital status, pregnancy, race, religion, physical or mental disability, color, or national origin in a term, condition or privilege relating to the use, sale, lease or rental of real property. . . .

Other states with anti-discrimination laws have also looked to federal decisional law for guidance. *See, e.g.*, *Matthews v. NCAA,* 179 F. Supp. 2d 1209, 1229 (E.D. Wash. 2001) (declaring Washington law against discrimination as it relates to disability discrimination substantially parallels federal law, and courts may look to interpretation of ADA when applying Washington law); *Chisolm v. McManimon,* 97 F. Supp. 2d 615, 622 (D. N.J. 2000), *reversed on other grounds*, 275 F.3d 315 (3d. Cir. 2001) (declaring standards applied in cases under New Jersey law against discrimination are same as those under ADA); *Matthews v. Jefferson,* 29 F. Supp. 2d 525, 540 (W.D. Ark. 1998) (declaring provisions of Arkansas Civil Rights Act are parallel to and coterminous with the coverage of Title II of the ADA and § 504 of the RA of 1973); *Bravin v. Mt. Sinai Medical Center,* 186 F.R.D. 293, 304 (S.D.N.Y. 1999), *vacated on other grounds* 58 F. Supp. 2d 269 (S.D.N.Y. 1999) (declaring there is no difference between the quantum of elements of proof required by ADA and New York state human rights law).

The ADA states in relevant part:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. 12182(a).

A plaintiff seeking relief under the ADA[3] must prove: (1) they have a disability; (2) the defendant is subject to the ADA; and (3) that they were denied the opportunity to participate in or benefit from services or accommodations on the basis of their disabilities; or that defendant has failed to make reasonable accommodation by modifying policies, practices, or procedures, when such modifications are necessary to afford such goods, services and accommodations to individuals with disabilities and defendant has not demonstrated that such modifications would fundamentally alter the nature of such goods, services or accommodations. *See* 42 U.S.C. § 12182.

"Disability means, with respect to an individual, a physical or mental impairment that substantially limits one or more of the major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment." 28 C.F.R. § 36.104.

> (1) The phrase physical or mental impairment means--
>
> (i) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive; genitourinary; hemic and lymphatic; skin; and endocrine;

---

[3]    The elements of a Rehabilitation Act claim are "identical" to those of an ADA claim, except that under the Rehabilitation Act, the defendant must have discriminated against the plaintiff "solely" because of the plaintiff's disability, whereas under the ADA, it is enough if the plaintiff's disability was a motivating factor in the discrimination. *See In re Allegheny Health, Educ. and Research Foundation*, 321 B.R. 776, 796 (B. W.D. Pa. 2005).

(ii) Any mental or psychological disorder such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities;

(iii) The phrase physical or mental impairment includes, but is not limited to, such contagious and noncontagious diseases and conditions as orthopedic, visual, speech, and hearing impairments, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, mental retardation, emotional illness, specific learning disabilities, HIV disease (whether symptomatic or asymptomatic), tuberculosis, drug addiction, and alcoholism[.]

28 C.F.R. § 36.104.

The purpose of the ADA is to place those with disabilities on equal footing and not to give them an unfair advantage. *Petition of Rubenstein,* 637 A.2d 1131, 1137 (Del. 1994). The ADA and RA do not provide protection for all disabled individuals. Instead, protection is limited to those who are able to meet all of the programs' requirements in spite of their handicap. *Castellano v. City of New York,* 946 F. Supp. 249, 252-53 (S.D.N.Y. 1996).

The plaintiff carries the burden of proof on her claim that she has been discriminated against on the basis of disability. To make a prima facie case under the ADA, a plaintiff must establish that (1) she has a disability as defined by the Act; (2) she is otherwise qualified; and (3) she is being excluded from participation in and being denied the benefits of, or being subjected to discrimination under the program solely because of her disability. *Jones v. City of Monroe, M.I.,* 341 F.3d 474, 477 (6th Cir. 2003); *Duffy v. Rivelind*, 98 F.3d 447, 455 (9th Cir. 1996).

A party seeking a reasonable accommodation under the ADA or RA must specifically request it. *Wisconsin Correctional Service v. City of Milwaukee,* 173 F. Supp. 2d 842, 849 (E.D. Wis. 2001); *Woolcott v. E.I. Dupont Nemours & Co., Inc.,* 1997 WL 251475 at *4 (W.D.N.Y. 1997) (declaring it is the responsibility of the disabled individual to inform employer of need for accommodation, and, if employee fails to request accommodation, employer cannot be liable for failing to provide one).[4] The duty to provide reasonable accommodations under the ADA and RA arises only when a policy discriminates on the basis of disability. *Weinreich v. Los Angeles County Metropolitan Transp. Authority,* 114 F.3d 976, 978 (9th Cir. 1997).

