IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

HELEN WINTERS, through her Power of)
Attorney Carol Winters,            )
                                   )
                     Plaintiff,    )
                                   )
v.                                 )
                                   )
CHUGIAK SENIOR CITIZENS, INC.,     )
                                   )
                     Defendant.    )
_____)

Case No. 3:06-cv-00083-TMB

VIDEOTAPE DEPOSITION OF ROBERT P. DREYER

November 16, 2006

APPEARANCES:

        FOR THE PLAINTIFF:          MS. SONJA D. KERR
                                    MS. BARBARA BRINK
                                    Alaska Legal Services
                                    Attorneys at Law
                                    1016 West Sixth Avenue,
                                    Suite 200
                                    Anchorage, Alaska  99501
                                    (907) 272-9431

        FOR THE WITNESS:            MR. TIMOTHY M. TWOMEY
                                    State Department of Law
                                    Attorney at Law
                                    1031 West 4th Avenue, Suite 200
                                    Anchorage, Alaska  99501
                                    (907) 269-5140

        FOR THE DEFENDANT:          MR. CLAY A. YOUNG
                                    MS. DONNA M. MEYERS
                                    Delaney Wiles
                                    Attorneys at Law
                                    1007 West 3rd Avenue, Suite 400
                                    Anchorage, Alaska  99501
                                    (907) 279-3581

        ALSO PRESENT:               MS. C. WINTERS
                                    MS. L. HENDRICKSON

EXHIBIT _B_
Page _____ of _____

Page 6

1    Usually, however, when the objection is stated you can go
2    ahead and answer the question.  By then you probably will
3    have forgotten the question though, if we've had a little
4    discussion, so you can always ask to have it repeated or
5    rephrased.
6  A  Okay.
7  Q  We don't want you to guess.  Although given your position
8    I may ask you some opinion questions.....
9  A  Uh-huh.  (Affirmative)
10 Q  .....but only you know whether it's a guess or an opinion
11   or an assertion.
12 A  Uh-huh.  (Affirmative)
13 Q  So you have to be the one to make that decision.
14 A  Okay.
15 Q  You can certainly read any documents that you need to read
16   in order to answer a question.  If I give you documents --
17   well, when I give you documents to look at.....
18 A  Uh-huh.  (Affirmative)
19 Q  .....I'll give you all the time you need to look at them
20   before you feel -- so you can feel comfortable before you
21   answer the question.  And if for some reason you need more
22   time we can certainly do that.
23 A  Okay.
24 Q  We can take breaks pretty much any time you need one.
25   You're sort of in charge of that.

Page 7

1  A  Okay.
2  Q  Do you have any questions before we go any farther?
3  A  No, I don't think so, other than the fact if somebody else
4    needs to take a break don't be afraid to say so.
5  Q  Every -- anybody can ask for.....
6  A  Okay.
7  Q  .....a break at any time.
8  A  Okay.
9  Q  We're not here to create discomfort.
10 A  Okay.
11 Q  Let me find out a little bit about you.....
12 A  Uh-huh.  (Affirmative)
13 Q  .....first of all.
14 A  Sure.
15 Q  What do you do for a living?
16 A  I'm a long-term care ombudsman for the state of Alaska.
17 Q  Is that a -- a full-time position?
18 A  Yes, it is.  Uh-huh.
19 Q  And how long have you done that?
20 A  Since April of 2005, I guess it is, yes.
21 Q  All right.  Is that a -- a position -- do you get your pay
22   check from the state of Alaska?
23 A  Yes, I do.  Uh-huh.
24 Q  Do you serve at the pleasure of anybody?
25 A  No.  It's a classified position.

Page 8

1  Q  Meaning what?
2  A  Meaning it's not -- it's not an exempt position which
3    means it's not appointed by the governor, sort of
4    politically appointed position.  So it's a classified
5    position.
6  Q  Who -- who is your boss?
7  A  Delisa Culpepper.  C-U-L-P-E-P-P-E-R.
8  Q  How do you spell the first name?
9  A  D-E-L-I-S-A.
10 Q  One S.  Okay.  And what position does Delisa Culpepper
11   hold?
12 A  She's the chief operations officer for the Mental Health
13   Trust Authority.
14 Q  Are you employed then by the Mental Health Trust
15   Authority?
16 A  No.  Actually it's an arrangement.  They're more of an
17   umbrella -- umbrella organization over us as far as
18   overseeing our budget, making sure that we don't do
19   anything illegally as far as procurements, things like
20   that.  But we're -- long-term care ombudsman is a pretty
21   autonomous type situation, or organization.  But for
22   administrative purposes we're under them.
23 Q  Administratively you're under than.....
24 A  Right.
25 Q  .....but otherwise you're somewhat autonomous.

Page 9

1  A  Right.  Yeah, it's -- they're -- they're basically there
2    for support if I need them, or whatever.  But that's about
3    it.  So.....
4  Q  Okay.  What do you do as long-term care ombudsman?  What's
5    your -- what's your charge?
6  A  Primary role is -- of my job and I guess the other 51 in
7    the country and territories is to advocate for and protect
8    elders, 60 and older.  Protect their rights and then
9    advocate for them in care, especially in long-term care
10   facilities such as nursing homes, assisted living homes.
11   We do -- we do do some private homes but that's the
12   exception rather than the norm.
13 Q  You can -- you can receive and investigate and look into a
14   complaint by any senior though anywhere, can't you?
15   Anywhere in the state?
16 A  Right.  Yeah.  It's -- we call that the part B, which
17   means it can be -- if the senior's having difficulties or
18   problems, we can take that on, investigate that, look into
19   situations for them, right.  But our primary role is for
20   assisted living homes and nursing homes.
21 Q  How many assisted living homes are there in Alaska?
22 A  Exact count, I'm not sure.  Roughly about 220, I guess,
23   totally.  And there's about 110 in Anchorage I guess.
24 Q  How many nursing homes are there in the state?
25 A  There's 15.

Computer Matrix, LLC                    Phone - 907-243-0668          EXHIBIT    B        jpk@gci.net
310 K Street, Suite 200                  Fax      907-243-1473                            sahile@gci.net
                                                                          Page ___ of ___

ROBERT DREYER                11/16/2006                WINTERS v. CHUGIAK SR. CITZ.
Vol. 1                                                 3:-06-CV-00083-TMB

4 (Pages 10 to 13)

Page 10

1  Q   Fifteen?
2  A   Uh-huh.  Two in Anchorage.  And the largest, which is
3      Providence Extended Care.
4  Q   What's the definition of a nursing home?
5  A   Oh, my definition?
6  Q   Okay.  Your definition will do.
7  A   Yeah.  I'm not sure what the proper definition is.  A
8      nursing home is some -- is a home that's probably where
9      the residents require medical staff on -- on board to
10     assist them in their -- in their care.  And -- so you
11     always have -- you always have nurses there, you have
12     doctors that make periodic visits.  But basically it boils
13     down to you have nursing staff on board to handle the --
14     the medical conditions of the residents.
15 Q   Are nursing homes regulated by the state of Alaska?
16 A   They're actually regulated by a center for Medicaid and
17     Medicare services, but the state does -- does survey them
18     and inspect them.  It's a different agency than us.
19 Q   Okay.  So your office doesn't regulate.....
20 A   Correct.
21 Q   .....nursing homes?
22 A   Right.  No.
23 Q   Okay.  What is your working definition then of assisted
24     living homes?
25 A   Assisted living homes are for folks who don't require the

Page 11

1      extent of care that folks would have to have in nursing
2      homes.  They may need help with medication management.
3      Maybe that's a good example.  A nursing home -- the nurse
4      may give the medications.  In an assisted living home
5      they're not allowed to do that.  The residents do that
6      themselves.  They can assist or -- and provide, as an
7      example, assisted living homes are -- they can't directly
8      give it whereas the nurses can in nursing homes.  A person
9      may -- may need help with bathing.  They're a little --
10     quite a bit more self sufficient.  Their mobility is
11     probably better than most folks in nursing homes.  Rehab
12     typically would come in -- or physical therapy would come
13     in to do that.  Most homes don't have that, whereas at a
14     nursing home you'd have physical therapy probably right
15     there on staff or tied to it.  So it's just -- it's --
16     it's a lower step and less care -- less intense care, I
17     should say, than nursing homes.  So.....
18 Q   Are assisted living homes regulated by the state of
19     Alaska?
20 A   They are.  They're like -- they're inspected by the
21     assisted living -- certification and license are two
22     divisions within the state.  Certification and licensing.
23     One inspects nursing homes and one inspects assisted
24     living homes.  So they are two divisions.  So assisted --
25     assisted living homes within the state, they do the

Page 12

1      inspections on those.  We don't.  We don't.
2  Q   Does your office regulate assisted living homes?
3  A   No.  No.  Unh-unh.
4  Q   Is there a bright line in Alaska statutory law, if you
5      know, between nursing homes and assisted living homes in
6      terms of the extent of care that might be provided?
7      MR. TWOMEY:  Objection.  Calls for a legal conclusion.
8      MS. KERR:  Objection.  Calls for a legal conclusion.
9  A   Yeah.  I don't know what you mean by a bright line or.....
10 Q   Okay.  Fair enough.  Do you know what a nursing home has
11     to do in order to call itself a nursing home in Alaska?
12 A   No, not really.  I'm just -- again, I think it boils down
13     to they have to meet, you know, federal standards, meet
14     specific conditions as far as what care of services they
15     provide.  Have nurses on staff.  I'm not sure what the
16     exact stipulations are for the regulation.
17 Q   Does your office get involved in determining whether some
18     place is an assisted living home or a nursing home?
19 A   Does your office get involved in placing people in nursing
20 Q   Does your office get involved in placing people in nursing
21     homes or assisted living homes?
22 A   Right.  No.
23 Q   And does your office get involved in determining whether
24     people are appropriately placed in a nursing home or an
25     assisted living home?

Page 13

1  A   No.
2  Q   Are there state agencies who do determine whether, or get
3      involved in determining whether someone is appropriately
4      placed in either a nursing home or an assisted living
5      home, if you know?
6  A   Yeah.  I -- I really don't know on that.  I -- I'm sure
7      there's input from licensing, certification and licenses.
8      There may be input from the adult protective service
9      dealing -- with cases they deal with.  But I can't speak
10     for them as to what the extent of that is.  But we don't,
11     no.
12 Q   Are there other state agencies with some input or
13     oversight into nursing homes and/or assisted living homes
14     that your office regularly interfaces with?
15 A   Can you repeat the question, please?
16 Q   Sure.  Do you work with other state agencies who get
17     involved in elder care?
18 A   Right.  Uh-huh.  Yeah.  We work with.....
19 Q   And which ones?
20 A   Well, both -- within both agencies within certification
21     licensing, assisted living licensing and -- and I'll --
22     I'll call it nursing home licensing, we work with them.
23     More so with assisted living because there are
24     so many -- so many assisted living homes.
25 Q   And who does that?  I know I interrupted you here, but who

EXHIBIT _B_
Page ___ of ___

ROBERT DREYER                         11/16/2006                    WINTERS v. CHUGIAK SR. CITZ.
Vol. 1                                                              3:-06-CV-00083-TMB

5  (Pages 14 to 17)

---

Page 14

1     does the assisted living licensing?
2  A  What person?
3  Q  Well, the agency or department?
4  A  State Department Health and Social Services.
5  Q  Is there a division in it that.....
6  A  Right. Certifications and -- Department of Health and
7     Social Services. And then underneath that bracket would
8     be certification and licensing, and then off that would be
9     on the left nursing home licensing and on the right
10    assisted living licensing.
11 Q  And that's -- they're different people who.....
12 A  Right. Correct.
13 Q  .....what goes to?
14 A  Uh-huh, right.
15 Q  Do you know what's required to be licensed as a nursing
16    home or as an assisted living home?
17 A  Not -- not specifically. There are statutes or federal
18    regulations for that, whichever is applicable.
19 Q  You don't get involved in that?
20 A  No. Unh-unh.
21 Q  But you work with them?
22 A  Right.
23 Q  Generally how is it you work with them?
24 A  If they get -- if they get inputs or intakes or
25    complaints, or likewise we get them, we'll typically share

