Donna M. Meyers
Clay A. Young
Delaney Wiles, Inc.
1007 W. 3rd Avenue, Suite 400
Anchorage, Alaska 99501
PHONE: 907-279-3581
FAX: 907-277-1331

Attorneys for Defendant
Chugiak Senior Citizens, Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| HELEN WINTERS, through her Power Of Attorney Carol Winters, </br></br>                               Plaintiff,</br></br>v.</br></br>CHUGIAK SENIOR CITIZENS, INC.,</br></br>                               Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. 3:06-cv-00083-TMB |

**DEFENDANT CHUGIAK SENIOR CITIZENS, INC.'S
PARTIAL EXPERT DISCLOSURE**

Defendant Chugiak Senior Citizens, Inc. ("CSC"), by and through its counsel, Delaney Wiles, Inc. hereby provides the expert disclosure for Deborah Geeseman, MD. Dr. Geeseman is a psychiatrist, and her report, and curriculum vitae are attached. Dr. Geeseman charges $275 an hour for a mental status evaluation, and $195 an hour to review records and all other services, including testimony and attorney consultations. To date, Dr. Geeseman has charged a total of $7,917.25 to review records, confer with counsel, and prepare a report. The information and documents considered by Dr. Geeseman are described in her report and the attached index of documents.

DELANEY WILES, INC.
SUITE 400
1007 WEST 3RD AVENUE
ANCHORAGE, ALASKA
(907) 279-3581

Defendant Chugiak Senior Citizens, Inc.'s
Partial Expert Disclosure
Winters v. Chugiak Senior Citizens/Case No. 3:06-cv-0083 (TMB)

EXHIBIT A
Page 1 of 19

Page 1 of 2

The expert disclosures of CSC's remaining experts, Theresa Panchot, and Sabine von Preyss-Friedman, MD, will be disclosed on or about December 29, 2006.

Respectfully submitted at Anchorage, Alaska, this 21st of December, 2006.

DELANEY WILES, INC.
Attorneys for Chugiak Senior Citizens, Inc.

Delaney Wiles, Inc.
1007 W. Third Avenue, Suite 400
Anchorage, Alaska 99501
Phone:     907-279-3581/Fax: 907-277-1331
E-mail:    dmm@delaneywiles.com
E-mail:    cay@delaneywiles.com
AK Bar No. 9006011

**CERTIFICATE OF SERVICE**

I hereby certify that on the 21st day of December 2006, a copy of this document was served USPS on: *fax*

Barbara Brink/Nikole Nelson
Jim Davis, Jr./Sonja Kerr
Alaska Legal Services Corporation
1016 West 6th Avenue, Suite 200
Anchorage, Alaska 99501

Donna K. Daniels (125719)

DELANEY WILES, INC.
SUITE 400
1007 WEST 3RD AVENUE
ANCHORAGE, ALASKA
(907) 279-3581

Defendant Chugiak Senior Citizens, Inc.'s
Partial Expert Disclosure
Winters v. Chugiak Senior Citizens/Case No. 3:06-cv-0083 (TMB)                   Page 2 of 2

EXHIBIT A
Page 2 of 19

# DEBORAH B. GEESEMAN, M.D.

PSYCHIATRY
711 H STREET, SUITE 400
ANCHORAGE, AK 99501-3459

TELEPHONE/FAX 907-276-7004
15 DECEMBER 2006

IN THE CASE OF
WINTERS V. CHUGIAK SENIOR CITIZENS, INC.

PSYCHIATRIC EVALUATION
OF
HELEN WINTERS

INTRODUCTION

The evaluator was hired by Donna M. Meyers of DeLaney Wiles, Inc., the law firm representing Chugiak Senior Citizens, Inc. to conduct an evaluation of Ms. Winters psychological status. Records were reviewed prior to meeting with Ms. Winters. These included progress notes from Chugiak Senior Center, hospital records, communications from Ms. Winters daughter, medical records from outpatient physicians, the deposition of Ms. Winters' daughter, etc. [Please see attached addendum regarding records.] One staff member at Chugiak Senior Center was interviewed, being asked specific questions regarding his observations of Ms. Winters' cognitive functioning. An evaluation of Ms. Winters herself was conducted on site in Ms. Winters' room on December 8, 2006.

