Donna M. Meyers
Clay A. Young
Delaney Wiles, Inc.
1007 W. 3rd Avenue, Suite 400
Anchorage, Alaska 99501
PHONE: 907-279-3581
FAX: 907-277-1331

Attorneys for Defendant
Chugiak Senior Citizens, Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

HELEN WINTERS, through her Power )
Of Attorney Carol Winters, )
                           )
                Plaintiff, )
                           )
     v. )
                           )
CHUGIAK SENIOR CITIZENS, INC., )
                           )
             Defendant. )
_____ )     Case No. 3:06-cv-00083-TMB

## DEFENDANT CHUGIAK SENIOR CITIZENS, INC.'S
## SUPPLEMENTAL EXPERT DISCLOSURE

Defendant Chugiak Senior Citizens, Inc. ("CSC"), by and through its counsel,

Delaney Wiles, Inc. hereby provides the following expert disclosures:

**Sabine von Preyss-Friedman, MD.** Dr. von Preyss-Friedman is a Clinical

Assistant Professor of Medicine at the University of Washington, Division of

Gerontology and Geriatric Medicine, Section for Long-Term Care. Her report and

curriculum vitae are attached. Dr. von Preyss-Friedman charges $400 an hour for

records review, research, and consultations. Dr. von Preyss-Friedman charges $3,600

per day for deposition and trial testimony. The information and documents considered

Defendant Chugiak Senior Citizens, Inc.'s
Supplemental Expert Disclosure
Winters v. Chugiak Senior Citizens/Case No. 3:06-cv-0083 (TMB)     Page 1 of 3

EXHIBIT _B_
Page _1_ of _84_

by Dr. von Preyss-Friedman are described in her report and the attached index of documents.

**Theresa A. Panchot, RN, BSN.**  Ms. Panchot is the Executive Director of Marlow Manor Assisted Living Facility and owner-operator of Alaska Legal Nurse Consulting, LLC.  Her report and curriculum vitae are attached. Ms. Panchot charges $100 an hour for records review, research, and consultations.  Ms. Panchot charges $150 per hour for deposition and trial testimony.   The information and documents considered by Ms. Panchot are described in her report and the attached index of documents.

Respectfully submitted at Anchorage, Alaska, this 5th day of January, 2007.

DELANEY WILES, INC.
Attorneys for Chugiak Senior Citizens, Inc.


Donna M. Meyers
Delaney Wiles, Inc.
1007 W. Third Avenue, Suite 400
Anchorage, Alaska  99501
Phone:  907-279-3581
Fax:  907-277-1331
E-mail:  dmm@delaneywiles.com
AK Bar No.   9006011

Defendant Chugiak Senior Citizens, Inc.'s
Supplemental Expert Disclosure
Winters v. Chugiak Senior Citizens/Case No. 3:06-cv-0083 (TMB)

EXHIBIT  B
Page  2  of  3

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day
of January 2007, a copy of this
document was served USPS on:

Barbara Brink/Nikole Nelson
Jim Davis, Jr./Sonja Kerr
Alaska Legal Services Corporation
1016 West 6th Avenue, Suite 200
Anchorage, Alaska   99501


_Donna K. Daniels_
Donna K. Daniels (126096)

Defendant Chugiak Senior Citizens, Inc.'s
Supplemental Expert Disclosure
Winters v. Chugiak Senior Citizens/Case No. 3:06-cv-0083 (TMB)

EXHIBIT B
Page 3 of 84
Page 3 of 3

# Sabine von Preyss-Friedman, MD
### Diplomate
### Certificate of Added Qualification in Geriatric Medicine
### American Board of Internal Medicine
### Certified Medical Director for Long Term Care

**10573 14th Avenue NW**
**Seattle, WA 98117**

January 7, 2007

Donna Meyers
Attorney at Law
Delaney Wiles, Inc.
1007 West Third Avenue, Suite 400
Anchorage, Alaska 99501

Re:   *Winters vs. Chugiak Senior Citizens, Inc.*
      #A-06-0083 Civil

## Geriatric Medicine Report

I am a board certified Internist and specialist in Geriatric Medicine and Long-Term Care.
I am currently on clinical faculty at the University of Washington, Division of
Gerontology and Geriatric Medicine, Section for Long-Term Care. As such I have
extensive expertise and experience in the care of frail , elderly patients with multiple co-
morbidities, disabilities and care needs. I have been asked to evaluate the case of Ms.
Helen Winters, a 91 year old patient who filed a lawsuit against Chugiak Senior Citizens,
Inc., an Assisted Living Facility, where she had resided since September 20, 2004 after a
humerus fracture in August, 2004.

This report is based on

1) Review of documents forwarded by your office, a complete list is attached to this
   report

2) Site visit of Chugiak Senior Citizens, Inc, Assisted Living on 12/7/06 and 12/8/06

3) Interviews with CSC staff on 12/7/06 and 12/8/06

4) Tours of other Assisted Living Facilities in the Anchorage Alaska Area

EXHIBIT  B
Page  4  of  84

January 7, 2007                                                                                          Page 2
S. von Preyss-Friedman, MD
Re: Helen Winters

## I.  Helen Winters File Chugiak Senior Citizens, Inc. assisted Living Program

### 1. Assessments

There is a prescreening assessment dated September 9, 2004, stating that the patient needed occasionally encouragement to maintain personal, social and recreational preferences and needed occasionally assistance of another person inside and outside.  She had a risk of falling and arm strength was limited.  She was evaluated as needing assist with transfers as well as standby assist to minimal assist with part of tasks such as clothing adjustment and washing hands.  She was assessed as requiring assistance to manage catheter care and incontinence and needed daily assistance for bowel control.  She was assessed as requiring minimal assistance with bathing and not requiring help with personal hygiene.  She did need assistance with bathing and occasional care from another person during the night.   Receptive and expressive communication was assessed as normal.  Judgement was assessed as good and patient was described as needing reassurance only at times of major decisions and in regard to her behavior it was described that her attitude, habits and emotional states did not limit the individual's relationships. The program director stated that the patient was able to cook, dress and do medications. She had fallen three weeks prior and did not want someone to have to care for her and was described as very independent.

There is a September 7, 2004, Chugiak Senior Citizens, Inc. Health Questionnaire signed by Carol Winters, her daughter.  As far as her activities of daily living, she was described as being socially independent, unable to ambulate and needed total assistance (one staff) for transferring, total of two-person assistance for toileting, independent bowel control, total assistance to manage incontinence and was dependent in personal care and hygiene. She had no difficulties in judgement, memory, depression or behavior according to the health questionnaire signed by Carol Winters.

There is a Resident Interest Survey, apparently filled out by Carol Winters, signed on September 24, 2004. Under types of food the patient enjoys is: cereals, fruit, bagels, pancakes, sandwiches, vegetables, salads, cottage cheese, soups, dessert fruit, salad, fish, chicken, turkey, vegetables, potatoes and rice. Activities preferred include music, socialization, reminiscing, Catholic rosaries, conversation and individual communication, range of motion and current events.

There is a September 22, 2004, document titled, Care Needs for Helen Winters authored by her daughter, Carol Winters.  Her care needs outlined are related to being hard of hearing, severe knee pain and spinal osteoporosis.  Under this point it is reiterated that the patient preferred to sleep on a couch and had done so for years.  She needed the pillows positioned under her head and legs and she could tell you how she needed them to be. She could do this herself, but now she will need help with this until her broken arm is healed.  Further outlined is history of blood clots, history of falls, chemical sensitivities and anxiety.  It is specified here that the patient had a "anxiety disorder."



