January 7, 2007                                                          Page 28
S. von Preyss-Friedman, MD
Re: Helen Winters

licensed survey is performed in the facility every two years and no unscheduled visits
have been done by the licensing agency.   DEC inspects the kitchen once a year
unannounced.  A Medicaid audit was performed last year.

Ms. Hendrickson stated that the decision to admit a resident was made upon assessment
with the nurse, the director and other interested parties.   At the time of Ms. Helen
Winters' admission, Ms. Hendrickson favored the admission of Ms. Winters as she felt
that while the patient had a recent increase in assistance needs due to a humerus fracture,
the expectation was for improved physical function as the patient's healing process would
take place.

She stated that there had been no other written complaints by residents or families against
the facility.

### III.  Site Visits of Assisted Living Facilities in the  Anchorage, Alaska region

### 1.  Pioneer Home, site visit December 7, 2006.

I visited Anchorage Pioneer Homes and toured the facility as well as interviewed the
administrator, Mr. David E. Frain.   This home is located on 923 West 11th Avenue,
Anchorage, Alaska 99501. Mr. Frain stated that the home has 165 beds, currently with
160 residents residing in the facility. The Pioneer Homes of Alaska are owned by the
State of Alaska and the Department of Health and Social Services operates these homes.
There are six pioneer homes in the State of Alaska.

Pioneer Homes currently has three levels of care services:  Level I is independent living
where meals, laundry, light housekeeping and activities are supplied.  There are voluntary
clinics on site and emergency help is provided but otherwise residents are independent in
activities of daily living.

Level II is the next higher level with some assistance being provided. There is some
assistance in dressing and medication is usually brought to the patient.  The patients are
generally able to ambulate or need minimal assistance with ambulation.

Level III: Pioneer Homes has two areas.  One for patients who are medically dependent
in all activities of daily living as well as patients with dementia.  The facility has a Hoyer
lift in order to pursue a no-lifts policy for staff in order for better staff retention and
prevention of back injuries.  Some pivot transfers occasionally are performed, and also at
times two-person assistance to transfer.  In general, these patients need assistance in all
activities of daily living.

The facility likewise has an ADRD (Alzheimer's dementia and related dementia) unit,
where residents receive assistance with many activities of daily living. This unit employs
a silent WanderGuard.    Two-person assistance with transfers and mobility is
accommodated in this facility as well as toileting at night.  However, no longer-term

EXHIBIT_____ B

Page ____ of ____ 84

31

January 7, 2007                                                    Page 29
S. von Preyss-Friedman, MD
Re: Helen Winters

repositioning on an around-the-clock basis is facilitated. The facility has two transitional beds for patients who have slightly higher needs on a transitional basis.

This facility has one physical therapist and two physical therapy techs and many employed in Level III and eight full time activity staff. The facility has RNs, LPNs, and CNAs for Level III, and it is staffed according to acuity. Level III has 38 residents and the ADRD level has 40 residents with an average age of 90. The dayshift employs three nurses and eight CNAs during the day and two nurses, six CNAs in the evening as well as one nurse and three CNAs at night. There is also an evening supervisor. The cost varies between $2400 and $5080 per month depending on the assistance needed. A payment assistance program is provided for Medicaid waivers with patients receiving $100 a month discretionary funds. The patients have a detailed care plan which is reviewed quarterly. This facility houses hearing impaired residents. No special accommodations are felt to be necessary. A typical hearing care plan would provide for instructions regarding hearing aid care, using a loud voice, appropriate approaches, such as within vision of the patient as well as speaking into a preferential ear. The facility has a full-time social worker who assists with transitions, grief groups, and performs active family counseling.

Patients cannot be housed in the facility with intensive skilled needs or having physician orders that cannot be complied with. There is also a no-smoking policy within the facility and patients who do not want to adhere to this policy within the facility are asked to leave.

The facility was toured and the library as well as Level III was inspected. Of note is that it had a calm and pleasant feel and was richly decorated. Mr. Frain noted that the facility is an Eden certified facility and strives towards providing a home like atmosphere.

## 2. Horizon House of Providence, site visit December 7, 2006.

Horizon House was toured and I interviewed the director of Horizon House, Ms. Sue H. Samet, MSW. Horizon House of Providence opened in 1995 and has six studio apartments and a dementia program with bedroom and bathroom privacy. Ms. Samet explained that the model for the facility is housing and supportive care and it is not unusual for residents to move in and out, depending on their care needs. As this is an assisted living facility, no guarantees are made that patients under any circumstances age in place. Discharge criteria include the necessity to do injections, failure to care and resident needing more care than can be provided and therefore are no longer appropriate. Ms. Samet cited an example of a resident who had a respiratory condition and really needed 24-hour supervision because of anxiety and excessive need for supervision. No definite levels of care are identified in this facility; however, there is a committee who determines the appropriateness of admission of residents to the facility depending on the resident care needs and the present case mix. Twenty-four hour staff is provided, along with medication assistance, three meals a day as well as activities. There is licensed staff, two RNs, two LPNs, with one nurse on site seven days a week, however, not 24 hours a day. Usually three assisted living attendants are available during the a.m. and p.m.



EXHIBIT     B
Page 29 of 84

January 7, 2007                                                        Page 30
S. von Preyss-Friedman, MD
Re: Helen Winters

Medication assistance is provided in the form of medisets refilled in the apartment, at times using a locking drawer. Levels of care, again, range anywhere from total independence to total assist. Certain services are not provided such as feeding. Patient's who need two-person assists cannot stay in the facility unless this condition is temporary. The facility just brought a Hoyer lift for falls on the floor to minimize staff injury. Physical therapy and occupational therapy services are available with home health agencies. Psychiatric support is provided through Anchorage Community Mental Health. A licensed social worker and ARNP give consultation to the staff on site.

Exclusion criteria necessitating patients to move from the facility are medically complex patients who exceed the level of care, anxious patients, patients with unsafe transfers, putting staff at risk, long-term two-patient transfer patients, and patients who need skilled services. Costs are around $134 a day and the facility accepts Medicaid waiver patients. Ms. Samet elaborated that usual evening care for a high needs resident is budgeted to be half an hour to 45 minutes at most. This would represent high needs patients, many of the residents just need checks.

The facility houses quite a few hearing impaired patients. The staff is instructed to talk loudly, be within vision and in front of the resident as well as encourage the resident to wear hearing aids.

The facility was inspected and appeared as a very modern facility. A computer lab enabling computer use among residents was present on the ground floor. The dementia unit had a common dining facility and several residents were observed eating with one attendant and there were private rooms with private baths with a breakfast nook. There is a beauty parlor on site.

### 3. Marlow Manor, site visit on December 8, 2006.

Marlow Manor, located on 2030 Muldoon Road in Anchorage, Alaska 99504 was visited on December 8, 2006. I had the opportunity to meet and interview the executive director, Theresa Panchot. Marlow Manor is an assisted living facility with 48 apartments. Marlow Manor distinguishes between Levels I to V with care with I and II mainly receiving medication assistance, III moderate supervision up to level V receiving lots of staff attention and hands-on direct care with staff ratio being from 1:10 to 1:12. Two RNs are on staff at Marlow Manor between Monday and Friday. They are mainly responsible for incoming assessment, consultations, supervision as well as training. No skilled nursing services are provided in this facility. After the initial assessment a care plan and a contract between the staff and resident is established and provides for detailed provision of services. Everything else needs to be negotiated. Besides medication services, activities of daily living assistance is available such as bathing, dressing, grooming and toileting. The facility has two lifts, a stand lift and a Hoyer lift. The facility does not have a mental health program on site; however, patients can bring in their own mental health providers. The facility is not accepting patients who have skilled nursing needs such as IVs, ostomies that they cannot manage themselves and PEG tubes. Residents are not admitted when they are dangerous to themselves or others, as well as being disruptive. If



January 7, 2007                                                                              Page 31
S. von Preyss-Friedman, MD
Re: Helen Winters

care needs exceed what the facility can provide an option is to hire additional private
caregivers but the provision is that the family would manage the private caregivers. This
is currently practiced at the facility and the provision is that the private caregivers sign
rules of conduct. This private hire does not seem to be an option for patients who are on
the Medicaid Choice waiver. Medicaid Choice waiver patients are accepted at this
facility and comprise about 30% of the residents. The facility cares for patients with
hearing impairment of varying degrees, some profound to less intense. No formalized
training has lately been provided to caregivers; however, caregivers are instructed how to
deal with hearing impaired patients.

The facility was toured and on the ground level there was a large common area with a
dining room, postal mail boxes and a large activity room in which patients were engaged
in community activity. The patients appeared to be at various levels of physical activity
ranging from wheelchair to independently ambulatory with assistive devices. Rooms in
the dementia unit as well as the other units were inspected. The rooms are in the form of
studio apartments with private bathrooms with walk-in showers as well as kitchen nooks
with refrigerators and microwaves.


**IV. Medical Records Helen Winters :**

**1. Maryland Primary Care Physician Records:**

There is a March 19, 1996, blood sample indicating normal liver functions and a
cholesterol of 162 within the normal range.

