# CURRICULUM VITAE

## Sabine Maria von Preyss-Friedman M.D.

January, 2006

**ADDRESS**

10573 – 14th Ave NW
Seattle WA 98177
Tel/Fax  (206) 781 2548

## PROFESSIONAL POSITIONS

| | |
|---|---|
| 7/01  - Present | Clinical Assistant Professor of Medicine, University of Washington, Division of Gerontology and Geriatric Medicine, Section for Long-Term Care |
| 10/97 – 6/01 | Clinical Instructor of Medicine, University of Washington, Division of Gerontology and Geriatric Medicine, Section for Long-Term Care |
| 8/03 – Present | Washington Care Center of Rehabilitation, Seattle Medical Director |
| 5/03 – Present | Avalon of Federal Way Healthcare Center (formerly Beverly) Medical Director |
| 11/00 - Present | Whittier Care Center (Formerly IHS), Seattle Medical Director |
| 1/98 - Present | Leon Sullivan Health Care Center (Formerly Branch Villa Health Care Center), Seattle Medical Director |
| 01/96  - Present | Mount Si Transitional Healthcare Center, North Bend, WA Medical Director |
| 04/93  - Present | Medical Consultants Northwest Examiner, Independent Medical Exams |
| 1/98  -   12/00 | Wedgewood Rehabilitation Center, Seattle Medical Director |



EXHIBIT B
Page 58 of 84
61

Sabine von Preyss-Friedman M.D.
Curriculum Vitae

08/92 - 10/96       Pike Market Medical Clinic
                    Locum Tenens and Weekend Coverage Medical Staff

03/94 - 2/98        Group Health
                    Locum Tenens Medical Staff

01/89 - 8/97        Seattle Medical and Rehabilitation Center (former Phoenix
                    Rehab Center), Medical Director and CQI Coordinator

04/91 - 7/92        Pike Market Medical Clinic
                    Staff Physician

07/90 - 3/91        Acting Instructor
                    Department of Medicine
                    Division of Gerontology and Geriatric Medicine
                    University of Washington, Seattle, Washington


## HOSPITAL PRIVILEGES

                    Harborview Medical Center
                    University of Washington Medical Center

## COMMITTEES

5/02                King County Elder Abuse Council/Criminal Neglect Panel
10/02-12/04         King County Long-Term Care/Law Enforcement Panel

## EDUCATION

07/87-6/90          Fellowship in Geriatric Medicine
                    University of Washington, Department of Medicine,
                    Division of Gerontology and Geriatric Medicine,
                    Seattle, Washington

07/84-06/87         Internship and Residency in Internal Medicine
                    Akron General Medical Center , Akron, Ohio

10/83 - 6/84        Rotation in Dermatology
                    Office Dr.med.J.A. von Preyss, Hamburg, Germany



EXHIBIT _B_
Page __ of __
62   2   84

Sabine von Preyss-Friedman M.D.
Curriculum Vitae

| | |
|---|---|
| 01/83 - 10/83 | Resident in Internal Medicine<br>Marienkrankenhaus Hamburg, University of Hamburg |
| 10/76-10/82 | Medical Faculties, Universities of Saarbruecken<br>and Muenchen, Germany |
| 12/84 | MD Thesis<br>Prescription Habits for Sleeping Pills for Elderly Patients in<br>Institutions, Technische Universitaet Muenchen, Germany<br>Summa cum laude |

## HONORS / AWARDS

| | |
|---|---|
| 10/78 | Konrad Adenauer Stiftung<br>Scholarship for gifted Students |
| 9/03 | Voted "Top Doctors for Women – Geriatric Medicine" as<br>chosen by their Peers, Seattle Magazine, September 2003,<br>Vol12, No7 |

## MEDICAL LICENSE

| | | |
|---|---|---|
| 09/87 | Washington | 252-09 0025022 - Active |
| 08/86 | Ohio | 54274 - Inactive |
| 11/82 | Germany | Active |

