Donna M. Meyers
Clay A. Young
Delaney Wiles, Inc.
1007 W. 3rd Avenue, Suite 400
Anchorage, Alaska 99501
Phone: 907-279-3581
Fax: 907-277-1331
dmm@delaneywiles.com
cay@delaneywiles.com

Attorneys for Defendant
Chugiak Senior Citizens, Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| HELEN WINTERS, through her Power of Attorney Carol Winters,<br><br>               Plaintiff,<br><br>    v.<br><br>CHUGIAK SENIOR CITIZENS, INC.,<br><br>             Defendant.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 3:06-cv-00083-TMB |

**OPPOSITION TO PLAINTIFF'S MOTON
FOR PARTIAL SUMMARY JUDGMENT**

**Introduction**

Plaintiff has moved for partial summary judgment on portions of her first and fourth claims. She contends Chugiak Senior Center (CSC) violated the Assisted Living Homes Act ("the ALH Act"), and breached the Residential Services Contract ("RSC") because (1) her level of care has not changed since her admission to CSC; and (2) CSC did not have any statutory grounds to terminate the RSC. Additionally, plaintiff claims she is entitled to partial summary judgment that CSC violated the ALH Act by

failing to have the statutorily required complaint process in place from September 2004 through January 6, 2006.

The motion should be denied in its entirety because plaintiff fails to demonstrate there are undisputed material facts entitling her judgment as a matter of law on those claims or portions of those claims. Plaintiff is not entitled to partial summary judgment on Count I or IV because there are controverted facts concerning plaintiff's level of care needs that are material to the pivotal question of whether plaintiff's level of care provided CSC with grounds to terminate the RSC. The fact that plaintiff's medical conditions and care plan may not have changed from her admission through January 2006 does not mean CSC violated the ALH Act and/or breached the RSC. Moreover, plaintiff fails to demonstrate the non-existence of the other valid statutory and contractual reasons CSC relied on as grounds to terminate the RSC. CSC appropriately sought to terminate plaintiff's RSC under AS 47.33.360(a) and the RSC itself, and therefore plaintiff is not entitled to partial summary judgment on aspect of Count I or Count IV.[1]

Plaintiff is also not entitled to partial summary judgment on Count I for the additional reason that plaintiff has no private right of action for alleged violations of the ALH Act. Thus, CSC is the party entitled to partial summary judgment on plaintiff's claim alleging violations of the ALH Act, and CSC has simultaneously cross-moved for partial summary on that basis. Finally, even if plaintiff could maintain a private right of action for alleged violations of the ALH, undisputed facts demonstrate CSC had the statutorily required complaint process in place from September 2004 to January 6,

---

[1] CSC has moved for summary judgment on Count I and IV. Dkt 121, 122, 134 and 135.

2006, and thereafter.  Accordingly, plaintiff's motion for partial summary judgment based on the grievance provision in AS 47.33.340 should be denied.

### Statement of Facts

Contrary to the subtitle in plaintiff's partial summary motion, plaintiff's rendition of the statement of facts is full of disputed material facts.  The nature of plaintiff's level of care and whether her care needs have changed since her admission to CSC are vigorously disputed fact issues.    Throughout this litigation, CSC has disputed plaintiff's characterization of her level of care upon admission.   CSC has always contended plaintiff's care needs were not readily apparent, and were not adequately disclosed, either intentionally or  innocently.   Moreover, plaintiff's rendition of the alleged facts assumes without any evidentiary support that the written service plans are the only applicable documents that describe the services  plaintiff demanded from CSC.  The services CSC provided to plaintiff and that plaintiff demanded from the  date of her admission until CSC issued the termination letter is reflected in several types of documents including, but not limited to, the progress notes by the program aides and care conference summaries documenting the multitude of problems and difficulties CSC encountered trying to  meet  plaintiff's  needs,  and  the  difficult  behavioral  problems plaintiff exhibited which led to CSC issuing the termination letter.  Rather than address the plethora of documentation supporting CSC's decision to issue the termination letter, plaintiff has chosen to ignore the  voluminous documentation of her problematic tenure at CSC and instead, she focuses selectively on a few documents that do not completely reflect  plaintiff's  behavioral  problems  and  care  needs  and  the  problems  CSC encountered trying to meet those needs.

**Argument**

I.    **CSC HAD VALID REASONS FOR TERMINATING PLAINTIFF'S RESIDENTIAL SERVICE CONTRACT UNDER AS 47.33.360(a) AND THE TERMINATION PROVISIONS IN THE CONTRACT ITSELF.**

Plaintiff contends CSC violated AS 47.33.360(a) and the RSC because none of the grounds for terminating the contract that are listed in the statute or the termination provision of the contract existed when CSC issued the termination letter.  Dkt 153 at 6-11.  Plaintiff's argument is without merit and it completely ignores substantial evidence demonstrating CSC has valid reasons for terminating the RSC.

