IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

HELEN WINTERS, through her Power of  )
Attorney Carol Winters,              )
                                     )
            Plaintiff,               )
    vs.                              )
                                     )
CHUGIAK SENIOR CITIZENS, INC.,       )
                                     )
            Defendant.               )
_____)
Case No. 3:06-CV-00083-TMB

VOLUME II

VIDEOTAPED DEPOSITION OF CAROL WINTERS

September 22, 2006

APPEARANCES:

   FOR THE PLAINTIFF:       MR. JAMES J. DAVIS, JR.
                             MS. BARBARA BRINK
                             Alaska Legal Services
                             Corporation
                             1016 West Sixth Avenue
                             Suite 200
                             Anchorage, Alaska 99501
                             (907) 272-9431

   FOR THE DEFENDANT:       MS. DONNA M. MEYERS
                             Delaney Wiles Inc.
                             1007 West Third Avenue
                             Suite 400
                             Anchorage, Alaska 99501
                             (907) 279-3581

   ALSO PRESENT:            MARLA NELSON


EXHIBIT C

Page 151

1    process.
2  Q  Okay. So before the litigation process, you didn't keep
3     any file on your mother?
4  A  I'm sure I kept copies of records but they may have been
5     in different places in the house.
6  Q  Okay. Well, at the time that you received this lease
7     agreement, did you read it?
8  A  I generally read every document before signing it.
9  Q  Okay. Did you consider this an important agreement?
10 A  It looks like an important agreement.
11 Q  Okay. And do you recall if you asked Lynn Moser or anyone
12    else in the administration about the document, what it
13    meant, or anything that was included in it?
14 A  I believe Lynn was with me and I may have -- I -- I don't
15    recall but she probably went over each document with me
16    -- with me a little bit.
17 Q  Okay. And my question is, do you recall having any
18    questions about what the lease agreement meant at the time
19    that you read it?
20 A  I don't recall that.
21 Q  I'm going to show you a document that we had previously
22    marked as an exhibit. It's marked as Exhibit G and the
23    document numbers are 30362 through 30364.
24              (Exhibit G proffered)
25    (Pause)

Page 152

1  Q  Now that your attorney has had a chance to look at that
2     exhibit, do you recognize this document?
3     MR. DAVIS: Counsel, can you give the witness a chance to
4  look at the exhibit herself?
5     MS. MEYERS: She can take whatever time she needs to look
6  at it.
7     (Pause)
8  Q  And Ms. Winters, whenever you've had enough time to look
9     it over, could you let me know?
10    (Pause)
11 A  Yes.
12 Q  Yes, you recognize the document?
13 A  Correct.
14 Q  Okay. What is it, please?
15 A  It's a letter to Chugiak Senior Center Assisted Living
16    providing information from a personal perspective and
17    knowledge of my mother's needs so that they could
18    administer services to her appropriately.
19 Q  Okay. And who pro -- do you know who provided that or who
20    authored the letter?
21 A  Yes, I did.
22 Q  Okay. And do you know when you provided that to Chugiak
23    Senior Center?
24 A  Either that day or the day after.
25 Q  Okay. And that day being what?

Page 153

1  A  I'm sorry, I didn't hear you.
2  Q  That day being what day?
3  A  The 22nd of September or shortly after that. This is not
4     something I would have kept.
5  Q  Okay. So this letter is -- it appears to be -- the first
6     page is a letter that's signed by you, correct?
7  A  Yes.
8  Q  Oh, by the way, going back to Exhibit K, the lease
9     agreement, did you sign that lease agreement?
10 A  Yes.
11 Q  Okay. So that's your signature on there?
12 A  Uh-huh. (Affirmative)
13 Q  All right.
14 A  Yes.
15 Q  Okay. On Ex -- with Exhibit G, the first page is --
16    appears to be a letter dated September the 22nd, 2004,
17    addressed to Dear Nursing Staff, Chugiak Assisted Living.
18    And there's a signature on that first page. Is that your
19    signature?
20 A  Uh-huh, yes.
21 Q  And the pages that follow that, there's a caption at the
22    top that says care needs for Helen Winters, Room 234. Do
23    you see that?
24 A  Uh-huh, yes.
25 Q  Is that correct?

Page 154

1  A  Uh-huh. (Affirmative)
2  Q  Okay. All right. Does this read -- this -- does this
3     document at all indicate to you the date that your mother
4     was admitted to Chugiak?
5  A  No.
6  Q  Okay. Was she admitted to Chugiak before or after you
7     wrote this letter?
8  A  Before.
9  Q  Okay. And in this letter, is -- were you trying to be as
10    accurate and as thorough as possible in terms of conveying
11    your mother's needs to Chugiak?
12 A  I -- my intent was to provide a general picture.
13 Q  In this document that you provided to Chugiak, is there
14    anywhere in this document that you discussed her dietary
15    needs?
16 A  I addressed her allergy to milk.
17 Q  Okay. It's my understanding that your mother -- either
18    you or your mother or both claim that she cannot eat beef
19    or pork. Is that correct?
20 A  The question was what? The beginning of that?
21 Q  Either -- what -- let me ask you this, what sort of
22    dietary needs does your mother have?
23 A  She does not eat beef or pork. And she doesn't drink
24    regular milk. It needs to be lactose free. And she has a
25    sensitive digestive tract so -- because of ulcers and