A plaintiff in an ADA action also bears the burden of showing that a reasonable modification is available. Once the plaintiff meets the burden of demonstrating this element, along with the other prima facie elements, the burden then shifts to the defendant to show that the requested accommodation is not reasonable. *Martin v. Taft,* 222 F. Supp. 2d 940, 972 (S.D. Ohio 2002); *Pickering v. City of Atlanta,* 75 F. Supp. 2d 1374, 1379 (N.D. Ga. 1999) (declaring ADA plaintiff has the burden of proving that a reasonable accommodation exists).

The test to determine the reasonableness of a modification of an entity's policies, practices, or procedures under the ADA regulation is whether it alters the essential nature of the program or imposes an undue burden or hardship in light of the overall program. *San Diego Unified Port Dist. v. Gallagher*, 73 Cal.Rptr.2d 30,

---

[4]    A copy of this decision is attached hereto as Exh. H for the court's convenience.

33 (Cal. App. 1998); *Easley by Easley v. Snider,* 36 F.3d 297, 305 (3d. Cir. 1994) (declaring a modification of a public entity's policies, practices, or procedures is not reasonable under ADA regulation, if it alters the essential nature of the program or imposes undue burden or hardship in light of the overall program).

A modification of the rules, as an accommodation for a disabled participant, might constitute a "fundamental alteration" under ADA if: (1) an alteration affecting an essential aspect of defendant's policies or programs would be unacceptable even if applied to everyone equally; and (2) even a minor change might be unacceptable if it gives the disabled individual an advantage over others. *Matthews v. NCAA,* 179 F. Supp. 2d 1209, 1225 (E.D. Wash. 2001); *see also Williams v. Wasserman,* 164 F. Supp. 2d 591, 638 (D. Md. 2001) (declaring modification to state's treatment programs for developmentally disabled residents of state's psychiatric institutions, in form of accelerated placement for such residents and community-based facilities, would have resulted in a fundamental alteration of state's provisions of services and programs in face of difficult fiscal and medical choices, and acceleration of process would have required shift of resources, in face of need to maintain minimal number of hospital beds and also to fund placements for other persons in need of community treatment).

In *Appenfelder v. Deupree St. Luke,* 1995 WL 17137468 (S.D. Ohio),[5] plaintiff, a resident of a retirement home, brought an action against the retirement home to

---

[5]    A copy of the court's opinion is attached hereto for the court's convenience as Ex. I.

allow her to eat in the main dining room. *Id.* at *1. She suffered from advanced Alzheimer's disease and required spoon feeding. *Id.* St. Luke Center administered a dining policy whereby residents requiring spoon feeding eat in a dependent dining room, rather than in the main dining room with the residents capable of feeding themselves. *Id.* All St. Luke residents are subject to the dining policy. *Id.*

Plaintiff asserted claims under the Rehabilitation Act, ADA, and the Fair Housing Act. *Id.* The court granted summary judgment in favor of the retirement center. *Id.* at *5. Regarding plaintiff's claim under the Rehabilitation Act, the court declared:

> Plaintiff first seeks relief under section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Section 504 prohibits a federally funded state program from discriminating against a handicapped individual solely by reason of her handicap. Section 504 provides in pertinent part:
>
> No otherwise qualified handicapped individual . . . shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . .
>
> 29 U.S.C. § 794. Thus, the elements of a Rehabilitation act claim are as follows:
>
> 1.    Plaintiff is a "handicapped individual" as defined in the statute;
>
> 2.    Plaintiff is "otherwise qualified" to participate in the program or activity;
>
> 3.    Plaintiff has been excluded from the program or activity solely because of her handicap;

4.    the program or activity received federal financial assistance.  [citations omitted]

*Id.* at *2.

The defendants in *Appenfelder* did not dispute that plaintiff is a "handicapped individual," nor did they dispute that they received financial assistance.  *Id.*  The defendants argued that plaintiff was not an "otherwise qualified" individual.  *Id.*  An "otherwise qualified" individual is one who is able to meet all of a program's requirements in spite of her handicap.  *Id.*  An individual can be "otherwise qualified" in some instances even if she cannot meet all the programs' requirements.  *Id.*  This is so when refusal to modify an existing program to accommodate an individual would be unreasonable and thereby discriminatory.  *Id.* (citing *Wagner v. Fair Acres Geriatric Center,* 49 F.3d 1002, 1009 (3d. Cir. 1995)).