Page 15

1     that information if we think it's -- for example, if we
2     think an individual is being abused and is being -- a
3     person is being abused by say family or somebody other
4     than a staff member or a volunteer of the home, we would
5     contact adult protective service and that would be their
6     case. That's what their statute says.
7  Q  Well, actually Division of Health and Social Services
8     licensing people is what I was asking about. How do
9     you.....
10 A  Right.
11 Q  .....work with them?
12 A  Okay. How do -- if we -- if there's a situation that we
13    -- we run across talking to a resident or a complaint,
14    whatever it might be, has to do with the care of that --
15    of the elder, and we think it may be a licensing issue
16    then we get a hold of either nursing home licensing or
17    assisted living licensing and we -- if we look -- there
18    are some things we know. For example, they're supposed to
19    have a certain number of fire extinguishers, supposed to
20    emergency food supplies. If we see conditions in the home
21    that aren't good, it's -- it's unkept or whatever, then we
22    would contact licensing and ask them to take a look at it
23    as well, or tell them what we saw.
24 Q  Okay.
25 A  Or if -- or maybe if -- depending, I guess in the long --

Page 16

1     long run maybe we do -- may do a report of investigation.
2     But typically work real closely together. Almost -- we're
3     probably in contact with assisted living probably -- at
4     least every -- every other day probably usually on -- on
5     various cases.
6  Q  Okay.
7  A  Either following up or on new cases. So.....
8  Q  Does the certificate for licensing for assisted living
9     homes, that branch.....
10 A  Uh-huh. (Affirmative)
11 Q  .....ever ask your office to do an investigation.....
12 A  Uh-huh. (Affirmative)
13 Q  .....for them?
14 A  Well, sometimes if they're -- if they're overwhelmed
15    they'll ask if we -- if we can maybe go out and do an
16    initial look-see and to see -- and bring back what we saw.
17    And then they would take it from there. Or -- or if it's
18    -- typically if it looks like the person needs an advocate
19    as opposed to a licensing problem, that -- that would come
20    to us. They'll say we think this person needs an
21    advocate, we don't really think it's a licensing thing.
22    Then we would take that one on. But occas -- occasionally
23    we do but that's usually not the case. Usually it's.....
24 Q  Okay.
25 A  They like to handle their own, which I understand.

Page 17

1  Q  Now you were about to tell me a minute ago.....
2  A  Uh-huh. (Affirmative)
3  Q  .....about your interaction with Adult Protective
4     Services.
5  A  Correct. Right.
6  Q  And now I'd like you to carry on with that.....
7  A  Okay. Yeah.
8  Q  .....explanation.
9  A  APS, Adult Protective Services is -- their primary role is
10    to protect vulnerable adults, as part of their role. And
11    what their statute -- their statute says is that if abuse
12    is occurring by a staff member or volunteer of a licensed
13    home, nursing home or assisted living home, then that --
14    that comes to us. Okay.
15 Q  Your office?
16 A  Right. Okay. Anything other than staff or volunteer of
17    the home then they're -- they're required to investigate
18    it. So typically for the most part they will do those.
19    We don't have that -- we have very few cases where it's
20    actually a staff member or a volunteer of the home that is
21    abusing the -- an elder. So.....
22 Q  Okay. So the statutes.....
23 A  Usually it's family or somebody else so.....
24 Q  .....as you understand them.....
25 A  Uh-huh. (Affirmative)

EXHIBIT B
Page ___ of ___

ROBERT DREYER                    11/16/2006           WINTERS v. CHUGIAK SR. CITZ.
Vol. 1                                                3:-06-CV-00083-TMB

6 (Pages 18 to 21)

Page 18

1  Q  .....say that if there is alleged abuse from staff or
2     volunteer at a home.....
3  A  Uh-huh.  (Affirmative)
4  Q  .....then that investigation goes to your office.....
5  A  Comes to our office, correct.
6  Q  .....as opposed to Adult Protective Services?
7  A  Correct.  Right.  Uh-huh.
8  Q  So what is your understanding of their jurisdiction, if --
9     if you know or have an understanding?
10 A  Anything -- anything other than staff or volunteer, it
11    falls within their purview.  So if it's family or it's
12    predator -- sexual predator, financial exploitation,
13    things like that, then that would be.....
14 Q  In or out of the home?
15 A  Correct.  Right.  Yeah.  Especially private homes, for
16    example.  They do all private homes.
17 Q  Their jurisdiction, like yours, as you understand it,
18    extends into and out of, or in addition to, licensed
19    homes.....
20 A  Uh-huh.  (Affirmative)
21 Q  .....is that right?
22 A  Right.  We only do licensed homes on abuse if it's a staff
23    or a volunteer.
24 Q  All right.  So if someone's living with their sister -- an
25    elder is living with her sister.....

Page 19

1  A  Uh-huh.  (Affirmative)
2  Q  .....I'm just picking a hypothetical here.....
3  A  Uh-huh.  (Affirmative)
4  Q  .....and there's some allegation of -- of abuse there.....
5  A  Uh-huh.  (Affirmative)
6  Q  .....your office would not get involved with that.....
7  A  Correct.  Right.  No.
8  Q  .....is that right?
9  A  We might take the initial phone call and get the
10    information and then pass that to APS.
11 Q  Okay.
12 A  But we -- we would typically not do the investigation, no.
13    The thing that -- one of the key roles is if there's an
14    imminent threat or imminent danger to the person
15    physically, that's -- usually that's obviously APS's role
16    and.....
17 Q  Why is that obviously their role?
18 A  Well, because it's what they do.  They're able to --
19    they're able to move people out on an emergency type basis
20    and force them to leave a residence if they have to.
21    So.....
22 Q  So APS could move that person out of the home where
23    they're living with their sister?
24 A  Against their will if they think that's the right thing to
25    do.

Page 20

1  Q  Does your office have similar authority in nursing homes
2     or assisted living homes?
3  A  No.  Unh-unh.
4  Q  If you thought.....
5  A  Not to my knowledge anyway, no.
6  Q  If you thought there was a situation where there was a
7     threat of imminent harm to a resident of.....
8  A  Uh-huh.  (Affirmative)
9  Q  .....an assisted living home or a nursing home, what, if
10    any, steps does your office have the authority to take?
11 A  Well, we would -- we'd call -- we'd call APS and say we
12    have a critical situation here and ask them to come out.
13    If they can't, and I can't ever recall this ever happened,
14    but if they can't for some reason make it they may give us
15    the go ahead to do that.  But I -- to my knowledge that's
16    never happened.
17 Q  So you -- it's your belief that they could delegate that
18    authority to you an -- in a rare situation?
19 A  I -- I think so.  But it's just -- it's doubtful that
20    would ever happen.
21 Q  Otherwise you're -- you're calling the police presumably?
22 A  Yeah.  Right.
23 Q  Okay.  In any event, it's never happened on your watch?
24 A  No.  And I.....
25 Q  Okay.

Page 21

1  A  To my knowledge it hasn't happened in the recent past
2     either.
3  Q  How many people work in the -- in your office other than
4     clerical staff?
5  A  Myself and two other assistant ombudsmen.
6  Q  So what -- what are their titles?
7  A  Assistant ombudsman for both of them.
8  Q  So there's two assistant ombudsmen and.....
9  A  Myself.
10 Q  .....the ombudsman?
11 A  Uh-huh.  (Affirmative)
12 Q  Do you have any investigators?
13 A  No.  We all -- that's what we -- what we do.  Part of our
14    job is investigation, mediation, conflict resolution,
15    information, consultation to -- to folks as calls come in.
16    And there are always complaints.  Sometimes it's just --
17    I've worked a couple lately where folks have had concerns
18    about long-term care insurance.  People sometimes ask have
19    you got any reports -- I'm looking to move my mother into
20    a particular home, you know, you got any reports about that home.
21    And we can kind of -- can't really -- got to be careful
22    how we say it but we can say -- we can go back and say
23    we've had, you know, five complaints in the last five
24    years, whatever, that's about it.  We can't get into any
25    -- too much extent of that excessively so.....

Computer Matrix, LLC                Phone - 907-243-0668        jpk@gci.net
310 K Street, Suite 200             Fax    907-243-1473   EXHIBIT ___ B    sahile@gci.net
                                                         Page ___ of ___

ROBERT DREYER                   11/16/2006              WINTERS v. CHUGIAK SR. CITZ.
Vol. 1                                                 3:-06-CV-00083-TMB

7 (Pages 22 to 25)

Page 22

1  Q  What are the confidentiality restrictions on you?
2  A  We can't release residents names to folks that we don't
3     know or we don't know what's going to be done with that.
4     Or maybe more -- or if -- specifics about the case
5     specifically if it's going to lean toward the identity of
6     that individual.  So.....
7  Q  If the resident gives you permission can you do that?
8  A  Yes.  Uh-huh.
9  Q  Can you release information about an assisted living home
10    or a nursing home that would otherwise be confidential if
11    the home doesn't permit it?
12    MR. TWOMEY:  Calls for a legal conclusion.
13 A  I'm not sure I understand the question.  Yeah.
14 Q  Okay.  Did -- let me put it another way.  You talked about
15    confidentiality restrictions on information about
16    residents.
17 A  Uh-huh.  (Affirmative)
18 Q  Are there confidentiality restrictions on information
19    about the homes?
20 A  Can you give me an example?  I'm trying to think of what
21    one might be.
22 Q  I don't know if I can but I'll see what I can do.  Say a
23    legislator calls you up.....
24 A  Uh-huh.  (Affirmative)
25 Q  .....and is interested in nursing homes in general or.....

Page 23

1  A  Uh-huh.  (Affirmative)
2  Q  .....assisted living homes in general.....
3  A  Uh-huh.  (Affirmative)
4  Q  .....and wants to know the names of the five worst, in
5     your opinion.  Could you do that?
6  A  No, don't think so.
7  Q  Why not?
8  A  Well, that's my -- you know, that's my opinion, if you
9     will.  What I think may be the five worst based, maybe the
10    cases I've dealt with specifically on that, other
11    ombudsmen may have a different opinion of what they think
12    the five worst would be.  So basically we would -- I would
13    pull maybe -- how I would satisfy that call, I guess,
14    would be to pull down a list of -- go to our data base,
15    pull down a list of complaints for whatever period of time
16    they're looking for and just let the numbers fall out, see
17    what they are.  And say in the last five years these homes
18    have had this many complaints, you know.  Unless -- I'll
19    just take an example.  Let's say Providence Extended Care,
20    they've had maybe a lot of complaints but they also have,
21    you know, 200 and some residents.  So going to have more
22    complaints there than you're going to have with a home
23    with five people in it which most of our assisted living
24    homes are, for example.  So if he'd ask me for a variety, I
25    don't think I could say that.  I could -- I could give

Page 24

1     him numbers and that's about it and try to explain where
2     the numbers came from, that they may not -- numbers aren't
3     necessarily telling the whole story.  So.....
4  Q  Does your office maintain some sort of data base of the
5     number of complaints as opposed to the number of residents
6     of assisted living homes and nursing homes?
7  A  We maintain a data base of each complaint that we get that
8     we work on.  As far as the number of residents, no, that's
9     -- that -- that list or data base is maintained by
10    assisted living licensing for -- assisted living licensing
11    and likewise for nursing homes.  So I'd have to -- I'd
12    have to take the -- the documents that's provided by the
13    licensing folks and combine them with the number of
14    complaints and provide that data.  So.....
15 Q  Did you have any experience in assisted living homes or
16    nursing homes before you became the ombudsman?
17 A  No, other than hav -- other than having close great aunts
18    and uncles and grandparents in them, you know.
19 Q  Other than -- other than personal experience.....
20 A  Right, no.
21 Q  .....you had, as most of us either have or will?
22 A  Not specifically, no.
23 Q  No professional experience then I should say?
24 A  Correct.  Uh-huh.
25 Q  Okay.  Do you have any formal medical training?

Page 25

1  A  No, I wouldn't -- no, I wouldn't say formal, no.
2  Q  Sounds like you've had informal training?
3  A  Well, just in -- typically CPR, medic alert type training
4     that's required for other jobs I've had.  But nothing as
5     far as like EMT or any of that kind of stuff.
6  Q  So in the past you've had CPR.  That was at one time
7     current.....
8  A  Correct.  Uh-huh.
9  Q  .....is that right?  Is it current now?
10 A  No.  Unh-unh.
11 Q  And medic alert?
12 A  Right.
13 Q  What's that?
14 A  It's just a little higher -- little higher stage of CPR.
15    It's like -- it's like the first person on the scene.
16    Like a first responder type situation but again, below the
17    EMT level.  So.....
18 Q  And is that current now?
19 A  No.  Unh-unh.
20 Q  So it's below EMT but above CPR?
21 A  Correct.  Right.  But not much.
22 Q  All right.  And before you came on the job as the
23    ombudsman did you have any formal legal training?
24 A  Any formal legal training?  No.  I'm trying to think.  No.
25 Q  Any of your.....