In general, Ms. Winters is a 91 year old white widowed female with multiple medical conditions who is in need of assistance for daily living. Difficulties have arisen between Ms. Winters and the staff of Chugiak Senior Center (hereafter known as CSC) where she resides, in the provision of this assistance. Ms. Winters needs assistance and desires this assistance be provided in the way she wants it done, sometimes in very specific ways. Records indicate Ms. Winters' and Ms. Winters' daughter's dissatisfaction with the service provided. CSC records indicate tensions arising in interactions between CSC staff and Ms. Winters, quantities of time spent in assisting Ms. Winters that are apparently in excess of the average for care provision at CSC, and that two staff members are soemtimes present when providing assistance to Ms. Winters which is not standard protocol for CSC provision of service.

Given the difficulties between Ms. Winters and the staff at CSC, the question was raised as to whether or not Ms. Winters has any psychiatric disorder, personality disorder, and/or dementia that might be contributing to this situation. Hence a request for psychiatric evaluation was made.

THE EVALUATION OF MS. WINTERS

The evaluation was conducted in Ms. Winters' room. On the evaluator's entry, Ms. Winters was found sitting in her recliner chair, TV on, fixing pins (jewelry) on her collar. She said she had just put on two pins that her church friends had given her, one on each collar point of her knit pullover shirt. She was very well groomed, dressed in coordinating pink shirt and patterned pink skirt, with make-up and jewelry, and her hair nicely done. She was pleasant and cooperative.

Before the interview was really started, Ms. Winters invited the evaluator to go look at her bedroom, especially wanting to show off the nice bedroom set that she has had since she was married. She has many family photos around the room, and many knick-knacks displayed on coffee tables and entertainment center surrounding where she sits, mostly angel figurines and Christmas decor.

The evaluator sat on a footstool alongside Ms. Winters' chair, on her left side, and spoke with a slightly increased volume. The evaluator had been told that Ms. Winters has better hearing in her right ear, but furniture arrangement was not conducive to other seating for the evaluator. The evaluator has a quality of voice that is usually easy to understand by people with decreased hearing. The TV was on also. Initially general information was gathered. There were only a few instances where Ms. Winters requested a repeat of the question. However, when more formal testing was begun, the evaluator suggested that the TV be turned off. Ms. Winters agreed and said that she usually does so when conversing with other people.

The evaluation moved back and forth between general information and formal test questions.

BRIEF PERSONAL HISTORY

Ms. Winters was born in Pennsylvania, having three brothers. She has one brother still living, who is 93 years old. Her father, a coal miner, died from occupational hazards when she was 2 years old. Mother raised the children and lived until her demise at 91 years old. Ms. Winters married at the age of 24 and lived with her husband in Maryland until he died of cancer at 69 years old. They had two children, a daughter, 59 years old, who is a rehabilitation therapist and lives in the Eagle River area and a son, 64 years old, who is an engineer living in Maryland. She has no grandchildren. For a time, she and her daughter had a condo. Apparently the daughter was gone frequently for work and eventually relocated to Alaska. When she was living alone, she continued to visit friends and talk on the telephone. Ms. Winters later moved from the East Coast to Alaska, arriving in here a few years ago.

Throughout her life, Ms. Winters was very family and people oriented. Her activities focused around time with her family and visiting with friends. When her children were older, she worked for a time to earn money to assist in the financial aspect of her children's education. She enjoyed sewing, learning the art from her mother. She has been very active in the Catholic church since she was young and this is still a very important part of her life. Her favorite memories are times spent with her husband and children.

Currently she says that she has *adjusted* to her situation and that she is not *bored*. She spends the day watching TV most of the time and thanks God for closed captioning since it makes it easier for her to follow the shows, given her hearing deficit.

HISTORY AT CSC

Ms. Winters has lived independently most of her life. However, with aging and medical conditions, and since her move to Alaska, she began needing some assistance in daily living. This was provided initially by Ms. Winters' daughter and in-home caregivers. Subsequent to a fall, resulting in fractures, Ms. Winters required more assistance and she moved into the assisted

living facility, Chugiak Senior Center (CSC). It was her first move into an assisted group living situation.

When Ms. Winters moved into CSC, given that her healing from the fracture was not complete, she had more needs for assistance in daily functioning than appears she has had at any time in her past, other than during acute illnesses. It appears that all involved believed her need for assistance would decrease from what it was at the time of admission to CSC, with the healing of her musculoskeletal injuries.

Per Ms. Winters' daughter's description, both Ms. Winters and her daughter like CSC very much, specifically commenting on the space, the room for Ms. Winters' bedroom set, the nice environment, and the convenience for Ms. Winters' daughter to continue to visit Ms. Winters. These comments seem to focus on the physical aspects of the home and not the service that is provided.