EXHIBIT _B_
Page _2_ of _5_ 84

January 7, 2007                                                                                     Page 3
S. von Preyss-Friedman, MD
Re: Helen Winters

Functional Assessment, Chugiak Senior Citizens, Inc., September 29, 2004:  Social:
Rated E, needs ongoing supervision to ensure safety. Mobility: E, can only get around
with regular assistance of another person, not safe to ambulate alone.  Broken arm and
cannot use the other. Does not even want to try.  Transfer: Transfer and position changes
require two or more people, dependent on two or more people for all position changes
and transfers or one person in a Hoyer lift. Feedings: Special dietary needs. Toileting:
Needs substantial assistance. Bladder control: Totally incontinent.   Bowel control:
Totally incontinent day or night. Dependent on others. Bathing: Dependent on others to
provide complete bath. Personal hygiene: Dependent on others to provide all personal
hygiene. Dress/undress: Dependent on others to provide all dressing and undressing.
Night needs: Requires occasional care from another person. Check for IBB.  Receptive
communication: Does not understand information conveyed.  May or may not hear.
Expression, communication:  Communicates information but is difficult to understand.
May or may not understand the language.  Seriously time consuming, handwritten.
Orientation: Performs repetitive behavior. Adaptation to change, onset of severe
disability or traumatic change of life to this 30 day evaluation: Level E.  Judgement:
Level A, is good.  Memory:  Level B, requires occasionally direction and reminding from
others.  Awareness of needs: Level B. Sometimes has difficulties understanding needs
which must be met but very cooperative when given direction.  Behavior: Level E.
Attitude, disturbances and emotional states create consistent difficulties and are
extremely difficult to modify to tolerable levels and can only be modified in a special
setting with a special care plan.  Wandering: Level A, does not. Danger to self or others:
Level A. Is not disruptive or aggressive, is not dangerous.  Medication: Level D, needs
mediset setup and needs prompting. Care facilitation: Level D. Frequently requires
assistance three to five times per month in accessing and coordinating health services and
interventions. "Comments: It was stated in a letter by client's daughter that her daughter
was totally independent five weeks ago. After working with the client these past two
weeks, none of us can see how that was possible. She can hardly stand up. Her knees and
feet have nothing to do with a broken arm. Evening care requires two aids, at least 30 to
60 minutes each time. She uses the call light. Staff, in this type of setting does not have
the time to spend two to three hours a night with one individual resident.   The
communication log now states that we are to walk her up and down the hallways.  That
would require another additional hour per day one-on-one with walker, not to mention the
fact that none of us are licensed physical therapists.  We realized that she is frightened of
being in a new place and of losing her independence but we do not have the time or
training to adequately accommodate her level of care.  Attempts to communicate with her
about how we organize our time is met with hurt feelings and confusion. Client does not
realize that she is no longer capable of doing everything herself and gets angry with us
for not getting everything just as she would have it done.  Client is not interested in
activities and will not socialize with other residents."  Signed Eliria, Angel, (unreadable)
second shift September 29.  "Most all staff agree that she would be better suited towards
a nursing home where individual time is available and all of her needs could be met
according to her own standards. She cannot comprehend the fact that we have 22
residents to be taken care of by two to three aids depending on the shift."



EXHIBIT _B_
Page _3_ of _8_
      _6_

January 7, 2007                                                              Page 4
S. von Preyss-Friedman, MD
Re: Helen Winters

## 2. Residential Service Contract

There is a Residential Service Contract entered into on September 20, 2004, between Chugiak Senior Citizens, Inc., Inc., and Helen Winters, signed by Carol A. Winters, POA, and Lynn Moser as CSC representative on September 24, 2004.

Under "Section 9. Admission Criteria," the agreement specifies the following admission criteria:

> 5. Admit and retain individuals whose ongoing needs do not exceed medical or nursing services allowed by AS 47.33.020.

> 6. Admit and retain individuals with no major areas of skin breakdown or open wounds.

> 7. Admit and retain individuals who do not have a tendency to wander far or who are verbally or physically abusive or socially inappropriate.

> 8. Admit and retain individuals whose behavior places little or no stress on self, other individuals or staff.

> 9. Must be physically stable with inactive chronic disease or transient acute illness which requires continued medical attention or it is determined that staff and staffing levels can meet these individual needs.

The manager shall not admit or retain a resident who …

> 4. is believed to require special intervention beyond the capacity of the manager or staff to provide or prevent active harm to self or others.

Under "Section 11. Termination", the agreement specifies the following about involuntary termination:

Residents may be involuntarily moved only if :

> 1. She/he poses an immediate threat to self or others:

> 2. She/he needs mental health services to prevent harm to self or others

> 3. She/he has breached the conditions of their Resident Contact Agreement and/or Residents Service Plan

> ….

> 5. The manager can no longer meet the resident's needs as defined in the resident service plan or the manager determines in consultation with the resident,

EXHIBIT ___ B___
Page ___ of ___ 7

physician or care coordinator that it is inappropriate for the resident to remain at the facility.

## 3. Service Plan

Chugiak Senior Citizens, Inc. Service Plan, dated October 25, 2006: Helen makes her own health decision with input from her daughter and care coordinator. Client alerts: Helen is at risk for falls and will be monitored while ambulating, when Helen calls and allows staff to assist and monitor her. Helen will request assistance from staff using her call light or verbally before ambulating or transferring. Medication: Staff shall assist Helen taking her medication by prompting her medication twice a day. Services: Helen's weight shall be monitored monthly. Vitals including blood pressure, temperature, pulse and respiration shall be monitored by staff weekly and reported. Safety: Staff will conduct wellness checks for Helen three times on each shift. Before leaving the resident's room, staff will assure that the call light is accessible. Nutrition. Resident shall be served three days a day and a snack. Resident provides some of her own meals. Resident shall be provided assistance with cutting up meat, etc., as requested. Activities of daily living: The resident will be assisted with bathroom needs as requested. Staff shall assist with grooming, hygiene and skin care daily as requested. Staff shall provide stand-by assist with showers two times weekly as scheduled. Socialization: Staff shall encourage the resident to participate in activities and congregate meal. CSC Anchorides and family shall provide resident's transportation. Housekeeping: CSC housekeeping shall perform light housekeeping weekly on Thursdays or as scheduled. This will include emptying trash and changing linens.

This service plan was signed by Glenda Kish, Marla Nelson, Jan Freels as well as on a separate page by her daughter, Carol Winters.

There is an additional comment on the CSC plan of service by Carol Winters, POA of Helen Winters, dated November 1, 2006, making the following comments among others: "In regard to assistance with Mom's ADLs, she does not need help to eat. She only needs somebody to prepare her meals. She partially assists with her dressing. She can comb her hair and also brush her teeth, clean her dentures and do her personal hygiene after toileting, using toilet paper and moist wipes. She puts on her own makeup, lipstick and eyebrow pencil. She washes her face and puts on jewelry herself. Despite her chronic pain from her knees and back, she does partake in giving herself a bath, washing the front of her body and personal area. She does need complete help with shoes and TED hose. She also does need somebody to put lotion on her legs. Mom can take care of her own medications, putting them into her mouth by herself as long as they are within reach." There is also a comment that "although it is commendable that the staff will continue to encourage Mom to attend social events and congregate meals, Mom is bilaterally hearing impaired and very uncomfortable in these environments."

January 7, 2007                                                                                  Page 6
S. von Preyss-Friedman, MD
Re: Helen Winters

There is a clarification by Marla Nelson, that while the addition to the plan of service is part of the chart, it would not be part of the service plan.


**4. Progress Notes**

There are resident progress notes on September 22, 2004, describing Helen as being extremely anxious. She was encouraged to do as much on her own as she could but she replied that she could not. She was able to do grooming with setup.

There is a PT note on September 22, 2004, recommending assisting Helen to ambulate in the hall at the rail five feet with a gait belt and minimum assist for sit and stand and minimal assist for balance with wheelchair following closely.

On October 1, 2004, the patient became weepy and anxious and raised her voice on talking to the RN regarding ambulating in the hall. The patient felt that the staff was inpatient with her fussiness.

There is an October 7, 2004, OT note stating that Helen needed help with putting Depends on, putting shirt on, putting socks and shoes on, showering and transferring.

On October 15, 2004, an OT note stated that the patient had improvement with her range of motion.

On October 20, 2004, OT note stated that the patient was progressing and able to be independent in shirt donning.

On October 24, 2004, a staff entered, possibly PT, that Helen was able to ambulate from bed to toilet using a walker with standby assist. She was able to brush her teeth, standing with assist.

There is a PT instruction on October 29, 2004, stating that it was ok to try to walk with walker and gait belt assist.

On October 30, 2004, at 1400, a CNA documented that the resident was up without a walker or assist.

On October 30, 2004, at 2240, a CNA, Rhonda, documented that she took Helen's vital signs, gave her a shower and put her to bed. She started at 8:40 and did not finish until 10:20. She described the patient as very uncooperative and very agitated about all staff on all shifts.

On November 1, 2004, PT described that patient was able to change her own shirt and that ambulating was getting better.

EXHIBIT B
Page 9 of 9

January 7, 2007                                                                                     Page 7
S. von Preyss-Friedman, MD
Re: Helen Winters

There is a note on November 2, 2004, by PT, stating that the patient should be ambulated with gait belt and should not be asked to propel her own walker.

An November 9, 2004, discharge instruction from PT was for home exercises, continue to use a blue gait belt for transfers and ambulation and to continue to assist Helen to walk after visiting the toilet.

On November 13, 2004, there is a chart note by the CNA documented that it took 50 minutes to toilet Helen, shower and re-toilet and get to bed. She complained a lot and did not try to use her good arm and wanted everything done for her.

On November 13, 2004, there is a chart note documenting that Helen was combative and refused to do activities of daily living such as wiping clean her peri area and applying lotion to peri area.

On November 20, 2004, there is a chart note that documenting "Helen was upset that we encouraged her to put pad in Depends. She was loud and angry."

On November 23, 2004, a chart entry reads "We will continue putting pad in Helen's Depends. She will be doing all she can for herself."