On November 9, 1999, blood sample indicated a TSH of 9.26 and a cholesterol of 252.

There is a September 29, 1996, evaluation by J. Danneberger, MD. The patient was seen
for urinary incontinence. She had urinary incontinence associated with cystocele and
rectocele managed with a pessary. She got up approximately every 1-1/2 hours at night
and voided, with similar frequency during the day. Past medical history was positive for
diabetes, hypertension and stomach problems, history of thyroid disease and recent
problems with vertigo. Past surgical history with cholecystectomy and hysterectomy in
1962. The impression was cystocele and rectocele causing significant urinary
incontinence. The plan was to schedule a cystoscopy.

On July 22, 1996, the patient was seen for tinnitus and costochondritis.

On August 7, 1996, there was a physician visit, presumably Dr. Danneberger. He states
that the patient related extreme difficulty in tolerating most medications and was quite
reluctant to take any drugs at all.

On June 24, 1996, there is a physical therapy referral.



EXHIBIT    B
Page 37  34  of 105  84

January 7, 2007                                              Page 32
S. von Preyss-Friedman, MD
Re: Helen Winters

On June 26, 1996, weight was 158 pounds. Blood pressure was 160/94. The diagnosis was improved cystocele, rectocele, chronic lower back and thigh pain, hypertension and question of urinary tract infection.

On May 16, 1996, the patient had a weight of 158 pounds. Blood pressure was 156/102. It was recommended to start a low dose hypertensive. The patient, however, declined.

On May 13, 1996, again the blood pressure was 164/102. The diagnosis was back pain, continued urinary tract infection, and hypertension. The patient stated that she had been walking with the help of a cane.

On May 6, 1996, there is a note by Dr. Chambers. The patient stated that she fell getting into the car and hit her left upper arm.

On May 1, 1996, her weight was 169 pounds. Blood pressure was 158/108. This was a progress note by Dr. Chambers. The assessment was lower extremity pain of unclear etiology; pessary.

There is a progress note from April 17, 1996, by Dr. Chambers with the assessment of hypertension, cystocele and questionably urinary tract infection.

There is a progress note on April 8, 1996, by Dr. Chambers. Weight was 157 pounds. Blood pressure was 178/108. The patient reported that she could not tolerate the Levothyroxine since it gave her an excessively dry mouth so she had elected to stop taking it. She tried Synthroid instead, one-half of a 0.025 pill but again developed urinary frequency. The assessment at the time was hypertension, maybe anxiety related. They were going to continue to follow and add antihypertensives.

On April 3, 1996, Dr. Chambers saw the patient for complaints of muscle weakness and recurrent tremors.

On April 3, 1996, weight was 159 pounds with blood pressure 168/108.

There was a March 16, 1996, visit with a weight of 163 pounds, documented. Blood pressure is 152/92. The patient had vulvitis.

She had an a gynecologic examination on March 8, 1996. Her blood pressure at the time was 158/118. The impression was "history of liver damage," urinary incontinence, recurrent urinary tract infections, total prolapse of vaginal cuff, atrophic vaginitis, large cystocele, rectocele, possible osteoporosis, "very sensitive to medications," has all kinds of reactions. Pessary versus surgery was discussed and the patient was to discuss this with her daughter.

There is a personal history form, presumably filled out by the patient, indicating that she had a history of high blood pressure, stomach problems, urinary tract infection and history of gestational diabetes. The allergies listed were sulfa, Cipro, cephalexin, and Floxin.



EXHIBIT ___B___
Page ___33___ of ___84___
                35

January 7, 2007                                                    Page 33
S. von Preyss-Friedman, MD
Re: Helen Winters

On September 25, 1996, a visit with Dr. Chambers documented that their recommendation for the patient to take previously prescribed antihypertensives and she start with 12.5 mg of hydrochlorothiazide each day, blood pressure 160/100.

On June 26, 1996, Dr. Chambers referred her to Dr. Danneberger for evaluation

On May 19, 1997, Dr. Chambers documented again that the patient remained resistant to taking antihypertensives or thyroid supplementation.

The same notation was made on March 11, 1997.

. On December 13, 1997, she came in for a pessary check change.  She continued to take half a Norvasc 5 mg each day. She had persistent urinary incontinence. Her urine was positive for red blood cells.  The diagnosis included cystorectocele, hypertension, and hypothyroidism.  The patient did not desire to take any antibiotics at this time as she was informed about possible urinary tract infections.


There is a October 14, 1998, office visit with Dr. Chambers. The patient came in with multiple complaints including knee pain, urinary incontinence, and muscle aches. The assessment was cystocele, hypertension and osteoarthritis.

On August 17, 1998, the patient came in to see the doctor and complained of rectal pressure, urinary frequency, abdominal bloating, decreased hearing, excessive gas and lower extremity weakness. She continued to take Vasotec for hypertension.

On July 13, 1998, the patient returned to the clinic with multiple complaints. She recently had an episode of vertigo at church which resolved spontaneously after sitting. She was concerned that the Vasotec may be causing this. She again complained of knee pain but she was unwilling to take any medication or be evaluated further.

On April 1, 1998, her weight was 169-1/2 pounds. Her blood pressure was 170/90, and 152/92. She had only been taking one-half of her Vasotec.

On March 2, 1998, the patient was seen for congestion, cough and postnasal drip.  She does not take a Norvasc anymore. She is concerned that it is making her hearing worse. Dr. Chambers' diagnosis at that time was bronchitis, hypertension, cystocele and osteoarthritis. Amoxicillin was prescribed.

There is an August 17, 1998, that documented that hearing testing was recommended but the patient refused.

There is a blood pressure sheet, vital sign sheet, recording vital signs from December 4, 1998, to July 12, 1999.  On January 11, 1999, the blood pressure was 160/112, which was the maximum blood pressure recorded. The lowest blood pressure recorded during that time period was on April 9, 1999, at 156/90.



EXHIBIT B
Page 33 of 84
36

January 7, 2007                                                        Page 34
S. von Preyss-Friedman, MD
Re: Helen Winters

There are ophthalmology records, the last one dated April 7, 2000, stating that the patient was moving to Alaska to live with her daughter.

## 2. Eagle River Family Practice.

There are vital sign sheets for patient, Helen Winters. Allergies were listed as "many allergies." Weight on September 13, 2000, was 165. The last notated weight was August 1, 2002, with a weight of 136 pounds. Blood pressure in September 13, 2000, was 160/98 and on August 1, 2006, 130/80.

On October 2, 2001, there is a prescription of BuSpar daily.

There is an August 13, 2001, cardiology consultation directed towards Eagle River Family Practice indicating that this patient came with her daughter on referral by Mr. May of Dr. Savico's office for evaluation of possible etiology for congestive heart failure. The diagnosis was hypertension with hypertensive cardiomyopathy, clinical diagnosis of congestive heart failure, improved with medication, normal electrocardiogram, abdominal mass, history of frequency and incontinence and difficulty suggesting medications. Under the history of present illness provided by Mr. May, the patient and her daughter, was that she had long-standing hypertension for which she had declined therapy for quiet a number of years. She apparently felt that she had side effects from practically any medicine given. She had noted edema for quite some time. Her cholesterol was about 200, and again as stated in this note under risk factors was that she had had hypertension for many years and perhaps when she was 40 years old. Under review of systems, she had been prescribed hydrochlorothiazide 25 mg and Monopril 10 mg daily which the patient had declined to take. She had problems severely with chronic knee pain and this limited her exercise. She had been advised to have knee replacements but had declined the recommendation. Her blood pressure was 180/100 maximum. An echocardiogram demonstrated mild concentric left ventricle hypertrophy and possible hypokinesis. The cardiologist, Dr. Finley agreed with the medication as prescribed by Mr. May and Dr. Savico, and reassured the patient and daughter.

There is a chart note on August 3, 2001. The notes states that the patient denied any symptoms, "is very confrontational about medicines." Under examination it states that the patient had flight of ideas. The assessment was depression, dementia, hypertension, and edema.

On August 8, 2001, Monopril 10 mg and hydrochlorothiazide 25 mg were prescribed. The patient was adamantly opposed to medication and stated she was "allergic" to everything.

There was a May 10, 2006, audiology report to Dr. Michael Jones indicating mild to severe mixed hearing loss. Recommendations were to consider ENT consultation and replace/repair current bilateral hearing aids.



EXHIBIT  B
Page 37 of 84

January 7, 2007                                                                    Page 35
S. von Preyss-Friedman, MD
Re: Helen Winters

There are multiple handwritten chart notes and it is difficult for me to identify exactly who the providers are. The records start on February 11, 2006, stating that the patient needed a primary care doctor. The diagnosis was urinary tract infection, osteoarthritis, hyperlipidemia, presbyacusis and cystocele.

**3.  Acute Family Medicine Clinic in Eagle River Alaska.**

There is a July 26, 2004, Quest Diagnostics Lab sheet indicating a lipid panel with a total cholesterol of 150 in the normal range and LDL cholesterol of 77, desirable.  A complete metabolic panel was essentially normal. There was a notation on this record of July 26, 2004, handwritten, "Patient aware of results and would like copy sent to her home address."