## CERTIFICATIONS

| | |
|---|---|
| 03/00 | Re-certified CAQ in Geriatric Medicine |
| 12/99 | Re-Certification as Certified Medical Director for<br>Longterm Care |
| 12/92 | Certified Medical Director for Longterm Care<br>American Medical Directors Association |
| 04/90 | Certificate of Added Qualification in Geriatric Medicine,<br>American Board of Internal Medicine |
| 09/87 | Diplomate, American Board of Internal Medicine |
| 06/86 | Federal Licensing Exam, Ohio |
| 09/83 | Visa Qualifying Exam, Frankfurt, Germany |
| 01/83 | ECFMG, Hamburg, Germany |



EXHIBIT B
Page 63 of 84

3

Sabine von Preyss-Friedman M.D.
Curriculum Vitae

## ORGANIZATIONS

American College of Physicians
American Geriatrics Society
American Medical Directors Association
King County Medical Society
Deutsche Gesellschaft fur Gerontologie
Deutsche Gesellschaft fur Geriatrie
Gesellschaft fur Inkontinenzhilfe

## COMMITTEES

| 09/02 | King County Criminal Neglect Panel |
| 09/02 - 12/04 | King County Long-Term Care/Law Enforcement Panel |

## GRANTS and RESEARCH AWARDS

02/90
Foerderpreis fuer Gerontologie (New Investigator Award for Gerontology)
Parkwohnstiftung Bad Kissingen, Germany, for submitted paper: Physician
attitudes toward tube feeding elderly nursing home patients as a model for life
sustaining therapy.a national survey of German primary care physicians and
geriatricians.

12/01/90 - 11/30/91
Weight regulation in aging rats. Pilot and Feasibility Grant, Clinical Nutrition
Research Unit, University of Washington, Seattle, Washington

## PUBLISHED ABSTRACTS

1.    Chen S, Mackall C, von Preyss S. In Vitro Sensitization of Human
      lymphocytes. Presented at the International Conference on Lymphokines,
      Boston, Massachusetts, July 1986.

2.    von Preyss S, Olson S, Multidisciplinary Geriatric Assessment in an Acute
      Care Hospital.  Presented at the Annual Meeting of the German
      Gerontological Society in Tassel, Germany, September 1988.  Published
      in Schmitz-Scherzer R, Tokarski W (Editors): "Die neuen Alten" Kasseler
      Gerontologische Schriften 6: 278, Kasseler Gesamthochschulbibliothek
      1989.

3.    von Preyss S, Uhlmann RF, Cain KC. Physician attitudes regarding tube
      feeding of elderly nursing home patients:.  Impact of selected factors be

EXHIBIT __B__
Page __64__ of __84__

fractional factorial design.  Presented at the Annual Meeting of the American Geriatrics Society, Boston, Massachusetts, May 1989.

4.    von Preyss-Friedman S, Uhlmann RF, Cain KC.  Physician attitudes regarding tube feeding of nursing home patients.  Clinical Research, Vol 38, No. 1, 1990

5.    von Preyss-Friedman S, Uhlmann RF, Cain KC.  Physician attitudes regarding tube feeding of nursing home patients: A national survey of geriatricians and primary care physicians.  Published in the proceedings of the Annual Meeting of the American Geriatrics Society, Atlanta, Georgia, October 1990.

6.    von Preyss-Friedman S, Uhlmann RF, Cain KC. Us and German Physician attitudes towards tube feeding of nursing home patients. Gerontologist Vol 30: 6A, October 1990

7.    von Preyss-Friedman S. A successful CQI Incontinence Committee utilizing AMDA Guidelines, Presented at the American Medical Directors Association Meeting, San Antonio, March 1998

     8.  von Preyss-Friedman S, Scott C. A CQI-Initiative on Treatment of Osteoporosis:  Multidisciplinary approach changing medical practice. Presented at the American Medical Directors Association Meeting, Orlando, March 1999

9.    von Preyss-Friedman S. Getting Ready for the Flu: A comprehensive CQI Program for Prevention and Treatment of Influenza. Presented at the American Medical Directors Association Meeting in San Francisco March, 2000, JAMDA Vol.2, No.1:A14, April 2000

## PUBLICATIONS

1.    von Preyss S. Geriatrie in den USA, Geriatrische Diagnostik und Kurz-Rehabilitationsstation in einem Akut-Krankenhaus (English title: Geriatrics in the USA, Geriatric evaluation and rehabilitation unit in an acute care hospital). Z Geriatrie 2: 509-512, 1989

2.    von Preyss-Friedman S, Uhlmann RF, Cain KC.  Physician attitudes towards tube feeding in chronically ill nursing home patients. Journal of General Internal Medicine 7: 46-51, 1992.