Assuming *arguendo*, plaintiff has a private cause of action for an alleged violation of AS 47.33.360(a),[2] she is not entitled to summary judgment for the alleged violation of that provision because there is substantial evidence supporting CSC's termination of the RSC for the reasons listed in AS 47.33.360(a)(2), (3) and (6).  Moreover, since Section 11 of the RSC also allowed CSC to terminate the RSC for reasons similar to those stated in AS 47.33.360(a)(2), (3) and (6), plaintiff's motion for partial summary judgment on the breach of contract claim also fails.

In support of its motion for summary judgment on Count I, CSC submitted the affidavit of CSC's Executive Director, Linda Hendrickson, establishing the basis for terminating plaintiff's RSC for the reasons  stated in AS 47.33.360(a)(2), (3) and (6).  Dkt. 122 at 13, 19, and Exh. A, ¶¶ 5-6 (Affidavit of Linda Hendrickson).  Ms. Hendrickson's affidavit testimony is also supported by the opinions of CSC's experts.

Dr. Geeseman not only performed an independent psychiatric evaluation of plaintiff in December 2006, she also reviewed extensive records that included progress

---

[2] *See* Section II, *infra*.

notes from CSC starting from the date of plaintiff's admission to CSC, hospital records, communications from plaintiff's daughter, and medical records from plaintiff's health care providers.  Dkt. 231, Exh. A at 3, 18-19 (Dr. Geeseman's Report).  In her report, Dr. Geeseman notes "plaintiff is in need of assistance with daily living. . . and [d]ifficulties have arisen between Ms. Winters and the staff of Chugiak Senior Center (hereafter known as CSC) where she resides, in the provision of this assistance.  Ms. Winters needs assistance and desires this assistance be provided in the way she wants it done, sometimes in very specific ways."  Dkt. 231, Exh. A at 3.  Dr. Geeseman further notes that "CSC records indicate tensions arising in interactions between CSC staff and Ms. Winters, quantities of time spent in assisting Ms. Winters that are apparently in excess of the average for care provision at CSC, and that two staff members are sometimes present when providing assistance to Ms. Winters which is not standard protocol for CSC provision of service."  *Id.*  Thus, Dr. Geeseman's assessment corroborates CSC's position that plaintiff's needs exceed the level of services CSC can reasonably provide without making unreasonable accommodations, straining staff, and potentially short changing other residents.

Dr. Geeseman also drew conclusions from her document review and evaluation that are directly relevant to whether CSC had grounds to terminate plaintiff's RSC based on plaintiff's need for mental health services.  For example, Dr. Geeseman concluded that by plaintiff's own self-reporting, she has "obsessive-compulsive personality traits" and "[u]nder stress, duress or fear, obsessive-compulsive characteristics may become exacerbated as the individual attempts to gain control over a situation that is not comfortable to them."  *Id.* at 8.  Dr. Geeseman further noted that it appeared from the

records plaintiff "demonstrates this perfectionistic characteristic" and [her] directions for specific steps to be performed when staff are assisting her, appear to fall into this phenomenon of exacerbation and do not appear to be secondary to an obsessive-compulsive disorder, which is a ritualized disorder distinct from obsessive-compulsive personality disorder." *Id.* at 8.  Dr. Geeseman also concluded:

> In reviewing both the statements of Ms. Winters' daughter and the staff notes, it appears that there is a mismatching of the resident's needs and the facility's service.  Ms. Winters does have needs for assistance in many areas by virtue of her many medical conditions.  The needs and the quantity of time needed to meet those needs does not appear to be compatible with the staff:resident ratio that exists at CSC.  It appears that both sides have had a difficult time trying to make the situation a workable one.  It appears that when the mismatches arise, that Ms. Winters may become more uncomfortable either physically and/or emotionally and she again attempts to give directions to bring her world back into a state of comfort.  However, these directions seems to complicate the situation further.  There appears to be a disparity between Ms. Winters' needs (real or perceived) and the staff's availability and limitations for meeting those needs.

*Id.* at 9.

In terms of plaintiff's mental health, Dr. Geeseman did find evidence of "some cognitive impairment", and noted "[m]ore formal psychological testing could be performed to evaluate the extent of the impairment." *Id.* at 8.  Clearly, Dr. Geeseman identified "the primary issue in the current difficult situation is in creating and/or finding a good match of assistance provision for Ms. Winters' needs." *Id.* at 10.

CSC's expert in geriatric medicine and long term care, Dr. Sabine von Preyss-Friedman, also provided an expert report supporting CSC's reasons for terminating plaintiff's RSC.  Based upon Dr. von Preyss-Friedman's review of numerous records,

her site visit to CSC, interviews with CSC staff, tours of other similar facilities in the Anchorage area, and her consultation with Dr. Geeseman and review of Dr. Geeseman's report, Dr. von Preyss-Friedman concluded the following:

### Can CSC meet the care needs of Helen Winters?

Looking at the mere physical capabilities of this patient it appears that admitting her to CSC in September of 2004 appeared reasonable as she had previously been independently living in the community and had increased disability due to a right arm fracture, that was expected to heal. However, after admission it became known to the CSC staff what was previously not known: that the patient's care needs were not primarily determined by her physical abilities but by the patient's psychological need to engage other people in control of her environment. Likely, due to the patient's losses that she has experienced as a consequence of old age and disability, the patient is apparently only able to cope with responding to her loss of control with a need to control her caregivers and engage them in ritualistic appearing caregiving demands. The patient's records at CSC document in detail the patient's time consuming needs for staff attention.