EXHIBIT C

Page 159

1  detailed, and extremely accurate.
2  Q  Okay. You said extremely accurate, do you have a sense of
3     the events that -- do you recall now the events that he
4     described in the report relating to the staff?
5  A  Probably. Yeah, most of them.
6  Q  Okay. The events that he described in the report, are
7     there any of those -- are any of those events, events that
8     you actually witnessed yourself?
9  A  Well, certainly the doors being open in the summer and
10    aides smoking on the deck and by the entrances.
11 Q  Anything else?
12 A  Just respect. I've seen that aides' faces or in their
13    tone of voice and I think last time I told you about the
14    aide Angel who yelled at my mother. So that's about it.
15 Q  All right. You did describe the one incident involving
16    Angel. And what I would like to know is, these complaints
17    of abuse that are alleged either in the long term care
18    ombudsman's report or in the complaint, which of these
19    alleged events did you actually witness with your own
20    eyes, other than the incident that you described with
21    Angel?
22    MR. DAVIS: I'm going to object. It's a compound
23 question. If you want to ask this witness about particular
24 events, incidents, you can do so. Asking that question
25 involves multiple if not over 20 different events in the

Page 160

1  complaint and the report and it's an unfair question. I'll
2  object.
3  Q  I'll ask the question a different way, Ms. Winters. What
4     events of alleged abuse have you actually witnessed, other
5     than the incident that you claim occurred with Angel?
6  A  Other than the two I described last time, I can't think of
7     any right now.
8  Q  Okay. I recall the incident that you described with Angel
9     and what was the second?
10 A  And Rhonda -- Rhonda when we first moved in.
11 Q  Okay. With the Depends?
12 A  No, when she just looked like she rolled her eyes when mom
13    was asking for help.
14 Q  Has -- so those are the only two events that you claim
15    you've actually witnessed?
16 A  Yes.
17 Q  Okay.
18 A  I -- as far as I can recall right now.
19 Q  Okay. Well, if you had witnessed any other alleged
20    incidents of abuse, would you recall them?
21    MR. DAVIS: I'll object to that question. It's
22 unintelligible as phrased.
23 Q  If you had actually witnessed any alleged -- what you
24    considered abuse, would that be important to you?
25 A  Yes, uh-huh.

Page 161

1  Q  Okay. And if it was important to you, would you recall
2     actually witnessing those events?
3  A  Well, I think like anybody, when you're just popped a
4     question, sometimes you don't recall and you may recall
5     later.
6  Q  Okay.
7  A  There were times aides were in my mom's room that I didn't
8     feel they were nice to her. They were just not nice.
9  Q  Okay. How were they not nice?
10 A  Oh, she would say something and smile and be friendly and
11    they wouldn't smile. Terri Wilde in particular. I --
12    when she comes in and I'm there, she's very straight faced
13    and mom will make small talk and she won't answer her or
14    she just won't smile, won't smile.
15 Q  And do you consider not smiling and not responding to be
16    abuse?
17 A  I think that not being pleasant can create an atmosphere
18    where the resident can feel anxious, unwanted. Yes. It's
19    -- there are many degrees of abuse and that would fall on
20    the lower end but that's one, very mild but yes. And
21    highly inappropriate.
22 Q  And when you had observed this alleged not being nice.....
23 A  Let's say disrespectful.
24 Q  Okay.
25 A  Mainly disrespectful.

Page 162

1  Q  Well, when you observed the aides not being -- or were --
2     that they were being disrespectful, did you actually --
3     did you say anything to anyone in administration about it?
4  A  No.
5  Q  Why not?
6  A  Well, because of the litigation and so forth. It's just
7     so many things, one after another.
8  Q  Okay. So you said in litigation. Are you saying that
9     these events happened after the litigation began?
10 A  This is recently. Uh-huh.
11 Q  Okay. Can you be more specific about when it occurred?
12 A  Three weeks ago.
13 Q  And who else was in the room?
14 A  I'm sorry, I didn't hear you.
15 Q  Who else was in the room? You mentioned Terri Wilde.....
16 A  My mother. My mother.
17 Q  Was there a second aide there too?
18 A  No.
19 Q  Was this the evening shift of night shift or do you know?
20 A  I think it was late afternoon.
21 Q  Well, since the litigation began, have you made any
22    complaints about the way your mother is treated? I mean,
23    but complaints to administration about the way your mother
24    has been treated?
25 A  Yes.


EXHIBIT C

Page 163

1  Q  Okay. So the fact that there's been litigation hasn't
2     stopped you from making complaints when you thought your
3     mother wasn't being treated.....
4  A  Well, if it's.....
5  Q  .....properly?
6  A  .....to a greater degree than disrespect, I have reported
7     that.
8  Q  Okay. And have you made -- since your last deposition,
9     have you made any complaints to the long term care
10    ombudsman about the way your mother is being treated?
11 A  Yes.
12 Q  Okay. And what are -- what's the nature of those
13    complaints?
14 A  The aides on the night shift -- it was going on for days
15    -- didn't want -- did not want to arrange her pillows,
16    mom's pillows under her neck and legs. And they said to
17    her, the last -- the day before I reported -- made an
18    official report that they did not want to work with her
19    anymore.
20 Q  Were you present when these aides allegedly made those
21    statements?
22 A  No.
23 Q  Okay. So this is information that you learned from your
24    mother?
25 A  Correct.