The court in *Appenfelder* went on to declare:

> Consequently, the Rehabilitation Act required that federal grantees make reasonable accommodations for their handicapped residents.  Requiring accommodation is unreasonable in two instances:  (1) if it would necessitate modification of the essential nature of the program; or (2) if it would place undue burdens, such as extensive costs, on the recipient of federal funds.  *Id.*  "Thus, in looking at whether an individual is otherwise qualified, [the Court] must analyze whether the person would be otherwise qualified if reasonable accommodations are made for his/her handicap."  *Id.*
>
> In this case, to qualify for dining in the main dining room, an individual must meet the following four requirements:
>
> (1)    The Resident should be alert enough to communicate with others; (2) The resident should be able to feed himself/herself with little or no tray set-up; (3) The resident

should indicate a choice to be in the dining room; (4) The resident should have social behavior patterns which will not disrupt the dining experience for other residents.

Resident Dining Policy, section IV(d).  St. Luke Center may waive the criteria if it would have significant benefit to the resident and no detrimental effect on the dining experience of other residents.  *Id.* at section V(B).

*Id.* at *3.

The court noted plaintiff did not meet any of St. Luke's established criteria, and therefore is unable to meet the requirements of dining in the main dining room in spite of her handicap.  *Id.*  The court then considered whether making an accommodation would be reasonable, so that she could eat in the main dining room. *Id.*  The court concluded it would be unreasonable for St. Luke to make an accommodation, declaring:

In this case, forcing St. Luke Center, a federal grantee, to accommodate Ms. Appenfelder would be unreasonable. Accommodation is unreasonable when it forces a federal grantee to change the essential nature of the program or imposes an undue burden on the federal grantee.  *Wagner,* 49 F.3d at 1009; *see also Alexander v. Choate,* 469 U.S. 287, 300, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) ("[w]hile a [federal] grantee need not be required to make 'fundamental' or 'substantial' modifications to accommodate the handicapped, it may be required to make 'reasonable' ones.").   Thus, the question after *Alexander* is whether some "reasonable accommodation" exists that will satisfy the legitimate interests of both the grantee and the handicapped person.  *Brennan v. Stewart,* 834 F.2d 1248, 1262 (5th Cir. 1988).

In this case, a reasonable accommodation is not available that will satisfy both the interests of St. Luke Center and Ms. Appenfelder.  Ms. Appenfelder must be spoon fed, and it takes her between thirty and sixty minutes to eat a meal.  Additionally,

the Plaintiff's daughter concedes that Ms. Appenfelder's behavior patterns could be disruptive of other residents' dining experience. Finally, everyone agrees that it is best if Ms. Appenfelder has a nurse to supervise her while she is eating.

St. Luke Center has found that the best way to allow everyone to have a peaceful and enjoyable dining experience was to serve food in separate dining rooms. Previously, St. Luke Center attempted to serve the residents in two shifts in the main dining room. Such a system, however, proved to be noisy and chaotic. St. Luke Center found that many residents felt rushed to complete their meals and showed signs of physical agitation. Moreover, some residents refrained from eating in the main dining room, thus reducing their socialization with other residents.

Accordingly, forcing St. Luke Center to go back to a two shift system would be very disruptive and would change the "essential nature" of the dining program. The only remaining alternative is to have everyone eat in the dining room at once. Ms. Appenfelder's daughter, however, concedes that the Plaintiff needs to be spoon-fed, can be disruptive, and should have supervision while eating. Providing for this in the main dining room would produce an unmanageable environment, whereby the other residents would be substantially affected. Finally, the Defendants proposed that if Ms. Appenfelder's daughter wanted to have the Plaintiff fed in the main dining room, she could do so as long as the daughter or another responsible party was present at the time. This accommodation, however, did not satisfy the Plaintiff, even though it appears to be the only "reasonable accommodation" available. Consequently, no reasonable accommodation exists that will satisfy both the Plaintiff and St. Luke Center.

In this instance, St. Luke Center must also take into consideration the other residents at their institution. St. Luke Center has made the best accommodations it can in this instance. Although we sympathize with Ms. Appenfelder's daughter's attempts to have her mother fed in the main dining room, we find that the Defendant's denial of her wishes is not actionable under the Rehabilitation Act because the Plaintiff is not "otherwise qualified."

*Id.* at *3-4.