ROBERT DREYER
Vol. 1

11/16/2006

WINTERS v. CHUGIAK SR. CITZ.
3:-06-CV-00083-TMB

8 (Pages 26 to 29)

Page 26

1  A   Other than just some business law courses from the
2      university, and that's it.  So.....
3  Q   University was some years ago?
4  A   Number of years ago, right.
5  Q   Part of your background is with the military; is that
6      correct?
7  A   Uh-huh.  Right.
8  Q   Which military service?
9  A   Air Force.  United States Air Force.
10 Q   U.S. Air Force?
11 A   Uh-huh.  (Affirmative)
12 Q   How long were you in the U.S. Air Force?
13 A   Twenty -- 22 years.
14 Q   What was the highest rank you achieved?
15 A   Lieutenant Colonel.
16 Q   Did you fly?
17 A   No.
18 Q   What was your -- gee, what do they call it, MO?
19 A   Job?
20 Q   Job.
21 A   It was -- it was almost evenly split between being a -- in
22     their terms, supply officer, which would be more like a
23     material management, the logistics type person.
24     Warehousing, storage, purchasing, things along those
25     lines.  And the other half was as patrolling officer,

Page 27

1      fuels officer, which is storage and dispensing of
2      petroleum at the retail and wholesale levels.
3  Q   Did you have anything to do in any formal way with the
4      military police while you were in the Air Force other than
5      perhaps interacting with them about subordinance?
6  A   No.  Unh-unh.
7  Q   No?
8  A   Not really.
9  Q   Have you had any formal, broadly defined.....
10 A   Uh-huh.  (Affirmative)
11 Q   .....legal training since you became the ombudsman?
12 A   No, not really.  I think all -- myself and the ombudsmen,
13     along those lines we attended a -- let's see what do they
14     call -- elder law Medicaid course that was given by Lorman
15     & Associates.  It was just a one day thing.  But that's --
16     that's pretty narrow in scope.
17 Q   Seminars then?
18 A   Right, right.
19 Q   You've attended seminars in the field?
20 A   Right.
21 Q   Elder law and.....
22 A   It's called Medicaid.....
23 Q   Medicaid.
24 A   It's in the -- it's in my -- in the packet there
25     somewhere.  In the -- the certifications, I think.

Page 28

1  Q   Any other seminars -- legal type seminars that you can
2      recall you attended?
3  A   No.
4  Q   There was something in the files that you produced, we'll
5      get into in a minute.....
6  A   Uh-huh.  (Affirmative)
7  Q   .....then have you describe what you produced, about some
8      presentations on interrogation techniques.
9  A   Uh-huh.  (Affirmative)
10 Q   Maybe I've misstated it, but.....
11 A   Right.  Okay.
12 Q   .....what was that?
13 A   That was -- I think it was a three -- four day course I
14     think.  First -- first one was -- first -- three days, if
15     I recall, and there was an advanced course another day.
16     Had to do with interrogation techniques that was given by
17     Reed Associates out of -- I think out of Chicago.  That
18     was just how to interview witnesses, interview folks on --
19     try to get -- different techniques.  How to read body
20     language, how to -- how to phrase questions to hopefully
21     get answers out and things like that that you're looking
22     for and validate the information you're getting.  And.....
23 Q   Maybe I should attend that.
24 A   Pretty good course actually.
25 Q   When did you attend that?

Page 29

1  A   I don't recall.  It's been less than a year ago.  I don't
2      recall the specific dates.
3  Q   Within the past year?
4  A   Right.
5  Q   And the seminar on elder law, do you remember when you
6      attended that?
7  A   It's been probably a little -- probably over a year ago,
8      yeah.
9  Q   Over a year?
10 A   Uh-huh.  (Affirmative)
11 Q   Now your -- your role is to be an advocate for and to
12     protect elders.....
13 A   Uh-huh.  (Affirmative)
14 Q   .....is that right?
15 A   Uh-huh.  (Affirmative)
16 Q   So your role is not to advocate for or protect nursing
17     homes or assisted living homes as such?
18 A   No.  Unh-unh.  If I understand your question right, no.
19     It's -- ours is the individual.
20 Q   Can you think of any other seminars that you've attended
21     since you became the ombudsman in.....
22 A   April.....
23 Q   .....April of '05?
24 A   .....of '05.  Attended a course -- it was a one day
25     seminar, had to do with culture change primarily -- and

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax    907-243-1473

EXHIBIT  B
Page ____ of ____

jpk@gci.net
sahile@gci.net

ROBERT DREYER                    11/16/2006          WINTERS v. CHUGIAK SR. CITZ.
Vol. 1                                                      3:-06-CV-00083-TMB

9 (Pages 30 to 33)

Page 30

1    even it's hard to say -- see that from the certificate,
2    but it was done at the BP center. That's got to do with
3    trying to get nursing homes staff, assisted living staff
4    to focus on the -- on the resident as a person -- or
5    resident centered care. Trying to focus your care to meet
6    their needs and what you think their needs are as far as
7    -- to get away from the old medical model nursing homes
8    primarily is where everything is done, a lock-step type
9    thing. And -- and to look at -- look at the individuals
10   and focus on what their needs are, what they would like to
11   have done, how they'd like to have it done. And that can
12   be anything from change the environment they're in to --
13   away from the old long hallways and semi-private rooms
14   with curtains and privacy curtains to -- you know, nice
15   rooms, decorations to -- nice sitting areas, sunning
16   areas, to change the meal times so they don't require
17   everybody to get up at 8:00 o'clock in the morning to eat,
18   and then they'll fall asleep, eat at noon, they fall
19   asleep. You know, to get out of that -- to get --
20   everybody have their own routines but have -- instead of
21   having the residents comply with the old nursing home
22   routines of the years gone by. So just relook at the
23   culture and focus on the -- on the residents. So.....
24 Q   When did you attend that seminar?
25 A   Oh, it's about six months ago or so, I think. I don't

Page 31

1    recall the dates.
2  Q   And any others?
3  A   Let's see. Any others. I can't recall any others. There
4    may be one or two I'm missing there's -- there's certifica
5    -- or certificates for in there. I have attended some
6    seminars, I guess. Went to St. Lewis Accord, which is a
7    three day event with ombudsman, nursing home
8    administrators, assisted living home administrators,
9    insurance companies, whatever, from around the country.
10   Again it was on culture change. Attended National
11   Association of State Ombudsman program meetings twice
12   where myself, my counterparts get together and discuss
13   issues, have guest speakers, things like that. And also
14   the National Citizens Coalition for Nursing Home Reform
15   annual meeting in, I think that was last April I went to
16   back in Massachusetts. But those are more
17   conference/meeting type, you know, you sort of pick which
18   seminar you're going to attend out of the three being
19   offered and do that. So it's.....
20 Q   Okay.
21 A   But there weren't any actual certifications for those
22   things. So......
23 Q   Are you required, as part of your position, to have a
24   certain amount of continuing education in your field?
25 A   No. Unh-unh. That's certainly advisable I think. But

Page 32

1    no, not required.
2  Q   Okay. And how about your staff? Is your staff required
3    to have a certain amount of.....
4  A   No. Unh-unh.
5  Q   .....continuing education?
6  A   Unh-unh. But the same thing. We try to -- we try to -- I
7    try to send them to staff -- or to send them to seminars
8    or whatever I think might be appropriate and cost
9    effective. And we also have quite a few number of
10   videotapes that we've been getting within the last year or
11   so on different elder issues. Dementia, meal
12   preparations, meal choice, Alzheimers, whatever issues
13   elders deal with. So it's more -- it's more of an
14   internal type training for ourselves. And we have --
15   actually it's on our web site. It's available to the
16   public for loan as well as to purchase initially.
17   But.....
18 Q   I printed the first page of your web site.....
19 A   Uh-huh. (Affirmative)
20 Q   .....I think. And I hope it's accurate.
21 A   I hope so too.
22 Q   Well, I hope I printed the correct one.
23     MR. YOUNG: Why don't we mark it Exhibit 2?
24            (Deposition Exhibit 2 marked)
25     REPORTER: Exhibit 2 marked.

Page 33

1  Q   Let me hand it to you.
2  A   Okay.
3  Q   If I printed it correctly, is this the first, or a page
4    from your web site, let me put it that way?
5  A   Yes, it is. Uh-huh.
6  Q   And does it -- does the overview accurately identify what
7    the function of your office is in a summary way?
8    Identify, investigate and resolve complaints made on
9    behalf.....
10 A   Uh-huh. (Affirmative)
11 Q   .....by or on behalf of Alaskans who are 60 years.....
12 A   Yeah.
13 Q   .....of age or older?
14 A   Right. Generally it's correct. Uh-huh.
15 Q   And then there's a short paragraph that says what is the
16   long-term care ombudsman?
17 A   Uh-huh. Uh-huh. (Affirmative)
18 Q   Is that accurate.....
19 A   Uh-huh. (Affirmative)
20 Q   .....in a summary way?
21 A   Uh-huh. (Affirmative)
22 Q   I forgot to give you one other piece of advice.....
23 A   Uh-huh. (Affirmative)
24 Q   .....about answering questions. And I'm sorry, I'll do it
25   now.

Computer Matrix, LLC              Phone - 907-243-0668                          jpk@gci.net
310 K Street, Suite 200           Fax   907-243-1473   EXHIBIT ___ B          sahile@gci.net

Page _____ of _____

Page 34

```
 1  A   Okay.
 2  Q   Try to answer yes or no.....
 3  A   Sure.
 4  Q   .....if the answer is yes or no.
 5  A   Gotcha.
 6  Q   You don't have to answer either way if that's not the
 7      answer.
 8  A   Okay.
 9  Q   But if it's yes, say yes, please.
10  A   Gotcha.
11  Q   Okay. We can set that down.
12  A   Okay.
13  Q   I'm done with it. Let's go back to the files that you
14      brought because.....
15  A   Uh-huh. (Affirmative)
16  Q   .....I told you I'd get back to that subject. As part of
17      the process of setting this deposition up we, with the
18      communication with counsel, had a subpoena served on you
19      to provide certain records.
20  A   Uh-huh. (Affirmative)
21  Q   And so I want you to describe for me what it is that you
22      provided. And I should tell you that in front of you is a
23      stack -- a thick stack of paper.....
24  A   Uh-huh. (Affirmative)
25  Q   .....marked Deposition exhibit 1.....
```

Page 35

```
 1  A   Uh-huh. (Affirmative)
 2  Q   ..... which if our office copied it correctly, is an exact
 3      copy of what your office provided to me.
 4  A   Uh-huh. (Affirmative)
 5  Q   With that hope that I didn't miss copy anything.
 6  A   Uh-huh. (Affirmative)
 7  Q   What is it that -- generally that -- that you did and what
 8      did you bring?
 9  A   Gave you basically everything that was in my file on this
10      particular case that I had with the exception of
11      attorney/client privileged communication, which I think
12      there are only four or five documents, mostly emails.
13  Q   Okay.
14  A   Including newspaper -- anything, newspaper articles, my
15      notes, notes that I made in our data base. Copies of
16      emails that received from folks. You've basically got it
17      all. So.....
18  Q   Okay. Let's -- let's go through categories just briefly.
19      Your resume, you brought that?
20  A   Right. Uh-huh.
21  Q   That's in there.
22  A   Uh-huh. (Affirmative)
23  Q   We'll talk about that in a minute. Procedures of the
24      office of the long-term care ombudsman regarding the
25      handling of investigations, initialing of reports.....
```