With regards to interaction with CSC staff, there have been numerous difficult times and complaints since Ms. Winters' residence at CSC.

There were no documents of any independent observations of Ms. Winters' daily routine in CSC to assess the appropriateness of the match between Ms. Winters' needs and the services that can be provided by CSC. Her daughter stated that she had not spent time observing her mother's care regimen.

HISTORY OF PSYCHIATRIC LABELS

By the daughter's report, Ms. Winters has had *anxiety* for some time. This word, be it diagnosis or adjective, is noted in several places in other medical records, both in inpatient and outpatient records. *Generalized Anxiety Disorder* also appears in the records, but without any further description. The words *depression* and *dementia* also appear in medical records. However, none of the records reviewed gave any substantiation to any of these words, as to whether they were an adjective, an impression, or a diagnosis.

Hospital records reveal Ms. Winters having a lot of anxiety at times during hospital stays. She has been treated with both IV and oral benzodiazepine anxiolytics in acute medical situations but it appears that she has not continued to use these at other times, even though a *PRN* (i.e. *take as needed*) order for alprazolam appeared at times in her chart, both in the hospital and at CSC; only a few doses were charted as taken by Ms. Winters. Hospital records indicate she was also on the anxiolytic Buspar for some period of time. This is a medication that must be taken daily for some time before it will show benefit. Records were not found that indicated when this medication was initiated, her response to it (be it positive or negative), nor when and why it was discontinued.

Recommendation was made for an evaluation to be done regarding Ms. Winters' mental health and cognitive functioning. No document was reviewed that indicated such an evaluation has been done, and further, her daughter stated that Ms. Winters has never had such an evaluation.

SYMPTOMATOLOGY

Ms. Winters denies being sad or depressed unless there is something happening that is depressing. Her sleep is interrupted by the need to urinate. She has gained weight since she is sitting all the time. She says she may worry or become anxious, depending on what is happening, denying having worry that is undirected or a general ongoing part of her life. She adds that she feels she's pretty good at accepting things.

Her house was always neat and clean; she says others would say she was *very fussy*. However, she never felt compelled to fix things at her friends' houses nor tell them what to do. She did receive compliments all the time on her fastidiousness. She would rather do the cleaning herself and was complete her tasks. She denies wanting things so perfect that she could not complete tasks. It's unclear, but appears that she could delegate some tasks to others and was not so perfectionistic that she had to do everything herself. She denies wanting to be the center of attention. She enjoyed receiving compliments but then could easily fade into the social circle. She never was jealous of others

FORMAL EXAMINATION

In the **Mini-Mental Status Exam**, she had a perfect score. She was oriented to date and place, could identify objects and recall them. She could perform serial 7 subtractions accurately. With language, she was able to name items, repeat a phrase, follow a 3-stage command, read and follow written directions, write a coherent sentence spontaneously, and copy a design of two intersecting pentagons.

In another set of screening questions, taken from the **7 Minute Screen**, which took much longer than seven minutes as Ms. Winters appropriately attempted to complete a few items, she performed very well but did have difficulty in a few areas. Again, all orientation items were perfect. She was given four sets of four pictures; after each set was identified, she was asked to recall them and only needed to repeat a couple items to assure that she had learned the items. In the initial identification, she could not name the animal "tiger" but once prompted, she knew it thereafter. She also was unable to name the toy "top" and the weapon "canon", saying that she had never seen or known about these items; when she was asked to recall all the items later, she could not recall these two unknown items. After the sixteen items had been rehearsed, she was asked to recite the months backwards, and did so accurately. Then she was asked to recall the sixteen items - she recalled nine objects without prompt, three more items with a prompt, and missed the two mentioned above plus one other item. She was asked to draw a clock and place the numbers on the face. She did this well. However, when asked to put hands on the clock giving the time of "20 to 4", she had difficulty. We discussed this, clarified the time in many verbal ways, but she could not figure out how to place hands on the clock. The examiner showed Ms. Winters her wrist watch, to perhaps help cue Ms. Winters in placing the hands on the clock. Instead, Ms. Winters read the watch correctly as "quarter to 11" but still could not figure out how to do the drawing. She knew that the "4" needed to be involved and drew an arrow alongside the "4". She also counted clockwise: "5-10-15-20" and knew that the "4" also represented "20 minutes". Eventually she drew a circle around the "12" but said she knew that her drawing wasn't right.