On November 25, 2004, record entry documents that Helen was frustrated with peri care. She refused to do her own personal care. The record also documented that "with no employees around she has them do everything. Tonight she had Teresa doing a complete lift with a gait belt. I did the next lift assisting with a gait belt. Helen lifted herself with no problem when she realized that I was not going to completely pick her up. Her TED hose were on so tight that they left purplish bruises where they were all bunched up."

On November 29, 2004, "Helen seems to have a problem putting on her hemorrhoid cream and skin cream, but she has no problem raising her arm to show us where her hair needs combing, as she has been seen doing it with the right arm. Resident tries to get out of doing peri care, but have observed resident doing it with no problem." This was documented by Rhonda, CNA.

On December 4, 2004, the chart note documented that Helen was extremely combative and hysterical at 2100. "She does not understand why people ask her to do things herself when every one knows, 'I can't do it myself.' During the whole conversation she was yelling and telling me that no one does anything for her."

On December 4, 2004, there is documentation that "I walked into Helen's room because I thought that Steven would need assistance with her shower. I heard the resident screaming and yelling at staff so I walked to the bathroom to see what was going on and she would not calm down and said she can't do things. She wanted Steven to change her briefs while she sat down instead of assisting her to toilet."

EXHIBIT _____ B
Page _____ 9 ____ of _____ 84
                  10

January 7, 2007                                                                                    Page 8
S. von Preyss-Friedman, MD
Re: Helen Winters

On December 12, 2004, the record documnted the resident did not want to do any of her personal care and was very argumentative.

On December 13, 2004, the patient was trained for wheelchair to self-propel. The patient was unable to propel. The plan was to provide an ultralight wheelchair.

On December 14, 2004, the staff documented that the patient occasionally reached behind her for hemorrhoid cream. She was able to reach it on the shelf even when sitting on the toilet. This, however, was quite a reach. Her ability to stand up seemed to be improving.

On December 19, 2004, Rhonda, CNA, noted that the resident "started yelling at me because she wanted me to fix the front of her skirt after toileting. I very nicely noted that she could reach the waist band on the front of her skirt. She kept complaining about not getting the same care as rest of the residents. The next toileting time she had no problems fixing the front of her skirt. Also resident got up by herself today and closed her blinds."

A late entry for December 4, 2004, staff documented that they spoke Dr. Coverdale's nurse who recommended Helen to be up in her room with walker, gait belt and standby assistance.

On December 31, 2004, staff, Wendy, documented that when she was helping Helen with her p.m. care. "She refused me to help her with her briefs. She was insisting that I go get Teri to do it because I have never helped her before".

On January 14, 2005, there is communication over the medication Protonix which was not in the mediset. Helen was informed that the medication had been discontinued on December 9, 2004. It was documented that Helen was upset. Her voice got louder and louder as she yelled about the issue. "I told her over and over that I will go and check orders and see if I have made a mistake. She starts crying, 'I talk this way because I am hard of hearing. I'm not yelling.'" Helen put her light on for help with the bathroom before the nurse left the room and when staff went to take her into the bathroom she was calm, no tears, no raised voice.

On January 15, 2005, Helen was observed walking around her room and she stopped at her window and played with the blinds for 15 minutes.

Late entry of February 10, 2005, Helen was upset in regard to the dining room table. Helen picked up the entire table and moved it over about one foot.

On February 10, 2005, at 1800, "Toileted resident and was walking back to chair with walker and while I was following behind her, she stopped and yelled at me that I was not doing it right."

On February 26, 2005, the resident got into an argument with another resident who had seen her walking the night before unassisted.


EXHIBIT ___B___
Page __8__ of __85__  84
        11

January 7, 2007                                                                                          Page 9
S. von Preyss-Friedman, MD
Re: Helen Winters

On March 4, 2005, "The resident told me after I brought her walker to her that she could not get up. I went for the nurse and went back to her room. I took her the wheelchair. She jumped into the wheelchair and continued carrying on about me going after Carol..."

On March 6, 2005, the resident appeared very upset and aggravated that a.m. She was complaining that she did not get back to her room as quickly as Jenny R. did.

March 9, 2005, late entry. "Last night on March 8, 2005, we were getting Helen ready for her shower when the electricity went out. The resident was upset that she could not have her shower. I told that there was nothing that we could do about it. I was trying to put her to bed as quickly as I could as we had many other residents to check on, especially those on O2 machines. We were finished with the bathroom, on our way to the couch, when she insisted I rub her back, shoulders and arms with lotion. I said that I was very sorry but due to the circumstances, I did not have time for skin moisturization. She got quite angry and said that I did not care about how much pain that she was in. I told her that most moisturizing lotions were not used to help with pain and she went hysterical, yelling and screaming about the 'terrible care' we give to her. She would not stop or calm down so I had to say 'Helen stop it. You are going to make yourself sick.' She did calm down a little after that and I again apologized for being in a rush."

On March 10, 2005, record documents "Helen was very ugly in mood on nightshift, argumentative, and rude in manner toward staff and cutting down staff members who work here, saying that no one cares how much excruciating pain that she is in and that staff here is just hired from off the street and should not be working here. Being very insistent on how staff do things."

On March 10, 2005, at 8 p.m., staff documented that Helen called her daughter this afternoon, saying that there was an emergency, then she used the call light. While the nurse was in the bathroom with Helen, Helen's daughter showed up thinking that there was an emergency. Helen showed both nurse and the daughter that any movement at all was too painful to handle. However, in the evening she was observed in the bathroom while she thought no one was watching and she used her "bad arm" to first reach all the way behind herself to grab the lotion and then she reached back and flushed the toilet. Also when she stood up she used her "bad arm" to reach behind her bottom and adjust her pads. These were quick movements and appeared to be pain free.

On May 6, 2005, "When I first walked in the room she was yelling at Tom and Forest for not making the bed right. She was verbally abusive to them. Tom asked her to lower her voice, and she said that she could not hear, and if she was talking loud she did not know it. He replied, 'That is why I was reminding you that you were being loud.' I tried to calm her down."

On May 15, 2005, Helen was vomiting at dinner time. She vomited about an hour. Her blood pressure was 150/100, pulse 124. They sent her out with the EMTs to the hospital.

EXHIBIT ___B___
Page __9__ of __84__
      13


January 7, 2007                                                                                    Page 10
S. von Preyss-Friedman, MD
Re: Helen Winters

On May 17, 2005, Helen returned from Providence via her daughter with Cozaar and Levaquin to start that day. The staff would take blood pressure two hours after the second Cozaar.

On May 17, 2005, "Helen raised her voice to me when I was getting her ready for bed. I told her not to raise her voice to me, and she said she was deaf and that was why she was talking loud. She continued to raise her voice and be abusive. I told her I would come back when she could speak civilly to me." This was signed by Tom Isaacs.

On May 20, 2005, staff documented anxiety over her medications.

On May 25, 2005, chart notes reflect that an unidentified staff probably Marla Nelson states, "I spoke with Carol re Helen's verbal abuse towards staff, gave specific examples such as calling staff 'trailer trash,' and stated that staff was hired off the street. Carol expressed concern that her mother had never used that type of language, and she was concerned if these allegations were true. Agreed that program director would speak with Helen re verbal abuse towards staff."

On May 23, 2005, "Spoke with Helen regarding verbal abuse towards staff, gave examples, see above notes, I advised Helen that it was my expectation that all staff and residents be respectful to one another. Helen denied allegations. Restated expectation of respectful behavior."

On May 26, 2005, her blood pressure was 124/90. Helen stated that trial of Xanax made her drowsy.

On June 3, 2005, "Discussed the Cozaar order with Helen and Carol. Helen agreed to take Cozaar 25 mg t.i.d., not 75 mg q.d."

On June 16, 2005, Jessica and Michelle went to Helen's room to start putting her to bed about 20 minutes early. "Helen was very upset about us taking her blood pressure. She say, 'You need to do it around my neck like Glenda and Fred.' I told her that we have never learned the method but the next time I see Glenda or Fred that I would have them teach us. Helen went on to say that we cannot put her to bed early because it is bad for her health. I explained that we have many people to attend to and that I would need to put her to bed now or it would be quite a bit later, but she did not want to do that, so we got her into the bed and the whole time she was upset because we don't have enough people who work here to be in her room all the time because of her problems. She requests a lot of special care. I told her that I would love to be with her all the time but it is not possible. She blew up and said that me and Michelle need not complain because she pays us a lot of money to do whatever she asks us to do. Then went on to say, 'All of you people are lucky to even have jobs.' We walked out to get Teresa to talk to her and because she was being verbally abusive." This was signed by Jessica and Michelle Nelson.



EXHIBIT _____ B
Page ___ of ___ 84
13

January 7, 2007                                                                                 Page 11
S. von Preyss-Friedman, MD
Re: Helen Winters

On June 22, 2005, "I was making Helen's bed. She did not like the way I was doing it. She got mad and tried to get up and walk over to the cough and do it herself. I told her all the time, 'You are not supposed to be walking without your walker.'"