There is a visit with a physician on July 5, 2004.  The patient had excessive swelling both ankles, left more swollen than right. The daughter reported that a week ago she slipped while getting out of the truck but had apparent injury today.  The assessment and plan was urinary tract infection, ankle sprain, and impacted cerumen.

A July 5, 2004, chest x-ray of the left foot did show severe osteoporosis in the left foot which was remarkable but no acute fracture was seen.  The chest was senescent in type but without acute findings.

**4.  Records from Dr. Kirk Moss in Eagle River Alaska.**

There is a March 27, 2006, record with the patient presenting with a one-week history of inability to stop coughing. Over the past week she had to sleep in an upright position. She had very bad arthritis and walked very little. Blood pressure was 140/80. She was markedly hard of hearing.  Lungs were clear to auscultation. The spine was kyphotic and the thoracic spine had the appearance of ankylosing spondylitis.  Active range of motion of the shoulders, hips and knees is within normal limits. There is marked crepitus over both knee joints.  The patient bears weight reasonably well with her walker for short distance. The assessment was pneumonia, hypertension, gastroesophageal reflux disease and erosive gastritis. The patient was given Rocephin IM times one plus Z-Pack as well as Keflex and was to return to clinic.  The patient was requested to use her walker inside of her room to walk between the bathroom and her chair, so as to try to get some pulmonary exercise.  Her room air saturation was 92%.

There are some handwritten chart notes that are poorly readable.

**5.  Records from Anchorage Community Internists.**

Records appear to commence on September 12, 2000, with the physician being Dr. Bateman.  Chief complaint was that the patient was there to establish care.  History of the Present Illness described that the patient's medical problems included osteoarthritis. She



EXHIBIT  B
Page  35 of  584
      38

January 7, 2007                                                                 Page 36
S. von Preyss-Friedman, MD
Re: Helen Winters

recently had a Synvisc injection which she tolerated well, but was not doing much for her symptoms. She had high blood pressure which was chronic. She did not take any medication secondary to intolerance. She also was described as having vertigo, especially medication triggered. If she took any medication she experienced vertigo. She had urinary incontinence which she treated with an intravaginal device. Social history revealed that she lived alone in an apartment. She recently moved from Maryland and her daughter lived in town and was present with her that day. The review of systems was positive for loss of sleep, nervousness, multiple musculoskeletal pains, urinary incontinence, loss of hearing which was recent and chronic, blurry vision. Blood pressure was 160/98. The assessment and plan was: (1) Osteoarthritis. She was to continue to follow with orthopedic surgeon. The patient refused medication at that time, so there was no push for pain management. (2) Hypertension. She was to continue to monitor and consider starting on medication. (3) Vertigo. (4) Urinary incontinence. (5) Health maintenance. (6) Heart murmur. The patient did not want to have follow up of this heart murmur.

There is a September 11, 2001, record. The patient came in for followup for recent hospitalization for pulmonary emboli and pleural effusion. The patient was to continue on Coumadin 5 mg. The effusion seemed to be improving. Further assessment was anxiety disorder with the patient's anxiety disorder being extremely active and refusing medication. "She was quite difficult today." Follow up was planned three days later.

There is a visit recorded on January 28, 2002, with Timothy Bateman, with the patient coming in for followup on multiple medical problems. She had a history of gastrointestinal bleed followed by Dr. Thomas Schrives, several endoscopies which showed resolution and healing of her gastric ulcer, but she continued to suffer from severe osteoarthritis. The extremities showed no clubbing, cyanosis or edema, as was wearing her tight stockings, with severe patellofemoral degeneration of the knees bilaterally. Neurological examination was nonfocal. The assessment and plan was status post pulmonary embolus, anemia, status post gastrointestinal bleed, peripheral edema, and severe osteoarthritis.

There is an August 7, 2002, handwritten note that is not very well readable. "'Allergies' were sulfa?, codeine with gastrointestinal upset. Many medications caused her to feel 'dizzy.'" Her vitals were described as a weight of 136 pounds and blood pressure 130/86. She was walking unsteadily and needed assistance/assistive device, i.e., walker. The impression and plan was history of deep vein thrombosis, history of gastrointestinal ulcer, history of hypertension, now normotensive off medications, degenerative joint disease bilaterally, stress/urge incontinence of bladder. Plan: Urine for urinalysis. Advised to use acetaminophen up to q.i.d. p.r.n. pain.

There is a Patient Questionnaire filled out on June 21, 2000. The patient stated that she wanted to establish herself with a primary care doctor. Medical problems were numerous allergies, urinary incontinence, high blood pressure, low thyroid, vertigo, hearing problem and macular degeneration. Allergies were numerous. She stated that she could not take medications well.



EXHIBIT ___ B
Page ___ of ___ 84

January 7, 2007                                                    Page 37
S. von Preyss-Friedman, MD
Re: Helen Winters

There is a July 5, 2000, Eagle Center Physical Therapy note by Tricia Gool, MS, PT. It was described that the patient used single-point cane most of the time and walker go to the mailbox. She had difficulty getting up from sitting and walking in her apartment. Her apartment was handicapped accessible and had no stairs. She reported falling only once. On examination, the patient was ambulating with slow walking but steady balance with the assistance of a single-point cane in the right hand. The assessment was that the patient was demonstrating fairly steady balance gait and required assistance of increased proprioceptive device such as rolling walker with curve navigation.

There is a Providence Health Systems radiology consultation, 9/21/2003 no contrast CT of brain, stating that the patient had a left posterior fossa meningioma and decreased attenuation in the periventricular white matter consistent with confluent, small microvascular infarctions.

An EKG of unknown date showed sinus tachycardia, right bundle branch block as well as left axis deviation.

There is a blood count on June 21, 2000, which was normal and comprehensive metabolic panendoscope was also normal.

## 6. Records Anchorage Medical and Surgical Clinic

Office notes begin on June 21, 2000. The patient came in to establish with a doctor. She complained of having unsteady gait and dizziness off and on. Her past medical history was significant for hypertension of 30 years, hypercholesterolemia, hypothyroidism, osteoarthritis, cystocele, left ear deafness, macular degeneration in both eyes, history of gestational diabetes. Her weight was described as 164 pounds with no recent weight changes. Cranial nerves were normal. Muscle strength was 5/5. The assessment was hypertension, borderline control. At present the patient was to avoid salt in her diet. She did not want to take prescription medication for hypertension. The plan was to obtain a comprehensive metabolic panel and fasting lipid panel because of history of hyperlipidemia. The patient was to be referred to Dr. Bickler for consult for osteoarthritis.

The patient was not seen by this provider group between July 19, 2000, and September 17, 2002. At that time it was noted by Dr. Nell E. Loftin that the patient had been seen previously by Dr. Bartlin and then later by Dr. Bateman and then more recently by Dr. Herndon. She had been released by Dr. Herndon from his practice as he was accepting less medicare patients. Diagnostic impression included vaginal prolapse, left shoulder pain, kyphosis with question of osteoporosis, possible HTN, prior pulmonary emboli and DVT with vena cava filter, severe DJD of knees.

The patient was seen on November 6, 2002. Her weight was 136 pounds with a blood pressure of 168/1000. It was described that the patient had a somewhat pressured speech and her history was somewhat difficult to be clear about. She was accompanied by her daughter. She reiterated numerous times how blood pressure medicines had always made her feel bad as she felt that her blood pressure was always up in the doctor's office and


EXHIBIT _____ B
Page _____ of _____ 84

January 7, 2007
S. von Preyss-Friedman, MD
Re: Helen Winters

Page 38

that she had always been "allergic" since she was a child. Later, repeated blood pressure was 170/104. Recommendations were made by Dr. Loften who saw the patient at that time. Possible treatment for osteoporosis was recommended, and it was suggested that a bone density study be done at this point. It seemed unlikely that Ms. Winters would consent for any additional medicines because of her fear of side effects. "I feel that she has at least mild and perhaps moderate dementia and may not be able to make these decisions by herself but as of yet her daughter is not ready to force her wishes on her mother. The daughter states that she would 'talk it over with her mother' and if her mother decides that she would take antihypertensives she would call with the name of the drug that she used in the past." Followup was in three to four months.

The next visit was on November 18, 2002, with Dr. Michael Jones. The assessment was hypertension, improved with treatment with Cozaar, fatigue, probably not related to Cozaar, sleep disturbance from urinary problems, and severe degenerative arthritis.

On February 12, 2003, Dr. Jones felt that she had back pain secondary to degenerative arthritis and lumbar scoliosis, hypertension, probably not adequately controlled and inguinal rash, possibly monilia.

On September 23, 2003, the patient came in for followup after the Providence Medical Center emergency room visit on September 20, for evaluation of visual field disturbances. The problem resolved in less than two minutes in the emergency room. Physical examination was unremarkable, except for blood pressure of 182/104. The patient was described as an alert, fairly pleasant and anxious woman in no acute distress. Blood pressure was 168/100. Assessment osteoarthritis, both knees symptomatic, aortic flow murmur, possible transient ischemic attack, meningioma left fossa, and hypertension, level of control unclear. Ms. Winters said that her blood pressure was fine when she was not agitated and anxious, and in general she was reluctant to take medications, fearing potential adverse effects, meningioma.