3.    Park CR, von Preyss-Friedman S, Schwartz RS, Woods SC. Disturbed body weight control in geriatric rats: A model for Anorexia in Alzheimer's. In: Meyer  EM, Simpkin JW, Crews ST. "The treatment of the dementias; a new gerontology program." Plenum Press, New York 1992.

Sabine von Preyss-Friedman M.D.
Curriculum Vitae

## SELECTED INVITED PRESENTATIONS

1.  Tuberculosis in the Elderly
    Madigan Army Medical Center, 02/02/90

2.  Skin Diseases in Aging
    Presented to the Geriatric Nurse Practitioner Program
    University of Washington, 02/15/90

    3.  Prevention of Geriatric Infectious Diseases
    Presented at the Geriatric Summer Institute
    University of Washington Geriatric Education Center, 07/17/90

4.  Quality Assurance in the Nursing Home
    Division of Gerontology, University of Washington, 10/14/92

5.  The German Health Care System
    Presented to the Snohomish and Skagit Chapters of the
    Washington Academy of Family Physicians, 2/11/93

6.  Surveys in the Nursing Home: State/Federal, JCAHO and CARF.
    Division of Gerontology, University of Washington, 11/10/93

7.  The Role of The Medical Director in Longterm Care
    Symposium Organizer for Sunrise Healthcare, Oct 6-8th, 1995

8.  An Overview of Nursing Home Care
    Swedish Family Practice Residency, 2/6/1996

9.  Hepatitis with special emphasis on Hepatitis C
    Crawford Insurance Company, 10/13/99

10. Pain Management in the Nursing Home Patient
    Mount Si Rehabilitation Center, 10/28/98

11. Comprehensive care of the terminal patient
    Branch Villa Healthcare Center, 11/12/98

Sabine von Preyss-Friedman M.D.
Curriculum Vitae

12.     Hepatitis C
        Medical Consultants Northwest Lecture Series
        Seattle, 11/19/98 and Portland, OR 12/03/98

13.     Pain and Pain Management in the Elderly
        Grand Rounds, Western State Hospital, Tacoma, WA, 5/27/99

14.     Pain Management in Long-Term-Care
        Seatoma Nursing Home/Provdience Hospital 4/18/00

15.     New Approaches to Managing Chronic Pain in the Elderly
        Washington Geriatrics Society, 4/26/00

16.     Chronic Pain in the Frail Elderly
        Northwest Geropsychiatric Breakfast Series, 5/3/00

17.     Pain Management in Long-Term Care: An Opportunity for CQI
        National Meeting of the American Medical Director's Association.
        Atlanta, GA 3/14/01

18.     Challenges and Pitfalls in Pain Management. CME Northwest Hospital,
        Seattle WA , 3/28/01

   19. "Pain Management in Long-Term-Care: What's a Medical Director to do?"
       Symposium at the National Meeting of the American Medical Director's
       Association, San Diego, 3/22/02

20.     "Pain Management in Long-Term Care, an Opportunity for Quality
        Improvement", presented at Annual Meeting of Surveyors for DSHS,
        Shoreline , WA 10/6/03

   21. Speaker, Nursing Home Quality Improvement Forum, Department of
       Health and Human Services, WA 2/11/04

   22.     Speaker, Director of Nurses Meeting in Marysville, Washington
           11/12/04. "Quality Improvement in Longterm Care, Pain Management"

   23.     Speaker, South End Coalition Forum for Long Term Care Providers,
           Federal Way, WA, 2/18/05

   24.     Speaker , Long Term Care Surveyors Continuing Educacrion,
           Department of Health and Human Services, Seattle WA, 6/2/05

EXHIBIT $\mathcal{B}$
Page 64 of 65
67

7

84

Sabine von Preyss-Friedman M.D.
Curriculum Vitae

EXHIBIT ___B___
Page ___68___ of ___84___



**Alaska Legal Nurse Consulting, LLC**

8211 E. 20th Ave.
Anchorage, Alaska
99504



Phone: (907) 351-0695
Email: alnc@gci.net

*Nursing in Alliance with the Legal System*

January 5, 2007

Donna Meyers, Attorney at Law
1007 West 3rd Avenue, Suite 400
Anchorage, AK 99501

Re: <u>Winters v. Chugiak Senior Citizens, Inc.</u>
    Case No. 3:06-cv-00083-TMB

I have been provided records pertaining to Helen Winters, and in particular her residency at Chugiak Senior Citizens, Inc.'s Assisted Living Home, and was asked to provide expert opinions based on my review of the documents provided, and my training, experience, and specialized knowledge of the standards, practices, and operations of assisted living homes in Alaska.