I have extensive experience in discharging patients to assisted living facilities and evaluating them for appropriateness of assisted living facilities as well as in the care of frail, elderly, and debilitated patients. It is my experience as a geriatrician who takes care of frail, elderly and debilitated patients, that assisted living facilities are usually overwhelmed by patients who need more than one person assist and care over an extended period of time as Ms. Winters does. On a more probable than not basis, the timing demands for toileting and showering also do exceed that what is usually provided in assisted living facilities.

It is unfortunate that Ms. Winters' need for control of her environment has escalated to the point of verbal abuse of staff as well as physical aggression towards staff as documented above. Further, the needs of Ms. Winters have affected the ability of staff to provide optimal care for other patients residing at Chugiak Senior Citizens, Inc.

The lease agreement signed by Carol Winters, POA, on September 24, 2004, specifies on page 4 that termination by management against the resident's will is agreed upon if the level of care is no longer available at the facility and for engaging in a documented pattern of conduct that is harmful to the resident, other residents or staff of the home.

*In regard to the level of care, again, consistent need for two-person care as well as lengthy toileting and grooming procedures, felt necessary* by Ms. Winters, exceed the level of care at CSC.

*As already outlined above, the patient unfortunately has acted verbally and physically abusive as well as socially inappropriate, placing significant stress on staff as well as other individuals in the facility.*

On a more probable than not basis, the patient's loss of hearing is not a major barrier to communication between staff and the resident and the care delivered to Ms. Winters. The staff during my interviews had appropriate knowledge on how to communicate with patients with hearing impairments such as Ms. Winters. Significant hearing impairment is not an unusual occurrence in the care of elderly patients, and there are other residents at CSC with similar hearing impairments. Also, in my experience treating numerous patients with severe hearing deficits, there is a distinct difference between speaking loudly because of hearing problems and an angry, raised voice and affect.

In summary, Ms. Winters is a 91-year-old female with multiple physical limitations that have been stable to improving after admission to Chugiak Senior Citizens, Inc. in September 2004. *However, her care needs are in excess of what the facility can provide due to the patient's expressed need to control her environment and caregivers beyond her mere physical restrictions. This has led to a burden on staff and other residents. Therefore, the facility has the right to terminate service to Ms. Winters according to Alaska State Statutes governing assisted living facilities and the agreed upon lease and service agreement at the time of Ms. Winters' admission.*

Dkt. 233, Exh. B, p. 4 and 56-57 (emphasis added).

Similarly, CSC also retained the services of Theresa Panchot, an expert with experience, training and knowledge as a direct caregiver and administrator of an assisted living facility.  Ms. Panchot is familiar with the statutes and regulations pertaining to assisted living homes in Alaska, and currently she is the administrator for Marlow Manor Assisted Living Facility, one of the larger facilities in the Anchorage area. Ms. Panchot's review of documents, including the progress notes and telephonic and written correspondence, led her to reach a conclusion similar to those reached by Dr. Geeseman and Dr. von Preyss-Friedman.  Ms. Panchot also concluded that there was a disparity between the services CSC could offer Ms. Winters, and Ms. Winters' apparent needs, demands and expectations.  Dkt. 235, Exh. B at 69-80.

For the reasons stated above and in CSC's motions for summary judgment on Count I (Dkt 121 and 122) and Count IV (Dkt 134 and 135), plaintiff has failed to establish she is entitled to partial summary judgment on her claim alleging a violation of AS 47.33.360(a) or her breach of contract claim.

## II.    CSC'S GREIVANCE PROCEDURE MET THE REQUIREMENTS OF THE ALH ACT.

Plaintiff's argument that CSC violated AS 47.33.340 of the ALH Act is contrary to undisputed evidence and as a matter of law, CSC is entitled to partial summary judgment dismissing any claim based on the alleged violation.  Plaintiff specifically alleges CSC violated the ALH Act because CSC never provided her with a copy of a written complaint form,[3] and CSC did not have a *written* complaint process in place during 2004 to 2006.[4]  However, nothing in the ALH Act required CSC to provide plaintiff

---

[3] *See* Dkt at 153 at 12 and Affidavit of Carol Winters, ¶ 11 at 2.
[4] Dkt. 153 at 11-12.

with a complaint form, and there is undisputed evidence CSC had a grievance policy

and procedure that complied with the ALH Act when plaintiff was admitted to CSC.

### A. The AHL Act Only Required Notification and Acknowledgment of CSC's Grievance Policy and Procedures.

There are several provisions in the ALH Act addressing a resident's right to

present a grievance and the assisted living home's grievance policy and procedures.

AS 47.33.340 provides:

> (a) An assisted living home shall establish a written grievance procedure for handling complaints of residents of the home. At the time a person begins residency in an assisted living home, the home shall give a copy of the grievance procedure to the resident and the resident's representative, if any.