Page 164

1  Q  Anyone else besides your mother?
2  A  No.
3  Q  Okay. And do you have an understanding of whether the
4     aides were just refusing to arrange the pillows or just
5     that they didn't want to arrange the pillows -- they
6     allegedly didn't want to arrange the pillows as many times
7     as your mother wanted them arranged?
8  A  I just thought of another aide though. Annette. I have
9     seen her face and attitude and how she treats me. And
10    also Terri, the older woman with the curly hair. I think
11    she's about 60 years-old. That now comes to mind. I have
12    seen their expressions with my mother and they have
13    treated me the same way.
14 Q  Okay. What have you seen in their expressions toward your
15    mother? Can you explain what it is you've actually
16    observed that you think is.....
17 A  They.....
18 Q  .....disrespectful?
19 A  It's just the same like Terri, just deadpan look, will not
20    respond, will not smile. Annette gave me a look and also
21    Terri a look personally that -- you know, that old
22    expression, if looks could kill? I got those coming into
23    the center.
24 Q  And when did this happen?
25 A  Shortly after the TV report, media exposure.

Page 165

1  Q  And so these looks of a deadpan look, not smiling, either
2     by Annette or Terri, are you claiming that these are
3     instances of abuse towards your mother?
4  A  I wouldn't consider that necessarily abuse if it was one
5     time. I think -- I think that if a lot of the aides were
6     being non-responsive for a long period of time,
7     absolutely. Absolutely.
8  Q  Okay. And I'm just trying to understand what your
9     definition of abuse is. Have you seen a lot of the aides
10    being -- having deadpan looks or not smiling or not being
11    responsible for a long period of time?
12 A  I mean, instances, yes. Especially recently. Especially
13    recently because of the media exposure, I believe.
14 Q  Okay. Did you instigate the media exposure?
15 A  I'm sorry, I didn't hear.
16 Q  Did you contact the media about the case?
17 A  No.
18 Q  Okay. You've never done that directly?
19 A  No.
20 Q  Now so are you claiming that there has been sustained
21    disrespect either through the aides' facial expression or
22    not responding that you would now consider that abuse?
23 A  This is not the abuse I reported to the ombudsman, no.
24    It's a totally different nature.
25 Q  Okay. And that's what I would like to understand more

Page 166

1     clearly. What are you claiming is abuse?
2  A  Well, not assisting my mother arrange the pillows in her
3     neck when she can't is neglectful and can cause her great
4     pain during the night. I sat on her couch and tried to do
5     it myself and I have two good arms and hands, I couldn't
6     do it. And she can't -- she's very disabled. She can't
7     arrange those pillows. So she has a stiff neck, that --
8     that's wrong.
9  Q  Okay. Why -- I don't understand why you could not arrange
10    the pillows for her.
11 A  Well, I -- I laid on my back on the couch. It -- it's
12    just -- it's hard to get them in the right place, to reach
13    back in that position and position them. And she has two
14    that need to be like together, one under the -- I couldn't
15    do it. It was very difficult, so I can't imagine that my
16    mother with a bad arm could do it.
17 Q  Okay. And do you -- have you ever observed the aides
18    arrange the pillows for your mother?
19 A  Only when she first moved in.
20 Q  Okay. And do you recall who the aides were?
21 A  I'm sorry?
22 Q  Do you recall who the aides were?
23 A  Rhonda and Eliria.
24 Q  Okay. Did you have any complaints about them arranging
25    the pillows at that time?


EXHIBIT C

Page 175

1    physical abuse and the last one you mentioned involved
2    Sheila. Any other claims of physical abuse?
3  A  We're talking purely physical, correct?
4  Q  Correct.
5  A  Okay. Oh, there was the event where Steven hurt my mom
6    turning her at night, which in that case, she did not
7    believe that was intentional, nor do I. But it was just
8    because of his lack of experience.
9  Q  So are you claiming that was physical abuse or not?
10 A  Well, no. I guess it wouldn't be abuse. He just didn't
11    know how to turn her.
12 Q  Okay. Any other allegations of physical abuse?
13 A  Terri Forsythe also reportedly, according to my mother,
14    hurt her putting on her stockings. It was sort of like
15    the tame -- same time frame. Same time frame, yeah.
16 Q  What was the time frame?
17 A  Just that was -- there was a period of a couple of weeks
18    where that was going on. It seemed Terri and -- by Lisa.
19 Q  Okay. Did you ever -- when your mother would complain to
20    you about the way the aides were putting on her TED hose,
21    did you ever think about going to Chugiak to observe the
22    aides put on the TED hose?
23 A  Hopeless. I just feel hopeless. I doesn't matter how
24    many calls I have left about so many things over so many
25    months and there's never -- nothing ever was done, so I