The court in *Appenfelder* then considered plaintiff's ADA claim. The court declared:

> The Plaintiff concedes that the ADA is to be interpreted consistently with section 504 of the Rehabilitation act. See Plaintiff's Cross-Motion for Summary Judgment, Document 31, at page 37; *Helen L. v. DiDario,* 46 F.3d 325, 332 (3d Cir. 1995); *Martin v. Voinovich,* 840 F. Supp. 1175, 192 (S.D. Ohio 1993). The ADA, like the Rehabilitation Act, does not require St. Luke Center to fundamentally alter its program. *Helen L.,* 46 F.3d at 336; *see also* 28 C.F.R. § 35.130(b)(7) ("A public entity shall make reasonable modifications . . . unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program or activity."). As demonstrated above, St. Luke Center would have to fundamentally alter its dining program in order to accommodate Ms. Appenfelder.

*Id.* at *5.

The 1998 amendments to the Fair Housing Act (FHA), codified at 42 U.S.C. §§ 3601–3619, make it unlawful to "discriminate against any person . . . in the provision of services or facilities in connection with [his] dwelling, because of a handicap" of that person or any person associated with that person. *See* 42 U.S.C. §§ 3604(f)(2), 3604(f)(2)(A), 3604(f)(2)(C) (1994). "Discrimination" includes "a refusal to make reasonable accommodations and rules, policies, practices, or services, when such accommodation may be necessary to afford [a handicapped] person equal opportunity to use and enjoy the dwelling." 42 U.S.C. 3604(f)(3)(B) (1994).

The Fair Housing Act (FHA) requirements are similar to those of the ADA and RA and it is therefore is interpreted similarly. *Groner v. Golden Gate Gardens Apts.,* 250 F.3d 1039, 1044 (6th Cir. 2001) (declaring that because the Fair Housing Act adopted the concept of a "reasonable accommodation" from §504 of the Rehabilitation Act, cases interpreting that term under the Rehabilitation Act also apply to claims under the Fair Housing Act); *Andover Housing Authority v. Shkolnik,* 820 N.E.2d 815, 821 nn. 12 & 13 (Mass. 2005) (declaring that unlike the Rehabilitation Act, the protections afforded by the Fair Housing Act extend beyond programs receiving federal financial assistance). Like the ADA and RA, the FHA does not "extend a preference to handicapped residents," and therefore, "accommodations that go beyond affording a handicapped person an equal opportunity to use and enjoy a dwelling are not required by the Act. *Prindable v. Association of Apartment Owners of 2987 Kalakaua,* 304 F. Supp. 2d 1245, 1254 (D. Hawaii 2003).

To prevail on a claim for failure to make a reasonable accommodation, the plaintiff must establish (1) that he or an associate of his is handicapped within the meaning of § 3602(h) and, that the defendant knew or should have known of this fact; (2) that an accommodation may be necessary to afford the handicapped person an equal opportunity to use and enjoy the dwelling; (3) that such accommodation is reasonable; and (4) that the defendant refused to make the requested

accommodation.  *Id.* at 1254.  As with the ADA and RA, the plaintiff has the burden of proof on each of these elements.  *Id.* at 1254 n.18.

However, nothing in 42 U.S.C. § 3604(f) requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals.  42 U.S.C. § 3604(f)(9); *Arnold Murray Construction, LLC v. Hicks,* 621 N.W.2d 171, 174 (S.D. 2001).  If a handicapped tenant is a direct threat to the health and safety of other tenants, the landlord is obligated to either reasonably accommodate the tenant's handicap or show that no reasonable accommodate will eliminate or acceptably minimize the risk posed by the handicapped tenant.  *Arnold Murray Construction*, 621 N.W.2d at 174-75.  When the landlord shows that no reasonable accommodation would curtail the risk, its duty to accommodate ceases.  *Id.* at 175.

The FHA thus requires an accommodation for persons with handicaps if the accommodation is (1) reasonable, (2) necessary and (3) to afford handicapped persons equal opportunity to use and enjoy housing.  *Bryant Woods, Inc. v. Howard County, Maryland,* 124 F.3d 597, 603-04 (4th Cir. 1997).  In measuring the effects of an accommodation, the court may look not only to its functional and administrative aspects, but also to its costs.  *Id.* at 604.  "Reasonable accommodations" do not require accommodations which impose undue financial or administrative burdens or changes, adjustments or modifications to existing programs that would be

substantial, or that would constitute fundamental alterations in the nature of the program. *Id.* at 603-04.