Page 36

```
 1  A   Right.
 2  Q   .....did you bring those?
 3  A   I gave you a draft copy of one that's under revision.
 4      That was what's -- it's been one of the charges I
 5      received. When I got in -- in the position there has
 6      never been -- I -- apparently never been policies and
 7      procedures that have been formalized, you know, so that's
 8      been part of the process that I'm going through to -- to
 9      do that. That's why you have a draft. But it's close --
10      close to finalization so it's -- I gave you what I had.
11      So.....
12  Q   What procedures have you followed in investigating and
13      issuing of reports since you started becoming the
14      ombudsman, given that there aren't any.....
15  A   Essentially that's.....
16  Q   .....procedures?
17  A   Essentially what's you -- what's in those policies and
18      procedures is for the most part how we do that. So --
19      because we -- we -- there were some previously drafted, we
20      modified those to be more I guess realistic, for lack of a
21      better word, where we actually do that. So the -- the
22      rest is pretty -- pretty close to what we do.
23  Q   Did you use materials from the national office to help you
24      do investigations and issuing the reports before you
25      started doing your own drafts? In other words, were there
```

Page 37

```
 1      national recommenda -- recommended standards?
 2  A   I don't recall if I used anything from the national level
 3      or from my counterparts or not. I.....
 4  Q   Where'd you get the draft from that you started working
 5      with?
 6  A   There was already one there. An initial draft when I --
 7      when I took the position. So we've modified it since
 8      then.
 9  Q   Oh, okay.
10  A   So.....
11  Q   All right. And the next item is the office of long-term
12      care ombudsman's complete files on any investigations
13      you've conducted on the Chugiak Senior Citizens, Inc......
14  A   Uh-huh. (Affirmative)
15  Q   .....Assisted Living Program.....
16  A   Uh-huh. (Affirmative)
17  Q   .....and Wickersham House.....
18  A   Uh-huh. (Affirmative)
19  Q   .....dating from January 1 to the present.
20  A   Uh-huh. (Affirmative)
21  Q   Have you done that?
22  A   Right. We pulled up -- pulled up what was on our data
23      base and -- and we have copies there of all the entries
24      in our data base applicable to those -- to those homes.
25  Q   And then all files constituting the investigative file of
```

Computer Matrix, LLC              Phone - 907-243-0668                    jpk@gci.net
310 K Street, Suite 200           Fax    907-243-1473    EXHIBIT   B      sahile@gci.net
                                                         Page ____ of ____

ROBERT DREYER                    11/16/2006                 WINTERS v. CHUGIAK SR. CITZ.
Vol. 1                                                      3:-06-CV-00083-TMB

12 (Pages 42 to 45)

Page 42

1    with respect to Helen Winters other than case 61?
2  A  No.
3  Q  Okay. If you could -- if you could take a look at two
4     different pages numbers in the file, 19 and 76. Both of
5     them say ombudsman manager case file. One is -- I'm just
6     going to use the last two numbers, 61 and one is -- I'm
7     not sure what, it's just -- there's no last two numbers.
8  A  Okay. What numbers? Nineteen.....
9  Q  Nineteen -- see, 19 is 2005-00061.
10 A  Right. Correct. Uh-huh.
11 Q  And then if you look at 76. That's -- it's 2005-000. Are
12    these the same files?
13 A  Yeah. I'm not sure why that's a different case number
14    there. Looks like -- looks like the it dropped off there
15    somehow.
16 Q  It may in fact be the same case number?
17 A  Yeah, I think it is.
18 Q  Okay. The first page appears to be -- well, not
19    exactly.....
20 A  It all.....
21 Q  ....identical.....
22 A  .....it all.....
23 Q  .....but pretty close.
24 A  They all look exactly the same, you know. I'm not sure
25    why that number got dropped off.

Page 43

1  Q  Okay.
2  A  But ye -- yes, it's the same case.
3  Q  Same case?
4  A  Uh-huh. (Affirmative)
5  Q  Okay. Good. Okay. Where was I? The resume and CV of
6     persons in the office who participated in the
7     investigation, and you've produced those.....
8  A  Uh-huh. (Affirmative)
9  Q  .....is that right?
10 A  Uh-huh. (Affirmative)
11 Q  That'd be Janice Olson and.....
12 A  Julie Bailey.
13 Q  .....Julie Bailey. In connection with -- can I refer to
14    file 61 as the Helen Winters investigative file? Would
15    that be a shorthand.....
16 A  Okay.
17 Q  .....that we could use here?
18 A  Right. Uh-huh.
19 Q  How would you prefer I refer to it?
20 A  Well, that's -- that's the correct number. Right.
21 Q  All right. So with file 61 did -- did the other staff
22    members participate in that investigation or was it just
23    you?
24 A  I did the initial investigation in it. But as -- as this
25    case developed and -- and it looked -- looked like or had

Page 44

1     decided to go to legal action, I backed off and asked my
2     assistants to -- to get involved in it.
3  Q  When did that happen? Look at anything you need to to
4     help refresh your memory about dates.
5  A  We may need to take a break. This could take a long time.
6  Q  Well, why don't I just make a note for you to look into
7     that and let me -- I want to keep going through this and
8     then we'll come back to that because I do want an answer
9     to that.
10 A  Okay. Sure.
11 Q  But to clear -- or at least to follow up on that, at least
12    at some point in the -- in the history of the case you
13    personally backed off and let your assistants.....
14 A  Right.
15 Q  .....take over in some respects?
16 A  I felt that I wanted to be -- I wanted another set of eyes
17    on it to see it -- if they were seeing the same thing I
18    was seeing or if they were seeing something different and
19    -- and secondarily I didn't want to walk in with
20    prejudiced eyes. So.....
21 Q  Did you write your report or did they write it?
22 A  I wrote my report.
23 Q  And was it after your report was written that they stepped
24    in and you stepped back, if you remember?
25 A  No. They had -- they -- I wrote the report after they had

Page 45

1     made some visits as well.
2  Q  All right. Okay. And then the next item in the subpoena
3     was all materials reflecting or documenting the training
4     and certification of office staff who participated in the
5     investigation. Have you produced that?
6  A  I'm sorry, repeat the question.
7  Q  Yeah. I apologize. We were dealing with the microphone.
8  A  Okay.
9  Q  All materials reflecting or documenting the training and
10    certification office staff who participated in the
11    investigation. Have you produced those?
12 A  Right. Uh-huh.
13 Q  Did you hire.....
14 A  Since -- oh, go ahead.
15 Q  Did you hire these two people?
16 A  No, I did not.
17 Q  They were already there?
18 A  Right.
19 Q  And then all regulations adopted under A.S. 47 -- Alaska
20    statues 47.62.010. Have you brought any of those?
21 A  No. No.
22 Q  Do you know if any have been adopted?
23 A  Rephrase the question, what -- rephrase.....
24 Q  Alaska Statute 47.62.010.
25 A  Can I see it?

Computer Matrix, LLC          Phone - 907-243-0668      EXHIBIT B          jpk@gci.net
310 K Street, Suite 200       Fax     907-243-1473      Page ____ of ____  sahile@gci.net

ROBERT DREYER                    11/16/2006              WINTERS v. CHUGIAK SR. CITZ.
Vol. 1                                                        3:-06-CV-00083-TMB

13 (Pages 46 to 49)

Page 46

1  Q   I'll show you the number.
2  A   I don't think I -- I don't think I provided that.
3  Q   Okay.
4  A   I'm not sure what that's referring to there.  Go ahead.
5  Q   Did I -- did I cite the wrong statute to you?
6  A   No.  I'm just curious as to what the heck -- I'm trying to
7      think of what the statute is.
8  Q   All right.
9  A   So.....
10 Q   Maybe I should be too.  Does your office, in the course of
11     the investigations that it does, sometimes make
12     determinations that the people involved need to hire
13     lawyers and file lawsuits?
14 A   No.  Not typically, no.
15 Q   Do you ever recommend that people do that?
16 A   Unh-unh.  (Negative)
17 Q   When they do, and it does happen from time to time,
18     doesn't it?
19 A   Uh-huh.  (Affirmative)
20 Q   Is that yes?
21 A   Yes.  Yeah, assumably yeah, I mean it's happened here.  I
22     mean there are primary roles to mediate and bring the
23     sides together if there is conflictions.  We don't -- we
24     don't go down that path.
25 Q   Okay.  What assistance, if any, have you provided to

Page 47

1      Alaska Legal Services in their lawsuit in this case, if
2      any?
3  A   I -- I think I had a meeting with Ms. Brink, geez, I don't
4      know, three or four months ago I guess, talk about the
5      case briefly and that was it.  So maybe an hour meeting,
6      45 minutes.
7  Q   Did you provide your file at that time, or any part of it?
8  A   I don't recall if I did or not.  I don't.....
9  Q   Now, when you.....
10 A   .....think I did.
11 Q   .....provided the.....
12 A   .....I don't think I did.  I talked about it, no, I don't
13     believe I did.  I talked -- I used my -- I think -- okay,
14     I think I remember using my file for reference to talk
15     about the case but I don't believe I provided a copy of
16     it, no.
17 Q   Okay.  When you provided your file to us in -- in response
18     to our subpoena.....
19 A   Uh-huh.  (Affirmative)
20 Q   .....you made a copy and provided it to Alaska Legal
21     Services as well, correct?
22 A   I gave everything to Mr. Twomey and he provided it to both
23     parties I -- I think.
24 Q   Do you know whether your file was provided to any party in
25     this case before then, before just a few days ago?

Page 48

1  A   Not by me.  Party meaning you or.....
2  Q   Yes.
3  A   .....or Alaska Legal Services?
4  Q   I don't mean your lawyer.
5  A   Right.
6  Q   I don't mean that.  I'm not trying to invade that
7      privilege.
8  A   No.
9  Q   But either Carol Winters or her lawyers or the Center or
10     its lawyers?
11 A   No.  Unh-unh.
12 Q   Okay.  Now, in addition to the materials that were
13     provided a few days ago, your counsel has brought a few
14     additional materials.
15     MR. YOUNG:  Tim, how do you want to.....
16     MR. TWOMEY:  We've -- we've Bates numbered these
17 sequentially.  I've brought with us today document numbers 1224
18 through 1235.  These are additional documents that were made
19 available to my office after the time that we produced the.....
20     MR. YOUNG:  Is there a copy we can use as an exhibit, Tim?
21     MR. TWOMEY:  There is.  I.....
22     MR. YOUNG:  You gave me one and I appreciate that.
23     MR. TWOMEY:  I have.....
24     MR. YOUNG:  Is there another one?
25     MR. TWOMEY:  .....an extra copy that you can use for an exhibit.

Page 49

1      MR. YOUNG:  Pass that down.
2      MR. TWOMEY:  Are you going to make this Exhibit 3 or part
3  of Exhibit 1?
4      MR. YOUNG:  We'll make it Exhibit 3.
5      MR. TWOMEY:  Okay.
6      REPORTER:  Exhibit 3 marked.
7              (Deposition Exhibit 3 marked)
8      MR. YOUNG:  No necessary rhyme or reason to the numbering
9  as far as I'm concerned anyway.  But the sequential numbering
10 on the bottom does go simply following the next number in
11 order, is that correct, from the prior one?
12     MR. TWOMEY:  So that we have some idea of what we've
13 produced.....
14     MR. YOUNG:  I appreciate that.
15     MR. TWOMEY:  .....and keep control of it.
16 Q   Okay.  Mr. Dreyer.....
17 A   Uh-huh.  (Affirmative)
18 Q   .....if you'll look at Exhibit 3, can you just generally
19     tell me what it is?
20 A   It appears to be a care plan for the care of Helen Winters
21     that's as to what type of care she should receive as far
22     as bathing, nutrition, toileting, skin care, et cetera.
23 Q   This is the care coordinator?
24 A   Signed by -- I saw a signature some place here.  Signed
25     by, it looks like Jan Freels who's the administrator for

Computer Matrix, LLC                Phone - 907-243-0668                    jpk@gci.net
310 K Street, Suite 200             Fax    907-243-1473     EXHIBIT  B      sahile@gci.net
                                                            Page ____ of ____

Page 50

1   the home at Chugiak. I think it's Carol Winters who
2   signed it as legal representative. And then it looks like
3   Cathy Husky has signed it as a care coordinator as well,
4   and again, signed by Carol Winters.
5 Q Okay. And there appears to be something else at the end
6   of it.
7 A Okay.
8 Q A second -- a second document, as it were.....
9 A Right.
10 Q .....which starts at 1234 and then 1235. What's that?
11 A That's a -- a complaint we received -- I'm looking for a
12   date on this, October 26 of this year in reference to
13   Helen Winters from -- reporter is Carol Winters and a
14   complaint that Janice Olson is -- is investigating.
15 Q Is that the one you referred to earlier?
16 A Yes. Uh-huh.
17 Q Okay. And this -- this document, this one we just talked
18   about, the one that's Bates numbered 1234, you referred to
19   Carol Winters as the reporter?
20 A Uh-huh. (Affirmative)
21 Q It.....
22 A That's the complainant, if you will, or we use the word
23   reporter.
24 Q Is there a difference between reporter and complainant?
25 A No. No.