[ See attachment.] In testing verbal fluency, she was given the category "animals" and asked to name as many as she could in one minute. She only listed six (6), and interestingly, included the "tiger" from the earlier test.

In the full formal psychiatric **Mental Status Exam** (as opposed to the Mini-Mental Status Exam which has a primary focus on cognitive function), Ms. Winters performed well. She was oriented to person, place, and time, well groomed, pleasant and cooperative. She spoke logically and coherently in a voice with normal volume and normal pace, had a bright affect and described her mood as "doing pretty good for my age". Her affect changed at the close of the interview, becoming intense, insistent and slightly agitated, wanting the examiner to confirm that she'd done well on the evaluation, and if so, to also confirm that this meant she could remain in residence at CSC. She had an adequate fund of information and could perform serial 7 subtractions accurately. She interpreted one proverb appropriately abstractly; the second proverb ("A stitch in time saves nine") she had never heard before and even with some thought, she could not produce any interpretation. Importantly with the latter proverb, Ms. Winters kept hearing the word "stitch" as "stick". The word was repeated several times, and finally with prompts of "sewing stitch" and pointing at the hem stitching on her skirt, she understood the word, but still was unable to interpret the proverb. She had an adequate remote memory and could recall more than three objects after five minutes. She denied hallucinatory experiences in all five senses as well as paranoia, and did not demonstrate any delusions or bizarre beliefs. She denies ever having suicidal ideations in her life.

QUESTIONS REGARDING MS. WINTERS' COGNITIVE FUNCTIONING

The evaluator met with Fred, a staff member at CSC who has worked with Ms. Winters for approximately two years, initially on day shift and now on night shift. He was asked specific questions regarding his observation of Ms. Winters' cognitive functioning. This included areas of memory, confusion, disorientation, geographic confusion, aphasia, apraxia, and personality change. He responses indicated that he has not observed any difficulties in these areas that would imply a decline in cognitive functioning.

He did make note that she has more difficulty hearing some times than at other times and that she hears better in her right ear. Also, if she's not happy about what is occurring, and an impasse is reached, then it appears she won't listen, not that she's unable to hear. The only time he's seen her upset or down is when there has been a negative interaction with the staff regarding her care. She is very specific about how she wants her towels placed for her shower, how she wants napkins covering her drinking glasses, how often she wants her water glass washed. She has an order to performing these desires, but if she if comfortable with the staff person, then it appears that the order is less important, just so that the end point is arrived at. If she's not as comfortable with the staff person, then she may be more insistent on the steps being done in a specific order also.

These days, she remains in her room. In the past she did participate in some center activities, and in going to the dining room. Fred perceives that since the lawsuit began and other

WINTERS V. DOUGLAS SENIOR CITIZENS, INC.
PSYCHIATRIC EVALUATION
Case 3:06-cv-00083-TMB    Document 231-2    Filed 01/31/2007    Page 8 of 19
PAGE 6

residents have made comments to her, she has not been participating in social interactions within the center.

STATEMENT OF *HELEN'S DAILY ACTIVITIES*

Upon arrival, Ms. Winters handed the evaluator a brown envelope titled *Helen's Daily Activities* that she said her daughter wanted the evaluator to have. At the end of the evaluation, this was opened and handed to Ms. Winters to read. She read it aloud without difficulty, and made comments along the way. Her daughter had written a two-page description of Ms. Winters' typical daily activities. Helen corrected or clarified the statement about staff assisting her in getting dressed, saying that she is able to put on her own blouse and skirt; but is unable to do her TED hose and shoes. She commented that the times listed were approximate but otherwise, she agreed with what her daughter had written up. [See attachment.]

GENERAL CONCLUSIONS FROM THE EVALUATION

Ms. Winters presented as a pleasant elderly woman who did not display any overt signs of depression or anxiety and upon questioning, stated that she only has these feelings secondary to situational circumstances. She also did not show any obvious cognitive impairment; however, on more formal screening, she did have several areas that revealed difficulties in cognitive functioning.