On June 27, 2005, the resident appeared to be extremely upset in the a.m. in regard to having her blood pressure taken.

On August 2, 2005, on the 6:35 rounds, Helen was found at the kitchen sink getting water, very upset, walking quickly around the counter saying, "Please don't tell no one, I never do this." She said, "It was an emergency." She needed to drink water.

On August 7, 2005, the resident refused to walk with gait belt and said, "My knees are hurting too bad." The resident also refused to do exercises when prompted.

On August 15, 2005, at 5:40, "I heard noise and went to Helen's room. She was up getting out her banana oatmeal and put her hearing aid on kitchen counter. She claimed her brief was bothering her and that was why she was up. She was seen by two aides."

On August 30, 2005, it was reported that she went to the doctor the day before and had a steroid injection of the left knee. She had had this before so she understood the expectation for improvement.

On September 1, 2005, the resident was raising her voice this morning saying, "'My knees are excruciating, put my shoes on now. I can't put my shows on now anymore, my arm hurts.' After adjusting the resident on toilet, I noticed that she removed her right shoe, put it back on and tied it by herself when I walked into her bathroom as she had on her call light. She was startled and replied, 'My shoe wasn't on right.' I said that I thought it was great that she was able to do that. She replied, 'No, no I can't.'"

On August 10, 2005, the progress notes document that the resident interrupted the staff several times while trying to serve residents their dinner. "'She said, 'I need my desert right now.' I said I was still serving residents their dinner, can you please wait a couple of minutes. After that I continued to serve dinner to the other residents. During dinner she started to talk to all within hearing and said, 'These people don't care about what I want; they always ignore me. They play favorites to everyone else.' (Another resident) along with several other residents heard what she said. (Another resident) became very upset and told her in a raised voice, 'Did you know that you are not the only one who needs help. You need to stop thinking you are the queen.'"

There is an undated note, probably before September 17, 2005 documenting that the resident was speaking in a loud voice talking and arguing with another resident, "If it wasn't for me you would not be getting communion." The two residents continued arguing until one walked away. Another resident approached her and said in a loud voice, "I'm sick of your shit. Take it outside." He repeated himself because Helen said she could not hear him. She was yelling at the other resident, "You don't understand," and the argument ended by the resident walking away.



January 7, 2007                                                              Page 12
S. von Preyss-Friedman, MD
Re: Helen Winters

On September 20, 2005, monthly assessment.  Daily routine remained the same. She needed assistant when using a walker, as standby plus gait belt in case of fall. She used wheelchair in the dining room for meals.  Peri area was presently less irritated.

On September 21, 2005, the resident demanded that staff member put more napkins in the holder on table.  The staff member explained that they get restocked after each meal. After a few minutes later, the resident started expressing to staff member loudly how she felt about it. She was removed from dining room because other residents were getting upset.

On September 25, 2005, the patient was really loud and disruptive in the dining room. She was arguing with another resident at her table.

On September 27, 2005 the record documents that the resident started screaming at staff member and visiting resident.  The staff member went to get Helen's trash, another resident was visiting Helen and as staff member started leaving the visiting resident followed.  Helen began screaming that the staff member was taking her friend away.  The staff member did not engage in any conversation and left room.

On September 29, 2005, at 11 p.m., "I found Helen up and about again in her kitchen without her walker doing dishes in the dark again. I asked her why she was up without her walker. She stated that she never does this. I suggested to her to take a walker with her next time. She said, 'No.' I suggested she just call someone. The third time I found her up in the dark washing dishes in the middle of the night. She was very upset that she was called on this issue."

On October 26, 2005, "I walked into Helen's apartment tonight and Helen was up walking around without her walker. She asked her to please not say anything to anyone."

On October 28, 2005, monthly assessment revealed no change in medication or daily routine. She gets very upset with the staff if her routine is altered in any way including placement of pillows on her couch.

On November 12, 2005, great toe of the right foot had a scab on it and may be tender.

November 3, 2005, 2145, late entry.  Helen was pushing her wheelchair while standing in her bathroom. She got off the toilet to get extra medication that she wanted to apply on her own. Helen did not want the employee to chart this incident.

On November 29, 2005, "Helen complained that her wheelchair was close to the couch and she hit her foot on it.  The chair was placed as close as always and she did not hit her leg.  Helen was shouting in a loud voice about her call light not working. She used the phone to call us.  Teri and I tested the call light unit times two the first time and times three the second time and each time the unit was working fine.  I asked Helen if she had gotten up and walked over to her hamper and she yelled out that I was calling her a liar and she was going to call her daughter and tell her that I'm not treating her right and that

January 7, 2007                                                                                 Page 13
S. von Preyss-Friedman, MD
Re: Helen Winters

I'm rough and everybody said so. Helen kept yelling in a loud voice that she never gets up on her own and everybody is lying. I tried to explain to her that if she does get up she needs to take her walker or wheelchair with her so she does not fall. She said, 'I can't believe the kind of place this is.' I said, 'If you don't care for this place, you can look into other options.'"

On November 30, 2005, Helen was upset because the call light was not working. She put in a report with maintenance and told Marla.

On December 4, 2005, at 1300 the record documents "Found resident at bathroom standing at sink with Depends down and brushing her teeth. Then she walked over to the shelf and got a roll of toilet paper"

On December 7, 2005, "Left voicemail at home re transportation to dentist. Spoke with her at home at her office. Carol will call this a.m. to schedule an appointment."

On December 17, 2005,the record documents "While assisting in the bathroom she asked for five Poise pads to be put in brief.  When we asked if she was sure she wanted five pads she started getting agitated and started yelling at us for not understanding that Geneva Woods told her to do it that way. We told her that it was fine.  It just looks uncomfortable. She became more agitated. We asked her to stop yelling before we left the room to go to lunch, and she would not. I stood in the kitchen to get her calmed down when she slapped at me on my left hand because she wanted to go to the dining room." Signed J.W.

On December 17, 2005, "Today after dinner Annette put her on the toilet. I went with her to get Helen off and she was across the bathroom with her briefs around her knees and I said, 'Helen why are you up without a walker and why didn't you just ask us for help?' She said, 'Well I needed toilet paper soon and I thought I should just get some but don't write any of this or tell anyone about this because I never do this.' I explained to her how dangerous it was and she said, 'I don't care.  I am fine and I am always very careful.'"

On December 24, 2005, records document "Helen was upset and raising her voice to Teri Wilde and myself because we could not serve lunch early in her room because we were quite busy at the time. She said, 'Neither one of you are nice people and you should not work here.'"

On December 27, 2005, there was a breakdown rash type on her upper abdominal fold.

On December 27, 2005, there was chart note by Marla Nelson.  "I spoke with Helen re incident with staff in the lunchroom on December 24, 2005.  Helen denied being upset with Tom and Teri."

On January 6, 2006, "Went in to do vitals blood pressure was 168/106, pulse 98, at 2150 180/110.  I called the on-call nurse and she said to send the resident to hospital.  The daughter was called and was going to meet them."

EXHIBIT ___B___
Page _B_ of __ 84
        16

January 7, 2007                                                    Page 14
S. von Preyss-Friedman, MD
Re: Helen Winters

On January 7, 2006 at 0100, "Helen returned to CSC. Carol came to door and had Helen in her truck. Helen had been released from ER. Helen had EKG in the ER. Helen and Carol both said that the ER said everything was fine. The blood pressure in the ER was said to be 140/90. Returned resident to room."

On January 7, 2006, vitals at 0500 reported blood pressure 166/96. They called to inform RN. RN advised to take vitals b.i.d.

On January 7, 2006 at 0745 hours, "Went in with Teri W. to get Helen ready for the day. When asked to take her blood pressure the resident refused to let me take it while she was lying down. Later blood pressure was 182/120. I notified RN and went back at 1100 and blood pressure was 148/102. Another blood pressure machine was advised to take blood pressure by RN."

On January 9, 2006, call to daughter Carol regarding followup appointment with Dr. Jones regarding Helen's elevated blood pressure. She would be seeing Dr. Jones the next day for evaluation.

On January 10, 2006 at 0800, "I tried to assist Helen Winters with her shirt that she took off. I went to help fold it and she smashed my hand in the middle of the fold," signed DW.

A late entry by, G. Kish, RN. "Talked with Fred by phone re hypertension and resident returned from ER. Advised to take blood pressure a.m. and p.m. Talked with Carol per phone. Discussed increased blood pressures and changed timeframe in the a.m. so that resident won't refuse. Talked with Annette per phone. Advised to call if blood pressure over 150/90, but have conversation with me. Talked with Carol per phone. Carol desires not to seek medical intervention as she did when I called her on January 7."

On January 8, 2006, at 2230, blood pressure was 166/106. "Called Carol. 'Not an emergency, I'm in bed and have to work at 7:30.' She stated that she would make a doctor's appointment on Monday." G. Kish, RN.