There is a telephone conversation on October 9, 2003, documented. "I reviewed the CT scan with Dr. Cole at PMC. It does not appear that the apparent meningioma is applying pressure to the left occipital lobe. Carotid Dopplers on October 1, 2003, show no significant ICA stenosis." It is further documented, "I discussed with the patient's daughter, Carol, who tells me that the patient's anxiety level has been relatively high lately. In the past BuSpar has been helpful but she did not like side effects. Carol will let me know the results of her pharmacy blood pressures measured when they are available."

There were no visits documented between September 23, 2003, and September 7, 2005.

On September 7, 2005, the patient came in accompanied by her daughter. Ms. Winters reported that she was short of breath when she walked with assistance from the wheelchair to the bathroom and back. She spent most of her time in the wheelchair and had gained substantial amount of weight in the past two years. She was described as alert, garrulous woman, hard of hearing and in no distress. She was sitting in a wheelchair but was able to stand up briefly with assistance. The assessment was exertional dyspnea



EXHIBIT B
Page 38 of 84
41

January 7, 2007                                                                      Page 39
S. von Preyss-Friedman, MD
Re: Helen Winters

probably secondary to chronic deconditioning and exogenous obesity, genital rash,
probably monilial and malodorous urine.

The next chart note is on January 10, 2006, for followup of hypertension.  A few days
ago she received a letter informing her that she was to be evicted from Chugiak Senior
Citizens, Inc. Assisted Living Facility where she had lived since September 20, 2004. She
became quite anxious after reading the letter and her blood pressure was found to be
significantly elevated.  Her daughter reported that her blood pressure was 220/113, but
the Providence Medical Center, emergency room physician's notes state that her systolic
blood pressure was 190.  Blood pressure was 156 in the emergency room and physical
examination was unremarkable except for hearing impairment.  Ms. Winter took Lasix 20
mg daily and had to urinate frequently, at least every two hours.  She would not wear her
custom compression stockings. "I can't get them on." She wore antiembolic stockings
instead. She had had no resting dyspnea or chest pain.  Medications were Cozaar 50 mg,
Pepcid 20 mg b.i.d., aspirin 81 mg and Lasix 20 mg.  On examination she was described
as an alert, lucid woman who was in no distress but talked continually about the problems
she had experienced at her living facility.   Assessment: Hypertension, not optimally
controlled. She had been taking Cozaar regularly.  Recurrent anxiety.  Right buttock pain,
likely related to degenerative disc disease of lumbar spine.  The plan was to start the
patient on atenolol, apply a hot water bottle to the patient's right buttock and to write a
letter to the assisted living facility director, urging him not to evict Ms. Winters since
relocation could result in emotional and physical harm. The patient would return in
followup.

The followup visit was on February 8, 2006. The physician, Dr. Jones, documented that
according to the patient's daughter, CSC threatened to evict Ms. Winters from the
facility. Carol had contacted the Municipal Ombudsman and Adult Protective Services
and was looking for an attorney. She requested from the physician to write a letter to the
court, reiterating the comments he made in the letter to the direct of the assisted living
facility dated November 11, 2006.  Her medical problems were listed as hypertension,
severe degenerative arthritis affecting spine and both knees, vaginal prolapse, urethral
carbuncle,  history of  postoperative  deep  vein  thrombosis  and  pulmonary
thromboembolism, IVC filter placement, upper gastrointestinal hemorrhage, osteopenia,
generalized anxiety disorder, possible transient ischemic attack, left posterior fossa
meningoma.   The assessment was hypertension not optimally controlled, chronic
recurrent anxiety, tinea cruris secondary to chronic urinary incontinence.

On April 18, 2006, followup visit in which they documented that her hearing was
gradually getting worse and they had an appointment with an audiologist and that she saw
Dr. Moss on March 27 for evaluation of a one-week history of persistent cough.  Ms.
Winter's complained feeling that the assisted living staff were making her walk more
often that she really was able to.  She appeared as an alert, lucid, comfortable, elderly
woman in no acute distress with minimal coughing, quite hard of hearing.  Blood
pressure was 128/60, pulse 76 and weight 174 pounds. The assessment was hypertension,
adequately controlled, chronic, recurrent anxiety stable, recent history of pneumonia;


EXHIBIT_____ B
Page ___ 37 of 85  84
        42

January 7, 2007                                                     Page 40
S. von Preyss-Friedman, MD
Re: Helen Winters

however, the provider documented that he was not convinced that the patient actually had pneumonia, and degenerative joint disease, interfering with ambulation. He advised the assisted living facility that the patient was to walk only as much as she could tolerate and they should encourage that she walk but not insist that she do so.

There is a followup note on September 6, 2006, by Dr. Michael Jones. The patient complained of three weeks ago having right sided sciatica symptoms. She attributed to her high blood pressure today to her uncomfortable ride in a TransCare van. She was described as an alert, nervously, garrulous elderly woman in no acute distress. The extremities showed 1 to 2+ edema proximal to her compression stockings. Skin covered by her compression stockings showed only trace edema. The assessment was hypertension not optimally controlled, recent episode of sciatica, irritated seborrheic keratosis, chronic, nonproductive cough, possibly due to nasal discharge and chronic deconditioning. The plan was to increase Ms. Winters' atenolol to 37.5 mg and a trial of Afrin 0.03% nasal spray. She may use Tylenol 500 mg q.4h. p.r.n. pain.

There is a October 11, 2006, followup by Dr. Irena Grimberg. The patient was brought in by her daughter, Carol, with complaints of pains in both legs and ankles which the patient attributed to Nystatin Swish-and-Swallow that was prescribed by dentist for "white spots in my mouth." The notes from Chugiak Senior Citizens, Inc. stated that the patient's pain was primarily centered in the knees, left greater than right. The pain decreased her mobility in transfer, caused difficulty getting out of her chair or sofa. She was noted to have an ecchymosis over her left eye without any history of trauma. She was noted to be short of breath at rest that morning with expiratory wheezing. On physical examination, the patient was described as an elderly Caucasian female sitting in a wheelchair agitated speaking very loudly and angrily, stating that she knew exactly why her legs hurt, "because of that Nystatin mouthwash." She spoke without interruption to close to a minute without any shortness of breath. The patient stated that in the past she had a male doctor whom she trusted because, "He was a man and he understood." Extremities: The TED hose was removed revealing trace shiny edema, mild squeezing from her ankles up to her thighs produces tenderness. Palpation of the knees was diffusely tender. The patient screamed and slightly jumped in her wheelchair with palpation of the medial aspect of her left knee. Neither knee was swollen, erythematous or warm. Both extend almost fully. The patient was able to hold her knees extended while sitting in the wheelchair for 30 to 40 seconds. There was no calf swelling or erythema. On neurologic examination she had diminished light touch to both dorsal feet and toes with preserved proprioception of the toes, absent vibratory sensation of bilateral great toes. The doctor was unable to elicit deep tendon reflexes. Assessment and plan: Leg pain, etiology unclear. No evidence of deep vein thrombosis, synovitis, thrombophlebitis or cellulitis. The patient rejected an injection of Toradol for acute pain relief because, "I'm sensitive to all medications and I know everything will spin around." The plan was to check a B12 and folic acid level and supplement if below normal and also Ultracet one or two tables p.o. once or twice a day as needed.


EXHIBIT B
Page 43 of 84

January 7, 2007                                                                    Page 41
S. von Preyss-Friedman, MD
Re: Helen Winters

## 6. Orthopedic Records.

Records commence on August 7, 2000, where the patient is seen by Dr. Peter Schaab. The examination was consistent with severe bilateral degenerative joint disease of the knees with palpable osteophytes. She was lacking 10 degrees of extension and flexion to 95 degrees. The patient received subsequent Synvisc injections in 2000.

Next the patient was seen in February 2002, at which time she received a steroid injection to the right knee.

On February 14, 2002, the right knee showed a large effusion.

There is a note on August 26, 2002, when the patient was seen by Dr. Schaab, stating that the patient was able to walk for short distances using her walker but she was reluctant to go out of her home for more social reasons. Her knees would periodically catch and grate, but overall she was not having much resting pain. The patient received a steroid injection.

On August 20, 2003, the note stated that the patient was fearful of pursuing knee replacement and was managed with two to three months alternating knee steroid injections.

On September 30, 2004, Dr. Schaab saw her 6-1/2 weeks post proximal right shoulder fracture. She was managed as an outpatient by physical therapy providing pendulum exercises and gentle elbow and hand range of motion. She had been essentially wheelchair bound with some assisted transfers. Her knees are again quite painful but she declined injection. Examination of the right arm showed marked dependent edema about the right elbow with an inability to extend past -20. She had full pronation and supination. The hand was not edematous and she had full apparent range of wrists and fingers. The patient was slightly tender to palpation throughout the right shoulder and passive flexion within the comfort zone was 30 degrees of flexion,. 10 degrees of abduction, 30 degrees of internal rotation and 0 degrees of external rotation. Radiographs were reviewed from the time of injury and showed a 50% translated two-point proximal humeral fracture with humeral head in continuity with the glenoid. It was recommended to begin more active range of motion of the hand, elbow and shoulder.