My opinions are based on my training and experience as the Executive Administrator of Marlow Manor Assisted Living Facility, a 48-apartment assisted living community, and as the Director of Resident Services for Marlow Manor. I also have experience, training and knowledge based on several years as a direct caregiver during high school, college, and an eight month time period at Marlow Manor. For the past seven years, I have been extensively involved in the assisted living homes industry and am familiar with the statutes and regulations pertaining to assisted living homes, as well



EXHIBIT _B_
Page _E_ of _F6_
        _65_      _84_

as the norms, practices, and standards followed by assisted living homes operating in Alaska.

I understand the primary issue in this case concerns Chugiak's decision to terminate Ms. Winters' Residential Service Contract ("RSC"), which was served on Ms. Winters in January, 2006. From my review of documents, including progress notes, telephonic and written correspondence, etc., it is obvious there were concerns voiced by Chugiak's assisted living program almost immediately following Ms. Winters admission to Chugiak in September 2004. There are multiple issues and factors contributing to the difficulties involving Ms. Winters' residency at Chugiak. The totality of circumstances shows a history, starting within the first month after Ms. Winters' admission, of Chugiak's inability to meet Ms. Winters' needs and expectations. The inability to meet Ms. Winters' needs were not due to any fault of or wrongdoing by Chugiak, and occurred despite Chugiak's multiple attempts to address issues brought to its attention and its efforts to meet Ms. Winters' demands that were not apparent upon her admission. When there is such a disparity between the services the assisted living home can offer and the resident's needs, demands or expectations, the disparity leads to a level of tension that detracts from the trust that should exist in the relationship between the assisted living home and the resident, and it places a burden on the assisted living home staff that detracts from services the staff is able to provide other residents. When that trust relationship has been adversely impacted and the resident's demands or expectations exceed the services the home can provide, as in the relationship between Ms. Winters and Chugiak, the home has the option to terminate



EXHIBIT _____ B
Page ___ 3 ___ of ___ 10 ___
                    70        84

the resident's RSC. The standard and practice in the industry is to discharge residents who are not a "good match" for the particular environment because the caregiving relationship between the assisted living home and the resident requires a certain level of trust between the home and the resident to ensure not only the resident's well-being, but the staff's ability to provide adequate services to other residents. In Alaska, the assisted living home determines the level of care (LOC) it provides, and the LOC can vary greatly from one home to another and is based on many factors, including the budgetary and staffing resources of the home.

### THE ADMISSION PROCESS

The only statutory and regulatory requirements pertaining to the admissions process in assisted living are the requirement to provide the RSC, documents informing the resident and/or the resident's responsible party of the house rules, resident rights, and grievance procedures upon move in, and an assisted living plan (of care) within 30 days following admission. Chugiak followed an admissions process that is standard or consistent with the admissions process followed by other assisted living homes in Alaska. The Program Director, Lynn Moser, conducted a prescreening assessment dated September 9, 2004, and obtained information from Ms. Winters' daughter, Carol Winters that included a Functional Assessment and Health Questionnaire dated September 7, 2004. However, the admissions process is a trial and error procedure since the home must rely heavily on the ability and willingness of the potential resident and/or interested family members to be reliable historians and to provide forthright



EXHIBIT  B
Page  6  of  80
      71      84

accurate information about the resident's abilities, disabilities, and care needs.  If it is the first time the prospective resident and the family member have had to consider and articulate the resident's care needs from the perspective of entering an assisted living environment as well as to an assessor who is unfamiliar with the resident, more often than not it is difficult for the home to obtain an accurate picture of the prospective resident's needs upon admission.  Even if the home obtains a comprehensive medical history for the resident, the medical history may not reveal everything pertinent and it often does not address the prospective resident's psychosocial needs, mental health concerns, or status of cognitive function.