> (b) The grievance procedure established under this section must provide that a resident and the resident's representative have the right to

> (1) present both a written and an oral explanation of the resident's grievance;

> (2) have an advocate of the resident's choice, and the resident's representative, if any, attend meetings concerning the resident's grievance; and

> (3) be notified in writing, within 30 days after the filing of the grievance, of the final decision of the home regarding the grievance.

*See* AS 47.33.340. The ALH Act also requires an assisted living home to provide a

resident with a copy of the resident rights set out in AS 47.33.300. S*ee* AS 47.33.310.

Those rights include the right to "present to the home grievances and recommendations

for change in the policies, procedures, or services of the home." AS 47.33.300(16). As

to notification of the resident rights, the ALH Act states the assisted living home "shall

obtain from the resident or resident representative a signed and dated acknowledgment

stating that the resident has read or been read the rights, understands the rights, and has had any questions about the rights answered by the home." AS 47.33.310(a). The ALH Act also states the assisted living home shall post a copy of the resident rights and the home's grievance procedure in a prominent place. AS 47.33.310(b)(1) and (4). As to the resident's right to file a grievance, the ALH Act only requires the resident's file to include a written acknowledgment by the resident or the resident's representative that the resident received a copy of and has read, or has been read the resident's right to pursue a grievance under AS 47.33.340. *See* AS 47.33.070 (a)(7)(B).

### B. Plaintiff Acknowledged Receiving CSC's Grievance Procedures.

When plaintiff was admitted in September 2004, CSC had a written grievance procedure in place.[5] On September 24, 2004, on plaintiff's behalf Carol Winters signed a document entitled "Acknowledgement of Receipt of Resident Rights" where she acknowledged she received a copy of CSC's Grievance Policy and Procedure.[6] Carol Winters also agreed she had read the documents or had them read to her in a language she could understand.[7] Thus, the undisputed evidence is plaintiff, through her daughter, acknowledged she received a copy the grievance policy and procedure, she understood the documents, and had an opportunity to have the policy and procedure read to her. The acknowledgment satisfied CSC's obligation to under AS 47.33.310(a) to obtain a signed and dated acknowledgment stating that the resident has read or been read the

---

[5]See Dkt. 139, Exh. D (Doc. No. 10066-10071; Residents Rights, Prohibition, Resident's Grievance Procedure, Immunity from Civil Liability and Resident Policies (House Rules)).
[6]Dkt. 139, Exh. D at 1.
[7]*Id.*

resident rights, understands the rights, and has had any questions about the rights answered by the home.

There is no requirement in either AS 47.33.340 or AS 47.33.310(a) to provide a resident with a written complaint form upon admission, and it is therefore immaterial whether Carol Winters ever received CSC's complaint form from a staff member. The ALH Act did not require CSC to give her or plaintiff the form at the time plaintiff was admitted and there is no evidence Carol Winters ever requested a complaint form or that she or plaintiff were ever denied the opportunity to present a complaint in writing or orally.

Plaintiff's claim that CSC did not have a written complaint process is not supported by any evidence, let alone undisputed evidence. The deposition testimony from CSC's staff certainly does not support plaintiff's argument. At most, the testimony from the CSC witnesses merely indicates some witnesses were unsure whether they had seen the complaint form or how a resident would know who to ask for the form.[8] However, the witnesses' testimony does not mean the grievance process did not exist nor does it mean plaintiff and/or Carol Winters was not notified of the grievance procedure. In fact, Lynn Moser, the former Program Director testified CSC's grievance procedure was posted by the dining room.[9] The fact that Ms. Moser could not remember the exact grievance procedures at the time of her deposition in November 2006, does not mean the procedures did not exist or were not posted, especially given

---

[8]Dkt at 153 at 12.
[9]Lynn Moser Depo. at 51, lines 11-14. Plaintiff conveniently omits reference to Ms. Moser's testimony that the grievance procedure was posted. Dkt 153 at 11-12.

that Ms. Moser was deposed almost 19 months after she left CSC and the State of Alaska.[10]

### C.    DHHS Certified CSC Had Complied With AS 47.33.340.

Plaintiff's argument that CSC did not have a complaint process also flies in the face of the survey conducted by the Division of Health & Social Services (DHSS), which is the state agency responsible for certifying CSC's compliance with the ALH Act.[11] Less than two months after Plaintiff's admission to CSC, DHHS conducted a survey in December 2004 and found CSC was in complete compliance with AS 47.33.340. The DHSS survey verified CSC had posted or made readily accessible "[a] Copy of the Grievance Procedure Established Under AS 47.33.346."[12] There is absolutely no evidence CSC was not in compliance with AS 47.33.310 two months earlier when plaintiff was admitted to CSC or at anytime after the DHSS survey.[13]