Page 176

1    just kind of gave up.
2  Q  But you never thought about going over there yourself to
3    see whether they were putting the TED hose on too quickly?
4  A  Well, they put them on really early in the morning. I
5    start work at 7:30, so they get her up I think about 7:30,
6    so it really wouldn't work.
7  Q  Could you have taken off time from work to go over there
8    to observe?
9  A  No.
10 Q  At any time during the course of your mother's admission
11    at Chugiak, you couldn't have taken out time to go over
12    there to observe how they were putting on the TED hose?
13 A  Well, I guess my thinking was I advised my mother often to
14    tell them -- I said, mom, well tell them. And she would
15    say yes, I do tell them it hurts, it hurts. And I -- I've
16    told her to instruct them. Because you have to -- well,
17    they're tight and you have to pull them at the ankle
18    before you work them up. And I told her to tell them
19    that. And she -- she told me, they don't want to listen,
20    they don't want to listen. So I believe I left more than
21    one call for Marla on that. That was not the first time.
22    I left a number of calls about the TED hose. A couple of
23    calls at least. And I thought she would take care of it.
24    It just kept going on.
25 Q  Okay. Do you know what kind of training -- had -- did you

Page 177

1    ever ask what kind of training the aides have in putting
2    on and off TED hose?
3  A  I -- I didn't hear you.
4  Q  Did you ever inquire about the type of training that the
5    aides had putting on and off TED hose?
6  A  No, but I had the feeling that they were intentionally
7    trying to hurt her so really, if I were -- I -- I just
8    -- I do believe especially after reading the ombudsman's
9    report that they were intentionally trying to hurt her.
10    It does -- it's not a matter of do they know how to do it,
11    it's a matter of they were purposely doing it, okay.
12 Q  Before you read the ombudsman's report, did you have the
13    opinion that they were purposely trying to hurt your
14    mother putting on and off the TED hose?
15 A  I suspected that but I was convinced after reading the
16    ombudsman's report.
17 Q  What is it about the ombudsman's report that convinced
18    you?
19 A  Well, his description of the aide Lisa and he related that
20    Lisa, it was obvious, did not like my mother and that she
21    admitted that the group of them were trying to get my
22    mother to put on her own TED hose. What better way than
23    to hurt her, to make it uncomfortable so she'd want to put
24    them on by herself. It just makes sense.
25 Q  To the best of your -- well, you read the ombudsman's

Page 178

1    report, and is it your understanding -- or do you believe
2    that Lisa told him that she didn't like your mother or was
3    that his impression?
4  A  I don't know if those were his words exact -- I mean, if
5    -- I'm not sure she said that. I think it was like he
6    inferred that. But in the very beginning when mom was
7    admitted, Lisa didn't want to do my mom's hair either.
8    That was a problem from the beginning. She didn't even
9    want to comb my mom's hair. And I went to Lynn Moser with
10    that complaint. And she didn't want to comb her hair.
11    And mom had her -- just got out of her, you know, her
12    splint. She can't -- couldn't raise her arm.
13 Q  Did you talk to the occupational.....
14 A  Mom would think she taunted her. Mom said Lisa -- Lisa
15    taunted her.
16 Q  How did she taunt her?
17 A  Huh?
18 Q  What did your mother say about -- did she describe how she
19    believed Lisa taunted her?
20 A  Just wouldn't do things for her that she wanted. Just
21    refused to do them.
22 Q  And that was what your mother meant by taunting?
23 A  Well, I'm not sure. There must have been -- I don't know
24    right now. I don't know.
25 Q  Okay.

Page 179

1  A  I can't remember.
2  Q  Did you ever talk to the physical therapist about whether
3     it was good for your mother to try to use her arm to comb
4     her hair?
5  A  I can't remember. That's so long ago. Gosh. That's a
6     couple of years ago. I don't remember.
7  Q  Did you ever talk to the physical therapist about whether
8     your mother was capable of putting on and off her own TED
9     hose?
10 A  I don't recall that conversation. But I do know that
11    later I talked -- when there -- this problem was going on,
12    I took mom to the knee doctor to get something from him to
13    stop this harassment and he did write a statement that mom
14    could not put on her TED hose by herself and needed to be
15    helped.
16 Q  And who was her knee doctor?
17 A  Schaab, Peter Schaab.
18 Q  Okay. And after you received that note from Dr. Schaab,
19    did the aides encourage your mother to put on her TED
20    hose?
21 A  Gosh, I can't remember, you know, exactly. I can't
22    remember. I mean, I think it got be -- I think they
23    stopped asking her to do it herself. It was -- it was a
24    big deal with Terri and Lisa. Teresa and Lisa. Not only
25    the TED hose but about putting on her shoes and tying her

Page 180

1     shoes. They wanted mom to put on her shoes and tie her
2     shoes. Well, my mother has gained 40 pounds since she
3     went to Chugiak Senior Center. She's really big in the
4     middle because she doesn't walk and the food. She can't
5     bend over. When she does, her back hurts. She gets out
6     of breath and she gets vertigo. And her shoulder hurts
7     her. And they're for -- trying to force her to put on her
8     shoes after she tells them over and over and over, I can't
9     do it, I can't do it. Almost like they're intentionally
10    harassing my mother.
11 Q  Did you ever talk to the physical therapist about whether
12    it was good for her to try to tie her shoes or to put them
13    on?
14 A  You know, I can't remember that.
15 Q  Okay.
16 A  Honestly, I -- I honestly can't remember.
17 Q  And do you.....
18 A  We may have had that conversation, I just don't remember.
19 Q  Okay. Do you recognize or do you have an idea -- well,
20    did you ever see anything in the record or did you ever
21    talk to anyone in administration about the fact that your
22    mother had been seen putting on and off her own TED hose?
23 A  Now say that again. My hearing problem.....
24 Q  Okay.
25 A  .....repeat it please.