The FHA provision mandating reasonable accommodations which are "necessary" to afford an equal opportunity requires the demonstration of a direct linkage between the proposed accommodation and the "equal opportunity" to be provided to the handicapped person. *Id.* at 604. This requirement has attributes of a causation requirement, and if the proposed accommodation provides no direct melioration of a disabilities effect, it cannot be said to be necessary. *Id.*

The "equal opportunity" requirement mandates not only the level of benefit that must be sought by a reasonable accommodation but also provides a limitation on what is required. *Id.* at 604. The FHA does not require accommodations that increase a benefit to a handicapped person above that provided to a non-handicapped person with respect to matters unrelated to the handicapped. *Id.* The requirement of even-handed treatment of handicapped persons does not include affirmative action by which handicapped persons would have a greater opportunity than non-handicapped persons. *Id.* In applying this principles in *Bryant Woods, Inc. v. Howard County, Maryland,* 124 F.3d 597 (4th Cir. 1997), the court held that a request for a zoning variance to allow expansion of a group home for handicapped from 8 to 15 residents was not a reasonable accommodation required by the FHA. *Id.* at 604-06. The accommodation was not reasonable, given the parking problems

created by the existing facility, and expansion was not necessary, as almost 30 such homes with 8 or fewer residents operated viably in the county. *Id.*

If the plaintiff carries her burden and establishes the foregoing elements, the burden shifts to the defendant to demonstrate that the requested accommodation is unreasonable. *See Huberty v. Washing County Housing & Redevelop. Authority,* 374 F. Supp. 2d 768, 773 (D. Minn. 2005).

A review of eviction cases applying these principles under the FHA is instructive. In *Andover Housing Authority v. Shkolnik,* 820 N.E.2d 815 (Mass. 2005), a public housing authority sought to evict tenants from their apartment for excessive noise in violation of the lease. *Id.* at 817-18. The court held that the authority did not violate the FHA by failing reasonably to accommodate the tenant's medical conditions. *Id.* at 826. The facts in that case were that a tenant complained about Shkolnik's continued excessive noise in violation of the terms of their lease. *Id.* at 817-18. The landlord sought to evict the noisy tenants, and their son presented medical documentation that his mother, Barskaya, was suffering from pain and depression and requested the authority to withdraw the notice to quit because his mother was ill. *Id.* at 818. Subsequently, she was diagnosed with shingles, lymphoma, Alzheimer's dementia and depression. *Id.* at 819.

The authority filed a summary eviction action, and the Shkloniks filed a counterclaim alleging in part that the authority had violated their rights under the FHA and RA by failing reasonably to accommodate Barskaya's medical condition.

*Id.* They also requested accommodations, including installation of soundproofing in their apartment, a room air conditioner so that windows could remain closed in warm weather, and withdrawal or delay of the eviction proceedings. *Id.* at 819-20. The authority investigated the feasibility of the requested physical modifications and concluded requested the accommodations either did not exist or were not feasible. *Id.* The focus of the trial was the reasonableness of the tenant's request that eviction proceedings be withdrawn or delayed as an accommodation for Barskaya's medical conditions. *Id.* at 824.

In the course of its opinion, the court noted that the tenants were required to demonstrate three factors: (1) Barskaya's condition constituted a physical or mental "impairment" as defined under the FHA and RA; (2) that affected at least one of her "major" life activities; (3) to a substantial degree. *Id.* at 823 n.15. The court declared an analysis of whether each of these factors has been established is critical because not every physical or mental impairment is considered to be a "handicap." *Id.*

The court also noted that the Shkolniks did not present any evidence at trial that they were "qualified" handicapped persons, such that, even if reasonable accommodations were made, they would be able to comply with the terms of their lease. *Id.* at 823. The court declared a "qualified" handicapped individual in the public housing context is one who could meet the authority's eligibility requirements for occupancy and who could meet the conditions of a tenancy with a reasonable

accommodation or modification in the authority's rules, policies, practices or services. *Id.* The Shkolniks had made no showing that, even if eviction proceedings were withdrawn or delayed, that they could comply with the terms of their lease by not disturbing their neighbors. *Id.* at 824.

In the course of its opinion, the court in *Shkolnik* declared a landlord has an equal responsibility to all of its tenants, many of whom are disabled or elderly. *Id.* at 824 n.17. In fact, the Landlord Act imposes liability on "any lessor or landlord who directly or indirectly interferes with the quiet enjoyment of any residential premises by the occupant." *Id.* The court noted a landlord may be liable as a result of failing to take action against noisy tenants for excessive noise. *Id.* The court in *Shkolnik* further noted that the role of a public housing authority is to provide housing for as many qualified tenants as possible, and eviction of those who threaten the well-being of the community is a necessary component of that function. *Id.* at 825-26.