Page 51

1 Q The reason I ask is the word complainant appears in the
2   other.....
3 A Right. Right.
4 Q .....files.
5 A No, there's really not. It's -- no.
6 Q Okay. Okay. A couple of more questions about a couple of
7   things and then we'll take a break here. If you'll look
8   at Page 1008.....
9 A Are you finished with that?
10 Q Yes. I'm sorry, yes.
11 A Okay.
12 Q Just sit it down on top of the other one. 1008. Feel
13   free to take the rubber bands off if it will help.
14 A I'm afraid I'll spill them on the floor. Okay.
15 Q This is -- 1008 and 1009 are your resume; is that right?
16 A Correct.
17 Q Is this.....
18   MS. KERR: I'm sorry. Repeat the question.
19   MR. YOUNG: 1008 is the number.
20   MS. KERR: Right, and I just couldn't hear your, question,
21   I'm sorry.
22   MR. YOUNG: Is this his resume.
23   MS. KERR: Okay.
24 Q And the answer was?
25 A Yes. Uh-huh.

Page 52

1 Q Is this the resume that you prepared when you applied for
2   the position of.....
3 A Yes, it is.
4 Q .....long-term care coordinator?
5 A Uh-huh. Uh-huh. (Affirmative)
6 Q Care ombudsman, I'm sorry. When did you retire from the
7   Air Force?
8 A Oh, October 1993.
9 Q And at that time you were the director and the commander
10   of Defense Fuels Region-Alaska?
11 A Correct. Uh-huh.
12 Q Okay. Stationed at Elmendorf?
13 A Correct.
14 Q And then you went to work for Chem Track International as
15   the health and safety compliance officer and supervisor?
16 A Correct.
17 Q Okay. And then after that you went to work for the State
18   of Alaska as a -- in the Department of Environmental
19   Conservation?
20 A Correct.
21 Q And were in that position as described in this until you
22   became the ombudsman, right?
23 A Right. There -- there are actually I guess three
24   positions within -- when I was with the Department of
25   Environmental Conservation.

Page 53

1 Q Manager I, Environmental Specialist III and Environmental
2   Specialist IV?
3 A Right. Uh-huh.
4 Q Okay.
5 A Environmental Specialist IV was a supervisory position as
6   was Environmental Manager I.
7 Q Okay. So if we go back 22 years from 1993, that's when
8   you joined the Air Force, 1971?
9 A Correct. Right.
10 Q All right. Do you have any formal education beyond your
11   Master's degree in business management, like college
12   courses or things of that sort, or graduate courses?
13 A No, I don't think so.
14 Q Did you get your Master's degree through the Air Force or
15   did you get that before you entered the Air Force?
16 A I got it while I was in the Air Force.....
17 Q Right.
18 A .....at night school.
19 Q Uh-huh. My father did too. And if you'll look at Pages
20   1110 and then 1113, are those Janice Olson and Julie
21   Bailey's resumes?
22 A Correct, uh-huh.
23 Q Were they current as of the time you produced them or.....
24 A They were.....
25 Q .....current as of the time that you joined the

Computer Matrix, LLC        Phone - 907-243-0668   EXHIBIT B        jpk@gci.net
310 K Street, Suite 200     Fax    907-243-1473                    sahile@gci.net
                                                  Page ____ of ____

Page 54

1    organization or when were they current?
2  A  I believe these were current as of -- as of the time they
3     applied for the -- for their positions as well.
4  Q  When did they join the organization? Join the of -- your
5     office? I know it was before you got there.
6  A  Yeah. I don't recall the exact dates of that.
7  Q  All right.
8  A  They've been there for some time.
9  Q  Okay. And if you'll look at numbers 1141 to 1145.....
10 A  Right.
11 Q  .....these are the certificates with relation to various
12    things that you did.....
13 A  Uh-huh. (Affirmative)
14 Q  .....is that right?
15 A  Correct.
16 Q  The seminars and similar kinds of certificates?
17 A  Uh-huh. (Affirmative)
18 Q  And according to this you -- you went to that Medicaid
19    elder law seminar in September of '05.....
20 A  Uh-huh. (Affirmative)
21 Q  .....right?
22 A  Correct.
23 Q  The Reed Technique Interrogation in March of '06?
24 A  Right.
25 Q  Both of them. Both courses.

Page 55

1  A  Right.
2  Q  And then a break all the rules work force first seminar in
3     April of '06?
4  A  Right. That's the culture change.....
5  Q  Culture change one. Okay.
6  A  .....for lack of a better word.
7  Q  And then the prevention of abuse and neglect of vulnerable
8     adults in June of '06?
9  A  Correct. Uh-huh.
10 Q  Any other certificates that you know of that might have
11    been inadvertently forgotten?
12 A  Not since I took the position, no.
13 Q  Okay.
14 A  I have several other training certificates before I took
15    this position. But I just provided you with what I've had
16    since I've been in that position. So.....
17 Q  Okay. What are the -- what is the statutory scheme under
18    which your office works?
19    MR. TWOMEY: Objection. Calls for a legal.....
20    MS. KERR: Objection. Legal conclusion.
21    MR. TWOMEY: .....conclusion. It's over broad.
22 Q  Are there statutes that control what your office does?
23 A  Correct.
24    MR. TWOMEY: Same objection.
25    MS. KERR: Same objection.

Page 56

1  A  Uh-huh. (Affirmative)
2  Q  What are they?
3  A  Specific numbers I don't recall off the top of my head.
4  Q  Is it.....
5  A  But they are there.
6  Q  .....is it part of your job as the ombudsman to be
7     reasonably familiar with the statutes that control your
8     office?
9  A  Right. But I couldn't give you the specific numbers, no.
10 Q  Okay, fair enough. Do the statutes define -- the statutes
11    that relate to your -- to the work that your office
12    does.....
13 A  Uh-huh. (Affirmative)
14 Q  .....define the term abuse?
15    MR. TWOMEY: Objection. Calls for a legal conclusion.
16 Q  You can answer if you can.
17 A  Would you rephrase your question, please.
18 Q  Do the statutes under which your office functions define
19    the word, or the term abuse?
20    MR. TWOMEY: Same objection.
21    MS. KERR: Same objection.
22 A  Do they specifically define a -- I don't think so. I'm
23    not sure though.
24 Q  Does your office have a working definition that it uses in
25    its work of the term abuse, and if so, what is it?

Page 57

1  A  Okay. I think typically what -- what we view -- view --
2     view abuse as is obviously physical abuse. That's the
3     easier one I guess. They can always use -- they can
4     sometimes tell that by bruises on -- on bodies, but not
5     necessarily. Verbal abuse. If a care giver is not
6     treating the -- the resident with respect and dignity,
7     demeaning them, yelling at them, whatever, degrading them,
8     that would be classified as verbal abuse. Mental abuse
9     could be things like making them feel they're not worthy
10    of care. Maybe just not doing things for them when
11    requested. Basically being non-caring, playing games with
12    them, if you will. Just not -- well, just not treating
13    them with dignity.
14 Q  Okay. Those are some examples I think.
15 A  Uh-huh. (Affirmative)
16 Q  But do you have a working definition of the term?
17 A  Working definition. I'm not sure if that -- if that's
18    included in our procedures or not. It may be. I'd have
19    to go back and look and see.
20 Q  Okay. Are you familiar with the definition of abuse in
21    Alaska Statute 47.24.900, which I'm going to give you to
22    look at.
23 A  Uh-huh. Okay.
24    MS. KERR: Are we marking this as an exhibit?
25    MR. YOUNG: Depends on whether he's familiar with it or


EXHIBIT _____
Page _____ of _____

ROBERT DREYER                    11/16/2006                WINTERS v. CHUGIAK SR. CITZ.
Vol. 1                                                      3:-06-CV-00083-TMB

16 (Pages 58 to 61)

Page 58

1  not.
2  A   I haven't -- I don't think I've seen this verbatim before.
3      No, probably not.
4  Q   Okay.  So the term -- assuming I'm reading it
5      correctly.....
6  A   Right.  Uh-huh.
7  Q   .....abuse means (a), the willful, intentional or reckless
8      non-accidental and non-therapeutic infliction of physical
9      pain, injury or mental distress, or sexual assault, and it
10     has a statute.
11 A   Uh-huh.  (Affirmative)
12 Q   You're not familiar with that -- that legal definition?
13 A   Not -- no, not really.  I mean not in a legal sense, no.
14 Q   Is that a definition that your office uses to determine
15     whether abuse has occurred, or do you use a different one?
16 A   I'm not -- I'm not sure we'd use this, you know, verbatim
17     but it -- it's hitting -- hitting the same areas that we
18     do use.  You know, willful abuse, intentional abuse, non-
19     accidental.  I mean it's -- we use one -- I guess say we
20     use one similar but I mean we don't use those words per
21     se.
22 Q   Okay.  Well, let's.....
23 A   Physical pain, injury, mental distress.
24     MR. YOUNG:  Counsel's right.  Let's mark this as an
25     exhibit so we know what we're talking about.  That'll be

Page 59

1  Exhibit 4; is that right.
2      REPORTER:  Exhibit 4, uh-huh.  All right, Exhibit 4
3  marked.
4                  (Deposition Exhibit 4 marked)
5  Q   Just to clean things up.  What were looking at a moment
6      ago.....
7  A   Uh-huh.  (Affirmative)
8  Q   .....before we had an exhibit on it.....
9  A   Uh-huh.  (Affirmative)
10 Q   .....is now Exhibit 4; is that correct?
11 A   Correct.  Uh-huh.
12 Q   Is there a long-term care ombudsman's program manual?
13 A   Yeah, I think you'd -- I think you -- I guess, you'd call
14     it a manual.  It's a thing that the National Association
15     prints out that we use for -- use for training and
16     reference.  Don't know how many chapters are in it.  I'll
17     say roughly 10 chapters.  And it covers things from aging
18     process to discussions on assisted living homes and
19     nursing homes.  Just a pretty general in nature.  If
20     you're -- if you're -- if I'm thinking the same thing
21     you're thinking.
22 Q   Well, we're going to find out if we thinking about the
23     same thing.
24 A   Okay.  Okay.
25 Q   It wasn't meant to be a trick question.