Personality traits are difficult to assess in a brief evaluation. Personality disorders can only be diagnosed based on current and historical characteristics, the individual's characteristics over the course of their adult years, not just recent behavior. By Ms. Winters' self-reporting, she has obsessive-compulsive personality traits. However, she did not acknowledge items nor an intensity that would lead to the diagnosis of an Obsenssive-Compulsive Personality Disorder. Under stress, duress, or fear, obsessive-compulsive characteristics may become exacerbated as the individual attempts to gain control over a situation that is not comfortable to them. It appears by the records, that Ms. Winters demonstrates this perfectionistic characteristic. Ms. Winters' directions for specific steps to be performed when staff are assisting her, appear to fall into this phenomenon of exacerbation and do not appear to be secondary to an Obsessive Compulsive Disorder, which is a ritualized disorder distinct from Obsessive-Compulsive Personality Disorder.

RESPONSE TO QUESTIONS POSED BY DONNA M. MEYERS

1. What findings, if any, were you able to make from the results of the Mini-Mental Status Examination?

> The Mini-Mental Status Exam was entirely normal. However, the 7 Minute Screen did reveal some cognitive impairment. Both of these exams are crude instruments to be used as an initial screen. More formal neuropsychological testing can be performed to evaluate the extent of this impairment.

2. Were you able to form any definitive psychiatric diagnosis from your evaluation, and if not, what additional information, tests, or evaluation(s) would be necessary to determine whether Helen Winters has a diagnosable psychiatric condition, personality disorder and/or cognitive impairment?

EXHIBIT A
Page 68 of 19

See response to #1 above, as well as the comments in the General Conclusions section above.

Gathering information about Helen from an objective witness who has known Helen for many years would be helpful. Formal psychological testing would provide an objective evaluation of her psychological status; this might include the Minnesota Multiphasic Personality Inventory - MMPI and Millon Clinical Multiaxial Inventory - MCMI, for example.

3. If you concluded Helen Winters has a psychiatric diagnosis, what is it, and is there a relationship between Helen Winters' diagnosis and any physical disability (perceived or real), functional impairment, and/or time or efforts from caregivers who provide assistance with Helen Winters' activities of daily living?

In reviewing both the statements of Ms. Winters' daughter and the staff notes, it appears that there is a mismatching of the resident's needs and the facility's service. Ms. Winters does have need for assistance in many areas by virtue of her many medical conditions. The needs and the quantity of time needed to meet those needs does not appear to be compatible with the staff : resident ratio that exists at CSC. It appears that both sides have had a difficult time trying to make the situation a workable one. It appears that when these mismatches arise, that Ms. Winters may become more uncomfortable either physically and/or emotionally and she then attempts to give directions to bring her world back into a state of comfort. However, these directions seem to complicate the situation further. There appears to be a disparity between Ms. Winters' needs (real or perceived) and the staff's availability and limitations for meeting those needs.

4. If you were unable to determine whether Helen Winters has a psychiatric diagnosis based on your evaluation, does Ms. Winters have any behavioral or personality traits that might affect the type of living environment that is best suited to meet Ms. Winters' needs?

The answer to this question has already been addressed above.

From what can be determined at this point in the evaluation, it is presumed that if Ms. Winters were in a setting that she found pleasant in its physical setting (the type and size and quality of the residence) and where staff were readily available to assist her in the way she would like, without limitation on staff time, that both Ms. Winters and staff would generally have pleasant interactions at this point in Ms. Winters' life.

5. What, if any, interventions, including pharmacological, behavioral or social, would you recommend to lessen Helen Winters' level of anxiety or agitation and/or to enhance her well-being?

Ms. Winters describes herself as a very socially oriented individual throughout her life. She would most likely benefit from ongoing social interactions with other people. Even with limitations in hearing, vision, and ambulation, Ms. Winters is still quite able to interact with other people and seems to enjoy doing so.

It would be helpful to have a clear definition of Ms. Winters limitations. This could be provided by her physician and/or a care provider or case manager who can assess and/or coordinate what is an appropriate level of involvement for Ms. Winters in self-care, ambulation, etc.

Setting up a behavioral plan which includes specific items regarding self-care, assistance, center interaction, and other things, could provide structure and reasonable expectations of what both Ms. Winters and the staff can and cannot do. It would be important that both Ms. Winters and the staff agree to the plan and that both stay within the guidelines of what is appropriate for each. It would be recommended that the plan be reassessed at regular intervals and adjusted as needed over time. A positive pro-active approach and acknowledgment of Ms. Winters' limitations and the provision of assistance that staff can provide, might help resolve the difficult times that now exist.