On January 11, 2006, at 2010: "Went in to take Helen's blood pressure. Her daughter told me I was using the wrong cuff. Got larger cuff. Helen upset because her blood pressure was 173/106. They insist that I go get the first cuff I originally had and she was still upset because the blood pressure was 176/100. Helen and her daughter were using extremely raised voices that were heard by another aide four rooms away. Helen's daughter stated to me back at the nurse's desk that it was okay about the blood pressure and not to take it again tonight and that her mother is fixated on her blood pressure like a little kid."

On February 17, 2006, staff was in the apartment at 0715 and asked resident if she was ready to take a shower. She asked who was giving the shower. "I told her me, Julia, upon which the resident rolled her eyes. She then asked if someone else could do it and I explained that it was my hall this week and the other aids were busy. She told me that she

January 7, 2007                                                              Page 15
S. von Preyss-Friedman, MD
Re: Helen Winters

would think about it and so I left.  When I came back 20 minutes later, the resident refused the shower.

On March 14, 2006, after getting out of the wheelchair to get on the sofa, Helen was out of breath and wheezing at 11 p.m.

There is a March 15, 2006, note stating that the lungs were clear to auscultation.

On March 22, 2006, "Talked with daughter Carol re present recommendation from PT, encouraging walking, moving.  Daughter will also encourage her to use her walker."

On March 23, 2006, monthly chart check.  She had a 5-1/4 pound weight gain since January, a 17-1/4 pound weight gain since September.  Progress notes, flow sheet and MD orders were reviewed.  She had been eating in her room.  She stated that her shoulder hurts to sit in the wheelchair and earlier, colds were among other residents.  PT/Bob called today to advise that he had been fired by her daughter, Carol and would not be back.

There is a chart note, probably (photocopied incompletely) dated March 24, 2006, at 1730 hours.  "All three of us, Annette Fee, Deborah Wasick and Rhonda Cameron were standing at the front door as Carol came out of mother's door stating, 'I need to talk to you three.  My mom is not to be walking.  I have fired the PT and I'm looking for a new one.'  Rhonda stated that we can only follow doctor's orders.  Carol interrupted and said, 'Rhonda, you have abused my mother in the past and you stay away from her,' and she was lunging towards Rhonda.  I, Annette, stepped in front of Rhonda.  Carol grabbed my hand.  I pulled my hand back and said, 'Do not grab my hand, calm down and leave.'  Carol came back with 'I pay taxes. I pay rent.  Do you know what I do?'  I said, 'Yes. I pay taxes too.  Please stop and listen to what Marla has told us to do with your mom and walking.'  I explained that if Helen wants to walk that is fine. If she wants to use the wheelchair that is fine too. Then I, Rhonda, said, 'We do not force anyone to do anything they do not want.'  I said, 'If they refuse then we have them sign a refusal form.'  Carol said that was fine and 'I don't know how any of this got started but as long as we are on the same page that's fine.'  Carol went outside. I had to go outside for something else.  Carol stated, 'I'm sorry,' and shook my hand and said, 'No hard feelings.'  I said, 'No hard feelings.'  Signed Annette Dee, Rhonda Cameron

On March 25, 2006 record documents: "When I entered Helen's room at 8 p.m. to toilet her, she was upset because the communion woman came to her last.  She went on and on why should (another resident) go first!  I explained that they did it out of kindness so that (another resident) could play Bingo on time.  Immediately she shouted, 'I guess you won't put lotion, shoulder again.'  I told her no because if her shoulder was injured skin lotion won't help and I might make the shoulder worse."

On March 28, 2006, there was a phone call by Kathy Haskey, care coordinator.  "She wanted to make sure that we knew that Dr. Moss said that Helen had pneumonia.  I advised her that we were aware of that."

EXHIBIT____B
Page____5____of____84
18

January 7, 2007                                                                    Page 16
S. von Preyss-Friedman, MD
Re: Helen Winters

On March 30, 2006, Dr. Moss visited Helen and said she was doing fine. There was a revisit in two to six days. There were no further orders.

On April 3, 2006, the right great toe was bruised from half way at base of right toe. There was pain and swelling. "They must have done it while putting on my shoe."

On April 4, 2006, "Helen keeps insisting that we take off her gait belt while she is standing doing her care at night. I told her no, the doctor wants it on her with written instructions for it at all times when she stands up or is walking, should she fall while doing her care."

On April 6, 2006, Dr. Moss was in to check Helen. "I told Dr. Moss that Helen was on her third bottle of cough syrup and none of the staff had heard her cough all week long." Dr. Moss went in to listen Helen's chest and said it sounded clear and that he wanted her to continue to walk and that she could use the cough syrup for another two weeks p.r.n. every four hours."

On April 11, 2006, "While taking her into the restroom with the gait belt she stated, 'This place gave me pneumonia from never walking me.' Then she said, 'Please don't write that down or tell anyone I said that.'"

On April 13, 2006, Helen's right ear was red and irritated from a new hearing aid.

On April 17, 2006, her right ear was without redness. Helen stated that the hearing aid was changed.

On April 19, 2006, at 10:30, "Discussed with Helen MD visit. Also discussed the use of the gait belt while standing. Reinforced safety issues. Will allow her to determine ambulation times versus wheelchair dependent upon her toleration. Will follow these orders."

On April 21, 2006, "Talked with Helen and Carol re standing at commode, standing adjusting Depends without gait belt. Carol states understands at least for safety reasons to keep on. Helen reluctantly agrees. When offered to sign a release to not wear the belt while standing, Helen decided not to." Marla was able to observe scenario of Helen's toileting routine. The gait belt did not seem to hinder Helen in any way. Also discussed with Helen that she had not been coming to the dining room since last fall. "I'm not ready yet." Carol had encouraged her to consider returning to the dining room for meals.

On April 26, 2006, a release was signed by Helen to allow her to stand at the commode and fix inserts without gait belt on, offered option to allow Carol to read before signing and she refused.

On April 27, 2006, "Upon doing rounds at 5:30 a.m. Fred and I entering Helen's room found her at the kitchen sink in the dark, unassisted doing dishes. I turned on the light

January 7, 2007                                                          Page 17
S. von Preyss-Friedman, MD
Re: Helen Winters

and she got very anxious and immediately asked me not to write this down, that she need to get up and move around."

On May 22, 2006, she had a 6-pound weight gain since January. She was aware. MD orders, flow sheets and progress notes were reviewed. Vital signs were normal. She continued to stay in her apartment. This was signed by G. Kish, RN.

On June 20, 2006, podiatrist removed ingrown toenails on June 14, 2006.

On July 10, 2006, 2310, when checking Helen on the nightshift at 2310 she was found standing next to sofa. "I checked what she was doing. She said she was fixing her pillows. She turned around just on sofa and fell in the same position on floor. Vitals were taken. No injury or bruising found. A message was left on Nurse Glenda's phone. Helen did not want this reported and said that she fell because staff came to check on her. Vitals 175/109, 98, temperature 96.9."

On July 18, 2006, at 1600, there is a chart note by Marla Nelson. "Helen requested to talk to me. I went to her room. She stated that some staff would not heat her TV dinners, soup and waffles in her room. I explained to Helen that we do not cook for anyone else and this was above and beyond our care level. I also advised her that the staff could either prepare her meals in the room or the dining room. Helen went on to say that some staff were not respectful and I had told her everyone is to be treated with respect and I agreed with Helen and I again stated that I expect everyone to treat everyone with respect."

On July 21, 2006, there is a chart check. She had a mammogram screening.

On July 30, 2006, Helen was up at 2 a.m. Helen was complaining that her right hip hurt. Suggestion was made that she contact her doctor. No bruising was found.

On July 31, 2006, she complained of right hip pain.

On August 3, 2006, she had right foot pain.

On August 8, 2006, Helen was very uncooperative and argumentative concerning her care and regarding her hip pain and while in this pain she was yelling very loudly and not speaking respectfully to nightshift, supervisor and staff. "I could not reason with her. Helen persisted in doing things her own way which at times is not safe or beneficial to help her in ADLs she needs assistance with."

On August 8, 2006, "Helen refused to go talk to manager about her present situation with me along. She did not want me to chart this."

On August 10, 2006, Helen had not been wanting to comply with the safety regulation of using the gait belt while transferring.

EXHIBIT __B__
Page __B__ of __B__ 84
20

January 7, 2007                                                                        Page 18
S. von Preyss-Friedman, MD
Re: Helen Winters

On August 15, 2006, the record documents "I was in Helen's room from 7:15 to 8:30 this
morning for all of her ADLs and shower. She is continuing to be more needy and taking
up a lot of time that is needed for other residents. Upon leaving each time for toileting
she keeps coming up with other things to do. (Turning the light up and down and looking
around the room, etc.) I told her I got everything and just walked out. She rang the light
eight times today with 10 to 15 minutes each time."