There was a Doctor Appointment CSC form filled out by Dr. Schaab, relating to February 4, 2004, appointment. New orders were to continue the same amount of ambulation, increase if Helen wants to try. Use safety belt and have standby assistance when Helen walks, avoid using belt to lift or move her. Difficulty with self propelling wheelchair at present. May be better with time and new lighter wheelchair.

There is a February 4, 2005, note when the patient presented for recheck of arthritic knees post fracture of her right humerus which occurred five months prior. She had soreness in the bone but was able to elevate her hand and gradually get her hand to the



January 7, 2007                                                         Page 42
S. von Preyss-Friedman, MD
Re: Helen Winters

top of her head. She was essentially wheelchair bound but did ambulate two to three times a day with guidance and support of staff. She required standby assist of one person and did use a support belt. The right arm was examined. Forward elevation was 70 degrees with hand on top of head. The fracture clinically appeared to be united, although she did have some slight tenderness. She had residual flexion contracture of the elbow to about 15 degrees, neurologically intact.

The last documented visit was August 29, 2005. She was described as having numerous comments and complaints as usual. She was engaged in limited walking with assistance on a daily basis which aggravated her as she felt that it was too much for her to do. The patient received an injection of steroids into her left knee. Shoulder examination was not performed.

### 7. Alaska South Central Urology Specialists.

The first record was on January 25, 2001. She was referred for urologic consultation from Ann Carter, ARNP, at Aurora Health Care Clinic in Eagle River and was also seeing Dr. Savico at Eagle River. The patient's chief complaint was urinary incontinence. On physical examination the patient's bladder was extended but difficult to examine as the patient would not lie flat due to her vertigo. She had an absent bulbocavernous reflex. She had a grade 4 wall prolapse and cystocele with the bladder herniating over the pessary which was easily removed. The assessment was urinary retention probably a combination of myogenic atony and urethral kinking from the large cystocele and inadequate support with the pessary, atrophic vaginitis. The plan was Foley recommendation, return visit and the daughter was encouraged to have the patient see an internist or an MD for evaluation of dementia and depression since the patient during the whole 45 minutes visit continued to perseverate regarding her incontinence and was not willing to evaluate and change.

The patient was continued to be seen through 2003 by Dr. Andre S. Gode for urinary tract infections, cystocele, rectocele and urethral caruncle, and pessary management.

She was seen in 2004, for the same indication.

There is a chart note on February 16, 2005, indicating that the patient was coming in today as always with her daughter for a routine pessary change. She was apparently treated for a course of antibiotics for skin infection in the area of the vulva. Diffuse slight raised bumps in the vulvar region were described, none appeared to be infected. The urethral caruncle was unchanged in appearance. The pessary was removed, cleansed and replaced. It was described, "The patient moved about briefly without any increasing discomfort."

She was seen on August 17, 2005. It was described that she had a large rectal hemorrhoid.



EXHIBIT     B
Page  ~~45~~ of ~~85~~ 84
         45

January 7, 2007                                                        Page 43
S. von Preyss-Friedman, MD
Re: Helen Winters

On January 16, 2006, the patient came without her daughter who was ill. Besides her prior diagnosis she had an inflamed fibroepithelial skin polyp.

**8.  Providence Hospital Anchorage, Alaska.**

*August 28, 2001, admission*

The patient was admitted from August 28, 2001, to September 2, 2001. The diagnosis was mixed serous and mucinous ovarian tumor bilateral, postoperative ileus and hypertension. Discharge summary was dictated by Tina R. Thompson. It was noted that this 85-year-old multigravida woman was admitted after Dr. Finley noted she had a mass in her abdomen, and she was admitted with a very large, probably left ovarian possibly malignant tumor. A huge left ovarian mass was dissected off the transverse colon and pelvis and the diagnosis was made with . frozen and final pathology of serous and mucinous tumor without carcinoma. Cytology was also benign. The patient did very well with early ambulation and minimal use of pain medication. It was described that the patient had on postoperative day one, nausea and vomiting and was put back on bowel rest. They were slow to feed her thereafter as she had numerous complaints. She was not happy with the hospital food, but was able to eat and keep things down very well as well as begin having bowel movement. The plan was for her to follow up with Dr. Finley for her blood medication, Monopril and hydrochlorothiazide.

Of note, her medication administration record, page 1030, noted that the patient refused her antihypertensive medications on two occasions and it was subsequently discontinued due to the daughter's request.

On page 992, a September 1, 2001, consult note said it was okay to liberalize diet now, but the patient had many dietary issues.

*September 3, 2001, admission*

The discharge summary states that the patient was admitted from September 3, 2001, to September 7, 2001, with pulmonary emboli. The patient presented to the emergency department on September 3, 2001, with shortness of breath. She was admitted for pulmonary emboli. She was treated appropriately and discharged on Coumadin. The second diagnosis included status post removal of mixed serous and mucinous ovarian tumor on August 28, as well as hypertension and medications were adjusted during the hospitalization. It was noted that the patient had a high amount of anxiety during her hospitalization. She was treated with small amounts of Xanax successfully. She had some chest pain with EKGs which showed no significant changes.

Nurses notes on September 5, 2001, page 955, describe the patient as anxious, asking questions re medication, "I can't make decisions. I have never been able to make decisions my whole life." Education regarding each medicine. Heparin and PTT testing was provided. Xanax was helping with anxiety. The patient continued to be anxious at



January 7, 2007                                                                          Page 44
S. von Preyss-Friedman, MD
Re: Helen Winters

present, "I don't want to take Xanax without my daughter." She denied dyspnea. The
plan was to continue teaching.

*September 25, 2001, admission*

The patient was admitted September 25, 2001, to September 27, 2001. The diagnosis was
upper gastrointestinal bleed secondary to gastric ulcer, pulmonary embolus, status post
vena cava filter placement, hypertension and anxiety disorder. She was transfused two
units of packed red blood cells with her initial hematocrit being 26.9. Her disposition
was to be discharged home where she lived with her daughter and follow up with her
primary care physician in one week. At that time it was to be determined whether to
reinstitute her extensive medications.

There is a consultation on September 25, 2001, cardiology, by Dr. Richard Anchuetz. He
documented that the patient had trouble with nausea ever since surgery. She called the
daughter today with weakness. The daughter went to the house and found the patient in
the bathroom with bloody stools. The paramedics were called and she was brought to the
hospital. She was found to have a hemoglobin of 8 and an upper gastrointestinal
endoscopy by Dr. Schrives demonstrated a gastric ulcer which was treated. She was
given fresh frozen plasma and parental vitamin K as well as several units of blood. She
currently felt better. In general, the past medical history was positive for being
moderately active with chronic pain throughout her legs, both in the calves but also
anteriorly. On physical examination she was alert and very talkative. The impression
was history of pulmonary emboli, gastrointestinal bleed, hypertension, and hypertensive
heart disease, resection of ovarian benign mass. The cardiologist documented an
extremely lengthy discussion that was held with the patient and her daughter regarding
the use of inferior vena cava filters and all of the possible ramifications, each potential
problem that was brought up was discussed in great detail with the family with numerous
questions on their part.

On September 25, 2001, an IVC filter was placed.

The patient was seen in followup by Dr. Schrives for repeat endoscopy.

There was a January 4, 2002, notation by the nurse in the endoscopy unit stating that to
the daughter was at bedside to observe the patient. The daughter appeared quite anxious
with multiple questions and concern. The questions were answered and explanations were
given.

Dr. Schrives documented in his procedure note that the patient had a healed gastric ulcer
and atrophic gastritis, otherwise a normal gastrointestinal endoscopy.

*September 23, 2003, emergency room admission*

The patient presented to the emergency room with right eye visual field loss. She had no
focal weakness. Past medical history was described as hypertension, peptic ulcer disease,



January 7, 2007                                                                                    Page 45
S. von Preyss-Friedman, MD
Re: Helen Winters

Greenfield filter, gastrointestinal bleed. She lived independently. In the emergency room her blood pressure was 183/104. The funduscopic examination was normal. Diagnostic studies: CT scan was found to be normal with mild vascular change without an acute infarct. The diagnosis was presumed transient ischemic attacks. She was supposed to be started on the baby aspirin and followup with Dr. Michael Jones.

There is a September 21, 2003, CT of the head. This unenhanced CT scan did show decreased attenuation in the periventricular white matter consistent with confluent, small microvascular infarctions, no hemorrhage, no large infarction. In the left posterior fossa a calcified extraaxial mass measuring approximately 2 to 3 cm in size, causing some minimal bone erosion of the mastoid bone along the inner table of the skull consistent with a meningioma. No other masses were identified.