### TRAINING AND STAFFING REQUIREMENTS

Chugiak's training curriculum is comparable to educational offerings I provide to my employees as well as what I have observed in other assisted living homes.  The regulations only require up to 12 contact hours per year for caregivers and 18 for administrative staff.  Chugiak provided an initial orientation upon hire in addition to annual contact hours which exceeded the required amount.  Staffing ratios in assisted living in Alaska are not set by regulation, but are determined by the type and level of care the home provides. Chugiak's staffing ratios complied with the assisted living home regulations and statutes and were certainly within the standards for other assisted living homes in Alaska.  There is also no statutory or regulatory requirement or industry practice that required Chugiak to have a nurse on the premises during the night shift. There is no requirement to have a nurse on the premises at all except to review and supervise or delegate health care service components of the assisted living plan.  Given



EXHIBIT _____ B
Page _____ 4 _____ of _____ 82
72                        84

the level of care Chugiak has chosen to provide in its program, it is reasonable and acceptable for Chugiak to have, as it did, a nurse available by telephone during the evening hours. For example, I and the Director of Resident Services at Marlow Manor work typical office hours but share the role of being "on-call", not to perform skilled nursing services, but to consult with the staff on an as needed basis for questions, concerns, and/or emergencies. We are not expected to return to the building unless it is a facility emergency.

## ADDRESSING RESIDENT CONCERNS/COMPLAINTS/GRIEVANCES

The records indicate Chugiak complied with the statutory and regulatory requirements and industry practices regarding its grievance policy and procedures. Chugiak's grievance policy and procedure was posted. Moreover, Ms. Winters, through her daughter who was her chosen representative, was informed of her right to submit grievances, and the daughter acknowledged she was informed of Chugiak's grievance policy and procedures, understood them, and had an opportunity to ask questions about them. There is no statutory or regulatory requirement to provide a specific form to file a complaint or grievance. AS 47.33.340 (b)(1) only stipulates that "a resident and the resident's representative have the right to present both a written and an oral explanation of the resident's grievance". In my practice, most complaints are handled verbally by either the resident or family member approaching me and we conference about the issue immediately, with the understanding that if resolution does not occur they will notify me as needed. Very rarely are issues addressed in written format unless they are



EXHIBIT $\beta$
Page 6 of 84
73

severe, require an internal unusual occurrence form, or require reporting to assisted living licensing or other agency. Most often the resident or family member may not even be privy to what action was taken, as it is a confidential interaction between administration and the other party involved (staff or resident). Unless mediation is required, there may never be a combined interaction.


**MEDICATION ISSUES**


There are allegations of medication errors, but the record shows there were three instances of errors made by the pharmacy, and not Chugiak. Chugiak's program nurse then corrected the pharmacy errors once they brought it to her attention.


**CONFIDENTIALITY ISSUES**

Chugiak provided education and policies for the staff and residents related to the program's confidentiality practices. By doing so, Chugiak met its statutory and regulatory obligation. It is a standard and expected practice for the staff and/or administration for the assisted living home to discuss resident issues at a staff meeting as a forum to work thru issues, and provide education/guidance, etc. In a communal environment like an assisted living home, other residents often discuss situations amongst themselves; particularly if they have been affected and will at times attempt to engage staff. Staff should always be mindful of confidentiality when addressing residents' concerns or conversing with them, but residents will draw their own conclusions/formulate their own opinions.



EXHIBIT ___ B
Page ___ of ___
74    84

## DIETARY ISSUES

The statutes state residents have a right to receive meals that are consistent with their health needs or religious preferences; but without extra cost to the home. The document that Carol Winters signed regarding the meal plan at Chugiak did not indicate the need for a special diet, nor did the assessment and Resident Assisted Living Service Plan, which was signed by both Carol Winters and Ms. Winters. Carol Winters claims this was discussed at the initial interview, but if it was not put in writing, there is no obligation by the home to provide special meals. The document Carol Winters provided for staff just after her mother moved in also did not mention the need for a special diet, other than her mother's lactose intolerance, although the intent of the document was to expound on and clarify her mother's needs. The CAT assessment for the Medicaid Waiver program did note that Helen Winters was lactose intolerant and preferred a low salt diet, but this document is rarely, if ever, seen by the assisted living home and this information was not transferred to the plan of care provided by the care coordinator, who, in combination with Ms. Winter's or her daughter Carol, would have been responsible for applying this information. Furthermore, the notes kept by the care coordinator from the monthly visits and phone calls never mentioned anything regarding a need for a special diet or concerns. Also, if a special diet is requested for health reasons, it is standard practice to require a doctor's order pertaining to the specific diet necessary.