During the DHSS survey, several resident files were also inspected to determine whether they contained notice of CSC's grievance policy and procedures.[14] Although plaintiff's file was not listed as one of the eight files inspected by the surveyor, the survey form is instructive because it contradicts plaintiff's argument that AS 47.33.340 or AS 47.33.310 required CSC to provide a resident with a complaint form. Nothing on the survey form indicates the resident files were required to contain an acknowledgment of anything more than the resident's receipt of the grievance process. There is nothing on the form suggesting the files should have also contained a complaint form or the

---

[10]*Id.* at 4; 51, lines 15-16; at 38, lines 12-15; at 40, lines 16-19.
[11]*See* AS 47.33.410 (DHSS is the "licensing agency" for assisted living homes).
[12]Ex. A (Doc. No. 40465).
[13]*See* Exh. B (Doc. No. 40494 and 40495 noting CSC's compliance with AS 47.33.310 and AS 47.33.340 in November 2005)
[14]Ex. A (Doc No. 40469, ¶ H).

residents' acknowledgment of having received a complaint form. Indeed, AS 47.33.070(a)((7)(B) only requires the resident's file to contain a written acknowledgment by the resident or the resident's representative that the resident received a copy of and has read, or has been read the resident's right to pursue a grievance under AS 47.33.340.

### III. CSC Is Entitled To Partial Summary Judgment Because Plaintiff Does Not Have a Private Right of Action for Any Alleged Violation of the Alaska Assisted Living Homes Act, AS 47.33 *et seq.*

The Court should not only deny plaintiff's motion for summary judgment on the claim that CSC violated AS 47.33.340, it should enter judgment for CSC dismissing the claim with prejudice and any other claim based on alleged violations of the ALH Act.[15] There is no private right of action for alleged violations of AS 47.33.005-.990. Thus, the Court may grant CSC partial summary judgment on the alleged violations of the ALH Act even though CSC did not originally move for partial summary judgment on that basis. *See e.g. Portsmouth Square v. Shareholders Protective Comm.*, 770 F.2d 866, 869 (9th Cir. 1985)(court may grant summary judgment for the non-moving party if it appears there is no genuine issue of material fact and the non-moving party is entitled to judgment as a matter of law).[16]

AS 47.33 *et seq.* is health and safety legislation governing assisted living homes. The purpose of the legislation is, in part:

> (1)    contribute to the development of a system of care by encouraging the establishment of assisted living homes that provide a home-like environment for elderly persons and

---

[15]See Dkt. No. 1, Exh. C (Amended Complaint, Count I).
[16]CSC is simultaneously filing a cross-motion for partial summary judgment to dismiss all alleged violations of the ALH Act on the basis that plaintiff has no private right of action under AS 47.33 *et seq.*

persons with a mental or physical disability who need assistance with the activities of daily living;

. . .

(3)    establish standards that will protect residents of assisted living homes, while at the same time promoting an environment that will encourage resident growth and independence, without discouraging the establishment and continued operation of those homes.

*See* AS 47.33.005.  Courts uniformly hold that health and safety legislation does not create a private cause of action in the absence of explicit language to that effect.[17] Alaska Statute 47.33.005-.990 nowhere evidences an intent to create a private right of action.  Although the ALH Act provides for the protection of the public, nowhere does it establish civil liability.

In *Reed v. Municipality of Anchorage*, 782 P.2d 1155, 1157-58 (Alaska 1989), the Alaska Supreme Court declared that courts uniformly hold that health and safety legislation "does not create a private cause of action <u>in the absence of explicit language to that effect</u>."  *Id.* at 1157 (emphasis in original).  Alaska Statute 47.33.005-.990 plainly is health and safety legislation, and nowhere does AS 47.33.005-.990 create a private right of action.

It would be inappropriate to imply a private right of action even if AS 47.33.005-.990 was not health and safety legislation.  *OK Lumber Co., Inc. v. Providence Washington Ins. Co.*, 759 P.2d 523 (Alaska 1988), is instructive in this regard.  There, the plaintiff alleged that Providence Washington violated the Unfair Claims Settlement Practices Act, AS 21.36.125, and that the statute impliedly created a private cause of

---

[17]The Alaska Legislature was certainly cognizant of its ability to create private rights of actions when it so desired.  For example, AS 18.13.020 authorizes private rights of action in the context of genetic testing.

action arising from the insurer's violation of that Act.   In rejecting plaintiff's claim, the

court declared:

> The director of insurance has authority to enforce chapter 36.  AS 21.06.080.   The director may conduct an investigation, institute proceedings, issue a stop order, impose a penalty, or revoke a license.   AS 21.36.320.   The director may also seek injunctive relief.  AS 21.36.330. In addition, violation of a provision of title 21 or regulations promulgated thereunder constitutes a "fraudulent insurance act" and a class B misdemeanor.
>
> The statute nowhere provides that a third party claimant has a private cause of action against the insurer for violation of the Unfair Claim Settlement Practices Act.  Thus, the question before us is whether the statute contains such an implied private right of action.
>
> In our view, there is much in the statute which suggests that the legislature did not intend to create a private right of action for damages.  The statute prohibits acts committed so frequently as to become a trade practice; it does not readily lend itself to enforcement by a private cause of action arising from a single claim.  [citations omitted.]  Further, remedies for violations are set forth specifically and in detail, giving rise to an implication of exclusivity.  [citations omitted.]  Moreover, the list of acts prohibited is extensive, some violations may be relatively minor, and the standards for determining whether a prohibited act has been committed are often imprecise. These characteristics are balanced by the relatively modest monetary sanctions imposed for statutory violations.  These limited sanctions stand in stark contrast to the potential compensatory and punitive damage awards which would be available in a private damage action.
>
> Thus, although we acknowledge that the statute was enacted to benefit both insureds and third party claimants, and that implying a private cause of action could have the effect of deterring conduct which the statute seeks to deter, implying the private right of action here asserted nonetheless seems inconsistent with the statutory scheme. Allowing such damage actions would tend to upset the implicit legislative judgment that the broad proscriptions of the act are tolerable because of the limited sanctions imposed when violations occur.  We therefore conclude that a third party claimant has no cause of action against an insurer under AS 21.36.125.

*OK Lumber Co.*, 759 P.2d at 526-27 (footnotes and citations omitted).

Similar to AS 21.36.125, which was the statute at issue in *OK Lumber*, AS 47.32 et seq.,[18] and AS 47.33.005-.990 contains an elaborate enforcement system, giving rise to an implication of exclusivity. The licensing agency has authority to enforce the regulations governing assisted living facilities. AS 47.32.030. The licensing agency may conduct an investigation, institute proceedings, revoke an assisted living home license, deny renewal of an assisted home license, suspend operations of an assisted living home, suspend the ability of an assisted living home to take in new residents, place conditions on the ability of an assisted living home to take in new residents, restrict the type of services that an assisted living home may provide to residents, or assess an administrative fine. AS 47.32.030; AS 47.32.090; AS 47.32.130; AS 47.32.140.

---

[18]The prior enforcement system that applied solely to assisted living homes was codified in AS 47.33 et seq. was repealed by § 49 ch 57 SLA 2005. The current enforcement system is codified in AS 47.32 et seq. and applies to numerous types of health care entities, including assisted living facilities. *See* AS 47.32.010(b)(2). Nowhere does AS 47.32 et seq. authorize a private right of action under facts similar to the situation involving Helen Winters and CSC. The only potentially relevant statute, AS 47.32.090(c) states:

> (c) A licensed entity may not take retaliatory action against a person who files a complaint. Except as provided in AS 47.05.350 and AS 47.32.160, a complainant against whom a retaliatory action has been taken may recover treble damages in a civil action upon a showing that the action was taken in retaliation for the filing of a complaint.

AS 32.090(c). However, this statute could not authorize Helen Winters' action against CSC because it is undisputed that Helen Winters did not file a complaint against CSC with the Department of Health and Social Services prior to CSC notifying Helen Winters of its intent to terminate her lease in January 2006. Consequently, there could be no retaliation for the filing of a non-existent complaint, and thus no grounds upon which a retaliatory suit would be authorized.

Additionally, similar to AS 21.36.125 which again was at issue in *OK Lumber*, the nature of the Assisted Living Homes legislation is not clear and precise, but is broad and general. Moreover, the list of acts prohibited is extensive, some violations may be relatively minor, and the standards for determining whether a prohibited act has been committed are often imprecise. *See, e.g.,* AS 47.33.300,[19] 47.33.330.[20] These

---

[19]AS 47.33.300 states in pertinent part:

**Residents' rights.** (a) Subject to (c) of this section, a resident of an assisted living home has the right to

(1)     live in a safe and sanitary environment;

(2)     be treated with consideration and respect for personal dignity, individuality, and the need for privacy . . .

(3)     possess and use personal clothing and other personal property, unless the home can demonstrate that the possession or use of certain personal property would be unsafe or an infringement of the rights of other residents;

(4)     engage in private communications. . .

(5)     close the door of the resident's room at any time, including during visits in the room with guests or other residents;

(6)     at the resident's own expense unless otherwise provided in the residential services contract, participate in and benefit from community services and activities to achieve the highest possible level of independence, autonomy, and interaction with the community;

(7)     manage the resident's own money;

(8)     participate in the development of the resident's assisted living plan;

(9)     share a room with a spouse if both are residents of the home;

(10)     have a reasonable opportunity to exercise and to go outdoors at regular and frequent intervals, when weather permits;

(11)    exercise civil and religious liberties;

(12)    have access to adequate and appropriate health care and health care providers of the resident's own choosing, consistent with established and recognized standards within the community;

(13)    self-administer the resident's own medications, unless specifically provided otherwise in the resident's assisted living plan;

(14)    receive meals that are consistent with religious or health-related restrictions;

(15)    receive the prior notice of relocation of the home or the home's intent to terminate the residential services contract of the resident required by AS 47.33.080 and 47.33.360, respectively;

(16) present to the home grievances and recommendations for change in the policies, procedures, or services of the home;

(17)    at the resident's own expense unless otherwise provided in the residential services contract, have access to and participate in advocacy or special interest groups'

(18)    at the resident's own expense unless otherwise provided in the residential services contract, intervene or participate in, or refrain from participating in, adjudicatory proceedings held under this chapter, unless provided otherwise by other law; and

(19)    reasonable access to home files relating to the resident, subject to the constitutional right of privacy of other residents of the home.