Page 181

1  Q  Did you ever talk to anyone in administration or review
2     any of your mother's records that show your mother was
3     capable of putting on and off her TED hose at any time
4     while she was at Chugiak?
5  A  No, I've never seen anything like that. No.
6  Q  What about tying her shoes? Did you -- I mean, if the
7     aides were trying to encourage your mother to do something
8     that they had seen her do before safely, do you consider
9     that harassment?
10    MR. DAVIS: Calls for speculation. I'll object.
11 Q  You can answer the question.
12 A  It was told to me by certain of the staff at Chugiak -- I
13    can't remember who exactly -- that they offered this to me
14    that she -- they -- she was trying to be encouraged to be
15    independent. And that's fine. I mean, of course that's
16    good. But what mom was reporting to me went far beyond
17    that, okay. It went beyond that. It's one thing to
18    encourage someone, they also kept, in my opinion, what --
19    what is -- would be really, truly taunting her -- and
20    that's my word -- in the same manner, was pulling up her
21    diapers when the doctor clearly said she could never stand
22    unassisted. It was the same type of pattern. There's a
23    difference between saying to someone, well, Helen, let's
24    try this today. Let's try it. Let's try a little more
25    each day and then if someone says they can't do it, well,

Page 182

1     do you want to try? And that would be encouragement,
2     which would be fine. As opposed to simply forcing them or
3     not doing it. And that's what mom met up with, especially
4     with pulling up her diapers when she was standing on the
5     -- on the toilet. My mother's knees give out. They just
6     give out. That's why she's there. I was with her when
7     she fell one day because her knee just went out and she
8     just went right over. Mom's doctor said she should never
9     stand alone, okay. So she's always on the toilet when she
10    -- she has pull-ons, pull-ups. The doctor said she always
11    needs to put her hand on the bar by the toilet. And the
12    aides would over and over try to get her to let go of the
13    bar. Helen, you can do it. And then Rhonda for sure --
14    and I don't -- I have to think about who else -- would
15    come to her room and they would let her stand there, she
16    would tell me. They would just let her stand there and
17    would refuse to pull up her diapers. Refuse to pull up
18    her diapers and let her stand there trying to get her to
19    make an effort. And she said, I can't, I can't. If I --
20    if I do, Carol, I'm going to let go and I'm going to fall,
21    I'm going to fall. I can't do that. They want me to, you
22    know, they're pushing, they're pushing, they're pushing
23    her all the time, all the time, all the time. I would
24    hear this day after day after day after day after day.
25    Harassment supreme.



Page 203

1  Q   What's.....
2  A   It wasn't to dialogue about correcting the situation.
3  Q   And why do you say it wasn't to dialogue about correcting
4      the situation?
5  A   Because it wasn't. Linda Hendrickson denied everything
6      and just stood her ground and defended her staff and
7      -- oh, actually her comment was, in the summer of '05, we
8      can't afford to -- I can't afford to lose my staff. I
9      can't afford to lose my staff.
10 Q   Well.....
11 A   Putting staff priority over my mother. No, there was --
12     there was no, you know.....
13 Q   Well, isn't it true that at those care conferences you
14     just denied that -- you took the opposite position and
15     that was that your mother was completely right and that
16     the staff was wrong?
17 A   I can -- I'm sorry, say that again. I didn't hear what
18     you.....
19 Q   At the care conferences that you're referring to, isn't it
20     true that you took the opposite position and you took the
21     position that the staff was wrong and that it was their
22     fault and that your mother was not at fault for anything?
23 A   I don't believe my mother was at fault at anything and I
24     still don't. Absolutely not.
25 Q   Okay. Did you.....

Page 204

1  A   My mother, you know.....
2  Q   So you took that position at the care conferences?
3  A   Well, I know I said I would -- well, I'm not -- no, I -- I
4      gave in the sense that I said -- I would talk to mom about
5      if she has a problem with staff, don't tell them. She was
6      in a habit of telling staff, well you shouldn't be working
7      here if you don't like it. I said, mom, don't do that,
8      instead go to Marla. You know, take it to Marla. Take it
9      to the program manager. Yes, I -- I've -- I was trying to
10     work both ends, yes. And telling mom to try to lower her
11     voice and -- yes.
12 Q   Okay. And did your mother heed your advice?
13 A   Yeah, for a long time she called Marla instead of talking
14     to the staff, yeah. She would call Marla.
15 Q   Now who -- was the care coordinator also present during
16     these care conferences?
17 A   She was in the summer of '05. Yeah, she was at the appeal
18     for the eviction. Yeah, uh-huh.
19     MS. MEYERS: Okay. We need to take a break. Off record.
20     REPORTER: This concludes the first video tape in the
21 video taped deposition of Carol Winters. The time is 2:49.
22 The date is the 22nd of September, 2006. Off record.
23     (Off record)
24     (On record)
25     REPORTER: On record. This is the second video tape in