The court further declared a tenant's request for a reasonable accommodation should inform the landlord that the tenant is a qualified handicapped person, and that the tenant is currently being denied an equal opportunity to use and enjoy a dwelling. *Id.* at 826. The court declared the purpose of the administrative process is to enable a public housing authority to resolve these violations without resorting to summary process. *Id.*

The court held that the Shkolniks failed to meet their burden of showing that their requested accommodation was reasonable. *Id.* at 825. There was a lack of

evidence that if a tenant's eviction was delayed, that they could conform their conduct to the terms of their lease. *Id.*

Similarly, in *Groner v. Golden Gate Gardens Apartments,* 250 F.3d 1039 (6th Cir. 2001), Groner, suffering from known depression and schizophrenia brought suit alleging that his landlord, Golden Gate, violated the FHA by threatening to evict him due to numerous complaints about his excessive noise. *Id.* at 1041. Groner alleged the landlord's refusal to provide a reasonable accommodation that would enable him to remain in his apartment amounted to unlawful discrimination.[6] The court entered summary judgment, declaring Groner's proposed accommodations were not reasonable. *Id.* at 1048.

The facts in that case were that requests had been made to renew Groner's lease as a reasonable accommodation in light of his mental disability. *Id.* at 1042-43. Gonzales, Groner's social worker, had requested the accommodation and further requested that the landlord make reasonable accommodations for Groner by contacting Gonzales immediately upon the receipt of any complaints against Groner. *Id.* at 1042.

The court declared that an accommodation is reasonable when it imposes no fundamental alteration in the nature of a program or undue financial and administrative burdens. *Id.* at 1044. The court declared that in determining whether the reasonableness requirement has been met, a court may consider the

---

[6]    Both parties conceded that the tenant's noise-making was directly related to his handicap. *Id.* at 1045.

accommodation's functional and administrative aspects, as well as its costs. *Id.* The court further declared the disabled individual bears the initial burden of proposing an accommodation and showing that that accommodation is objectionably reasonable. *Id.* at 1044-45. The employer then has the burden of persuasion on whether the proposed accommodation would impose an undue hardship. *Id.*

On appeal, Groner pursued a total of four accommodations that would have allowed him to remain a tenant at Golden Gate. *Id.* at 1045-46. The first proposal was that Golden Gate could have moved him or the complaining tenant to another apartment within the complex. *Id.* at 1046. However, Groner would likely have disturbed whomever was the neighboring tenant, thus he failed to show that this was a reasonable accommodation. *Id.* Furthermore, Golden Gate could not force the complaining neighbor to vacate her apartment. *Id.* The court declared that as a matter of law, the neighbor's rights do not have to be sacrificed on the alter of reasonable accommodation. *Id.*

Second, Groner argued that the complaining tenant could have been replaced by a hard-of-hearing tenant. *Id.* at 1046. However, Groner was unable to produce evidence of any hard-of-hearing tenant within the apartment complex, and the accommodation was not shown to be feasible. *Id.*

Third, Groner suggested that Gonzales be contacted for his immediate intervention whenever a complaint was received. *Id.* at 1046. However, this proposed accommodation had proven to be ineffective in the past, and complaints

had continued even after Gonzales' attempted intervention. *Id.* The court further declared that such an indefinite arrangement would likely have imposed an undue administrative burden on the Golden Gate staff. *Id.* Accordingly, Groner failed to demonstrate that such an accommodation was reasonable. *Id.*

Groner finally proposed that Golden Gate could have undertaken further soundproofing of his apartment. *Id.* at 1046. Golden Gate, however, raised legitimate safety concerns that could have resulted from soundproofing an entire apartment, such as an increased fire hazard and an inability to communicate with the tenant in the event of an emergency. *Id.* Furthermore, such an undertaking would substantially alter Groner's apartment beyond his tenancy, and despite Groner's contention he would have undertaken the expense himself, the FHA does not require "changes, adjustments or modifications that would constitute fundamental alterations." *Id.* Soundproofing would amount to such a fundamental change. *Id.* As such, Groner did not demonstrate that this would have been a reasonable accommodation. *Id.* at 1046-47.

Groner also argued that Golden Gate violated its duty to engage in a dialogue with Gonzales in order to accommodate Groner's disability. *Id.* at 1047. The court noted that there is no language in the FHA imposing such an obligation on landlords and tenants. *Id.* In any event, the landlord had been in close contact with Gonzales for months, and previous efforts to accommodate Groner's disability had proven unsuccessful. *Id.*

The court in Groner concluded:

> Because Golden Gate has a legitimate interest in ensuring the quiet enjoyment of *all* its tenants, and because there has been no showing of a reasonable accommodation that would have enabled Groner to remain in his apartment without significantly disturbing another tenant, Groner has failed to raise a genuine issue of material fact as to a violation of his rights under either the Fair Housing Act or the equivalent laws of Ohio.

*Id.* at 1047.