Page 60

1  A   Okay.
2                  (Deposition Exhibit 5 marked)
3  Q   What I just am about to hand you, I've given it to counsel
4      first, which we've marked as Exhibit 5, is something that
5      we printed off, I believe, from the web page, Chapter 7,
6      the problem solving process from the Alaska LTCL program
7      manual.
8      MR. YOUNG:  And after he's had a chance to look at it then
9      I wonder if you would look at it and see if you recognize it.
10     MR. TWOMEY:  Where did you represent you obtained this?
11     MR. YOUNG:  Down loaded it.
12     MR. TWOMEY:  Off of where?
13     MR. YOUNG:  It was either the Alaska web page or the
14     national web page.  I can't remember frankly.  I'd be happy to
15     try to reconstruct it / where I got it from later.
16 Q   I'm not going to ask you any questions about it.....
17 A   Uh-huh.  (Affirmative)
18 Q   .....until you've had a chance to look at it, believe me.
19     So.....
20 A   I'm -- yeah, I'm familiar with it.
21 Q   You are?
22 A   Uh-huh.  (Affirmative)
23 Q   Okay.  What is it?
24 A   It's -- it's -- it appears to be Chapter 7 in the manual I
25     was speaking about previously that the -- is -- is

Page 61

1  provided -- or that -- that was developed for the -- for
2  the state here and is tailored after the -- after the
3  national manual that's used to train ombudsmen.  And we
4  also use the same thing for -- for certifying our
5  volunteers.
6      MR. YOUNG:  Does somebody have my copy with yellow
7  highlighting?
8      MS. KERR:  Pardon me?
9      MR. YOUNG:  Does somebody have my copy with yellow
10 highlighting?
11     MS. KERR:  I don't.
12     MR. YOUNG:  Okay.  That one might not either.
13 Q   And is this something that you and your office uses?
14 A   I would say probably infrequently, right.
15 Q   Okay.
16 A   So we use it, as I said, during training of -- of new
17     volunteers.  I read through it when I first got in the
18     position a couple times.  I also attended one of the
19     volunteer trainings as well.  Went through it I guess a
20     third time.  So it's a good -- it's a good reference
21     manual.
22 Q   You don't typically -- when you're doing an investigation,
23     pull it off the shelf and take a look at it?
24 A   Typically don't, no.  It's fairly general in nature.
25 Q   Do you consider that your role as ombudsman, when you're

ROBERT DREYER
Vol. 1

11/16/2006

WINTERS v. CHUGIAK SR. CITZ.
3:-06-CV-00083-TMB

17 (Pages 62 to 65)

Page 62

1   doing an investigation, to be that of an independent
2   objective fact-finder?
3 A   Uh-huh. Yes.
4 Q   And how do you independently and objectively find facts?
5 A   Well, typically we would -- you know, because we get a
6   complaint we usually try to talk to the complainant, if
7   that's possible. Sometimes they're anonymous. They don't
8   want to give us anything more than what they gave us over
9   the phone, or by letter, whatever. If at all possible
10   talk with complainants, ask more questions than maybe
11   they've given us in the first situation. And then decide
12   who else we need to talk to if there are other parties
13   involved. If it's family members, or if it's care givers,
14   or if it's care coordinator, or if it's the homes, whoever
15   may be. We just kind of go through the process and -- and
16   -- and talk to as many folks as we think is appropriate, I
17   guess, without -- of course there's a limit. At some
18   point in time you -- a lot of returns, I guess at some
19   point in time, I guess. But, you know, it's -- we try it
20   initially talk with the complainant and then go from
21   there. And either see if there's substance to it, or if
22   it's not -- sometimes we get disgruntled employees that
23   are, or we find it's just not valid. So.....
24 Q   How do you square your -- what you just said about being
25   an independent and objective fact-finder with your role --

Page 63

1   your statutory role as an advocate for an elder?
2 A   Uh-huh. I -- I think that -- I think part of our role --
3   I believe part of our role and my role is to go out and
4   investigate, hear -- hear the concerns, the complaint
5   first. Hear the sides. But you're right, we do -- we do
6   lean -- part of our job as an advocate towards the elder.
7   And -- but there are some times that, you know, more than
8   we'd like to probably admit sometimes, but we'll talk to
9   an elder and what story we get on one day may be totally
10   different from another day because of you, know, medical
11   reasons so we're pretty cautious about that. So try to --
12   try to balance both sides as best we can. But I think --
13   to -- to answer your question, I think more directly is
14   that if we get in a situation where it looks like there is
15   confliction and -- and we not -- may not be able to
16   resolve it, we -- we try to bring the -- what we feel the
17   resident's rights and concerns are to -- to the home or
18   whoever it may be and say put yourself in this person's
19   shoes, you know, are you doing the right thing here; is
20   this what you do typically, you know. So -- but -- and if
21   -- if we find there's some validation to it, if not, then
22   we'll say, you know, we investigated and we don't -- don't
23   find anything of -- of substance here, and let the
24   resident know that as well. But it's -- we didn't -- we
25   didn't find validation of the complaint, if you will.

Page 64

1 Q   In a close call do you give the benefit of the doubt to
2   the resident or the complainant?
3 A   In a close call, probably, yes, uh-huh, I think that's our
4   role.
5 Q   Do you take sworn statements from people?
6 A   We can. Uh-huh.
7 Q   Did you in this -- in this matter with.....
8 A   No, I did not.
9 Q   .....matter with Helen Winters?
10 A   No.
11 Q   Did you tape record any statements in this matter?
12 A   No. Unh-unh.
13 Q   Did you take notes of your interviews with people?
14 A   I did. Uh-huh.
15 Q   Are they in this file?
16 A   Yes. Uh-huh.
17 Q   Are all of the interviews that you took -- or that you had
18   reflected in notes?
19 A   Yes. Uh-huh.
20 Q   I mean handwritten notes?
21 A   Handwritten -- either handwritten notes or -- or the data
22   base notes of the record -- record of my visits, which you
23   also have.
24 Q   So as.....
25 A   So I may go out and do -- may go out and do a visit say

Page 65

1   with -- in this case with Helen and then come back that
2   day or the next day and input -- summarize the
3   conversation or the discussion I had with her and put it
4   in the data base.
5 Q   All right. So you either would take handwritten notes --
6   well, let me -- let me ask the question a different way.
7 A   Uh-huh. (Affirmative)
8 Q   In -- in situations where you would come back and enter
9   whatever occurred in the data base.....
10 A   Uh-huh. (Affirmative)
11 Q   .....so it's then typed up.....
12 A   Right. Uh-huh.
13 Q   .....were there originally handwritten notes of -- of
14   whatever happened?
15 A   Sometimes. But not always.
16 Q   Sometimes.
17 A   Uh-huh. (Affirmative)
18 Q   And if there were handwritten notes on those sometimes,
19   would they be preserved in the file?
20 A   Correct. Uh-huh.
21 Q   All right. So all the handwritten notes then that -- that
22   you prepared.....
23 A   Uh-huh. (Affirmative)
24 Q   .....you -- are in the file and you produced them.....
25 A   Uh-huh. (Affirmative)

Computer Matrix, LLC
310 K Street, Suite 200

Phone - 907-243-0668
Fax    907-243-1473

EXHIBIT ____ B____
Page _____ of _____

jpk@gci.net
sahile@gci.net

Page 70

1    -- in your case notes files -- is that the last case note
2    as it were?
3  A  I think you probably have -- that's my last case notes
4    that I have -- that I've -- that I have that I pulled out
5    of the data base.  I'm thinking there may be some other --
6    some others that I'm sensing that I think you have copies
7    of as well that Janice Olson did.
8  Q  On this case, case 61?
9  A  Yes.  I think there may be.  Let me see here.
10 Q  I -- I don't know specifically how your file is organized
11    so I can't point you to what.....
12 A  Right.
13 Q  .....you're looking for.
14 A  No, I understand.  Let me look here, yeah, I think I --
15    I'll need to find that.  I'm pretty sure I gave it to you
16    when I -- when I was copying this because it -- I asked --
17    I have asked Janice to go out and talk to some other
18    residents and see if this was a bigger problem than just
19    Helen, and -- and -- and -- talk to some other residents.
20    I'm pretty sure there's -- that's in there somewhere.
21    I'll have to find it for you later.
22 Q  Is it possible it's not in this file that you produced but
23    it's somewhere on the computer still?
24 A  It's possible but I think -- I'm pretty sure I remember
25    seeing it when I copied all the documents.

Page 71

1  Q  I'm going to need you to find it.....
2  A  Right.
3  Q  .....but I don't know that you need to.....
4  A  I can find it later.
5  Q  If you can find it relatively quickly, fine.  But.....
6  A  I think I'll need to come back to you with that one,
7    honestly.
8  Q  Okay.  Other case notes by Janice Olson after.....
9  A  After.....
10 Q  .....April of '06?
11 A  Right.
12 Q  All right.
13 A  Right.
14 Q  Is it -- is it -- would it be correct to say that April of
15    '06 is your last case note?
16 A  That's correct.  Right.
17 Q  Do you typically write a case note when you write up a
18    report, an investigative report?  In other words, case
19    note, have written report.
20 A  I'm not sure I understand how -- what you're asking me.
21 Q  In this case you wrote an investigative report?
22 A  At the end -- at the end of my investigation?
23 Q  Yes.
24 A  Right.  Uh-huh.
25 Q  Now, do you -- do you write a case note and enter it into

Page 72

1    your data base when you do that typically?
2  A  I didn't, no.
3  Q  Do you typically?
4  A  I think -- I -- I think this is the first one that I've
5    had -- I've had to do that I've had to go to this -- to
6    this conclusion to actually do a formal -- a formal.....
7  Q  Okay.  I may have assumed.....
8  A  .....a formal investigation.
9  Q  I may have assumed too much in my question.  Let me back
10    up.
11 A  Oh, okay.
12 Q  How many written investigative reports have you written?
13 A  Like this?
14 Q  Yes.
15 A  This is the first one.
16 Q  Is it the only one?  I mean have you written one since
17    then -- this one, for example?
18 A  No.  Typically this is -- this is I believe the only one
19    that I've done thus far.  Typically Janice and Julie do
20    most of the cases.
21 Q  Okay.  This is the only one.....
22 A  Right.
23 Q  .....you've written?
24 A  Correct.  Uh-huh.  On -- on other cases I'll work the case
25    and then hopefully resolve it and then it goes into my

Page 73

1    case notes with that and then I'll close the case that
2    way, period.
3  Q  And the case notes are typically in a computer data base;
4    is that right?
5  A  Right.  We print them out -- I print out -- print out the
6    final action and then include those in the -- in the -- in
7    the file and that case is filed away.
8  Q  And is that what you.....
9  A  I've never -- I've never -- I haven't -- this is the first
10    case I've had that's gone this far down the road.....
11 Q  And.....
12 A  .....that I've handled.
13 Q  And in -- in this -- in this case when you were preparing
14    documents to produce to us did you print out your case
15    notes data base for us?
16 A  Yes.
17 Q  That was your intention anyway?
18 A  Uh-huh.  Uh-huh.  (Affirmative)
19 Q  So if you did that and there are case notes by Janice
20    Olson, they're somewhere in this file?
21 A  They should be.
22 Q  Is that right?
23 A  Right.  They should be.
24 Q  Okay.  Well, we'll -- we'll work with that.....
25 A  Okay.

Computer Matrix, LLC              Phone - 907-243-0668                jpk@gci.net
310 K Street, Suite 200           Fax    907-243-1473  EXHIBIT          sahile@gci.net
                                                       Page _____ of _____

**Page 74**

```
 1  Q   .....assumption and -- and then move on.
 2  A   And if not I can certainly -- certainly provide them later
 3      but I'm pretty sure I saw them in here.
 4  Q   Okay.  Do you agree that an assisted living home can
 5      terminate a resident's contract for certain reasons?
 6      MR. TWOMEY:  Objection.  Calls for a legal conclusion.
 7  Q   Unless he says don't answer you can answer.
 8  A   I -- I think it's too broad for me to answer that to be
 9      honest with you.
10  Q   Do you know -- let me ask you a different way.  Do you
11      know whether an assisted living home can terminate a
12      resident's contract for any reasons?
13  A   Yes.  They can -- they can do in -- in certain situations.
14      I guess I'll give you an example.  If -- if I'm aware of
15      some homes that don't allow smoking.  If the resident then
16      starts smoking later, or whatever, and that's -- that's
17      part of the contract they would not, then that's grounds
18      for eviction, right.
19  Q   Do you -- what is your understanding of the reasons, if
20      you have an understanding, for which an assisted living
21      home can terminate a resident's contract?
22      MR. TWOMEY:  Objection.  Calls for a legal conclusion.
23  A   One would be lack of payment for services.
24  Q   Lack of payment.  All right.  Let me ask the question this
25      way just to make sure I'm not missing something.  Do you
```

**Page 75**

```
 1      have an exhaustive understanding of the reasons for which
 2      an assisted living home can terminate a resident's
 3      contract?
 4      MR. TWOMEY:  Objection.
 5  A   Yeah, I......
 6      MR. TWOMEY:  Vague and ambiguous.
 7  Q   No is the answer?  You don't?
 8  A   Exhaustive, no.  Right.
 9  Q   Okay.  So you have some understanding?
10  A   Right.
11  Q   All right.  And -- and that includes lack of payment.....
12  A   Uh-huh.  (Affirmative)
13  Q   .....I think you said smoking?
14  A   Smoking if that -- if that's a non-smoking home and a
15      resident was there -- it was that way and the resident
16      moved in.
17  Q   Any other reasons that you are aware of?
18  A   I suppose if there was a no pet policy and they brought
19      pets in.  It'd pretty much determine what the assisted
20      living home's contract is with the resident.
21  Q   Would we say violation of reasonable rules?
22  A   It'd be tough to define reasonable, I think.
23      I agree.  But let's -- let's assume that we can.  Would
24      that be, in your understanding, a reason?  If there's
25      rules of living and the resident violates them, is that a reason?
```