Pharmacologic intervention might provide a benefit. However, that is unclear at this time. The behavioral and social changes are a more important first step. It would be recommended that once the other interventions have been put in place, that Ms. Winters be reassessed for anxiety and depression, the only two diagnoses that have been labeled for her in the past which might respond to medication. However, if the anxiety is only secondary to situational circumstances and/or an exacerbation of personality traits, ongoing medication management may offer little benefit. PRN (as needed) medication might still be helpful in this setting. After other interventions are in place and an attempt to rectify current difficulties has been made, if Ms. Winters continues to have periods of anxiety, depression, or agitation, then another assessment can be made for possible underlying disorders that might benefit from medication treatment. She does have a long history of sensitivity to medications. If at some point medications are recommended, she will need a clinician whom she trusts and one who will work with her fears while prescribing the medication.

It is important to note that if Ms. Winters is in early stages of a dementia, and if it appears that this is early Alzheimer Disease, then decisions will need to be made regarding whether to use medication to slow the progression of this disorder. Further, if a dementia is present, her presentation will change over time, dependent on the progression of cognitive decline.

In sum, Ms. Winters is an 91 year old woman who is still quite functional cognitively, enjoys interaction with other people, and has needs for assistance in basic daily functions. It appears that the primary issue in the current difficult situation is in creating and/or finding a good match of assistance provision for Ms. Winters' needs.

Respectfully submitted,

Deborah B. Geeseman, M.D.

## MY DAILY ROUTINE

I sit in my recliner all day. I watch TV, usually game shows or the mass and I pray for family and others. I have telephone conversations 3 times a day with my daughter and weekly with my niece. I also call other friends and family in the lower 48, Ohio and Maryland. Sometimes other residents drop by to see me. I used to go out 2-3 times a week with my daughter. Since I have to use a wheelchair we do not do this any more because she cannot push me with her bad wrists. Every Sat or Sunday the deacon or one of the eucharistic ministers brings me Holy Communion and we visit afterwards.

The following times are close estimates but they may vary day to day.

7:50 I am assisted in getting dressed and then helped into my wheelchair and pushed into the bathroom. I then, on my own, brush my teeth, wash my face comb my hair. I am assisted to the toilet but I wipe and perform personal hygiene with wipes myself and also put the liners into the pull-ups myself. I am assisted back to my recliner. Twice a week I get a shower and am assisted with this. I can wash my personal areas and the front of my body.

8:30 The aides come in and fix me my breakfast, banana and oatmeal with apple juice. I then put on my make-up and jewelry.

9-10 My daughter calls me from work to check on me.

9-11 Pray, say the rosary and watch TV.

10:30-11 I am assisted to the bathroom

11:30 The aides come and make me lunch, a frozen entrée with yogurt and milk and juice.

1-3 pm All afternoon I sit and either watch TV, pray or talk to friends and family on the phone. My daughter calls in the afternoon. The aides bring in my mail and I read that or pay a few bills.

EXHIBIT A
Page 11 of 19

Page 2

2or 3  I call the aides to take me to the bathroom. I use a walker I then sit and watch TV. I watch soaps and the religious channel or game shows.

4;30  I call aides to take me to the bathroom.

5:00  I eat my dinner, a frozen entrée, cup of milk and yogurt that my daughter keeps in frig, or I sometimes eat a dinner from the dining room if it is fish, chicken or turkey.

5:30 8  I watch TV and daughter calls in evening.

7-8  Ring for aid to take me to bathroom

9:30  Aides bring me cookies and milk

10:10

10:30 aides push me to bathroom where I sit in front of sink and do my personal hygiene, taking my dentures out and brushing my teeth and washing up for bedtime.

11:00 to 2  Sleep

2:00  Have to be taken to bathroom and pull-ons and/or pads changed. I do this myself with some assistance.

5:00  have to be taken to bathroom and pull-ons and/or pads changed again. I do my own personal hygiene.

7:30  Daily Routine begins again.

My daughter typed this but I agree that it is accurate.

Helen H. Winters

*/s/ Helen H. Winters*

Date December 7, 2006

EXHIBIT __A__
Page __12__ of __19__



EXHIBIT A
Page 13 of 19

# DEBORAH B. GEESEMAN, M.D.

711 H Street, Suite 400 ▪ Anchorage, AK 99501-3459 ▪ Tele 907-276-7004 ▪ Fax 907-276-7004

## EDUCATION

**MONTANA STATE UNIVERSITY - BOZEMAN, MONTANA**
*B.S., Microbiology, March 1974*
Royal Neighbors of America four-year fraternal scholarship
Pi Sigma Alpha - member, national fellowship for graduate study
Phi Kappa Phi - fellow, national fellowship for graduate study
Various other university and departmental recognitions for outstanding performance, including top student in class years