August 16, 2006, at 1815 hours, record documentation "Helen came back from her
doctor's appointment at 1815. We needed to have her weight and vitals taken. We got
her weight but she refused to have her vitals taken, and she refused to sign a refusal form.
Helen was very upset about being asked to sign a refusal form. We took her back to her
room and she yelled at us the whole way down the hall upsetting other residents in the
process. Helen continued to scream at my coworker accusing her of 'not wanting to help
her' and I was being mean to her. My coworker continued to do Helen's ADLs in an
extremely professional manner. This seemed to further upset Helen to the point where
Helen even said to my coworker, 'I hope that your mother gets old and sick and ends up
in a nursing home and we will see who is laughing.' Helen's only real complaint about
my coworker was that she was not smiling when we first entered the room."

On August 16, 2006, 2200 hours, "Two aides went to put Helen to bed. Helen started in
on both of them saying that one aide was going to 'rub off' her bad manners on the other
aide and how the other aide does not care about anyone. Once in the bathroom, Helen
continued to fuss over everything they did. She was angry at the aides because the brief
was not fitting and they had to use tape to keep them on her. The took her out of the
bathroom to the couch/bed, and Helen continued to verbally abuse both staff members,
screaming and crying on the top of her lungs. Once Helen was safely in bed she
continued to yell at them both. They eventually just had to walk out as the disturbance
was loud enough to wake up half of the hall." This chart note was by a CNA. I cannot
read the signature. A side note states, "During Helen's first episode at 1815, Helen also
wanted me to switch halls with the other aide. She was trying to 'pit me' against the other
aide trying to say that I took better care of her and I understood her better. We both
explained (tried to explain) to her that I had responsibilities on my own hall and we could
not just switch. This just made her more agitated. Another resident was very upset over
this. She thought that the aides were being abused, scared to the point that she thought
Helen was hitting us. Helen was not physically hitting us just extreme verbal abuse."
Signed Teri Wilde and the CNA whose signature is unreadable.

On August 17, 2006, "Helen out to urologist yesterday. Received orders for Cleocin and
vaginal cream times three days. Helen will do it herself."

On September 11, 2006, at 1310, "Marla and I discussed with Helen the following: Per
her request: 140/80 per my reading, manual. Helen states my readings are always lower.
I state that I usually takes them after she has had a blood pressure pill. I also explained
that on several occasions the auto box blood pressure was verified by manual. Her
request to change her shower back to Tuesdays and Fridays was agreed upon by Marla. I
explained to her about the red indentation by her TEDs on both lower legs and mentioned


EXHIBIT _B_
Page _21_ of _84_

January 7, 2007                                                        Page 19
S. von Preyss-Friedman, MD
Re: Helen Winters

decreased circulation and she said that it was okay. 'The doctor knows what he is doing.'
She states that she alternates the folds so there is never an indentation. Discussed that her
soup and TV dinner together was approximately 1000 mg. (She doesn't drink the DR
also) and that was okay for a low sodium diet. 'I don't think I'm that picky.' I explained
to her that Thursday p.m. when I fixed her dinner, I offered her three different glasses to
pick from for her soy milk, heated in the microwave just enough to get the chill off and
she requested a white cup. She explained to me that the handle on the cup made it easier
to drink, and I asked how that compared with a glass that she drinks her chilled purified
H2O out of and she stated she sips the H2O and needs to drink the milk." G. Kish RN

A right and left eye ecchymotic area was noted on October 10 without trauma.

On October 11, 2006, Helen returned from a doctor's appointment. She needed two
person assist to get up.

On October 11, 2006, "Helen is still insisting that we have to 'pull her up' with the gait
belt and when we could not, she raised her voice saying things
like, 'God will punish you,' and 'Everybody says how horrible you are.' We told her
twice that if she did not stop raising voice at us that we were going to walk out. She
didn't stop so we walked out. She used the call light a few minutes later. We went in to
finish assisting her. she was silent and did not say a word. We left her sitting on the couch
and when we went back she was lying down with her legs propped up on the pillows."

On October 12, 2006, "Resident was changed on couch."

On October 13, 2006, "At 2: 30 changed brief, Helen unable to stand, took 30 minutes.
At 4:30 changed brief again. Helen was unable to stand, took 35 minutes.

On October 13, 2006, "Helen took a second Ultram pill this evening around 7:30 p.m.
and when we put her to bed she complained that the pill did not help any; however, she
was getting up and down a little easier last night."

On October 12, 2006, there was a quarterly assessment and monthly chart check. The left
eye was assessed. "Sclera remained (unreadable). Appears reactive. Skin intact. Distal
(unreadable). Has extended to 3.5 cm. Other has extended from 2.5 to 3 cm. Upper area
bruising has decreased bruising. Helen denies pain, trauma. Able to transfer chair to
wheelchair times one assist using gait belt."

On October 14, 2006, "While putting her into bed tonight she could not get her neck
comfortable. We adjusted her pillow over 10 times but she still did not like the way they
were. She told us to just keep moving it and we told her that we would try one more time.
(She then raised her voice very loud and said, 'You will do it as many times as I tell you
to do it.') We tried one more time and said good night. As we left the room she was
saying, 'I hope one day you will have to suffer.' (I again said good night and shut the
door.)



January 7, 2007                                                           Page 20
S. von Preyss-Friedman, MD
Re: Helen Winters

On October 16, 2006, 1340, "Went to Helen's room per phone request, wanting to know what to do about there bilateral knee pain. I suggested: (1) Followup with ortho consult. (2) Change pain meds. (3) Try taking increased Ultracet. Helen is concerned about increased Ultracet. I suggested she try 1-1/2 tabs. She will think about it. Ecchymosis has decreased in size OS 1 cm from eye. Bruising continued 1 x 2 cm. Still denies trauma." Signed G. Kish, RN.

On October 18, 2006, "Discussed with Helen knee pain. Unable to give a pain level 0 to 10. She states Carol had talked with Dr. Schaab last week, and he suggested to use knee pads again. Carol can't locate them at this time. I suggested: (1) I could call MD and get new knee pads. Helen desired not. (2) Increase Ultracet to 1-1/2. She will think about it. She states it is still difficult to pivot her right foot. Decreased ecchymosis … Denies pain. Talked with Carol about knee pads. Carol looked again in Helen's apartment and at her house. At this time Carol desires that I not call MD to get a new order. Advised Carol of better mobility and pain a little better."G. Kish RN

On October 23, 2006, "Talked with Carol Winters re Helen being changed in place on nocs on her couch. I advised that this is a safety concern for both Helen and staff and was to be a temporary measure during the crisis with Helen's knee. Advised Carol we needed to get back to Helen going to the bathroom at night or get a hospital bed to chance her in place. Carol agreed to talk with Helen about going to the bathroom at night as she does during the day. We agreed to see what progress Helen makes in the next couple of nights when encouraged to get into the wheelchair to go to the bathroom. If that does not work Carol agreed to look into a hospital bed." Marla Nelson

On October 25, 2006, "Helen requested 1-1/2 Ultracet pain pill. She had agreed to try 1-1/2 to see if she gets better pain relief. Per her request, I will check on her in a couple of hours and then Mary will need to check her before she leaves. Discussed her getting the flu shot this Saturday when CSC` has their health fair. Form is complete but Helen believes she will decline. She acknowledges Carol wants her to take it. Vitals signs done. When entering at first visit, I found Helen standing up at commode, she herself adjusting her peri pads. 'When did I stop walking to the bathroom? Whose idea is that I use this wheelchair?' When I explained about her knee pain, 'I don't remember.'" Signed G. Kish, RN.

On October 25, 2006, "Helen stated that she does not want to take the flu shot because of taking pain meds. Helen stated, 'I will not use a hospital bed and I want to be changed on the couch during the night because I've gotten used to it.' Explained to Helen that continuing to change her on the couch is too hard the staff. Helen stated, 'I don't care about them. What about me having to get up?'"

On October 25, 2006, "Phone call to Carol Winters, advised starting tonight Helen needs to get up during the night to get to the toilet. Carol said her mom said that she would try it and then asked if the hospital bed was still an option if Helen did not want to get up at night. Advised her yes as long as the aides can get on both sides and raise the bed to their

January 7, 2007                                                    Page 21
S. von Preyss-Friedman, MD
Re: Helen Winters

waist. I advised Carol that raisers on the couch would not work as aides would still need to be able to get on both sides of the bed."

On October 26, 2006, "I reminded Helen to use her call button to go to the bathroom during the night. I explained to Helen how skin could breakdown from lying and sitting in urine for long periods of time."

On October 26, 2006, "Phone call to Carol Winters. Left message re Helen's response and that Helen understood that her skin could breakdown if she did not have brief changed at night or go to toilet."