*August 15, 2004, emergency room admission*

The patient presented to the emergency room at Providence Alaska Medical Center with a fall, head laceration and right arm pain. She was described as an 88-year-old female patient who continued to live on her own and conduct all her activities of daily living. She required the use of a walker at all times and she stated that day that she got up from her chair, reached for her walker, misjudged the distance, missed her walker and struck her head as she fell onto her right arm. She had a laceration in the left frontal area and complained of swelling and pain of the proximal right humerus. The patient was described as living alone. Her daughter lived several miles away and usually checked on her on a regular basis. On physical examination, the blood pressure was 178/101. She had a 3 cm, obliquely aligned, left forehead laceration. She was sent for a CT scan which was unchanged from the CT scan done on in September 2003. The x-ray revealed an impacted fracture at the head of the humerus without evidence of dislocation. The plan was 24 hour in-home assistance for at least the next two weeks. She was also given Darvocet N-100 and advised that she needed to be in a shoulder immobilizer at all times until she had been rechecked and cleared. She was given the address and phone number of Anchorage Fracture and Orthopedic Clinic.

On August 15, 2004, an x-ray report of the right humerus revealed a fracture of the humeral neck with some impaction and some lateral displacement of the humeral head relative to the shaft but no dislocation of the humeral head.

A CT scan of the humeral head on August 15, 2004, did show a stable sized posterior fossa mass consistent with calcified meningioma, decreased attenuation of the periventricular white matter and bilateral basal ganglia calcifications.

*May 15, 2005, admission*

The patient was seen in the emergency room complaining of nausea and vomiting and was accompanied by her daughter. She stated that she began vomiting approximately three hours prior to arrival and had been vomiting every 10 minutes. She also had loose stools and had nausea a few hours before she started vomiting. Her blood pressure was



EXHIBIT    B
Page 45 of 65  84
48

January 7, 2007                                                      Page 46
S. von Preyss-Friedman, MD
Re: Helen Winters

166/86. Heart rate was 22. Temperature was 97.5. The patient was in no acute distress, sitting comfortably in the bed. The patient appeared appropriate. She was hard of hearing so it was difficult to communicate with her. Some underlying dementia was suspected. The urinalysis was positive. The clinical course described by Dr. Rabinowitz stated, "The patient initially refused any IV for fluids and Phenergan. The patient was extremely difficult while in the emergency department. She refused any urinary catheterization, stating that she had had a catheter placed by a physician in the past and developed a carbuncle and refused any catheterization. The patient was to be treated for a urinary tract infection versus pyelonephritis. She was given Levaquin 500 mg times one and would be admitted by Dr. Grimberg.

There is a May 15, 2005, nursing assessment done by Kay Purrington, RN. The patient stated that she had no recent appetite change and when questioned whether she had a special diet at home she answered, "I eat what I like." When asked about comfort she stated that her right shoulder and both knees were hurting with movement. The patient underwent screening questions regarding abuse. She was specifically asked, "Do you feel your caregiver is not meeting your needs?" The answer was no. "Have you been fearful, hurt or injured by another person?" The patient answered, "No. "Do you believe anyone has misused your money or property for their own personal benefit?" The patient answered, "No." "Do you have any financial concerns regarding this hospitalization?" The patient answered, "No." "Do you have any discharge concerns regarding housing or transportation?" The patient answered, "Yes." Under the learning assessment of patient and family it was noted that the patient's physical barrier was hearing and an emotional barrier was anxiety.

There is a nurse's note on May 17, 2005, at 0700 regarding anxiety, describing, "Patient worries over everything. Insists on care given to her demanding specs as she is 'very sensitive' to foods, meds, etc., and says that she is the only one who really knows how she should be cared for.

Nursing flow sheet, page 672, with a date of May 17, 2005, specify that the patient was needy, anxious and needed lots of reassurance. There was a question whether the patient was confused. The patient was discharged on May 17, 2005.


*January 1, 2006 Emergency Room Admission*

Providence Health Systems emergency records show that the patient arrived to the treatment area via stretcher. The history was obtained from EMS. The patient appeared comfortable and the patient was cooperative, alert and oriented times three and in no acute distress. There was no complaint of pain. Vital signs revealed a blood pressure of 156/80, to 158/83. The patient was afebrile.

A 2323 nursing note stated that the patient was in no apparently distress, had readings of blood pressure that were abnormally high for her tonight that caused anxiety at Chugiak

January 7, 2007                                                                 Page 47
S. von Preyss-Friedman, MD
Re: Helen Winters

Senior Citizens, Inc.. The patient wore a hearing aid. She denied problems other than that
high blood pressure. Discharge was performed at 0013. The patient was discharged to
home. The patient ambulated by walker. She was transported via family friend driving,
accompanied by family member. Instructions given to daughter.

Dr. Tim Silbaugh dictated the emergency room note from January 6, 2006. He described
that the patient had an unexpected letter telling her that she was to be evicted from her
assisted living facility. With this she did have some anxiety. Her blood pressure was
noted to be somewhat elevated. It measured at the assisted living facility at 190 systolic.
She had no associated headache, focal neurologic symptoms, chest pain or shortness of
breath with this elevated blood pressure. She did note that she could hear pounding of her
pulse in her ear. Since that time, symptoms had improved. She had been taking
medications as prescribed. Physical examination showed the blood pressure to be
156/80. She was a 90-year-old female looking younger than her stated age. Her cardiac
and chest examination were normal. Her upper and lower extremities were described as
normal. She was described as somewhat hard of hearing. Otherwise she acted and
interacted appropriately. She moved all her extremities well and ambulated without
assistance. She had normal upper and lower extremity strength. Medical decision making
documented that the patient presented with a brief episode of elevated blood pressure
with no evidence of end organ hyperperfusion. Her blood pressure had improved and it
was only mildly elevated. She had a recent stressor which could have contributed to her
elevated blood pressure. She was advised to monitor her blood pressure and follow up
with Dr. Michael Jones. The diagnosis was mildly elevated blood pressure, recent
stressor, continue current medications and followup with Dr. Jones.

**9. Psychiatric Evaluation and Report of Helen Winters by Deborah B. Geeseman,
MD, dated December 19, 2006**

The evaluator sat on a footstool alongside Ms. Winters' chair and was able to
communicate with Ms. Winters using a slightly raised voice and was able to
communicate with the patient with only a few instances where Ms. Winters requested a
repeat of the question.

Per Ms. Winters' daughter's description, both Ms. Winters and her daughter like CSC
very much, specifically commenting on the space, the room for Ms. Winters' bedroom
set, the nice environment, and the convenience for Ms. Winters' daughter to continue to
visit Ms. Winters. These comments seem to focus on the physical aspects of the home
and not the service that is provided. With regards to interaction with CSC staff, there
have been numerous difficult times and complaints since Ms. Winters' residence at CSC.

Ms. Winters was able to read a two page description of daily activities written by her
daughter. She clarified the statement about staff assisting her in getting dressed, saying
that she is able to put on her own blouse and skirt, but is unable to do her TED hose and
shoes.


EXHIBIT    B
Page    of    84
50

January 7, 2007                                                                                          Page 48
S. von Preyss-Friedman, MD
Re: Helen Winters

On Mini Mental Status exam the patient had a perfect score, however the 7 Minute Screen did reveal some cognitive impairment, mainly in the area of naming and clock drawing.

She did not display overt signs of depression and anxiety and upon questioning, stated that she only has these feelings secondary to situational circumstances. Ms. Winters appeared to have obsessive-compulsive personality traits that may become exacerbated under stress, duress and fear in the attempt to gain control over an uncomfortable situation. Ms. Winters was not diagnosed with Obsessive-Compulsive Personality Disorder or Obsessive –Compulsive Disorder. Formal psychological testing (e.g. MMPI or Millon Clinical Multiaxial Inventory) would provide an objective evaluation of her psychological status.

Ms. Winters described herself as a very socially oriented individual throughout her life. The psychiatrist concluded that she would most likely benefit from ongoing social interactions with other people. Even with limitations in hearing, vision and ambulation, Ms. Winters is still quite able to interact with other people and seems to enjoy doing so.

Dr. Geeseman stated that it appeared that there is a mismatching of the resident's needs and the facility's service. There appeared to be a disparity between Ms. Winters' needs (real or perceived) and the staff's availability and limitations for meeting those needs. The needs and the quantitiy of time needed to meet those needs does not appear compatible with staff:resident ratio that exists at CSC.

The psychiatrist recommended to have a clear definition of Ms. Winters limitation to coordinate an appropriate level of involvement for Ms. Winters self care and ambulation. Setting up a behavioral plan which provided structure and reasonable expectations of what both Ms. Winters and the staff can and cannot do could be helpful. It would be important that both Ms. Winters and the staff agree to the plan and that both stay within the guidelines of what is appropriate for each.

While pharmacologic intervention could be helpful, it remained unclear at this time and would have to be reevaluated. The long history of sensitivities to medication would require a clinician whom she trusts and one who will work with her fears while prescribing medication.

## V. Diagnostic Impression :

1) Severe bilateral osteoarthritis of the knees with bilateral knee pain and gait instability as well as risk for falling.

2) Deconditioning


EXHIBIT _B_
Page _18_ of _84_
_51_

January 7, 2007                                                                        Page 49
S. von Preyss-Friedman, MD
Re: Helen Winters

3) Status post impacted right humeral head fracture on August 15, 2004, subsequently documented healing as well as subsequently documented full range of motion in both of her upper extremities.