EXHIBIT B
Page 9 of 84
75

**INVOLUNTARY TERMINATION PROCESS**

The records indicate Ms. Winters was appropriately informed of Chugiak's decision to terminate her RSC.  The statutes provide the procedure for involuntary termination of the contract.  The statues also state the conditions that may exist that would support the involuntary termination of a RSC.  The reasons cited by CSC correlate with the following statutory provisions:  47.33.360 (a)(2) "for engaging in a documented pattern of conduct that is harmful to the resident, other residents, or staff of the home", (3) "for violation of the terms of the residential services contract,. . .and (6) "when the home can no longer provide or arrange for services in accordance with the resident's needs and the resident's assisted living plan.

The RSC, which was signed by Carol Winters, clearly states in more than one area information to support the termination of the contract.  For example, the first line of Section 9. Admission Criteria states that "The Manager may admit Residents for assisted living services who meet the following criteria:

> (1) Accept only residents whose needs we can meet. This includes assessing resident's needs, abilities and preferences, staffing ratios, physical spaces, etc. . . ."

As I alluded to previously, the initial assessment is often not as telling as we would prefer and the resident's true needs are usually revealed once the resident is admitted and starts receiving services.  Whether the home can provide the services required to meet the resident's needs is a delicate balance based on what the home



EXHIBIT B
Page 8 of 84
76

offers and the dynamics of the current population.  The Administrator must have the ability to adjust the milieu to ensure all residents are treated with equality and their needs can be met safely; for both the resident and the care givers.  There are many factors to consider and in my practice it is the resident(s) who have the most factors that prevent this from occurring that must be considered for alternative approaches (such as private hired care givers) or possibly eviction.  The fact that Ms. Winters (and notably many of the other Chugiak residents) are participants of the Medicaid CHOICE Waiver program suggests a higher level of care since one of the qualifications for this program is the need for an "intermediate" or "nursing home" level of care.  That being said, if it is determined that a resident requires time for tasks that detracts from services the staff can provide other residents or the particular resident demands services or time from the staff that is too demanding based on staffing patterns, then it is most likely time for that resident to relocate to a skilled facility or a different assisted living setting that has the staffing and ability to perform that level of care.

All of the information reviewed regarding this case supports a history, starting within a month after move in, of an inability of Chugiak to meet Ms. Winter's needs and expectations despite multiple attempts to address issues that were brought to their attention as well as attempting to address Chugiak's concerns of a higher level of care required than initially assessed. It is also interesting to note that Ms. Winters had commented on more than one occasion that she was happy at Chugiak and it was not until it was brought to Carol Winters' attention that her mother's care needs might be higher than what Chugiak could provide did complaints start to occur.



EXHIBIT _B_
Page _6_ of _8_
77    84

The criteria in the RSC for Ms. Winters also states Chugiak will:

(7) Admit and retain individuals who do not have a tendency to wander, fall, *act verbally or physically abusive or socially inappropriate*, and

(8) Admit and retain individuals whose behavior places *little or no stress on self, other individuals or staff*.

Documentation on multiple occasions shows Ms. Winters has a tendency to be verbally abusive towards staff.   Her daughter even admits in her rebuttal letter: "Granted mom will get very upset and raise her voice, but this is the extent of it and she does this only when provoked".   From the progress notes and other sources of documentation it seems as though Ms. Winters becomes "verbal" when things are not done to her exact orders or she does not care for the individual working with her.   It became to the point where staff would leave the room and return when she was calmer. This is not an uncommon practice and I instruct my staff to do the same when they are in this situation.  I let residents know staff also have rights as individuals to be treated with respect in their work place.  The daughter also refers to Ms. Winters' hearing loss as the reason why she speaks loudly to others, yet this is intermittent and according to one staff member seems selective, depending on the situation.  It is obvious from the medical record that Ms. Winters does have hearing loss; however, it is also obvious to others by other characteristics of speech and communication beside volume when the intent is negative; such as tone, body language, and word selection.  Ms. Winters' agitation when the Chugiak staff cannot meet her needs in the exact manner she