. . .

(c)    The rights set out in (a)(3), (4), (7), (12) and (14) of this section do not create an obligation for an assisted living home to expend money for the specified rights unless otherwise provided by the residential services contract.

[20]AS 47.33.330 states:

**Prohibitions.**    (a)   An assisted living home, including staff of the home, may not

characteristics are balanced by the relatively modest monetary sanctions imposed for statutory violations.[21]   These relatively limited sanctions stand in stark contrast to the potential compensatory and punitive damage awards which could be available in a private damage action.   Just as in *OK Lumber*, large tort damage awards could upset

---

(1)    deprive a resident of the home of the rights, benefits, or privileges guaranteed to the resident by law;

(2)    enter a resident's room without first obtaining permission, except . .

(3)    impose religious beliefs or practices upon a resident or require a resident to attend religious services;

(4)    place a resident under physical restraint unless the resident's own actions present an imminent danger to the resident or others;

(5)    place a resident under chemical restraint; this paragraph does not prevent a resident from voluntarily taking tranquilizers, or other medication, prescribed by a licensed physician;

(6)    compel a resident to perform services for the home, except as contracted for by the resident and the home or as provided for in the resident's assisted living plan; or

(7)    restrain, interfere with, coerce, discriminate against, or retaliate against a resident for asserting a right specified by this chapter or by other law.

(b)    An assisted living home may not physically restrain a resident unless the home has a written physical restraint procedure that has been approved by the licensing agency.   The home shall terminate the physical restraint as soon as the resident no longer presents an imminent danger.

(c)    An owner, administrator, employee, or agent of an assisted living home may not act as a representative of a resident.

[21]AS 47.32.140(f) (an administrative fine may not exceed $2,500 a day for each day that a violation continues, and may not exceed a total of $25,000 for a single violation).

the implicit legislative judgment that the broad prescriptions of the act are tolerable because of the limited sanctions imposed. Additionally, existing remedies are adequate, and there is no need to create a private cause of action. (Plaintiff has asserted numerous other statutory, breach of contract, and common law claims against CSC that would provide her adequate protection and relief for the alleged unlawful acts committed by CSC.) It is also noteworthy that the Honorable Morgan Christen, Presiding Judge of the Alaska Superior Court in Anchorage, in an unpublished disposition, explicitly rejected the same argument that plaintiff is making here, concluding that the Alaska Assisted Living Homes Act "does not create a private right of action[.]"[22]

The Wisconsin Court of Appeals in *Farr v. Alternative Living Services, Inc.*, 643 N.W.2d 841 (Wis. App. 2002) dismissed a similar claim alleging health and safety legislation created a private right of action. *Id.* at 843. There, Farr, an elderly woman suffering from dementia and other health problems, resided at Woven Hearts of Middleton, a community-based residential facility ("CBRF").[23] Farr eloped from the

---

[22]Ex. C (Order, *Metcalf v. Chugiak Senior Citizens, Inc.*, 3AN-02-13137 CI). This order was not published, and was decided by a different court, so it has no binding or precedental effect on this Court. *See* D. Ak. LR 7.1(c); *McCoy v. State*, 80 P.3d 757, 764 (Alaska App. 2002) (holding that unpublished decisions may not be cited as binding precedent, but may be relied upon by judges and lawyers "for whatever persuasive power those decisions might have"). However, the Order is appropriately cited for educational, informative, and persuasive purposes because it is a ruling from the only court that CSC is aware of that has addressed whether AS 47.33.005-.990 confers a private right of action.

[23]"'Community-based residential facility' means a place where 5 or more adults who are not related to the operator or administrator and who do not require care above intermediate level nursing care reside and receive care, treatment or services that are above the level of room and board but that include no more than 3 hours of nursing care per week per resident." *Farr v. Alternative Living Services, Inc.*, 643 N.W.2d 841, 843 n. 12 (Wis. App. 2002).

Woven Hearts facility, wearing only a thin nightgown, on a winter morning when the temperature was approximately twelve degrees. *Id.* at 843. A passerby found her between 4:00 and 5:00 in the morning, walking away from the facility with her walker, barefoot on a frost-covered sidewalk. *Id.* She was returned to the facility and subsequently admitted to a hospital, where she was treated for frostbite injuries to both feet. *Id.*

Prior to Farr's elopement, the Department of Health and Family Services, Bureau of Quality Assurance, had investigated Woven Hearts in response to complaints of inadequate treatment. *Id.* The investigation revealed that the facility had not complied with certain provisions of applicable statutes and regulations, and the Bureau ordered the facility not to admit any additional residents until the Department received plans of correction. *Id.* Following Farr's elopement, the Department again conducted an investigation that revealed the facility was still in non-compliance with the law. *Id.* With regard to Farr's elopement, the Department reported in its "Statement of Deficiencies" that the facility failed to report Farr's elopement as required; that the facility failed to meet Farr's treatment needs by waiting until two days after her elopement before seeking medical intervention for her injuries; that staff knew of her potential risk to elope from the facility; and that an exit door alarm was not functioning properly at the time of Farr's elopement thus failing to alert staff. *Id.*

Farr commenced the action against Woven Hearts asserting negligence, seeking among other relief, punitive damages based upon the facility's alleged intentional disregard of her rights. *Id.* Farr later moved to amend her complaint, framing her cause

of action largely in terms of alleged violations of applicable statutes and regulations.  *Id.*

at 843-44.