Page 205

1  the video taped deposition of Carol Winters. The time is 2:51.
2  The date is the 22nd of September, 2006. Counsel, you may
3  continue.
4     MS. MEYERS: Thank you.
5  Q   Ms. Winters, I want to go back to your comment about the
6      administration. Are you claiming that there are any
7      particular individuals in administration who are out to
8      get your mother?
9  A   I can't say that for a fact but it would appear from the
10     many times they encouraged me to move her to a smaller
11     facility that they probably would appreciate if she was
12     out of the facility.
13 Q   Okay. And who are those individuals you're referring to?
14 A   Linda Hendrickson. Linda would be the one and that came
15     from Lynn Moser, too. I don't believe Marla had ever
16     stated that.
17 Q   And are you saying that because.....
18 A   And Jan Freels. Jan Freels.
19 Q   And you're -- are you saying that because those
20     individuals have encouraged you to move your mother to a
21     smaller facility that somehow they're out to get your
22     mother?
23 A   Well, I'm saying they would rather not deal with my
24     mother. They would rather she leave the facility, yes.
25 Q   Okay. Has anyone of those individuals ever told you that

Page 206

1  they thought it would be in your mother's best
2  interest.....
3  A   Oh, of course. That's what they say.
4  Q   .....to go to another facility?
5  A   Yes.
6  Q   Okay. And they ever explained to you why they thought it
7      would be better for your mother to be at a smaller.....
8  A   Yes.
9  Q   .....facility? And what have they told you?
10 A   Their main point is that she would get more attention.
11     Get more attention. She needs more attention.
12 Q   Do you think your mother needs more attention?
13 A   No.
14 Q   Do you think that your mother's level of needs have
15     increased since she's been at Chugiak?
16 A   She's -- they decreased. Her needs have decreased.
17 Q   Okay. How have they decreased?
18 A   When she came there she was in a -- a splint for probably
19     a month or so. So she couldn't use her right arm at all.
20     And then it was slow progression to where she can use her
21     arm quite a bit now. So that has improved tremendously.
22     And she took much more time in her, like showering.
23     Showering and everything because of that. And now the
24     time she takes is much less.
25 Q   How much time does it take to give her a shower?

Page 219

1      Absolutely impossible.
2 Q So tell me -- so no matter what the administration said
3      about the reasons why they wanted to move your mother, you
4      didn't believe the reasons?
5      MR. DAVIS: I'll object to that.....
6 Q Is that fair?
7      MR. DAVIS: .....question, to its form.
8 A There's been no sincere effort by this -- by the
9      administration. No really, really sincere effort to
10     solver problems where you look someone in the eye and you
11     say, Carol, do you want your mom to stay here? Okay,
12     Helen, do you want to stay here? Let's make it work.
13     Let's talk about these problems. Nothing like that.
14 Q Okay. What do you think? Do you think that -- what do
15     you think would solve the problems that your mother is --
16     then that your mother and you are complaining about?
17 A It's so simple. It's just so simple. None of this had to
18     take place. So simple. Like I wanted to do and I offered
19     to do, to come in there a few times and just talk to the
20     staff about my mom's personality, how she was raised, what
21     made her into what she is, her chronic pain, her severe
22     hearing problem. And the fact that all she needs ever
23     when she's upset is to someone to be like the nurse Mary.
24     They have a great nurse right now. I saw her with my mom.
25     Perfect. She gets close to mom. She puts her hand on my

Page 220

1     mom's shoulder and she'll look at my mom in the eyes and
2     she'll smile. And she calms mom down just by doing that.
3     And she'll say -- and she'll explain the procedures. You
4     know, she'll just explain things to her. It's that simple
5     with my mother. It's just that simple. To be kind,
6     reassuring, smile, supportive. Honestly.....
7 Q So.....
8 A .....that works when I do it. It's just that simple.
9 Q So is your mother -- your mother needs to be calmed?
10 A No, that's out of context. I mean -- well -- well, I mean
11    yeah, if she was ever, let's say excited, about anything
12    -- no, you're not going to take that out of context. Not
13    that my mother is a, you know, raging all the time or
14    anything. But what I'm saying is, if mom gets upset or
15    has anxiety, all you have to do is talk to her in a
16    respectful manner and smile, and that's what I put on my
17    document of September 22nd, right after she was admitted.
18    That's why I wrote that, so people would understand how to
19    deal with my mother, because she's anxious. She's just an
20    anxious, frail woman. Her nervous system is shot. She
21    had a lot of illnesses. And that's how you should deal
22    with all elderly people, not just my mother. All elderly
23    people.
24 Q Does she have unprovoked anxiety?
25 A Basically respect and dignity. So fundamental to an

Page 221

1     operation of an assisted living.
2 Q Does she have unprovoked anxiety?
3 A Well, she's -- yes, I think she's always anxious to some
4     degree because of chronic pain, yes.
5 Q All right. So you believe that the center -- correct me
6     if I'm wrong -- can accommodate your mother by just having
7     you come in and give a -- explain your mother's character
8     and tell them -- tell the staff what they need to do?
9 A Yeah, like -- well, it might take a couple of times before
10    -- you know, we need to look at the -- the types of aides.
11    They don't -- most of them don't have a lot of training,
12    it's usually on the job. Maybe they don't have a high
13    level of education. And maybe some of them, for example,
14    may take offense to being told what to do. Well, mom at
15    her age has a tendency to repeat. They need to
16    understand, she's not doing it to put them down. She
17    might say, well do this now, do that now, do this now. I
18    mean, it's understand that, you know. It's not like she's
19    telling them they have a bad memory, it's just that she
20    repeats. And yeah, they needs some in-service training.
21    And it would be good for anybody that's having a problem
22    with a resident to have the family come in and share.....
23 Q What.....
24 A .....share their experience with that family member.
25 Q What do you know about the training at Chugiak?