### 2. Plaintiff's claims under the ADA, RA, Alaska Human Rights Act and Fair Housing Act lack merit.

Here, Helen Winters claims under the ADA, RA, Alaska Human Rights Act and the FHA lack merit.[7]  There is no evidence that plaintiff has a disability.  28 C.F.R. § 36.104.  There is no evidence that CSC discriminated against plaintiff on the basis of any disability.  42 U.S.C. 12182(a).  There is no evidence that plaintiff was denied the opportunity to benefit from services on the basis of any disability or that CSC failed to make any reasonable accommodation by modifying its polices, practices and procedures.  42 U.S.C. 12182.  Assuming *arguendo* that plaintiff produced admissible evidence regarding these matters (which she has not), her claims still fail because she failed to specifically request any reasonable accommodation and notify CSC that she is disabled and is a qualified handicapped person who wants an accommodation.  *See Wisconsin Correctional Service*, 171 F. Supp. 2d at 849; Ex. H (*Woolcott*, 1997 WL 1997 WL 251475 at *4); *Shkolnik*, 820 N.E.2d at 826.  Plaintiff has also failed to demonstrate that any reasonable

---

[7]     Dkt. No. 1, Exh. C (Amended Complaint, Counts II, V, VI, and VII).

modification is available to CSC or that plaintiff proposed any reasonable modification. *See Groner*, 250 F.3d at 1045-46. Again assuming *arguendo* that plaintiff produced such admissible evidence (which she has not), CSC has demonstrated that it is not able to provide plaintiff with any reasonable modification and CSC was justified in terminating its lease agreement with her.

To reiterate, CSC is a small non-profit corporation that operates an ALP.[8] It offers a limited level of care to its residents.[9] Tenants of CSC reside in their own apartments within CSC's facility, where they can have complete privacy.[10] CSC's program and budget permits a 7:1 resident to staff ratio. It is not a skilled nursing facility, and does not offer skilled nursing services on a full-time basis.[11] Indeed, CSC offers very limited nursing services during the day on Monday through Friday.[12]

Shortly after Plaintiff's admission to CSC's assisted living program, CSC informed Carol Winters that Helen's level of care exceeded the level of services CSC could safely provide and Plaintiff should be placed in a smaller facility where she could receive 1-on-1 care for her own safety.[13] However, neither Plaintiff nor Carol Winters wanted to seek alternative housing, so CSC attempted to make efforts

---

[8]    Ex. A at ¶ 2 (Affidavit of Linda Hendrickson).
[9]    *Id.*
[10]    *Id.* at ¶ 3.
[11]    Assisted living homes are permitted by law to determine the level of services they want to offer and provide, and they are not required to accept residents exceeding those levels of service. An assisted living facility may involuntarily terminate a residential services contract when the home can no longer provide or arrange for services in accordance with the resident's needs and the resident's assisted living plan. *See* AS 47.33.360. As a result, the cost of residing in an assisted living home is substantially less than at a skilled nursing facility.
[12]    Ex. A at ¶ 3.
[13]    Ex. A at ¶ 5.

DEFENDANT CHUGIAK SENIOR CITIZENS, INC.'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT NO. 2 RE: COUNTS II, V, VI, AND VII
*Winters v. CSC*, Case No. 3:06-cv-00083-TMB                              Page 24 of 28

to provide the services Plaintiff needed although her level of care exceeded the limits of what CSC could reasonably provide and had agreed to provide, and her care needs continue to exceed the limits of services CSC can safely offer residents.[14]  During plaintiff's tenancy at CSC, she has also continuously engaged in a pattern of behavior and conduct consisting of unnecessary yelling and verbal abuse of staff and other residents.[15]  Her pattern of unacceptable behavior has been discussed with her, and CSC has participated in several care conferences to discuss this behavior and the appropriateness of terminating the Resident Services Contract.[16]  Despite these efforts, plaintiff's pattern of unacceptable behavior has not abated, and is in violation of the Residential Services Contract and Lease Agreement.[17]   Plaintiff's anger has become so intense that she actually struck a staff member in December 2005, which was one of the more recent events resulting in the decision to terminate the Residential Service Contract and Lease Agreement.[18]   Her continuous unacceptable behavior has also disrupted the peaceful and enjoyable atmosphere for both other residents and staff, and her conduct is detrimental to the safety and well-being of other residents and the staff.[19]  Staff members have expressed such extreme frustration with Plaintiff's outbursts,

---

[14]     *Id.*
[15]     *Id.* at ¶ 6.
[16]     *Id.*
[17]     *Id.*
[18]     *Id.*
[19]     *Id.*

insults and extreme demands that some staff members have either quit or threatened to quit.[20]