**Page 76**

```
 1      MR. TWOMEY:  A reason for what?
 2      MR. YOUNG:  Termination of the resident's contract.
 3      MR. TWOMEY:  Objection.  Calls for a legal conclusion.
 4  A   Yeah, I -- I don't think I can really -- I can really
 5      answer that.
 6  Q   Okay.
 7  A   You know, it's -- it's awfully broad.
 8  Q   Do you ever, as an ombudsman, get into the question of
 9      whether or not an assisted living home has properly
10      attempted to terminate a resident's contract?
11  A   Uh-huh.  Correct.  Uh-huh.
12  Q   Under what circumstances do you do that?
13  A   There are -- for example, they -- if they -- they are
14      going to oppose the eviction there's a -- a certain time
15      period.  I believe 30 days they have to require
16      notification party evictions, give the resident time to
17      either appeal or to find some place else, I guess.  So
18      yes, there are situations that we look at, make sure
19      they're done properly.
20  Q   All right.  So.....
21  A   And advise -- advise the resident or complainant, whoever
22      it might be, that everything's -- everything's right, if
23      you will, legally.
24  Q   Right in the sense of the required notice has been given?
25  A   Right.  Correct.  Uh-huh.
```

**Page 77**

```
 1  Q   Do you -- do you get into examining the specific reason
 2      that was given for the.....
 3  A   Sometimes.
 4  Q   .....for the
 5  A   Right.
 6  Q   .....termination?
 7  A   Uh-huh.  (Affirmative)
 8  Q   Sometimes?
 9  A   Sometimes if -- if -- we got one the other day on an
10      eviction that -- and looked -- looked at the reasons for
11      the eviction, asked for a copy of the eviction letter and
12      -- and looked at it to see if it was valid or not.
13      And.....
14  Q   What criteria do you use to determine whether it's valid?
15  A   Well, the ones I mentioned earlier, you know, is it -- you
16      know, is it for lack of payment, is it a proper
17      notification; did they violate rules that were established
18      as part of the contract.
19  Q   Timing?
20  A   Timing, right.  And the -- the other is, just common
21      sense, for lack of a better word.
22  Q   Common sense.
23  A   Uh-huh.  (Affirmative)
24  Q   What do you mean by that?
25  A   What the -- what the common man or average man would do.
```

Computer Matrix, LLC              Phone - 907-243-0668         jpk@gci.net
310 K Street, Suite 200           Fax    907-243-1473   EXHIBIT  B   sahile@gci.net
                                                        Page _____ of _____

ROBERT DREYER                    11/16/2006                    WINTERS v. CHUGIAK SR. CITZ.
Vol. 1                                                         3:-06-CV-00083-TMB

21 (Pages 78 to 81)

Page 78

1 Q   Is -- if you know, is -- are there any statutes which
2     determine or set out the reasons for which an assisted
3     living home can terminate a resident's contract.....
4     MR. TWOMEY:  Objection.....
5 Q   .....if you know?
6     MR. TWOMEY:  Objection.  Calls.....
7     MS. KERR:  Objection.
8     MR. TWOMEY:  Objection.  Calls for a legal conclusion.
9 A   I'm sure there are but I'm not aware of exactly what they
10    are.
11 Q  And is your office charged with enforcing those statutes?
12 A  No.
13 Q  Did you specifically investigate the reasons by which --
14    the reasons cited by the -- my client.....
15 A  Uh-huh.  (Affirmative)
16 Q  .....to terminate Helen Winters' contract, to determine if
17    they were valid?  Is that part of what you did in this
18    case?
19 A  I think, yes, I looked at those, right, to see if -- if I
20    felt they -- if I felt they were valid, right.
21 Q  Where.....
22 A  In fact, I -- I asked that they, you know, revoke the
23    eviction letter based on what I knew about the case.
24 Q  Well, yes, you did ask them to do that.
25 A  Uh-huh.  (Affirmative)

Page 79

1 Q   But my question is did you look at whether the reasons
2     were valid?
3 A   Yes, I think so.
4 Q   Where in your report do you discuss the reasons set out in
5     the termination letter, whether they were valid or not?
6 A   Reports.  What page, do you have any idea?
7 Q   Report.  Two something.  I'll find it, 257.  Actually it
8     starts on 258; 257 is a cover letter.
9 A   Okay.  I don't think that I referred to the actual
10    eviction in -- in this -- in this report.
11 Q  Did you refer to it in any other report?
12 A  No.  Other than I think both verbally and the letter I
13    sent to the home that suggested that they -- they should
14    revoke the eviction.  And part of that -- I think there's
15    email that Linda and I had corresponded on that I said
16    that I con -- was concerned that she wasn't on solid
17    ground to proceed with the eviction sometime back in --
18    whenever that was, October I think it was.  But, no, to
19    answer your question, I don't believe I specifically
20    talked about the grounds for eviction in this -- in this
21    report.
22 Q  The termination letter was sent in January of '06, wasn't
23    it?
24 A  I think so.  Right.  Yeah, you're -- you're correct.  But
25    there was -- yeah, prior to that there was.....

Page 80

1 Q   There was some discussion of it?
2 A   .....discussions, right.
3 Q   All right.
4 A   Uh-huh.  (Affirmative)
5 Q   And the -- the determination letter give the required
6     period of time.....
7 A   Yes.
8 Q   .....the notice?
9 A   Uh-huh.  (Affirmative)
10 Q  As part of your investigation in this case you've obtained
11    some medical records regarding Helen Winters; is that
12    correct?
13 A  Some.  Correct.  Uh-huh.
14 Q  Where'd you get them?
15 A  They were provided by her daughter, Carol.
16 Q  And are those medical records in the file.....
17 A  Yes.
18 Q  .....that's produced?
19 A  Uh-huh.  (Affirmative)
20 Q  Okay.  Did you get medical records from any other source
21    other than from the complainant?
22 A  No.  Well, let me -- there may have been some letters that
23    we'd received one or two I think letters from doctors,
24    from -- from the care coordinator, from Cathy Husky.
25 Q  From Cathy Husky?

Page 81

1 A   Right.
2 Q   All right.  Did you see in the medical records that Helen
3     Winters had been diagnosed by somebody as having a
4     generalized or a general anxiety disorder?
5 A   Yes, I did.
6 Q   Do you remember who it was that diagnosed that?
7 A   I think it was -- I think it was Dr. Jones, I believe.
8 Q   And did you recommend as part of your work in this matter
9     that Helen Winters undergo a mental status evaluation by
10    a.....
11 A  No, I did not.
12 Q  .....a qualified mental health professional?
13 A  No.
14 Q  Why not?
15 A  I don't think that's within my capacity to do that.
16 Q  You weren't making a determination one way or the other
17    then whether that should be done?  That's just not part of
18    your job?
19 A  Right, right.
20 Q  Did you see in the medical records any medical diagnosis
21    of any allergies of Helen Winters?
22 A  I don't recall.  I don't recall any.
23 Q  You recall, don't you, that there was some food
24    preferences?
25 A  Correct.

Phone - 907-243-0668
Fax    907-243-1473

EXHIBIT _B_
Page _____ of _____

jpk@gci.net
sahile@gci.net

Page 90

1  Q  Okay.
2  A  It's a tracking system, if you will, then -- and they're
3     compiled from 50 states and they track what types of
4     complaints are happening most nationally.
5  Q  So you submit reports to the -- what, the national.....
6  A  Right.
7  Q  .....some national organization about.....
8  A  Right. Done once a year.
9  Q  .....about the number of complaints you have under certain
10    codes?
11 A  Number of complaints -- types of complaints, types of
12    codes.
13 Q  All right. And you just make your best informed judgment
14    what code something works under?
15 A  Right, right. Which one it fits the best or -- so you may
16    -- so you may -- you may have one complaint but you may --
17    or maybe one complaint from a resident or a complainant,
18    but you may have two or three or four different types of
19    complaints rolled into that. That's why you'll see
20    several codes there.
21 Q  Okay. Did you ever witness, yourself, any physical abuse
22    of Helen Winters?
23 A  Unh-unh. (Negative)
24 Q  Did you ever witness any verbal abuse of Helen Winters?
25 A  No, I -- I would say not. I wouldn't call it abuse, no.

Page 91

1  Q  Would you turn to Page 195, please. There's three pages I
2     want to ask you about generally.
3  A  Uh-huh. (Affirmative)
4  Q  What are they, 195, 196 and 197?
5  A  These -- these are notes I made to myself. I don't -- I
6     don't recall when I did this. Sometime into the case, the
7     first few months of it. Just to -- just to try -- trying
8     to categorize the concerns, I guess. Health issues,
9     residential, special needs, special care, based on the
10    intake that I initially got back when because it was all
11    starting to get sort of muddled together. I mean I wanted
12    sort of an outline for myself. My own use.
13 Q  Is that your handwriting at the top right?
14 A  Yes. Uh-huh.
15 Q  What -- what does it say?
16 A  My notes typed after talking with Carol Winters in July.
17 Q  Of July '05?
18 A  Uh-huh. Which is -- which is -- again this is a -- this
19    is similar things that are on the intake initially.
20 Q  So these notes were typed up in July of '05, or the notes
21    were taken in July of '05 and you typed them up later, or
22    something else?
23 A  These -- these were probably typed up, as I recall,
24    probably -- I think probably a month -- month in the case
25    or so.

Page 92

1  Q  A month?
2  A  Right. Just more to -- for my own use to.....
3  Q  So that'd be August.....
4  A  .....organize -- organize myself.
5  Q  So that'd be August or September of '05?
6  A  It could be but I -- yeah, it could be.
7  Q  Well, I don't know. I'm just asking you.
8  A  I -- no -- yeah. No, I don't recall specifically, it was
9     quite a while ago.
10 Q  Did you communicate directly with Helen Winters on
11    occasion?
12 A  I did. Uh-huh.
13 Q  How did you communicate with her?
14 A  Most of it was -- were personal visits that I made -- made
15    her. I think the first time I met her was in July, I
16    believe it was that -- that I first got involved in the
17    case. Myself, her daughter Carol was there, Marla --
18    can't remember her last name right now, was there. Linda
19    was there. I think that was it. That was the fir -- that
20    was the initial meeting.
21 Q  Did you talk with her directly, with Helen Winters
22    directly?
23 A  Yes. Uh-huh.
24 Q  Did she talk with you?
25 A  Yes. Uh-huh.

Page 93

1  Q  Did you ever talk with Helen Winters alone without anybody
2     else around?
3  A  Yes. Uh-huh.
4  Q  How many times?
5  A  I believe four, five.
6  Q  Four or five times?
7  A  Uh-huh. (Affirmative)
8  Q  In person?
9  A  Yes.
10 Q  And how did you communicate with her?
11 A  Sat down like you and I are doing right now and just
12    talked to her.
13 Q  Just talked to her?
14 A  Right.
15 Q  Did you have any trouble communicating with her?
16 A  Little bit. She's hard of hearing.
17 Q  And what did you do to take care of that?
18 A  Talked slower. But what I -- what we -- what I -- what we
19    found, when she is -- because of my -- tone of my voice
20    she was able apparently to understand me, hear me better
21    than she could Janice and Julie when they went out because
22    their -- their tone is higher. She had difficulty hearing
23    them but with me it was -- we didn't have much of a
24    problem. So.....
25 Q  All right.

EXHIBIT  B
Page _____ of _____

Page 114

1    again, if -- if we -- if things are being -- are sort of
2    out one side versus the other side totally and we don't
3    have a feel one way or another, then we'll just say it's
4    inconclusive.  But.....
5  Q  You've actually never written an investigative report.....
6  A  That's.....
7  Q  .....other than this one?
8  A  Of this -- for this -- not for this particular job.  I've
9    written many in the past but not.....
10 Q  For this job?
11 A  Right.
12 Q  For this job you've never written another one?
13 A  Right.  That's correct.
14 Q  Is the term validate or verify a complaint something that
15   you use?  Is that a term that you use?
16 A  We use that -- we use that.  And where that comes -- that
17   particular validate or verify comes from is that's
18   required entry in that national ombudsman reporting system
19   data base I told you -- it has to be sent in every year.
20   When we go do a complaint and the disposition of
21   complaint, we have to say it was verified or not verified,
22   or validated or not verified.  So that's where that word
23   comes from but.....
24 Q  Okay.  And what -- what -- what does the term.....
25 A  And that -- that's kind of carried over.