**UNIVERSITY OF WISCONSIN MEDICAL SCHOOL - MADISON, WISCONSIN**
*M.D., 1978*

**EASTERN VIRGINIA GRADUATE SCHOOL OF MEDICINE - Norfolk, Virginia**
*Flexible Internship, 1978-1979*

**UNIVERSITY OF WISCONSIN MEDICAL CENTER - MADISON, WISCONSIN**
*Psychiatry Residency, 1979-1982*

**DARTMOUTH MEDICAL SCHOOL - HANOVER, NEW HAMPSHIRE**
*Rural Community Psychiatry Fellowship, June-December 1981*

## BOARDS

**DIPLOMAT OF NATIONAL BOARD OF MEDICAL EXAMINERS**
*September 1979*

**DIPLOMAT OF AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY**
*April 1984*

## STATES OF LICENSURE

WISCONSIN *September 1, 1979 -*
ALASKA *July 29, 1982 -*

## CURRENT PRACTICE

**PRIVATE PRACTICE**
*June 1983 -*

EXHIBIT A
Page 14 of 19


RECEIVED OCT 2 2006 DELANEY WILES, INC.

Deborah B. Geeseman, M.D. - Curriculum Vitae

# ACADEMIC AFFILIATIONS

UNIVERSITY OF WASHINGTON - WWAMI PROGRAM
*Clinical Associate Professor*
*Auxiliary Faculty 1983 - 2004*
*Clerkship Director for Alaska Psychiatry WWAMI 3rd Year Medical Student Clerkship*
*1994 - 2001*
*Clinical Supervision and lectures for WWAMI students and residents*
*1982 - 2001*

UNIVERSITY OF ALASKA
*Associate Affiliate Professor 1994 - 2004*

# TEACHING

UNIVERSITY OF WASHINGTON WWAMI PROGRAM - see Academic Affiliations above

UNIVERSITY OF WISCONSIN
INTERVIEWING SKILLS - *Co-instructor with Carl Whitacker, M.D., 1980*
GROWTH & DEVELOPMENT - *Instructor for discussion section, 1980, 1981*

MONTANA STATE UNIVERSITY
LITERATURE AND THE OUTDOORS - *Wilderness Expedition Leader*
*Graduate level course; included group dynamics*
1974-1977

MEDICAL MICROBIOLOGY - *Laboratory instructor*
*Senior and graduate level course*
1974

PRIDE - EDUCATIONAL TUTORING PROGRAM FOR MENOMINEE INDIANS
*Menominee County/Reservation, Wisconsin*
1968-1970

# OTHER PROFESSIONAL ACTIVITIES

AWAIC CENTER - DOMESTIC VIOLENCE AND WOMEN'S SHELTER
*Consulting Psychiatrist     June 1984 - June 1994; August 2000 - July 2002*

ANCHORAGE POLICE DEPARTMENT - RESERVE TECHNICIAN
*Member of Crisis Negotiation Team     1997- 2002*
*Trainer for Law Enforcement Officers Training School - Hostage Negotiations 1997- 2002*

CORDOVA CENTER - Halfway House for Mentally Ill from Corrections
*October 1993 - June 1994*

MALE AWARENESS PROGRAM - AWAIC CENTER - Domestic Violence
*Consulting Psychiatrist, June 1984 - June 1994*

BOOTH MEMORIAL HOME - Salvation Army Residential & Day Treatment Program - Adolescents
*Consulting Psychiatrist, November 1985 - June 1992*

Deborah B. Geeseman, M.D. - Curriculum Vitae

# OTHER PROFESSIONAL ACTIVITIES - CONTD.

ALASKA PSYCHIATRIC INSTITUTE
*Staff Psychiatrist, September 1982 - June 1983*
*Contract Psychiatrist for On-call coverage, June 1985 - December 1988*

HOMER COMMUNITY MENTAL HEALTH CENTER
*Consulting Psychiatrist, July 1986 - December 1988*

FAIRBANKS COMMUNITY MENTAL HEALTH CENTER
*Consulting Psychiatrist, October 1989 - February 1990*

MCLAUGHLIN YOUTH CENTER - Division of Corrections, Adolescents
*Evaluator & Consulting Psychiatrist, July 1983 - September 1985*