On October 26, 2006, "Marla and I to Helen's room per her phone request. Helen is still having difficulty hearing adequately with her hearing aid. We reiterated the significance of having Depends changed in a timely manner to prevent skin breakdown. Helen still states that there are no issues for safety, etc., with her being changed on her sofa. Unable to convince Helen that safety is an issue. Encouraged her to congregate in dining room with meals. She states that it is too loud.  Suggested (unreadable). She states it is too loud. Will attempt ambulation with walker to toilet this evening. Helen states pain pills are not helping.  I tried to explain to her the improvement in the past two weeks." Signed G. Kish, RN.

"The resident was using toilet, went into assist resident, getting up noticed that resident had blood all over hand, some on her (unreadable) what was wrong?  Resident stated that she had to use a hemorrhoidal suppository that the pill was making her do this. I gave her three large wipes and toilet paper to clean.  Blood pressure was 173/100, 84."

On October 31, 2006, "I checked Helen's stool after toileting at her request.  There was no blood in the Toilet and no blood on the toilet paper. There were times three stools formed, one of them was a normal dark one in color.

November 1, 2006, late entry for October 30.  "Late entry because I was not working October 31.  2050, call from Annette re blood on hand and 1 tablespoon clot in toilet. Called Carol and advised. She states that in 2002, she had almost bled to death. She had been on Coumadin and at that time had had stomach ulcer. After third endoscopy it was okay.  A mesh filter had also been placed. Carol said that her mom had called and said she had a little blood on her napkin. We discussed the Ultracet issues with gastric problems. Advised that Carol we would take her blood pressure now q.2h. if she could call Helen and convince her of that need. She agreed to call Helen.  Called CSC back and advised Melodie to take blood pressure. She called with 173/100, sitting.  Advised not to give Ultracet and take blood pressure with manual.

11/1/06 record documentation: It took 45 minutes to get Helen ready for bed tonight.  We were trying to adjust her neck pillows but she could not tell us up or down, left or right.After trying to get them right for about 5five minutes& told her we had to go& take care of other residents as well. Helen raised her voice realy loud & said "you have to make me comfortable" I tried one more time & she was still talking loud about how we

EXHIBIT   B
Page  21  of   84
       24

January 7, 2007                                                                    Page 22
S. von Preyss-Friedman, MD
Re: Helen Winters

should stay as long as it takes until dhe is comfortable. We then told her good night & left the room, she was still "talking loudly" when we left.

On November 7, 2006, "When resident was in shower, I noticed blood. Helen said, 'It must be my hemorrhoids.' Helen put in a suppository and used hemorrhoidal cream. Nurse was notified."

On November 8, 2006, "Helen is standing and sitting much better. She is able to walk back and forth a couple of times.

On November 20, 2006: "Talked with Helen about gait belt not staying in place. She refuses to use a cotton one due to Dr. Schaab's advice. I ambulated Helen to bathroom with walker with gait belt and went slowly but well, tolerated well. 1315: Notified Carol re issues." G. Kish, RN.

11/26/06 Monthly checks, MD orders, progress notes, flow sheets were reviewed by G. Kish, RN.

The chart further contains prompt sheets/vital sign sheets indicating that on October 2004, her weight was 132 pounds. In December 2004, the weight is 142 pounds. In May 2005, her weight is 156 pounds. In July 2005, her weight is up to 161 pounds.

## 5. Care Conferences and communication with resident and resident's daughter

There is extensive written communication and documents regarding phone conversations, facility, resident and family concerns and care conferences, commencing 12/21/04 to 10/26/06.

Care conferences with CSC Program Director , Carol Winters, Helen Winters and others were held on 6/24/05, 7/5/05, 7/15/05 and 7/29/05.

There is a copy of a notice of termination to Helen Winters by Jan Freels, Project Director , Assisted Living Program Administrator, CSC. There are notes from a meeting on 1/9/06 with CSC Administration and the patient's care coordinator Kathy Huskey and the Ombudsman, Bob Dryer.

## 6. Report Ombudsman August 30, 2006

The report was in response to a complaint received by on July 8, 2005. The complainant stated that the resident was being "verbally and mentally abused" by CSC staff and is not being treated with "respect and dignity". Another issue was a complaint about meals and alternative meals as resident needed a low salt diet. The LTCOmbudsman received subsequent complaints.

He met with the complainant and as well as resident and staff. Based on these interviews the Ombudsman issued an opinion that the facility violated AS 47.33.330 and AS 47.33.350, specifically staff being abrupt with resident, insensitive, don't accept

EXHIBIT B
Page 22 of 84
25

January 7, 2007                                                                          Page 23
S. von Preyss-Friedman, MD
Re: Helen Winters

resident's wishes to have her home in a certain order, refusing to provide care when resident needed to attend bodily functions and causing mental trauma and hospitalization by issuing letter of eviction directly to resident rather than her Power of Attorney. Further, he cited failure of CSC to provide therapeutic meals and the prevention of practicing her religious beliefs due to failure to accommodate appropriate eating times.

He recommended that the Department of Health and Social Services, Division of Public Health, Certification and Licensing Unit issue a notice of violation.

**7. Letter Marla Nelson to Department of Health and Social Services 1/23/06**

Program Director Marla Nelson issued a letter to Richard Saville, Community Care Licensing Spec. II on 1/23/06 in response of complaints from Carol and/or Helen Winters and attached requested record documentation.

**II. Site Visit Chugiak Senior Citizens Assisted Living Program on December 7 and 8, 2006**

**1. Tour of Chugiak Senior Citizens, Inc. on December 7 and 8, 2006:**

Two visits were made, December 7, 2006, in the evening and December 8, 2006, in the morning. Chugiak Senior Citizens, Inc. is a modern one-level building with multiple entrances. I entered through the entrance of the assisted living portion. There were no staff observed at the entrance smoking. The facility was clean and there was no odor. Ms. Winters' file was inspected and the nursing files appeared completed. The facility was tidy, the residents appeared clean and well groomed. On December 7, 2006, a party had taken place and several residents approached the three nursing assistants with cookies they brought from the party, two residents gave the assistants flowers that they had received from the party. The assistants were observed to have a friendly affect towards the patients and the residents appeared to enjoy interacting with the assistants. The dinning room area was toured on December 8. It had a home-like feeling. Every table had not-immediately-perishable items such as fruit, crackers and snacks. There was also cake and banana bread laid out for self service as well as coffee. The common areas of the facility were decorated for the holidays. There was a mailbox at the entrance of the facility. A representative apartment was toured with permission of the resident inhabiting it and showed a living room and separate bedroom area as well as a kitchen corner and a separate bath with a walk-in shower which had a shower bench.

Grievance procedure was posted.

**2. Interview with Glenda Kish, RN:**

Ms. Kish has worked at Chugiak Senior Citizens, Inc. since April 2005. Work hours vary between 15 and 40 hours per week. She is responsible for overseeing nursing policies and procedures, and putting together an education book and educating the staff. Nurse Kish does quarterly and as needed health assessments as well as admission health assessments.


EXHIBIT ___B___
Page ___35___ of ___84___
26

January 7, 2007                                                         Page 24
S. von Preyss-Friedman, MD
Re: Helen Winters

She does perform monthly chart checks, checks the plan of care for discrepancies and pill charting. She checks doctor orders and reviews the progress notes and vital signs. She works together with another nurse, Mary, an LPN, in doing monthly chart checks and medisets. Nurses are on site between Monday and Friday and both are on call the remainder of the time. Medication is assisted by a bubble pack from outside pharmacy and two levels of medication assistance is provided. One is prompting only as well as providing the resident with assistance. LPNs are available for assistance with eyedrops and topical wound care prescription by the nurses. Ms. Kish volunteers that she now works on Thursday evenings to relieve staff from taking care of Helen Winters as this has provided a significant burden on staff. She states that she toilets Ms. Winters at 4:30 and then fixes her dinner. Dinner usually consists of a microwave TV type dinner; however, it is not clear what brand. Ms. Kish has observed Healthy Choice pizza as well as glazed chicken. Together with a microwavable dinner Ms. Winter eats yogurt, a large jar of baby food and waffles. She also has chocolate and candy available to her. Ms. Kish relates a recent episode of decrease in function of Ms. Winters due to complaints of increased knee pain that Ms. Winters attributed to a swish-and-spit oral medication that she was taking for yeast infection. Nurse Kish relates that Ms. Winters is not amenable to her suggestions and that the daughter, Carol, has to be involved in order for Ms. Winters to consider the nurses' suggestion. A recent example sited is that the nurse suggested that Ms. Winters partake in the flu shot offered at the health fair and she was reminded several times. However, the patient did not partake of this offer and when the health fair was over she did want the flu shot given. However, the nurse did not feel it safe to give the shot, which would have had to be specially obtained in a multidose vial, because she was concerned that the patient might have unpredictable side effects comparable to the side effects from the Nystatin swish-and-swallow.