4) Hypertension of longstanding duration, at times poorly controlled, pre-existing January 2006.

5) Urinary incontinence due to vaginal and rectal prolapse.

6) Bilateral moderately severe mixed hearing loss.

7) Status post recurrent urinary tract infection.

8) Fluctuating weight with 30 to 40 pound weight gain between September 2004 to March 2006.

9) Posterior fossa meningioma diagnosed in 2003, unchanged in size up to 2005.

10) Macular degeneration.

11) Large hemorrhoid.

12) Diffuse osteopenia and degenerative joint disease, lumbar spine.

13) Variable cholesterol levels with the most recent cholesterol in the normal range in 2004.

14) Brain white matter small vessel disease without diagnosis of dementia and subtle cognitive testing abnormalities in the area of naming and clock drawing.

15) Past surgical history, status post cataract surgery with bilateral cataract lens implant, status post appendectomy, status post hysterectomy, status post cholecystectomy, status post removal of large ovarian tumor, August 2001, status post subsequent pulmonary emboli, September 2001, status post upper gastrointestinal bleed due to gastric ulcer, September 2001, with subsequent Greenfield filter placement.

16) Documented history of anxiety observed by various care providers, medicated for anxiety in September 2001, no psychiatric disorder established.

17) Failing Thyroid



January 7, 2007                                                                Page 50
S. von Preyss-Friedman, MD
Re: Helen Winters

## VI. Discussion:

Ms. Helen Winters is a currently 91-year-old female who was admitted to Chugiak Senior Citizens, Inc. in September 2004, after a fairly recent humerus fracture. Subsequent to her admission, the staff at Chugiak Senior Citizens, Inc. felt that the patient's care needs were exceeding the level of care offered.

### *What are Ms. Helen Winters' Medical Diagnoses ?*

For a summary of her medical Diagnoses please see above.

In regard to her hypertension, the patient has a longstanding history of poorly controlled hypertension that is well documented in the medical records and referenced in this report. While the letter of eviction may have caused her some anxiety and associated aggravation of hypertension, on a more probable than not basis, this was only temporary and back to baseline already in the emergency room without any documented end organ damage. The persistent hypertension is, on a more probable than not basis, not caused by any anxiety that the patient may have experienced in association with the eviction letter, but rather related to longstanding, preexisting and poorly controlled hypertension. Of note is that the hypertension also may have been aggravated by excessive weight gain.

In regards to her weight gain, there are large weight fluctuations documented in the records. The patient's diet is currently self-directed and reports of her current dietary intake appear to indicate that her intake is in excess of her caloric needs. The patient indicated to independent health care providers that she "eats what she likes," see above.

The patient has no persistent elevated cholesterol documented. Her last cholesterol measured in 2004 was actually within normal limits and the patient was informed of these results. There is no documentation in the medical record at all that she should be on a low cholesterol diet. It is not clear to me that her current diet, that is largely self directed, is low sodium but I have not seen the exact specifications of her current dietary intake.

According to the psychiatric evaluation by Dr. Geeseman a diagnosis of dementia, depression or anxiety disorder cannot be established. Subtle cognitive defects in the area of naming and clockdrawing may correspond to small vessel disease in the brain and the patient may be at increased risk for developing dementia in the future.

Neither during the psychiatric evaluation nor according to screening questions while hospitalized was the patient identified as high risk or a victim of elder abuse.

In regards to her humerus fracture of August 2004, this has healed and is on a more probable than not basis fixed and stable.

The patient is hearing impaired and has hearing aids. She is able to interact with staff and others verbally, given some basic patterns of communication such as slightly raised voice, good enunciation and visibility of lip movements and facial expressions.



EXHIBIT ____ B
Page 53 of 84
53

January 7, 2007                                                                 Page 51
S. von Preyss-Friedman, MD
Re: Helen Winters

### *What are Ms. Helen Winters current limitations ?*

Although I went to Alaska to evaluate the patient, I was unable to examine the patient. I am relying on medical records from her various providers, interviews with the staff and the psychiatric report to make an estimation of her current physical and mental abilities.

Activities of Daily Living:

The patient has severe degenerative osteoarthritis in both knees. On a more probable than not basis the majority of her care needs are due to the knee osteoarthritis with resultant gait disorder and fall risk.

Dr. Kirk Moss described during his last examination of March 2006, that she had good active range of motion in both upper and lower extremities. Dr. Schaab describes good finger and wrist motion and healing of the right humeral fracture with ability to touch her head. Her daughter describes that the patient is able to do her own grooming.

The records document that she is able to ambulate with a walker and stand-by assist, at times she was observed to independently ambulate with a Front wheeled walker without physical assistance. It appears that she is not able, or does not self-propel her wheelchair for unknown reasons, despite the fact that this has been changed to a light weight wheelchair. The patient is at risk for falls and therefore should not be standing up unsupported while performing upper extremity tasks. On a more probable than not basis she needs standby to contact guard assist with bathing (utilizing a bath bench), toileting and transferring. It is unclear at this point whether she could perform these tasks independently with the aid of an assistive device such as a Front wheeled walker (as she has been observed to do).Ms. Winters likely needs some assistance with lower extremity dressing such as with her shoes and Ted hose. She is likely independent with upper extremity dressing. On a more probable than not basis Ms. Winter is independent with grooming as long as her toiletries and grooming implements are organized so they are within reach and she can perform the grooming tasks in a sitting position.

Instrumental Activities of Daily Living

Ms. Winters is able to independently use the telephone and handle her finances with some assistance from her daughter. She is also able to be responsible for her own medications with set-up. She is unable to do most housekeeping and shopping independently due to her gait disorder. It is unclear how much food preparation she is able to do. It is possible that she could heat and serve herself with prepared meals as long as they are within reach and the microwave is within reach. On a more probable than not basis she can travel within the community with assistance.

Ms. Winters does not have any diagnosed psychiatric disability.

*Do you have any suggestions to improve Ms. Winters function and wellbeing ?*

I recommend that Ms. Winters be medicated with regularly scheduled pain medication, starting out with Tylenol one gram three times a day, adding to that lidocaine patches to her knees in order to alleviate the added stressor of chronic pain that put her at higher risk for irritability and excessive need to control her environment. I am aware that Ms. Winters feels sensitive to all medications and that it has prevented her from benefiting from medications that could alleviate her suffering from chronic pain. Engaging with a trusted care provider on an ongoing basis would be recommended.

I further recommend occupational therapy reevaluation of Ms. Winters and her home set-up as it appears that the assistance provided with her activities of daily living is in excess of what she can actually do given her recovery from her humerus fracture. The goal would be to put her more in control of her environment herself and lessen her sense of loss due to debility and aging.

I suggest that the patient be evaluated for an electric scooter if visual acuity permits. It is of note that she never apparently self-propels her wheelchair and she may be a lot better off using an electric scooter. It appears that she has fairly well preserved cognition and should be able to manipulate this in a better way, again making her more independent of staff and giving her more control thus lessening her losses from age and debility and improving her independence.

Ms. Winters has significant hearing loss but appears to be able to communicate with care providers adequately. It is recommended that she continue to use her hearing aid as well as close caption TV and amplified telephone. Should the hearing aid malfunction I recommend a pocket amplifier as temporary measure. I provided CSC with a simple amplifier.

*Does Ms. Winters have a disorder preventing her from moving out of Chugiak Senior Citizens, Inc. Assisted Living Facility ?*

No.

I respectfully disagree with Dr. Jones' assessment that moving Ms. Winters from her present living situation would invariably cause her deterioration in mental and physical health. It appears according to questionnaires of preferences filled out and initial behavior at Chugiak Senior Citizens, Inc. that the patient previously had enjoyed social interaction with other residents as well as in offered activities. Since the eviction notice the patient chooses to refrain from social interactions with other CSC residents and groups. The psychiatrist also concluded that the patient would benefit from ongoing social interactions. While the patient is hearing impaired, on a more probable than not basis she is still able to meaningfully interact socially, especially since hearing impairment is a frequent occurrence in her age group. I think that it could actually be beneficial to the patient if she were able to start out fresh in a different social environment.


EXHIBIT B
Page 5 of 5 84
55

January 7, 2007                                                                                    Page 53
S. von Preyss-Friedman, MD
Re: Helen Winters

### *Can CSC meet the care needs of Helen Winters ?*

Looking at the mere physical capabilities of this patient it appears that admitting her to CSC in September of 2004 appeared reasonable as she had previously been independently living in the community and had increased disability due to a right arm fracture, that was expected to heal. However, after admission it became known to the CSC staff what was previously not known: that the patient's care needs were not primarily determined by her physical abilities but by the patient's psychological need to engage other people in control of her environment. Likely, due to the patient's losses that she has experienced as a consequence of old age and disability, the patient is apparently only able to cope with responding to her loss of control with a need to control her caregivers and engage them in ritualistic appearing caregiving demands. The patient's records at CSC document in detail the patient's time consuming needs for staff attention, which go beyond what could have been reasonably expected on admission given her physical morbidity.