EXHIBIT $\beta$
Page 18 of 84



chooses results in frustration between all parties involved.  As previously discussed, trust has eroded, creating a tense environment. It has been documented that her agitation has disturbed other residents, as well, and certainly the staff having to spend additional time outside of the regular time allotted for particular care tasks can also infringe on time that is relegated for other residents, thus affecting their care.  In addition, the incident whereby Ms. Winter's "slapped" the hand of a staff member of Chugiak also indicates an inability to handle situations in an appropriate manner, thus resorting to physical lashing out in this instance.  I know that Carol Winters insists that her mother reported otherwise, but as with most of the allegations by Carol Winters, they are her impressions based on discussions with her mother, not incidents she herself witnessed.

Ms. Winters' RSC also states in Section 11 that if a "*resident does not meet regulatory or Manager's criteria for occupancy...*" a 30 day notice may be given.  It further clarifies that a resident may be involuntarily moved only if "she/he has breached the conditions of their Resident Contract Agreement and/or Resident Service Plan." Considering the above information, there has been a breach in the condition of the RSC and therefore the notice issued.

**CONCLUSION**

A sense of trust and rapport is essential for a positive experience during caregiving in an assisted living home environment.  For multiple reasons, the trust

EXHIBIT $\mathcal{B}$
Page 19 of 84


relationship between Ms. Winters and Chugiak deteriorated over time and regardless of allegations attributing fault to either party, the resulting mismatch between Ms. Winters' perceived or actual needs and the services Chugiak provides warranted the need for Chugiak to terminate the Residential Services Contract. Chugiak acted reasonably and within industry standards and the assisted living home regulations and statutes. Over the past two years Chugiak made efforts to work with Ms. Winters and her daughter to no avail, and contrary to Carol Winters accusations, Chugiak has done what other assisted living homes in similar situations would have done by counseling with the resident, the interested family member, and care coordinator in an attempt to resolve the issues, and after that failed, Chugiak made the decision to terminate Ms. Winters' Residential Service Contract.

Respectfully Submitted,

Theresa Panchot, RN

Theresa Panchot, RN, BSN, CLNC
Executive Administrator
Marlow Manor ALF



EXHIBIT B
Page 80 of 84

## INDEX OF ENCLOSURES SENT TO
## THERESA PANCHOT, RN, BSN

A.    Amended Complaint for Injunctive and Declaratory Relief and for    Damages

B.    Defendant's Amended Answer

C.    CSC's 1/5/06 Letter to Helen Winters Re: Notice of Termination of Residential Service Contract (Nos. 10072-10073)

D.    Carol Winters' Rebuttal Letter (Nos. 10075-10087)

E.    Plaintiff's Disclosures (w/ some enclosures)

- Photocopies of photographs of Helen Winters (Nos. 1-9)
- Plan of Care Supplements 9/10/05-9/10/06 (Nos. 157-161)
- Consumer Assessment Tool (CAT) dated 7/21/05 (Nos. 162-173)
- Plan of Care from 9/11/06-9/10/06 (Nos. 174-189)
- Plan of Care Supplement 9/10/05 (Nos. 190-193)
- Long Term Care Assessment dated 9/11/01 (Nos. 194-208)
- Long Term Care Assessment dated 9/11/02 (Nos. 209-224)
- Long Term Care Assessment dated 9/11/03 (Nos. 225-243)
- Plaintiff's First Supplemental Disclosures (Nos. 244- 559) (medicals)

F.    Defendant's Initial Disclosures (w/out enclosures)

G.    Discovery

- CSC's First Set of Discovery Requests
- Plaintiff's Responses to CSC's First Set of Discovery