In dismissing her claim based upon alleged violations of applicable statutes and

regulations, the court in *Farr* held:

> Farr claims that she has a private right of action for violations of her
> rights as a resident of a CBRF as set forth in Wis. Stat. ch. 50 and
> Wis. Admin. Code § HFS 83. Whether a statute creates a private
> cause of action presents a question of statutory interpretation,
> subject to our de novo review, during which our goal is to "ascertain
> and give effect to the legislature's intent."  [citations omitted.]  "[A]
> private right of action is only created when (1) the language or the
> form of the statute evinces the legislature's intent to create a private
> right of action, and (2) the statute establishes private civil liability
> rather than merely providing for protection of the public."  [citations
> omitted.]

643 N.W.2d at 846 (emphasis added).

> The court in *Farr* went onto declare:

> The Department of Health and Family Services must, under Wis.
> Stat. § 50.02(2), "by rule . . . develop, establish and enforce
> regulations and standards for the care, treatment, health, safety,
> rights, welfare and comfort of residents in community-based
> residential facilities."   The department has established these
> standards in Wis. Admin. Code § HFS 83 ("Community Based
> Residential Facilities"). Farr bases her entitlement to a private
> cause of action for violations of the statute and regulations on Wis.
> Stat. § 50.10 . .

> The plain language of Wis. Stat. § 50.10 demonstrates that
> the section applies only to residents of a "nursing home," which is
> different from a CBRF by statutory definition.  Moreover, the private
> remedy under § 50.10 is limited to an action for mandamus or
> injunctive relief.  Suits for monetary damages, such as the present
> one, are not mentioned.  In short, we find no "clear indication" of a
> legislative intent in chapter 50 to permit CBRF residents to sue for
> compensatory and punitive damages based solely on alleged
> violations of the standards for CBRFs set out in the statutes or
> administrative code.

643 N.W.2d at 846-47.  The court held Farr's only remedy for statutory violations appeared to lie in certain reporting requirements and a mandated grievance procedure. *Id.* at 847 n.5.

In accord with the Alaska Supreme Court's declaration that health and safety legislation "does not create a private cause of action in the absence of explicit language to that effect," *Reed*, 782 P.2d at 1157, absence of any provision under AS 47.33 et seq. (or any other Alaska statute) providing for a private right of action that would enable plaintiff to sue CSC for alleged violations of the Alaska Assisted Living Homes Act, and the reasoning in *Farr*, 643 NW2d at 846-47, plaintiff may not assert a private right of action against CSC for an alleged violation of the Alaska Assisted Living Homes Act.  The Court should therefore deny plaintiff's motion for partial summary judgment and grant CSC's cross-motion for partial summary judgment on plaintiff's claim for relief under the Alaska Assisted Living Homes Act.

## CONCLUSION

As a matter of law, CSC did not violate either the Alaska Assisted Living Homes Act or the Residential Services Contract with Plaintiff.  CSC properly issued notice of the termination of plaintiff's Residential Service Contract for valid, non-discriminatory reasons allowed by both the ALH Act and RSC.

As a matter of law, CSC also did not violate the provision in the ALH Act requiring a grievance process, and in any event plaintiff has no private right of action based on the alleged violation, or any other alleged violation of the ALH Act.

For the above reasons, CSC respectfully requests the Court to deny plaintiff's partial summary judgment motion, and to enter judgment dismissing with prejudice all claims alleging violations of AS 47.33 *et seq*.

DATED at Anchorage, Alaska, this 7th day of February, 2007.

DELANEY WILES, INC.
Attorneys for Chugiak Senior Citizens, Inc.

s/Donna M. Meyers and Clay A. Young
Delaney Wiles, Inc.
1007 W. Third Avenue, Suite 400
Anchorage, Alaska 99501
Phone: 907-279-3581/Fax: 907-277-1331
AK Bar Nos.: 9006011 (DMM)/7410117 (CAY)
E-mail:      dmm@delaneywiles.com
E-mail:      cay@delaneywiles.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 7th
day of February, 2007, a copy of
**Opposition to Plaintiff's Motion
For Partial Summary Judgment/
Cross-Motion Re: Alleged Violations
of the Assisted Living Homes Act**
was served electronically on:

Jim Davis, Jr./Barbara Brink/
Nikole Nelson/Sonja Kerr
Alaska Legal Services Corporation
1016 West 6th Avenue, Suite 200
Anchorage, Alaska 99501

s/Donna M. Meyers and Clay A. Young
(125916)