Page 222

1 A I'm sorry, I didn't hear.
2 Q What do you know about the training at Chugiak?
3 A What I know I guess I got from the ombudsman and Kathy
4     Huskey, what they got from a meeting with Jan Freels a
5     long time ago. I got it secondhand.
6 Q Okay. Have you ever asked to sit down with either Marla
7     Nelson, or Jan, or Linda Hendrickson, and to talk about
8     the training that the staff actually receives?
9 A Well, a couple of times I offered to, I think probably on
10    voice mail, to come in and do -- talk to -- offered, I
11    think on Marla's voice mail, to come in and meet with the
12    family but I never got a.....
13 Q Okay.
14 A .....response so.....
15 Q Those.....
16 A .....I kind of dropped it.
17 Q .....were messages that you left offering to come in
18    yourself.....
19 A Uh-huh.
20 Q .....but I'm asking, did you ever sit down and find -- to
21    find out what kind of training is provided to staff?
22 A No, I haven't. No.
23 Q All right. Since your last deposition, have you done
24    anything more to find any alternative housing for your
25    mother?



EXHIBIT C

CAROL WINTERS    9/22/2006    WINTERS v. CHUGIAK SR. CITZ.
3:-06-CV-00083-TMB

24 (Pages 235 to 238)

### Page 235

1  Q  Have you read in the records that her showers can take up
2     to an hour or more?
3  A  No, I haven't read that.
4  Q  Okay. If your mother is getting up on her own and, you
5     know, unassisted by staff, do you think that that puts her
6     at risk?
7  A  If she does what?
8  Q  If she gets up on her own, whether it's to get water or
9     something else.....
10 A  Well, she.....
11 Q  .....that's she's at risk?
12 A  .....stopped that. I got on her about that. She stopped
13    that completely.
14 Q  Okay. And when did this stop?
15 A  A long time ago. Maybe a year ago. Maybe a little less
16    than that. But she did slide on the floor. I forgot to
17    tell you about that one. She did slide on the floor from
18    her couch at night because the aides did not fix her
19    pillows under her knees. That's something they don't like
20    to do and she tried to do it herself. She didn't get up,
21    she just kind of sat up to get them and she slid on the
22    floor. That was another thing I forgot to mention.
23 Q  Okay. So are you saying that the aides are at fault
24    because your mother slid on the floor?
25 A  Yes.

### Page 236

1  Q  Okay. And when did this happen?
2  A  She didn't hurt herself fortunately though. She didn't
3     hurt herself that time.
4  Q  And when did this occur?
5  A  Oh, five or six month -- maybe four or five months ago.
6     And it is in the records because I saw it.
7  Q  Okay. And why do you think it's because the aides didn't
8     put the pillows under her knees properly?
9  A  Well, they -- it's a constant argument with some of them.
10    They don't like to do it. And that Carol -- not Carol --
11    Annette, Terri on the night shift, those were the ones who
12    didn't like to -- they just don't like to do it. Because
13    what she'll -- she needs three pillows under her legs and
14    she'll say, I want them this way, I want them that way.
15    And if -- and if they're not exactly like she wants them
16    changed, shifted. And the process doesn't take longer
17    than 30 seconds and yet they don't want -- they just don't
18    want to do it.
19 Q  Did your mother tell you that that's the reason why she
20    slid off the couches, because the aides didn't position
21    the pillows correctly?
22 A  Well, yeah, because I asked her how that happened and she
23    said well the pillows weren't right so I got up to move
24    them, move the pillows. That's what she told me.
25 Q  Okay. Do you know what the ratio is, staff to residents

### Page 237

1     at Chugiak?
2  A  I didn't hear that.
3  Q  Do you know what the ratio, the staff to resident ratio is
4     at Chugiak?
5  A  I don't really. Maybe one to five or one to seven. I'm
6     not sure.
7  Q  The complaint alleges that Chugiak has a pattern and
8     practice of evicting or threatening with eviction CSC
9     residents who are demanding. Do you recall seeing that in
10    the complaint?
11 A  What? What's the second part?
12 Q  Do you recall.....
13 A  Yes. It's in here, yes. Yes, yes.
14 Q  Okay. And is that your opinion?
15 A  Uh-huh, yeah.
16 Q  And what is that opinion based on?
17 A  The ombudsman's statement to me. Ombudsman's report
18    or.....
19 Q  Did he give you any specific examples of -- that
20    constitute this pattern of practice?
21 A  He said that he got that information when he interviewed
22    Jan Freels.
23 Q  You don't have any -- other than talking to the ombudsman,
24    you don't have any other independent knowledge of the --
25    of Chugiak.....