Consequently, CSC is no longer able to provide the level of services plaintiff needs, and she has continuously engaged in a pattern of behavior and conduct consisting of unnecessary yelling and verbal abuse of staff and other residents.[21] Her anger has become so intense that she actually has struck a member of the staff.[22] Her continuous unacceptable behavior disrupts the peaceful and enjoyable atmosphere for both other residents and staff.[23] Her pattern of unacceptable behavior has been discussed with her, and CSC has participated in several care conferences to discuss this behavior and appropriateness of terminating the Resident Services Contract.[24] Despite these efforts, plaintiff's pattern of unacceptable behavior has not abated, and is in violation of the Residential Services Contract.[25] Her continuous verbal, mental abuse and aggression towards staff and other residents is unacceptable and is grounds for termination of her contract.[26] Her conduct is detrimental to the mental and physical safety and well-being of other residents and the staff.[27]

CSC is not required to make a fundamental alteration or even a minor change if it gave the disabled individual an advantage over others. *See Matthews*, 179 F.

---

[20]    *Id.*
[21]    Ex. A at ¶¶ 5, 6.
[22]    *Id.* at ¶ 6.
[23]    *Id.*
[24]    *Id.* at ¶ 6.
[25]    *Id.*
[26]    *Id.*
[27]    *Id.*

DEFENDANT CHUGIAK SENIOR CITIZENS, INC.'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT NO. 2 RE:  COUNTS II, V, VI, AND VII
*Winters v. CSC*, Case No. 3:06-cv-00083-TMB                                              Page 26 of 28

Supp. 2d at 1225; *Williams*, 164 F. Supp. 2d at 638.  Here, just like in *Appenfelder*,
where plaintiff's claims under the RA, ADA and Fair Housing Act fail, Helen Winters'
claims similarly fail.  Ex. I (Appenfelder, 1995 WL 17137468).  CSC is not able to
provide the level of care plaintiff requires, and attempting to provide plaintiff with the
level of care she desires detrimentally takes away from the time CSC is able to
spend with the other residents.[28]  As Dr. Deborah B. Geeseman found:

> The needs and the quantity of time needed to meet those
> needs does not appear to be compatible with the staff :
> resident ratio that exists at CSC. . . .  There appears to be
> a disparity between Ms. Winters' needs (real or preceived)
> and the staff's availablity and limitations for meeting those
> needs.[29]

CSC has a legitimate interest in ensuring that it is able to provide the requisite
standard of care for all of its resident, without incurring additional administrative, and
financial burdens by providing one resident, i.e., plaintiff, extra time and care.  CSC,
like retirement home in *Appenfelder* is not required to fundamentally alter its facility
and program by incurring extra expense, time, staff, and staff hours to accommodate
plaintiff.

    Because plaintiff's claims under the ADA, RA, Alaska Human Rights
Act and the FHA are legally deficient, the Court should grant CSC's motion for
summary judgment.

---

[28]    Ex. J (Deborah Geesman Evaluation)
[29]    *Id.* at 7.

DEFENDANT CHUGIAK SENIOR CITIZENS, INC.'S MEMORANDUM IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT NO. 2 RE:  COUNTS II, V, VI, AND VII
*Winters v. CSC*, Case No. 3:06-cv-00083-TMB                                    Page 27 of 28

## III.   CONCLUSION

CSC requests the court to enter partial summary judgment on the claims in Counts II, V, VI, and VII of the Amended Complaint, with prejudice.

DATED at Anchorage, Alaska, this 19th day of December, 2006.

DELANEY WILES, INC.
Attorneys for Chugiak Senior Citizens, Inc.

s/Clay A. Young
Donna M. Meyers
Delaney Wiles, Inc.
1007 W. Third Avenue, Suite 400
Anchorage, Alaska  99501
Phone:     907-279-3581
Fax:          907-277-1331
E-mail:     dmm@delaneywiles.com
E-mail:     cay@delaneywiles.com
Alaska Bar Assoc. No. 9006011 (DMM)
Alaska Bar Assoc. No. 7410117 (CAY)

**CERTIFICATE OF SERVICE**

I hereby certify that on 19th day
of December, 2006, a copy of foregoing
**Defendant's Memorandum in Support of
Motion for Summary Judgment No. 2 Re:
Counts II, V, VI, and VII** was served electronically on:

Jim Davis/Jr./Barbara Brink/
Nikole M. Nelson/Sonja Kerr
Alaska Legal Services Corporation
1016 West 6th Avenue, Suite 200
Anchorage, AK  99501


s/Clay A. Young
125555