Page 115

1  Q  .....what does the term verify mean in that context?
2  A  Verified means that we did find enough substance to the
3    complaint to -- to validate it to say that it was, in fact
4    factual, or as close to factual as we're going to get.
5  Q  Does validate mean something other than verify?  And if it
6    does, what does it mean?
7  A  Not really.  No, same.  To my mind it seems the same
8    thing.
9  Q  Okay.  Can you find that a complaint is validated or
10   verified based solely upon the resident's version of an
11   event?
12 A  No.  Not typically, no.  As I said earlier sometimes --
13   especially some of the -- the age we deal with, the
14   story's changed by the different days you go in there.
15 Q  Well, 16 days in a row you hear the same story, I mean
16   it's.....
17 A  And -- could be.  And also you -- you look at it whether
18   you believe the person is cognitive intact or not.  So --
19   unfortunately we deal with folks who are schizophrenic,
20   delusional, whatever, sometimes.
21 Q  Okay.  If you could go to your report.  It's Page 258 and
22   thereafter, a couple of questions about it.  Just tell me
23   when you get there.
24 A  Okay.
25 Q  In various places in the report there are -- I'm not sure

Page 116

1    what the -- it's not a parenthesis but it's sort of an
2    angle parenthesis.....
3  A  Right.
4  Q  .....with a bracket and then there'll be a term.....
5  A  Uh-huh.  (Affirmative)
6  Q  .....that's written in there.
7  A  Right.
8  Q  What does -- what does -- what does that bracket and what
9    are those terms supposed to mean generally speaking?
10 A  Indications of lack of respect, and dignity, as an
11   example, towards the elder.
12 Q  Okay.
13 A  That's -- that basically that the -- what I found there
14   was indication there was -- that particular case, I'm
15   looking at Page 267, the second paragraph.....
16 Q  So it's your conclusion based upon certain things; is
17   that.....
18 A  Right.  That there's an indication that -- that it -- that
19   it happened, or could have happened.
20 Q  Does indication mean it could have happened?
21 A  Correct.
22 Q  All right.
23 A  And so -- so I guess to kind of go back to what you as --
24   you asked before, is if I get numerous indications of --
25   of a specific situation, those numerous indications would

Page 117

1    -- would tha -- would then maybe potentially lead to a
2    verification or a validation of the complaint.
3  Q  Well, let's stay with 261 for a minute.....
4  A  Okay.
5  Q  .....because I've got a question about that.  The December
6    9th entry.
7  A  Correct.
8  Q  Do you see that?
9  A  Uh-huh.  (Affirmative)
10 Q  You got a phone call from the complainant about
11   something.....
12 A  Uh-huh.  (Affirmative)
13 Q  .....and that'd be Carol Winters, correct?
14 A  Correct.
15 Q  And then the complaint is outlined, correct?
16 A  Right.
17 Q  And then you say both -- or complaints actually.....
18 A  Uh-huh.  (Affirmative)
19 Q  .....and then both incidents were validated with the
20   resident, and that means Helen Winters?
21 A  Correct.
22 Q  So what you -- what you did is you heard from Carol
23   Winters.....
24 A  Right.
25 Q  .....you talked with Helen Winters.....



EXHIBIT _____
Page _____ of _____

ROBERT DREYER                    11/16/2006         WINTERS v. CHUGIAK SR. CITZ.
Vol. 1                                              3:-06-CV-00083-TMB

31 (Pages 118 to 121)

Page 118

```
 1  A   Several days later.
 2  Q   .....and that validated, in your view.....
 3  A   Uh-huh. (Affirmative)
 4  Q   .....what happened.....
 5  A   Uh-huh. (Affirmative)
 6  Q   .....is that right?
 7  A   Right.
 8  Q   Did you talk to anybody else about that incident at that
 9      time?
10  A   On the Depends, I don't think so on this particular one,
11      on the Depends. I know there was an issue on the Depends
12      I spoke with one of the care givers on. So.....
13  Q   Well, I'm just wondering about this one.
14  A   Right.
15  Q   This one was validated.....
16  A   Right.
17  Q   .....a conversation with Carol and Helen and that's
18      it.....
19  A   Right.
20  Q   .....correct? Okay.
21  A   I believe.
22  Q   When you looked at the residential services contract did
23      you see in it a clause which indicated where notices were
24      to be sent?
25  A   I'd have to look at it to recall. I don't know if you
```

Page 119

```
 1      have a copy of it at hand, please.
 2  Q   Oh, you got it in there but we'll find.....
 3  A   Okay. What page?
 4  Q   .....it here. I know. I know.
 5  MS. KERR: It's Page 573.
 6  MR. YOUNG: 5 who?
 7  MS. KERR: 573.
 8  MR. YOUNG: 573. 573.
 9  A   Thank you. And, sorry, your question was what about this
10      page?
11  Q   Is there a section in here which states where notices are
12      to be sent?
13  MR. TWOMEY: You're asking him to read this document and
14  tell you what it says?
15  Q   Well, if you'd look at Page 582, please, section 31. Does
16      it read as follows, any notices provided for herein shall
17      be given in writing and transmitted by personal delivery
18      or prepaid first class mail and addressed as follows,
19      manager, Chugiak Senior Citizens, Inc., with an
20      address.....
21  A   Uh-huh. (Affirmative)
22  Q   .....tenant, Helen Winters, Chugiak Senior Citizens
23      Inc......
24  A   Uh-huh. (Affirmative)
25  Q   .....and then the address, correct, or.....
```

Page 120

```
 1  MS. KERR: Objection. Misstates.....
 2  MR. YOUNG: I'm sorry?
 3  MS. KERR: I'm sorry, you were not done.
 4  Q   Or such other persons or addresses as manager or resident
 5      may from time to time designate in writing.
 6  MR. YOUNG: Did that cure your objection?
 7  MS. KERR: Yes, sir.
 8  Q   Did I read that correctly?
 9  A   Uh-huh. Yes.
10  Q   Were you aware of that notice provision in this agreement?
11  A   Not generally, no.
12  Q   Are you aware of any further designation or other
13      designation by either the manager or the resident where
14      notices were to be sent?
15  A   No.
16  Q   Would you look at Page 264 of your -- which is Page 6 of
17      your report and we're going to stay with the report for a
18      minute.
19  A   Okay.
20  Q   I'm sorry to keep making you do this.
21  A   264, yes.
22  Q   264, yeah.
23  A   Uh-huh. (Affirmative)
24  Q   At the very bottom you have a statement that the center
25      caused mental trauma leading to hospitalization by issuing
```

Page 121

```
 1      letter of eviction directly to resident.....
 2  A   Uh-huh. (Affirmative)
 3  Q   .....rather than power of attorney.
 4  A   Uh-huh. (Affirmative)
 5  Q   See that?
 6  A   Correct.
 7  Q   Is this a finding that you made?
 8  A   It's an opinion.
 9  Q   Okay. An opinion that you -- you drew?
10  A   Uh-huh. (Affirmative)
11  Q   Didn't the agreement require issuing notices to Helen
12      Winters?
13  MR. TWOMEY: Objection. Calls for.....
14  MS. KERR: Objection. Calls for a legal conclusion.
15  MR. TWOMEY: Same objection.
16  A   You want me to answer that?
17  Q   I would love to have you answer it.
18  A   Okay.
19  Q   If you can.
20  A   As you -- as you read it, yes, it does.
21  Q   You made some recommendations in your report in various
22      places, that the Department of Health consider issuing a
23      notice of violation consistent with certain of the
24      findings. Do you know whether the Department of Health
25      did?
```

Computer Matrix, LLC          Phone - 907-243-0668      EXHIBIT    B        jpk@gci.net
310 K Street, Suite 200       Fax    907-243-1473                           sahile@gci.net
                                                        Page ____ of ____

ROBERT DREYER                    11/16/2006         WINTERS v. CHUGIAK SR. CITZ.
Vol. 1                                              3:-06-CV-00083-TMB

34 (Pages 130 to 133)

Page 130

1  A   I don't know -- don't know. I felt it was appropriate to
2      have it here because it -- I think it potentially could
3      have affect -- it could affect the care.
4  Q   Did it?
5  A   I can't prove that, no.
6  Q   Did you talk with the employees in question to see why
7      they worked at both places?
8  A   I talked with some of the employees. I didn't ask --
9      specifically ask the question why they worked at both
10     places, no. I think some of it was probably -- in some
11     cases I think some of them lived out in Wasilla so it was
12     probably for convenience, I'm guessing, but that's a
13     conjecture on my part.
14 Q   Is it possible that they were on call at both places and
15     needed the money and wanted to work as much as they could?
16 A   It's quite probably the case.
17 Q   Okay.
18 A   It's not unusual to have care givers work two jobs in this
19     field unfortunately.
20 Q   You asked a couple of residents, or certain residents were
21     asked to give their consent to.....
22 A   Uh-huh. (Affirmative)
23 Q   .....providing their own files; is that correct?
24 A   Uh-huh. (Affirmative)
25 Q   And what was.....

Page 131

1  A   I didn't -- I didn't ask, I had -- I believe Janice Olson
2      asked that question.
3  Q   And they refused to do it?
4  A   Correct.
5  Q   That was within their rights to do that?
6  A   Yes.
7  Q   You thought the home was building a case against Helen
8      Winters and in part you thought that because her file was
9      thick?
10 A   Uh-huh. (Affirmative)
11 Q   Correct?
12 A   Uh-huh. (Affirmative)
13 Q   Do you agree that an assisted living home, or for that
14     matter a nursing home should put things that they think
15     are important on a resident's care.....
16 A   I agree.
17 Q   .....in the.....
18 A   Uh-huh. (Affirmative)
19 Q   .....file?
20 A   I agree. But when I went through -- went through those
21     files or -- I initially went through and started tagging
22     and -- what I thought the good comments with green tags,
23     the questionable comments with yellow and the adverse
24     comments with red and I got a huge preponderance of reds
25     and yellows as opposed to greens.

Page 132

1  Q   Did you consider the possibility.....
2  A   Which -- which made me -- gave me the possibility that are
3      they -- I don't know -- didn't know at this point, are
4      they trying to build something here.
5  Q   Well.....
6  A   Not meaning them specifically, but the workers.
7  Q   Well, did you come to the conclusion based upon your
8      professional training and experience by preponderance of
9      the evidence that the center was fabricating evidence?
10 A   I don't think fabrication's the right word.
11 Q   What's the right word?
12 A   Over zealousness, I think, probably is the right word.
13 Q   Wouldn't you want a home to be complete in what they put
14     in their resident's files about issues and problems as
15     opposed to not putting anything in?
16 A   I think that there's a difference between fashionable and
17     complete and being opinionated in the -- in the -- in the
18     progress notes, for example.
19 Q   Have you compared this file with say 30 other files from
20     this and other homes to see.....
21 A   I loo -- I -- well, maybe not that many, that number, but
22     I've looked at others and typically you don't see those
23     kind of comments in other files.
24 Q   Isn't a possible explanation for that that there were all
25     those things that happened and.....

Page 133

1  A   That's poss.....
2  Q   ..... the comments were accurate?
3  A   Yes, that's possible.
4      MR. YOUNG:  It's noon. And I don't think I have anymore
5      questions at this time.
6      MR. TWOMEY:  Who's next? I have no questions.
7      MS. KERR:  We have a few questions.
8           ROBERT P. DREYER
9  testified as follows on:
10          CROSS EXAMINATION
11 BY MS. KERR:
12 Q   Mr. Dreyer.....
13 A   Yes?
14 Q   .....I'm Ms. Kerr, I'm working with Helen. I just have a
15     few questions. I think you said that your direct --
16     strike that -- you have -- you have some sort of oversight
17     or administrative relationship with the Alaska Mental
18     Health Trust?
19 A   They -- they have over me, if you will.
20 Q   Okay.
21 A   They're -- administratively we're an umbrella beneath
22     them.
23 Q   Okay.
24 A   And part -- part of that reason is because we used to be
25     under the Department of Administration and because of

Computer Matrix, LLC          Phone - 907-243-0668                    jpk@gci.net
310 K Street, Suite 200       Fax    907-243-1473   EXHIBIT    B      sahile@gci.net
                                                    Page _____ of _____