CRISIS INTERVENTION SERVICE - DANE COUNTY MENTAL HEALTH CENTER - MADISON, WISCONSIN
*Crisis Worker, 1979-1982*

COURT OF DANE COUNTY, WISCONSIN
*Court-appointed Examiner and Expert Witness, 1979-1982*

INDIAN HEALTH SERVICE - KANAKANAK HOSPITAL - Alaskan bush hospital
*Medical Student Externship, January & February 1978*

# PROFESSIONAL ASSOCIATIONS AND POSITIONS

AMERICAN PSYCHIATRIC ASSOCIATION
   General Member    *April 1982 -*
   Fellow            *December 1991 -*
   Wisconsin Psychiatric Association  1982
   Alaska Psychiatric Association     1982 -
       President    *1987-1989*
       Secretary    *1990-1991*
       Treasurer    *1986-1987, 1994-1996*

AMERICAN MEDICAL ASSOCIATION
   ALASKA STATE MEDICAL ASSOCIATION
       Mental Health Committee    *1985-1986*

INTERNATIONAL SOCIETY FOR THE STUDY OF DISSOCIATION

PROVIDENCE HOSPITAL
   Medical Education Committee *1984-1986*
       Chair    *1985-1986*

PHI KAPPA PHI
   Member    *1973-*
   Fellow    *1974-*
   ALASKA CHAPTER
       President Elect    1990-1991
       President          1991-1992

EXHIBIT A
Page 16 of 19

# Legal Testimony by Deborah B. Geeseman, M.D. 2002-2006

Deposition regarding Edward Hensley     April 2001
    Att'y - Dan Fitzgerald

EXHIBIT A
Page 17 of 19

## INDEX OF ENCLOSURES SENT TO
## DR. DEBORAH GEESEMAN

A. Amended Complaint for Injunctive and Declaratory Relief and for Damages

B. Defendant's Amended Answer

C. CSC's 1/5/06 Letter to Helen Winters Re: Notice of Termination of Residential Service Contract (Nos. 10072-10073)

D. Carol Winters' Rebuttal Letter (Nos. 10075-10087)

E. Plaintiff's Disclosures (w/ some enclosures)

- Photocopies of photographs of Helen Winters (Nos. 1-9)
- Plan of Care Supplements 9/10/05-9/10/06 (Nos. 157-161)
- Consumer Assessment Tool (CAT) dated 7/21/05 (Nos. 162-173)
- Plan of Care from 9/11/06-9/10/06 (Nos. 174-189)
- Plan of Care Supplement 9/10/05 (Nos. 190-193)
- Long Term Care Assessment dated 9/11/01 (Nos. 194-208)
- Long Term Care Assessment dated 9/11/02 (Nos. 209-224)
- Long Term Care Assessment dated 9/11/03 (Nos. 225-243)
- Plaintiff's First Supplemental Disclosures (Nos. 244- 559) (medicals)

F. Defendant's Initial Disclosures (w/out enclosures)

G. Discovery

- CSC's First Set of Discovery Requests
- Plaintiff's Responses to CSC's First Set of Discovery

H. Resident File
- Progress notes (Nos. 20000-20224)
- All other records, (30000-30568)

I. Other Records

- Assisted Living Homes (AS 47.33.005- .990)
- Definitions (AS 47.24.900)
- Alaska Administrative Code (excerpts)
- Residents Rights/Prohibitions/Grievance Procedures (Nos. 10065-10071)
- Move-Out Criteria (No. 10527)
- Job Ready/Ready Care records (Nos. 40080-40121)
- Easter Seal records (Nos. 40122-40193)
- Marla Nelson e-file (Nos. 40194-40219; 40425-40426; 40538-40540; 40640-40642)
- APD report Case No. 06-13893 (Carol Winters)
- Carol Winters' Deposition (Vol 1)

EXHIBIT A
Page 18 of 19

| | |
|---|---|
| J. | PAMC records (plaintiff's Bates 560-1080) |
| K. | Complete Deposition of Carol Winters |
| L. | Plaintiff's 3rd Supplemental Disclosures with records from Dr. Jones, Bates 1082-1089 |
| M. | Plaintiff's 4th Supplemental Disclosures with attachments, Bates 1090-1208 |
| N. | Plaintiff's 5th Supplemental Disclosures with attachments, Bates 1209-1262 |
| O. | Plaintiff's 6th Supplemental Disclosures with attachments, Bates 1304-1305 |
| P. | Documents produced at Dr. Jones' deposition (exhibits A-G to deposition) |

Doc No. 125623

EXHIBIT A
Page 19 of 19