Nurse Kish stated that during a two to three week episode of increased knee pain due to the oral antifungal medication, she observed that the patient made multiple unsuccessful attempts at rising up for transfers to toilet and had use a wheelchair. Prior to that she had been using a walker. After being placed on the commode, the nurse observed that while the patient felt herself to be unobserved, she stood up independently and wiped her peri area.

Nurse Kish routinely toilets her in the afternoon on Thursdays now and describes a very fixed ritual of sequentially adjusting briefs and changing pads as well as transporting her back to her chair with, again, ritualistic needs for being repositioned on the chair and the pad being positioned on the chair in a sequential manner. Nurse Kish observed that the toileting can take up to 45 minutes. Recently the patient had received pain pills and was accepting them for a while and the nurse observed decreased pain, more mobility and less anxiety. Nurse Kish observed that she took over the p.m. care of Helen on Thursdays because staff was in tears and threatening to quit because of verbal abuse by Ms. Helen Winters. It is her observation that Ms. Winters appears to observe a hierarchy, letting the more trained staff, Mary and her, get away with less ritualistic routines than the aides. The extra duty of taking care of Ms. Helen Winters on Thursday evenings has interfered with her regular duties such as the monthly chart checks. Nurse Kish also observed that



January 7, 2007                                                                      Page 25
S. von Preyss-Friedman, MD
Re: Helen Winters

Helen wanted the nurses to talk with her daily, and it is her impression that Ms. Winters is lonely. She does not interact with other residents as previously.

Nurse Kish has no significant difficulty with communicating with Ms. Winters. She talks in a loud voice to make herself understood, but she has also been successful in talking to her further away at times.

Nurse Kish stated that there are 28 patients on the assisted living unit with three aides in the evening.

**3. Interview with Program Assistants Eliria, Melodie and Teri:**

Eliria identified herself as an almost five-year employee and team leader CNA. She works full-time between 2:30 and 11 p.m. and has known Ms. Winter the entire time. The current issue is that the resident is wearing a blue gait belt that cannot be grabbed with the entire hand but has specific hooks for fingers in the back. As far as her activities of daily living abilities, Ms. Winters can take her shirt on and off and does her grooming with setup, such as setup with denture cup and toothpaste. She is able, however, to put in her own eyedrops. When she takes clothing off she folds it and puts it out for attendants to put away.

The attendants prepare food for her at about 4:30. This usually consists of a microwavable entrée for example Stouffer's pizza or glazed chicken as well as yogurt, a jaw of baby food and sometimes a waffle. The aides noted that the resident stopped going to the dinning room since the eviction letter. She is encouraged on a regular basis to participate in activities but is declining. A volunteer singer requested her presence but the patient no longer participates in the singing activity that she used to enjoy. The aides observed that she used to socialize with another resident and have asked the other resident to visit with Helen but this resident chooses not to go to see her anymore. At 7 to 7:30 the dinner dishes are being picked up and then the patient is toileted. The toileting lasts for about half an hour to 45 minutes. The aides state that they try to go to the room at all times with two people because of previous and ongoing allegations of abuse. The goal is to have a witness. This patient is transferring from a chair with standby assistance to wheelchair and from there with standby assistance to commode. She stands up to do the peri care herself and is able to reach back. The patient takes out her own briefs and squeezes them and throws them away. Then she arranges her pads and briefs for about five minutes. Once the patient reaches her chair she requests readjustment of her pads and pillows multiple times. It is observed that the patient never self-propels her wheelchair. The aides describe an elaborate bedtime ritual after grooming and transferring with standby assistance. The patient always sleeps on the couch and requests several cloth pads, towels, hot water bottle, flashlight, specific water glass, placement of water glass and tissues on other surfaces.

Aide Melodie stated the need to go into the resident's room with two aides and the length time routine which interferes with the activities program at night.



January 7, 2007                                                                                   Page 26
S. von Preyss-Friedman, MD
Re: Helen Winters

**4. Interview with Fred, Program Assistant on the nightshift, on December 8, 2006:**

Fred stated that he used to work on days for 1-1/2 years and has now been working on nights for about one year. He observed that Ms. Winters likely has no memory problems. She tends to ask repetitive questions, however, mostly knows the answers. It is his impression that the repetitive questions are out of a need for affirmation. Fred thinks that Ms. Winters likes working with men better than with women and at one point called him her deceased husband's name. Upon direct questioning he denied that the patient appeared bothered, or confused about important events. Her sentences appear fluent. She is able to operate the remote control for her TV. He has not observed any paranoid ideations, or visual or auditory hallucinations. The patient believes she has a lot of allergies. It is his observation that she appears to be isolating herself. He states that he has generally gotten along with the resident. He observed that the resident had some obsessional component to her behaviors in the correct placement of her towels, for example, during showers. The more controlling behaviors, in his opinion are exacerbated during confrontational situations. Fred observed, however, "If she likes you, she will cut you some slack." It is also his impression that the patient is more capable in some of her physical activities than the needs that she expresses for assistance on an ongoing basis. It is his impression that time consumption for assisted living level would appear excessive. She is toileted at least twice a night for 20 to 25 minutes with two attendants, which is usual during the night shift. During the nightshift she does not interfere and infringe on the care of other residents. During a period of increased complaints of pain at night she asked to have her Attends changed on the couch which was difficult to do as the couch was relatively low, he estimated 18 to 20 inches from the ground, and the patient could not lift up her pelvis and therefore needed to be rotated. The low couch and the need to bend over caused a strain on his back. Fred observed that the patient is capable of giving herself drugs with question of some depth perception as well as capable of donning and taking off her own T-shirt.

**6. Interview of Marla Nelson, Assisted Living Program Director on December 8, 2006:**

Ms. Nelson was interviewed on December 8, 2006, at Chugiak Senior Citizens, Inc.. Ms. Nelson is the program director of the assisted living portion. Ms. Nelson stated that she had had the opportunity to do some hands-on care with the patient. She had given the patient a shower. Ms. Nelson observed on those occasions a very fixed set of routines had to be observed, starting with the emptying of shelves in the bathroom and specific arrangements of specifically colored towels. She used one-arm contact guard assistance for transfer into the shower. The resident was able to wash her underarms, legs, arms and peri area. She was able to put on her on T-shirt. She needs assistance with her toothpaste, however, no assistance with feedings.

She stated that most residents are able to complete showers in 20 minutes. I asked her about other written complaints by other residents or family members and stated that the only written complaints were filed by Ms. Carol Winters. She stated that a customer satisfaction survey was done yearly.

EXHIBIT    B

Page 25 of 84

January 7, 2007                                                          Page 27
S. von Preyss-Friedman, MD
Re: Helen Winters

Upon questioning, she stated that she had coached and mentored staff regarding approach to hearing impaired patients including Ms. Winters, talking in a loud voice, but not shouting, talking at eye level so that they can be observed and not startling the patient by coming, for example, from behind. Ms. Nelson states that at the assisted living portion there are other residents who have significant hearing impairment to the level of Ms. Winters. She estimated about four.

Ms. Nelson observed that the Ms. Winters was paying her own bills and would call the facility if she perceived that her bill did not arrive in a timely manner.

**5. Interview with Jan Freels, Administrator for Assisted Living CSC, on December 8, 2006:**

Ms. Freels was interviewed at Chugiak Senior Citizens, Inc. and identified herself as the Administrator for Assisted living. Ms. Freels' duties involved that of a deputy director of financing, program and development, quality assurance as well as staff counseling. Ms. Freels is also on call.

She stated that Chugiak Senior Citizens, Inc. has 21 assisted living apartments and is licensed for 30. Ms. Freels stated that due to the requirements of two staff in the room with Ms. Winters at all times that staff is stretched too thin.

When I question her whether she has received any written complaints from other family members or residents she denied same. There is a complaint form and a grievance procedure posted. When I question if there has been a state investigation in regards to this case, Ms. Freels denied that an investigation by the State of Alaska has taken place. The last state survey was conducted in November 2005, with no deficiencies. I questioned again if there have been any other residents or family members who have come forward with complaints of abuse and Ms. Freels stated that there were no other resident or family member complaints of abuse. I questioned her regarding any informal complaints and she stated that they mostly centered around food.

Discharge criteria from the assisted living facility according to Ms. Freels were nonpayment, safety issues, increased care needs with inability to meet resident needs. Ms. Winters was discharged due to increased care needs beyond what the facility can provide as well as behavioral issues with verbal abuse and physical abuse of staff.

**7. Interview with Linda Hendrickson, Executive Director of Chugiak Senior Citizens, Inc., on December 8, 2006:**

Ms. Hendrickson was interviewed on December 8, 2006. She stated that she is the Executive Director of Chugiak Senior Citizens, Inc., Inc., a management company, not for profit organization 501c3. The building is owned by the City of Chugiak and licensed as an assisted living facility as well as 20 independent and 20 HUD apartments. A


EXHIBIT ___B___
Page ___27___ of ___84___
30