I have extensive experience in discharging patients to assisted living facilities and evaluating them for appropriateness of assisted living facilities. It is my experience as a geriatrician who takes care of frail, elderly and debilitated patients, that assisted living facilities are usually overwhelmed by patients who need more than one person assist and care over an extended period of time as Ms. Winters demands. On a more probable than not basis, the Ms. Winters' timing demands for toileting and showering also do exceed that what is usually provided in assisted living facilities. However, there are some assisted living facilities and adult family homes who (likely due to different budget or personnel resources) are willing and able to meet more advanced care needs and can accommodate more intensive care regimens.

It is unfortunate that Ms. Winters' need for control of her environment has escalated to the point of verbal abuse of staff as well as physical aggression towards staff as documented above. Further, the needs of Ms. Winters have affected the ability of staff to provide optimal care for other patients residing at Chugiak Senior Citizens, Inc..

The lease agreement signed by Carol Winters, POA, on September 24, 2004, specifies on page 4 that termination by management against the resident's will is agreed upon if the level of care is no longer available at the facility and for engaging in a documented pattern of conduct that is harmful to the resident, other residents or staff of the home.

In regard to the level of care, again, consistent need for two-person care as well as lengthy toileting and grooming procedures, felt necessary by Ms. Winters, exceed the level of care at CSC.

As already outlined above, the patient unfortunately has acted verbally and physically abusive as well as socially inappropriate, placing significant stress on staff as well as other individuals in the facility.


EXHIBIT _____ B
Page ___ 53 ___ of ___ 84
56

January 7, 2007                                                                                      Page 54
S. von Preyss-Friedman, MD
Re: Helen Winters

Alaska Statue Section 47.33.060 specify what Assisted Living Facility house rules can
address. Under Paragraph 7 it is specified that physical, verbal or other abuse of residents
or staff may be addressed in house rules.    Alaska Statute Section 47.33.360 also
addresses involuntary termination of contract.  It specifies that assisted living homes may
terminate residents against their will for engaging in a documented pattern of conduct
that is harmful to other residents or staff of the home, or when the home can no longer
provide or arrange with services in accordance with the resident's needs in the resident's
assisted living plan. Both these conditions are met in Ms. Winters' case.

On a more probable than not basis, the patient's loss of hearing is not a major barrier to
communication between staff and the resident and the care delivered to Ms. Winters. The
staff during my interviews had appropriate knowledge on how to communicate with
patients with hearing impairments such as Ms. Winters. Significant hearing impairment is
not an unusual occurrence in the care of elderly patients, and there are other residents at
CSC with similar hearing impairments. Also, in my experience treating numerous
patients with severe hearing deficits, there is a distinct difference between speaking
loudly because of hearing problems and an angry, raised voice and affect.

In summary, Ms. Winters is a 91-year-old female with multiple physical limitations that
have been stable to improving after admission to Chugiak Senior Citizens, Inc. in
September 2004. However, her care needs are in excess of what the facility can provide
due to the patient's expressed need to control her environment and caregivers beyond her
mere physical restrictions. This has led to a burden on staff and other residents.
Therefore, the facility has the right to terminate service to Ms. Winters according to
Alaska State Statutes governing assisted living facilities and the agreed upon lease and
service agreement at the time of Ms. Winters' admission.

If Chugiak Senior Citizens, Inc. chooses not to exercise termination of Ms. Winters I
would make the following recommendation:

Engagement of an independent caseworker, i.e., a social worker to create a behavior plan
that would help the patient to be more comfortable with her limitations and feel reassured
that her care needs were met without an excessive need to control the environment and
the caregivers in a ritualistic and inflexible manner.  Such care and behavior plan would
have to be agreed upon by all parties involved including the patient and her daughter.

All personnel would have to be trained and in-serviced by a caseworker/social worker
with a mental health background on appropriate behavior plans with patients who have
personality profiles as Ms. Winters and resultant care needs. Such a behavioral plan and
program would however change the environment at CSC from one that is fundamentally
geared to support and nurture the residents to one that is oriented toward establishment of
boundaries, limit setting and reward systems. I have seen behavior plans like that work in
hospitals, especially psychiatric units, skilled nursing facilities with on-site mental health
and social work support as well as adult family homes with specialty mental health
orientation.

January 7, 2007                                                                        Page 55
S. von Preyss-Friedman, MD
Re: Helen Winters

Another alternative would be for Ms. Winters and her daughter to engage a private care giver that would be able to solely devote her/himself to Ms. Winters additional care needs.

Please let me know if you have any further questions.

Respectfully submitted,

Electronically authenticated
Sabine von Preyss-Friedman, MD
Internal Medicine, Geriatic Medicine
Certified Medical Director for Long-Term Care
SPF/dmc

Attachment

EXHIBIT B
Page 58 of 84

## INDEX OF DOCUMENTS FORWARDED TO
## DR. SABINE VON PREYSS-FRIEDMAN

A.      Amended Complaint for Injunctive and Declaratory Relief and for Damages

B.      Defendant's Amended Answer

C.      CSC's 1/5/06 Letter to Helen Winters Re: Notice of Termination of
        Residential Service Contract (Nos. 10072-10073)

D.      Carol Winters' Rebuttal Letter (Nos. 10075-10087)

E.      Plaintiff's Disclosures (w/ some enclosures)

        • Photocopies of photographs of Helen Winters (Nos. 1-9)
        • Plan of Care Supplements 9/10/05-9/10/06 (Nos. 157-161)
        • Consumer Assessment Tool (CAT) dated 7/21/05 (Nos. 162-173)
        • Plan of Care from 9/11/06-9/10/06 (Nos. 174-189)
        • Plan of Care Supplement 9/10/05 (Nos. 190-193)
        • Long Term Care Assessment dated 9/11/01 (Nos. 194-208)
        • Long Term Care Assessment dated 9/11/02 (Nos. 209-224)
        • Long Term Care Assessment dated 9/11/03 (Nos. 225-243)
        • Plaintiff's First Supplemental Disclosures (Nos. 244- 559) (medicals)

F.      Defendant's Initial Disclosures (w/out enclosures)

G.      Discovery

        • CSC's First Set of Discovery Requests
        • Plaintiff's Responses to CSC's First Set of Discovery

H.      Resident File
        • Progress notes (Nos. 20000-20224)
        • All other records, (30000-30568)

I.      Other Records

        • Assisted Living Homes (AS 47.33.005- .990)
        • Definitions (AS 47.24.900)
        • Alaska Administrative Code (excerpts)
        • Residents Rights/Prohibitions/Grievance Procedures (Nos. 10065-10071)
        • Move-Out Criteria (No. 10527)
        • Job Ready/Ready Care records (Nos. 40080-40121)
        • Easter Seal records (Nos. 40122-40193)
        • Marla Nelson e-file (Nos. 40194-40219; 40260-40262; 40425-40426; 40538-
          40540; 40637-40642)
        • APD report Case No. 06-13893 (Carol Winters)
        • Carol Winters' Deposition (Vol 1)



EXHIBIT  B
Page  59  of  84

J.      PAMC records (plaintiff's Bates 560-1080)

K.      Excerpts from Kathy Huskey's care coordination records

- 50593-50598;  50747-50754;  50756;  50758;  50760-50763;  50769-50771;
  50261-50263;  50265-50267;  50268-50269;  50273-50274;  50276-50277;
  50279-50280;  50282-50286;  50288-50289;  50292-50293;  50296-50297;
  50825-50826;  50831-50832;  50835;  50837-50838;  50840-50841;  50843-
  50844;  50846-50847;  50850-50851;  50853-50854;  50856-50857;  50859-
  50860; 50862-50863; 50865-50866
- Supplemental records (Bates 50868-50948)

L.      8/30/06 LTCO report

M.      Documents from State of Alaska, Division of Certification and Licensing (Bates 40431-40536)

N.      Plaintiff's 3rd Supplemental Disclosures with records from Dr. Jones, Bates 1082-1089

O.      Plaintiff's 4th Supplemental Disclosures with attachments, Bates 1090-1208

P.      Plaintiff's 5th Supplemental Disclosures with attachments, Bates 1209-1262

Q.      Plaintiff's 6th Supplemental Disclosures with attachments, Bates 1304-1305

R.      Deposition of Dr. Michael Jones taken 11/28/06 with exhibits

S.      CSC's Quality Assurance Complaint form (Bates 10473A)

T.      CSC's 19th Supplemental Disclosures with attachments (Bates 10527-10526

U.      CSC Personnel Background Check files (Bates 63526-63876)

V.      Policies re complaint handling, termination of contract, eviction (Bates 10473-10474, 10479-10483

W.      Pre-assessment screening dated 9/2004 (Bates 40263-40268)

X.      Shift schedule/responsibilities checklist (Bates 40541-40543)

Y.      CSC Menus (Bates 40774-40780)

Z.      Helen Winters' menu choices (Bates 40781-40802)

AA.     CSC Satisfaction Surveys (Bates 40813-40933)

Doc No. 125599



EXHIBIT  B
Page  57  of  65
        60       84