H.    Resident File
- Progress notes (Nos. 20000-20224)
- All other records, (30000-30568)

I.    Other Records

- Assisted Living Homes (AS 47.33.005- .990)
- Definitions (AS 47.24.900)
- Alaska Administrative Code (excerpts)
- Residents Rights/Prohibitions/Grievance Procedures (Nos. 10065-10071)
- Move-Out Criteria (No. 10527)
- Job Ready/Ready Care records (Nos. 40080-40121)
- Easter Seal records (Nos. 40122-40193)
- Marla Nelson e-file (Nos. 40194-40219; 40425-40426; 40538-40540; 40640-40642)
- APD report Case No. 06-13893 (Carol Winters)
- Carol Winters' Deposition (Vol 1)



EXHIBIT B
Page B of B
81    84

J.        PAMC records (plaintiff's Bates 560-1080)

K.        Select Records from CSC's Initial Disclosures:

- CSC's Assisted Living Program Brochure (No. 10097)
- CSC Policies & Procedures (No. 10460- 506)
- Nurse Delegation Packet (No. 10507- 10526)
- Excerpted Procedures
    - Disputes Between Residents (10528)
    - Managing Aggressive, Assaultive Residents (10529)
    - Report of Abuse (10530)
    - Critical Incident Reporting (10546- 47)
- Education Packet (10548- 575)
- Critical Incident Forms Re: HW (10365; 10089 – 94)
- E-mail exchanges between LTCO and Linda Hendrickson Re: HW (40007- 22)
- E-mail exchanges between Linda Hendrickson and third-parties  (No. 40023- 26)
- Functional Assessment dated 9/29/04 (No. 40263- 68)
- Staff Training Records (No. 10099-10126)

L.        Excerpts from Kathey Huskey Care Coordination Records

M.        8/30/06 LTCO report

N.        Documents from State of Alaska, Division of Certification and Licensing (Bates 40431-40536)

O.        Supplemental Kathy Huskey Care Coordination Records (Bates 50868-50948)

P.        Transcript of deposition of Carol Winters, Vol. 1 & 2

Q.        Theresa Forsyth personnel file, redacted

R.        Tom Isaacs personnel file, redacted

S.        Angel McKinley personnel file, redacted

T.        Don Hollenbeck personnel file, redacted

U.        Annette Fee personnel file, redacted

V.        Rhonda Cameron personnel file, redacted

W.        Terri Wild personnel file, redacted

X.        Eliria Solseng personnel file, redacted

Y.        Shelia Randall personnel file, redacted


EXHIBIT   B
Page 82 of 84

Z.      Lisa Elsholz personnel file, redacted

AA.     Plaintiff's 5th Supplemental Disclosures with attachments

BB.     Plaintiff's 6th Supplemental Disclosures with attachments

Doc No. 125627

EXHIBIT  B
Page  B  of  B
        83        84

8211 E.20th Ave.
Anchorage, AK
99504

Phone (907)351-0695
E-mail
Theresa@marlomanor.com

# Theresa A. Panchot, RN

| | |
|---|---|
| **Summary of qualifications** | <ul><li>Several years experience as in-home caregiver to the elderly and disabled prior to baccalaureate completion</li><li>Solid reputation in community as Executive Director at 48 apartment assisted living community</li><li>Assessment (initial and ongoing) of potential and current residents at assisted living community</li><li>Develop and maintain Individual Service Plans for residents at assisted living community</li><li>Daily review of medical and other pertinent documentation</li><li>Developed and update policies and procedures for assisted living community</li><li>Secretary of the Assisted Living Association of Alaska (ALAA)</li><li>Previous instructor of "Nursing in Assisted Living" for Administrative Training presented by ALAA</li></ul> |

**Education**

University of Alaska, Anchorage
- Baccalaureate in Nursing Sciences

Medical-Legal Nursing Consulting Institute
- Certification as Legal Nurse Consultant

Assisted Living Federation of America
- Certified Assisted Living Administrator

**Professional experience & associations**

Marlow Manor Assisted Living Facility

| | |
|---|---|
| • Executive Director | 1/01-current |
| • Director of Resident Services | 12/99-1/01 |
| • Resident Living Assistant | 5/99-12/99 |

Hidden Heights Assisted Living Home

| | |
|---|---|
| • Nurse Consultant | 5/03-5/04 |

Member: National Gerontological Nursing Association
Member: American Assisted Living Nurses Association
Member: Assisted Living Federation of America

*References available upon request*

EXHIBIT _B_
Page _84_ of _84_