### Page 238

1  A  Well.....
2  Q  .....asking residents to -- just a minute, please.
3  A  Oh.
4  Q  Asking residents to leave or evicting them or threatening
5     eviction?
6  A  Yeah, in a way. Indirectly. I knew of one man who told
7     me that and another resident who told me that. So two
8     residents and my mom told me about another resident.
9  Q  Who was.....
10 A  So three since I had her there.
11 Q  Okay. So three res -- so you're saying that you know of
12    three residents who have been threatened with eviction or
13    have been asked to leave?
14 A  Two were asked to leave and one was evicted, yeah.
15 Q  Okay. And who are these residents?
16 A  One was Connie, one was her boyfriend, and I can't
17    remember his name, but he's dead now. And I believe the
18    other one was, I think Delores or -- I think it was
19    Delores but I'm not positive.
20 Q  Okay. Are you saying that Connie told you this
21    information or Connie was a resident who was asked to
22    leave?
23 A  No, Connie -- Connie and her boyfriend at different times
24    for different reasons were asked to leave.
25 Q  Okay. Did -- and who gave you this information?

Computer Matrix Court Reporters    PH -  907-243-0668    jpk@gci.net
                                   FAX - 907-243-1473    sahile@gci.net


EXHIBIT C

Page 239

1  A   Connie and the other -- her boyfriend, when he was living.
2  Q   Okay. Did they tell you the reasons they were asked to
3      leave?
4  A   Yeah, they -- they did. Yeah.
5  Q   Okay. What's your understanding of why they were asked to
6      leave, if this occurred?
7  A   Connie couldn't pay her rent. She said she couldn't pay
8      the rent. But then when they did the evic -- they did her
9      -- they sent her an eviction letter but they sent it to
10     her daughter, not her, and then her care worker got
11     involved, her care coordinator, and they worked out a way
12     to get money for her -- this is coming from Connie. They
13     worked out a way to get her rent paid, so she stayed
14     there.
15 Q   Okay. And then the boyfriend?
16 A   I believe it was a similar situation involving back --
17     back rent.
18 Q   Okay. But the allegation is that CSC has a pattern and
19     practice of evicting or threatening with eviction CSC
20     residents who are demanding. Do you know or have you been
21     told of any residents who are demanding and who were asked
22     to leave or who were threatened with eviction?
23 A   Oh, I think my mother for one, because of my complaints
24     and demands.
25 Q   Anyone else?

Page 240

1  A   Not right off, no.
2  Q   Okay. And so the other -- the third resident that you're
3      referring to, who is that?
4  A   It was a woman.....
5  Q   And I think you said Delores might be her name.
6  A   I think so. It was a woman who came and only stayed a
7      short time, maybe a month or so, was asked to leave and I
8      don't know what's behind that.
9  Q   Okay. One of the claims in the complaint is that CSC has
10     violated the Assisted Living Homes Act. Do you recall
11     that claim?
12 A   The assisted living what?
13 Q   The Assisted Living Homes Act.
14 A   What page is that?
15 Q   And I can refer you to -- on page 6.....
16 A   Uh-huh.
17 Q   .....count Roman numeral I.
18 A   Okay. Page 6?
19 Q   Yes.
20 A   Okay.
21 Q   All right. What's the factual basis for your claim that
22     CSC has violated the act?
23     MR. DAVIS: I'll object.
24 A   Say it ag.....
25     MR. DAVIS: It calls for a legal conclusion. The witness

Page 241

1      can talk about facts but not the law.
2  A   I didn't.....
3  Q   Do you have.....
4  A   .....hear you.
5  Q   Do you -- basically do you have -- is that your opinion?
6      You think CSC has violated the living homes act?
7      MR. DAVIS: Same objection.
8  A   Yeah.
9  Q   And what's your understanding of the facts that lead you
10     to believe that Chugiak has violated the act?
11     MR. DAVIS: Same objection.
12 Q   You can answer, if you can.
13 A   Well, they had no grounds for termination and they failed
14     to treat her, my mother, with respect and dignity. And I
15     believe they tried to retaliate against me for my
16     complaints.
17 Q   Okay. Are you alleging any damages on your behalf in this
18     lawsuit?
19 A   I'm not hearing. Say -- I'm sorry.
20 Q   Are you alleging any claims or any damages on your behalf
21     in this lawsuit?
22 A   No.
23 Q   The next count is count Roman numeral II, violation of the
24     Alaska Human Rights Act. Do you have any -- what are the
25     ba -- what are the facts that you allege show a violation

Page 242

1      of the Alaska Human Rights Act?
2      MR. DAVIS: Same objection.
3  A   I'm not sure which falls under which, honestly. My
4      attorneys, you know, have more knowledge of that than I
5      do.
6  Q   Okay. Looking at page 7, count Roman numeral II,
7      paragraph 26, do you see that?
8  A   27?
9  Q   Paragraph 26.
10 A   Uh-huh. (Affirmative)
11 Q   All right. It reads, defendants threatened eviction of
12     plaintiffs violates the Alaska Human Rights Act, AS
13     18.80.200 et sec [sic], and that plaintiff has a right to
14     be free from discrimination. Are you claiming that your
15     mother has been discriminated against?
16 A   I'd say definitely in terms of her dis -- hearing
17     disability. Absolutely.
18 Q   And are you claim -- so you're claiming that the hearing
19     is the disability that she's being discriminated on the
20     basis of?
21 A   Oh, there might be more than that. Again, my attorneys
22     would know about this. But the one that comes to mind is
23     her hearing because people misinterpret her loud voice as
24     being intentionally threatening, like she's trying to be
25     nasty and it's not. That's just -- she just has -- her


EXHIBIT C