IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

HELEN WINTERS,                          )
through her power of attorney           )
Carol Winters,                          )
                                        )
        Plaintiff,                      )
                                        )
vs.                                     )
                                        )
CHUGIAK SENIOR CITIZENS, INC.,          )
                                        )    Case No. 3:06-cv-00083-TMB
        Defendant.                      )
_____)

**OPPOSITION TO DEFENDANT CSC'S MOTION FOR SUMMARY
JUDGMENT ON COUNT 1 – VIOLATION OF THE
ASSISTED LIVING HOMES ACT.**

I.      **Introduction**

CSC's First Motion for Summary Judgment on Count I of Plaintiff's complaint must be denied.  Count I of Ms. Winters' complaint alleges that CSC violated the Assisted Living Homes Act by amongst other things:  terminating her residential contract and seeking to evict her without having a legal basis for so doing.  In its motion, CSC contends that there are no disputed facts with regard to whether CSC either (1) had legitimate grounds to terminate Ms. Winters' residential contract and notice her with eviction; or (2) whether CSC's attempts to evict Ms. Winters were retaliatory.

Specifically, CSC alleges that the facts unequivocally demonstrate that Ms. Winters' needs exceed the level of services the center can provide, and that she has engaged in pattern of unacceptable behavior.  That there are no contested facts with respect to these issues, is quite a remarkable statement given that Bob Dreyer, the state of

Alaska's Long-Term Care Ombudsman,[1] after independently investigating the matter concluded otherwise. Mr. Dreyer's deposition and report in and of themselves, while not conclusive as to liability, should suffice to defeat the present motion for summary judgment. However, the evidence contradicting CSC's allegations does not end with Mr. Dreyer, Ms. Winters' treating physician refutes CSC's allegations, as do the depositions of CSC's own employees.

Ms. Winters has credible admissible evidence that demonstrates that (1) her medical condition has not changed since the time she moved into the facility and that the facility can provide the care she needs and in fact does so with other residents; (2) what CSC claims to be a pattern of abusive and disruptive behavior is simply Ms. Winters' speaking loudly due to hearing loss and her legitimate complaints regarding the manner in which she is being cared for by untrained and unsympathetic staff; and (3) CSC violated the Alaska Assisted Living Homes Act by retaliating against Ms. Winters' for her complaints to Mr. Dreyer as well as in its day to day operation of the facility.

## II. The Standard for Summary Judgment

Summary judgment is only appropriate when a court finds that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is not genuine issue as to any material fact and that the moving party in entitled to judgment as a matter of law." Fed. Rule 56(c). The Court must construe all evidence and draw all evidentiary inferences in favor of the non-moving

---

[1] The OLTCO was established as a result of the Elder Americans Act in 1978 that required each state to have ombudsman for the elderly. (T. 142) The OLTCO is an independent agency. (P. Ex. 35B, at 134) The OLTCO is charged with investigating abuse and has a specific definition of abuse. (P. Ex. 35A, Ex. 1 at 1146). It is common for the OLTCO to provide training to staff of assisted living homes and other providers about the elderly. (P. Ex. 35B, Dep. Dreyer, at 141)

party.  10 A Charles Alan Wright *et al*., Federal Practice & Procedure § 1717, R 349 & no. 5 (3ed 1998)(*citing Adickes v. S.H. Kress & Co*. 398 U.S. 144 (1970)).

A dispute over a "genuine" material fact exists if the evidence would allow a reasonable fact-finder to return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 248 (1986).  The non-moving party may defeat a motion for summary judgment by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial.  *Celotex Corp. v. Catreet*, 477 U.S.  317, 322-23 (1986).  Moreover, the moving party has the specific duty to identify "parts of the record" which it believes indicate an absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 91 L. Ex. 2d 265, 106 S. Ct. 2548 (1986); *Schultz v. Hemet Youth Pony League, Inc.,* 943 F. Supp. 1222 (C.D. Cal. 1996).

### III.        Statement of Facts

### A.     Procedural History

Helen Winters is a now-91 year old woman with various disabilities.   Her daughter and Power of Attorney ("POA") is Carol Winters. (Doc. 113).  Ms. Winters' moved into the Chugiak Senior Center (hereinafter "the Center" or the "Facility") in late September, 2004 after sustaining a fall in which she broke her arm.  Both prior to and after her mother's admission to the Center, Carol Winters and her mother made numerous attempts to ensure that the elder Ms. Winters would and was receiving appropriate care. To this end, Ms. Winters' and her daughter had numerous discussions with staff and administrators, and a number of care conferences during the Fall of 2004.  (P. Ex.[2] 8, 10,

---

[2]  "P. Ex." denotes Plaintiff's Exhibits and "D. Ex. " denotes Defendant's Exhibits as the parties have already submitted proposed exhibit lists and the underlying exhibits to the Court.

13, 14, 15, 16, 17, 18, 19, 20)   However, because their concerns went unaddressed and their complaints went unresolved, the Winters' contacted the Alaska Office of Long Term Care Ombudsman (hereinafter "OLTCO") in June of 2005.  The OLTCO attempted to informally resolve these issues encouraging CSC to work with the Winters' family.  (P. Ex. 35C, p. 2-3; p. 20-21).  When that failed, the OLTCO proceeded with a more formal investigation.  (P. Ex. 35C, p. 3)   While the OLTCO investigation was pending, on January 6, 2006, CSC attempted to evict Ms. Winters.  (P. Ex. 40).  Ms. Winters and her daughter opposed the eviction.  (P. Ex. 43). T he OLTCO also opposed CSC's attempt to evict Ms. Winters.  (P. Ex. 35A, p. 423).  As did, Ms. Winters' primary physician, Dr. Michael Jones (P. Ex. 45), and her care coordinator, Kathy Huskey, (P. Ex. 35A, p. 238; P. Ex. 64, p. 102).  Despite this, CSC adamantly refused to retract the eviction notice.  (P. Ex. 35A, p. 238-251).  *See also*, Answer, Dkt. 19, Par. 17, 18, and 21; Amended Complaint, Dkt. 1(Ex. C), at Ex. 1.[3]   CSC further refused to cooperate with the investigation by the OLTCO, including stonewalling the provision of documents.  (P. Ex. 35A, p. 402-408, 378-379)  Ms. Winters' then brought suit in state court to protest the eviction, resulting in a Temporary Restraining Order issued by Judge Stowers on April 13, 2006.  (P. Ex. 49)  CSC removed the case to this Court thereafter.

---

[3] The amended complaint contains an exhibit marked Ex. 1, which is a January 5, 2006 letter from Jan Freels to Helen Winters indicating Ms. Winters must leave the facility.  The purported reason for termination is an alleged "continued pattern of behavior and conduct is detrimental to the safety and well-being of other residents and staff, and your unwillingness or inability to refrain from unnecessary verbal abuse and hitting of staff suggest you may need mental health services to prevent harm to others and/or the facility can no longer provide the level of services you need." CSC cited to AS 47.33.360(a)(2)(3)(6). However, CSC has otherwise indicated in its original eviction letter of January 5, 2006 that the eviction was due to verbal abuse and hitting of staff, i.e. that it was detrimental to the safety and well-being of other residents and staff.  CSC has since maintained that the eviction is predicated on its belief that Ms. Winters' care needs have increased since her admission to the facility.

**B.    The Indisputable Disputed Facts Regarding Whether CSC Had Valid Grounds to Terminate Ms. Winters' Contract.**

AS 47.33.360(a) permits involuntary termination of a resident's contract only in very limited circumstances such as for: medical reasons, engaging in a pattern of conduct harmful to the other residents and staff, violating the terms of residential services contract, or if a home can no longer provide the services in accord with the resident's needs.  On January 5, 2006 CSC sent a termination letter to Ms. Winters' informing her that her "Residential Services Contract was being terminated pursuant to AS 47.33.360(a)(2), (3), and (6) because she had engaged in a documented pattern of conduct harmful to the other residents and staff of the facility, she violated the terms of the Residential Services Contract, and the facility could no longer provide for services in accordance with her needs."  (P. Ex. 40  - CSC Letter, Dated January 5, 2006).

**1.    There is Ample Evidence Supporting Ms. Winters' Contention that her Medical Condition Has Not Changed Since she began her Residency at CSC, and That Her Medical Condition is Not the Basis for CSC's Attempt to Terminate Her Contract.**

Without question, there are genuine issues of material fact as to whether Helen Winters' Residential Services Contract could be lawfully terminated due to "medical reasons" under AS 47.33.360(a)(2).  In fact, CSC's present motion fails to articulate precisely what are the "medical reasons" that gave rise to this assertion. (Dkt. 122, pg. 19-20)

It seems that CSC's reference to "medical reasons" relates in part to an allegation that Ms. Winters' has unmet mental health needs. When CSC sent its January 5, 2006 Notice of Termination, it did not explain what the "medical

reason" was that justified its termination of the lease; but it did allege that Ms. Winters "may need mental health services to prevent harm to others." (Doc. 122, pg. 14)

While Ms. Winters acknowledges she suffers from some anxiety she contends she does not have any mental health disorder that would cause her to harm anyone. And, CSC has offered absolutely no evidence that supports this allegation. In fact, CSC's own expert, Dr. Geeseman, concluded just the opposite. After examining Ms. Winters, Dr. Geeseman, declined to assign her any "mental health" disorder. (Doc. 139, Ex. J Geeseman Report, 6-7) Instead, she noted that Ms. Winters may be situationally depressed and may be somewhat of a perfectionist, but she found her Mini-Mental exam to be normal with some memory issues as might be expected given her advanced age. (Geeseman Report, 6-7) Thus, CSC's claim that Ms. Winters' unmet mental health needs provide a "medical reason" for her eviction is not only contested, but is without any support whatsoever.

CSC additionally contends that Ms. Winters' medical condition has worsened since she took up residency at CSC in September of 2004 and as such CSC has a "medical reason" for terminating her contract. However, this contested by Dr. Michael Jones, Ms. Winters' primary care physician. (P. Ex. 52, Dep. Jones, T. 79) Dr. Jones has been treating Ms. Winters for the past five years for hypertension, arthritis, and is aware of her severe hearing problem and general anxiety disorder. (T. 56, 63, 79) During his deposition, he stated that Ms. Winters' medical problems in January of 2006 were not really any different than the problems she had when she first moved in to CSC's Center.

(T. 80)  He testified that now, like in September of 2004, she needs physical assistance but it would not have to be a nurse and that at night she needs help with transfers.  Dr. Jones testified that Ms. Winters does not need skilled nursing care she needs only physical assistance.  (T. 77-78).

The contention that Ms. Winters' condition has worsened is also belied by CSC's own documents.  Prior to her admission to CSC, CSC staff assessed Ms. Winters' care needs.  (P. Ex. 3, 4, 5, 6; P. Ex. 94, Dep. Moser, T. 14-15).  Using their screening tool, Ms. Winters' was assigned a functional assessment score of 26.  (P. Ex. 5, p. 6)  CSC's "Move-Out Criteria", an internal policy, states that an individual must exceed a score of 56 on a functional assessment to be deemed unsuitable for CSC.  (P. Ex. 95)  The same policy, as well as the Resident Services Contract requires that if staff believe there has been a change in the resident's needs, a new functional assessment will be completed. (Cf. P. Ex. 12, Resident Services Contract, and P. Ex. 95, and P. Ex. 50, Dep. Hendrickson, T.119-120.)  From the time of her admission to CSC in September 2004 until January 6, 2006, CSC did not conduct any other assessment of Ms. Winters to objectively measure any change in her level of care.  (P. Ex. 94, Dep. Moser, T. 51).  In fact, the October 2005 plan of care in place for Ms. Winters prior to January 6, 2006 is nearly identical to the plan of care from the Fall of 2004, once again recognizing that "Helen requires maximum assistance of her ADL's and IADL's." (P. Ex. 33, at 30042, P. Ex. 34, and P. Ex. 38).

As set-out above, there is substantial evidence contradicting the self-serving affidavits and letters of CSC's administrators regarding whether there is medical justification for CSC's attempts to terminate the Ms. Winters' contract.

2.    **There is Evidence to Support Ms. Winters' Contention that CSC Can Meet Ms. Winters' Care Needs.**

CSC further contends that there is no genuine dispute as to whether the Center can meet Ms. Winters' care needs. But again, contrary to CSC's contention, there is ample evidence suggesting that Ms. Winters' medical condition and care needs are not extraordinary among the residents at the Center. Thus, summary judgment must be denied.

a.    **CSC's admission records demonstrate that Ms. Winters' medical conditions and care needs were fully disclosed to CSC prior to her admission to the Center and that CSC committed to meeting those needs.**

There is no dispute regarding whether Ms. Winters needs skilled nursing needs; she simply does not. Ms. Winters' current plan of care, as well as her plan of care as the day she was admitted to CSC demonstrate as much. (See, P. Ex. 87, Sept. 11, 2006 DSDS Choice Program Service Plan; and P. Ex. 8, Sept. 15, 2004 CSC Plan of Care, and P. Ex. 7, Sept. 2004 DSDS Choice Program Service Plan) As does the deposition of Dr. Jones. (P. Ex. 52, Dep. Jones, T. 77-78) All the evidence clearly establishes that Ms. Winters' simply needs assistance with her activities of daily living (hereinafter "ADL's")(*i.e.* eating, dressing, bathing, toileting, transferring, walking) and instrumental activities of daily living (hereinafter "IADL's")(*i.e.* preparing meals, shopping, medication management, money management, using the telephone, doing housework, using transportation) and that her needs in these areas were the same on the date she received the eviction notice as they were on the day she moved into CSC. [*Id.*] Likewise, there is no dispute that CSC provides these services to its residents. (P. Ex. 8, P. Ex. 53, Dep. Isaacs, T. 56-57, 59-61, 63-64, 69-70).

Also, there can be no genuine dispute with respect to whether Ms. Winters' medical condition and assistance needs were fully disclosed by the Winters' prior to Ms. Winters' admission to CSC. Before accepting Helen Winters as a resident, CSC had full opportunity to determine her needs.

Lynn Moser coordinated the pre-admission process. (P. Ex. 94, T. 18) On September 3, 2004, Carol Winters signed a Release of Information for CSC so that it could obtain any necessary medical records about her mother's needs from her doctors. (P. Ex. 9). The release allowed CSC to obtain a wide variety of medical information about Ms. Winters and is in effect indefinitely unless revoked. (P. Ex. 9.)

Ms. Moser conducted a pre-screening assessment of Ms. Winters in September 2004. (P. Ex. 5, CSC Pre-Screening Completed Sept. 7, 2004); Answer, Dkt. 19, Par. 11. CSC staff also completed a Client Profile. (P. Ex. 6.) Ms. Moser told Carol Winters that Helen Winters was the "perfect resident" for CSC. (P. Ex. 43, p. 1) The pre-screening instrument of Sept. 7, 2004 assigns Ms. Winters a functional assessment score of 26 (according to CSC's own policies a care level of 56 or higher indicates the Center cannot meet a resident's needs). P. Ex. 5. The initial CSC service plan written for Helen Winters is dated September 15, 2004. (P. Ex. 8). This one page document acknowledges that Helen Winters needs assistance in with all of her ADLs. (P. Ex. 8). CSC admits that this Plan of Care Contract describes the services CSC committed to providing Ms. Winters, and was to include, among other things, assistance with activities of daily living, self-care and medication management. Answer, Dkt. 19, Par. 12. Furthermore, CSC was given a copy of the State of Alaska, Department of Senior and Disabilities Services" Choice Plan of Care dated September 2004. This document also stated that Ms. Winters

requires 24 hour supervision and "substantial assistance with all of her ADL's and IADL's." (P. Ex. 7, at 30046.)

In addition, on September 22, 2004, as Ms. Winters was getting ready to enter CSC, Carol Winters wrote a letter to the facility explaining her mother's various disabilities, needs and anticipated care. (P. Ex. 10). In the letter, Carol Winters gave her perspective as Ms. Winters' daughter and caregiver as to the type of help her mother would need. (P. Ex. 10, p. 1). She asked CSC to keep a copy of the letter in her mother's chart and make it available to all of those caring for her. (P. Ex. 10, p. 1) In that letter, Carol Winters explained that Ms. Winters was hard of hearing, such that she could not hear out of her left ear, only her right ear, could not hear if there was noise in the background or if the speaker was far away. She told CSC that Ms. Winters had severe pain in her knees and thus had to be moved "slowly and gently." (P. Ex. 10, p. 2) She explained that Ms. Winters' had spinal osteoporosis which caused her lots of pain but that she had difficulty taking pain medications. She noted that Ms. Winters' had slept on the couch for years due to this and would need assistance with her pillows being placed but that Ms. Winters could explain to staff exactly how to place the pillows. (P. Ex. 10, p. 2) Carol Winters told CSC staff that her mother had allergies to milk, certain chemicals, perfumes and smoke. Finally, she explained that her mother was somewhat anxious and that going to the assisted living facility had increased her anxiety. She asked CSC staff to help her mother, to wit:

> The staff could help mom by being patient, supportive, friendly and supportive during this transition period. Mom responds best to organized, structured activities, and knowing that people really care about her. A smiling face and positive attitude work well to calm her down when she is anxious. (P. Ex. 10, p. 3)

CSC clearly knew that Ms. Winters was an elderly woman who had been diagnosed with various maladies, including hearing loss, severe knee pain, spinal osteoporosis, a history of blood clots, had fallen twice within the last two years resulting in a broken shoulder and suffering from anxiety related to her move to the Center. Answer, Dkt. 19, Par. 6. In fact, CSC fully admits that the conditions listed in the preceding sentence were disclosed to it on or about the time of Ms. Winters' admission to the CSC in September 2004. Answer, Dkt. 19, Par. 6.

On September 24, 2004, Carol Winters, as Power of Attorney for Helen Winters, signed a CSC Assisted Living Program Lease Agreement. (P. Ex. 11) She also signed a CSC Living Program Resident Services Contract ("Resident Services Contract"), for Ms. Helen Winters. (P. Ex. 12)

Both the Lease Agreement and the Resident Services Contract affirm that CSC will provide care to Ms. Winters based upon the September 5, 2004 plan of care. *See,* P. Ex. 11, at 30334; P. Ex. 12, at 30337.[4] Thus, the Lease Agreement and the Resident Services Contract committed CSC to rely upon the plan of care developed in September, unless revised. (P. Ex. 7, 8).

Without question, Ms. Winters' medical condition and care needs were fully disclosed to CSC prior to Ms. Winters' admission to the center, and CSC committed to

---

[4] Specifically, CSC's Services Contract specifically states that CSC is to conduct a standardized interview to determine needs of residents before move-in and develop a written service plan before move in. P. Ex. 12, at 30337. The written service plan is to include a description of "..what, when, how and how often services will be provided, support the principles of dignity, privacy, choice in decision-making, individuality, and independence; support a homelike environment when the health or reasonable safety and well-being of others are not at risk; and be reviewed and updated quarterly and *more often if needed.*" (emphasis added.), P. Ex. 12, at 30337-30338.

meeting those needs.  Such evidence directly refutes CSC's allegations that Ms. Winters' needs are beyond what it can provide at the Center.

> **b.**    **The depositions of Dr. Jones, the Long-Term Care Ombudsman, and Tom Isaacs refute CSC's claims that Ms. Winters' care needs are greater than other Center residents and that the Center cannot meet them.**

Contradicting CSC's claims that Ms. Winters' care needs are greater than the other residents of CSC and that CSC is unable to meet Ms. Winters' care needs are the testimony of Ms. Winters' treating physician, Dr. Jones; Bob Dreyer, the LTCO, and Tom Isaacs, a nurse's aide currently employed by CSC.

First, there is the testimony of Dr. Jones.  In his deposition, he stated that he frequently makes recommendations to assisted living homes and nursing facilities regarding the appropriateness of his patients' placement in such facilities and as to whether such facilities can meet his patients' care needs.  (P. Ex. 52, Dep. Jones, T. 76) He further testified that Ms. Winters' does not have any "skilled nursing needs" and simply needs physical assistance with her ADL's, as such he expressed concern about her needs being met in a smaller facility and testified that her placement in an Assisted Living Facility like CSC is appropriate.  (P. Ex. 52, Dep. Jones, T. 77-78, 80, 76)

Next, Bob Dreyer's report and file indicate that he has firsthand knowledge of the level of care that CSC's center provides as he had visited the facility and worked with its administrators.  (P. Ex. 35C, p. 2-4)  He further testified that he has firsthand knowledge of Ms. Winters' care needs, the care needs of other CSC residents.  Mr. Dreyer indicates that he believes that CSC is capable of meeting Ms. Winters' needs.  (P. Ex. 35A, p. 190, 188, 18, ; P. Ex. 35B Dep. Dreyer, at T. 79)

Also, contradicting CSC's claims that Ms. Winters' care needs exceed those of other CSC residents and are beyond what the facility can provide is the testimony of Tom Isaacs. Mr. Isaacs is a nurse's aide and currently employed by CSC. (P. Ex. 53, Dep. Isaacs, T. 18-19, 23) Mr. Isaacs has worked at the facility since March 2004. (P. Ex. 53, Dep. Isaacs, T. 23) and has provided care for Ms. Winters since she first began living there, seeing her every time he works. (P. Ex. 53, Dep. Isaacs, T. 118) In fact, Mr. Isaacs was one of the employee's that Ms. Winters' initially had complained about. (P. Ex. 53, Dep. Isaacs, T. 11-12).

During his deposition Mr. Isaacs was asked to explain Ms. Winters' care needs, he responded:

> She does all of her hygiene herself. We help put on her…Ted hose and her shoes. We assist her with her pull ups, her Depends, assist her maybe a little with her skirt. She pretty much gets dressed by herself. Aside from the shoes, the Ted hose, handing her her shirt and her skirt, she does everything herself. We help pull her Depends down and put them back on. She does almost everything herself.

…

> She combs her own hair. She brushes her teeth. She looks like she puts on makeup.

….

> We take her into the bathroom in there, park her up by the sink and then come back when she rings the bell. ..When she's ready to get up, we'll come back…it's a total of 40 minutes because a lot of that is coming and going…

(P. Ex. 53, Dep. Isaacs, T. 732-74.)

Contrary to the suggestions of CSC administrators, Mr. Isaacs indicated that the amount of time spent with Ms. Winters is comparable to that of other residents. He noted that:

> There's Helen and another resident who take the most time and in the
> mornings without a shower, the other resident might take a half an hour;
> possibly 25 minutes. ….Helen might take, in the morning, 30 minutes,
> maybe 40 minutes.  It's hard to say because in the meantime she's – we're
> doing certain things with her, then we've got her in the bathroom, then
> visiting, then we're saying okay, ring the bell when you're ready, and
> going down the hall doing something else.  (P. Ex. 53, Dep. Isaacs, T. 72.)

Mr. Isaacs acknowledged that Ms. Winters might need more time for transferring but

explained:

> Helen takes a little more time.  There's another resident, however, who
> takes a fair amount of time too, as much time as Helen.

(P. Ex. 53, Dep. Isaacs, T. 66).


> In fact, according to Isaacs:

> This other resident is just – I don't know how to put this without saying
> too much. He's in worse shape than Helen, worse shape physically,
> mentally.

(P. Ex. 53, Dep. Isaacs, T. 66)

Mr. Isaacs testified at length that Ms. Winters is comparable to the other residents.

Like Ms. Winters many residents have difficulty ambulating:  there are at least two other

residents that use wheelchairs, one uses a cane, and four use walkers.  (P. Ex. 53, Dep.

Isaacs, T. 66-68).  There have been residents in the past, other than Ms. Winters, for

whom a two-person transfer was needed.  (P. Ex. 53, Dep. Isaacs, T. 69-70).  Mr. Isaacs

also explained that there had been other residents with varying medical needs at CSC's

Center, including four other residents who needed oxygen (T. 56), some in the past had

required physical therapy (T. 57), there was a resident who needed regular injections (T.

56), some residents who use catheters (T. 59-61[5]), a resident who needed a spinometer due to respiratory distress and needing to have lungs clear (T. 60), residents who have suffered a stroke (T. 63-64). Some residents, other than Ms. Winters, suffer from depression. (T. 105) Other residents, not Ms. Winters, need assistance with personal hygiene, including shaving (one resident), brushing teeth (three or four). About 25% of the people at CSC suffer from bladder incontinence. (P. Ex. 53, Dep. Isaacs, T. 107) In fact some of the residents, other than Ms. Winters, need assistance every two hours. *Id.* There are at least five people, who like Ms. Winters, eat in their rooms at CSC. (P. Ex. 53, Dep. Isaacs, T. 39).

Again, the testimony of Dr. Jones, Mr. Dreyer, and Mr. Isaacs directly contradicts CSC's allegations that Ms. Winters' care needs are greater that the Center can provide and are greater than the needs of CSC's other residents and thus presents a genuine issue of material fact that a must be presented to the jury.

**3.     There is Evidence that Disputes CSC's Contention that Ms. Winters Ever Engaged in a Pattern of Conduct that was Harmful to Staff or Other Residents of the Facility.**

CSC contends that wheelchair bound, frail 91 year old Ms. Winters has struck a staff member and "continuously engaged in a pattern of behavior and conduct consisting of unnecessary yelling and verbal abuse of staff and other residents." (Doc. 22, pg. 13). To support this outrageous claim, CSC relies exclusively upon the conclusory statements in an affidavit of Linda Hendrickson. (Dkt. 22, Ex. A)

**a.     A genuine issue of material fact exists as to whether or not Ms. Winters "actually struck a staff member in**

---

[5] Catheter care includes emptying the catheter bag, document everything, observe to make sure the urine isn't cloudy, clean the tubing. This is done once per shift. This takes about 10 minutes by itself. (P. Ex. 53, Dep. Isaacs, T. 61-63)

**December 2005" and as to whether that incident had
any impact on CSC's decision to terminate her contract.**

Ms. Winters disputes that she ever "struck a staff member in December of
2005."  In a letter to CSC about the allegation, Ms. Winters vehemently denied
that allegation stating that her arm accidentally hit the staff member when it her
arm flew out because she thought she was going to fall.  (Dep. Carol Winters, Ex.
J, January 9, 2006 Letter, pg. 6).  Ms. Winters' version is not only believable but
was corroborated by the staff person who was allegedly struck.    When
interviewed by Mr. Dreyer, the LTCO, regarding the allegedly slapping incident,
the staff person stated that she considered the incident "no big deal" and had
essentially "forgotten" about it.  (P. Ex. 35C, Dep. Dreyer, T. 6)  Had Ms. Winters
actually "struck" the aide in some sort of violent means as suggested by the
outrageous characterizations of CSC, the staff person would surely have
characterized the incident differently.  Ms. Winters' letter as well as the staff
person's recount of the incident (as reflected in Dr. Dreyer's report), demonstrates
that there is a genuine issue as to this material fact that should be presented to the
jury.

   **b.  There is a genuine issue of material fact as to whether what
      CSC deems as Ms. Winters' "unnecessary yelling" is in fact
      unnecessary.**

Next, CSC claims *via* the same conclusory affidavit of Linda Hendrickson,
that Ms. Winters engages in "unnecessary yelling."  However, all credible

evidence demonstrates that Ms. Winters has a severe hearing impairment.[6] Moreover, not only is Ms. Winters very deaf, but her daughter Carol, also has a hearing impairment. (P. Ex. 10, P. Ex. 96, P. Ex. 35A, p. 36) Thus, when Ms. Winters and her daughter are attempting to converse, they will speak in what would be viewed to those unaware of their hearing impairments as loud voices. Clearly, a genuine issue of material fact exists as to whether what CSC's administrators claim is "yelling" is rather two deaf individuals trying to communicate, sometimes with each other and sometimes with staff or other residents who do not understand their disabilities.[7]

> c.    **Ms. Winters' disputes that she has been or is verbally abusive to staff.**

Another material issue of fact relates to CSC's assertion that Ms. Winters verbally abuses staff. (Doc. 121 at 13) Linda Hendrickson claims that there has been "verbal abuse of staff" causing them to leave or threaten to leave. However, in doing so Hendrickson conveniently ignores the lack of staff qualifications when hired, the lack of training, and the lack of supervision by trained medical staff.

At the time Ms. Winters was contemplating admission to the Center, CSC's brochure (P. Ex. 88) advertised:

---

[6] Dr. Jones, Ms. Winters' long time physician characterized her as having a "severe hearing problem." (P. Ex. 45, Letter of January 11, 2006)

[7] Hendrickson testified at her own deposition that she was not aware that Carol Winters had a hearing impairment until sometime during the fall of 2006,t hat she had no specific training in hearing impairment, and could not point to any specific training provided to staff about hearing impairment. (P. Ex. 50, Tr. 80-81 and P. Ex. 35A, P. 36)

The Chugiak Senior Center Assisted Living Program (ALP) is a 20 unit complex providing **24 hour assistance** to people in need of a supportive environment.  ALP provides a special combination of housing, **personalized assistance** and health care.

…

With the support of **24/7 licensed staff** and **individualized service plans**, residents are able to maximize their independence and participate in activities that can promote socialization, friendships and health.

(P. Ex. 88, emphasis added).

But, during the time that Ms. Winters has been a resident at CSC, it has not had 24/7 licensed staff. In fact, CSC has only one "licensed" staff person, the Center's sole RN, who works full-time at the Center during the week and is on-call at other times.  Furthermore, CSC's Center does not even have 24/7 "certified" staffing.  (P. Ex. 51, Dep. Jan Freels, T. 52, 53-54, 55-56.)[8]  There is mounting evidence that demonstrates that CSC's staff lacks the basic training necessary to perform their jobs.

For instance, as one of the aides, Tom Isaacs explained in his deposition, if he had received training about Ms. Winters' needs it would have been easier for him to work with her. During his deposition, Mr. Isaacs admitted that initially he lacked knowledge about Ms. Winters' medical conditions, and did not have sufficient training about how to work with her.  (P. 53, Dep. Isaacs, T. 114).  It was during this time that the incident concerning Ms. Winters' being denied communion occurred.  (P. Ex. 53, Dep. Isaacs, T. 123-124).  In retrospect, he

_____

[8] Though CSC has claimed it has staff which is "75%" or "90%" Certified Nursing Assistants ("CNAs"). (P. Ex. 54, T. 9; P. Ex. 51, T. 55). A review of the personnel files of CSC shows there to be far less than that number. A review of some 52 files of program assistants, a total of just 19 appeared to have Certified Nursing Assistant certification or about 37%.

would have found the time to help her and allow her time to fast before communion.  (P. Ex. 53, Dep. Isaacs, T. 123-124)

Isaacs noted that he was surprised at his first evaluation as he thought he was doing a good job.  However, he had to learn to improve his interactions with residents, including Ms. Winters.  (P. Ex. 53, Dep. Isaacs, T. 83-87)  In response, he explained that it had been "months and months" since Ms. Winters had raised her voice to him and that he felt that when she did so, it was due to anxiety or old age and a patient response worked well.  (P. Ex. 53, Dep. Isaacs, T. 95-103)

He noted that:

> I have to say this going back to the anxiety; a big part of why people have problems, I think, that I've heard about relates to Helen's anxiety and I have to say this that if we would have gotten more training dealing with it, that things would have gone much smoother.

(P. 53, Dep. Isaacs, T. 114)

Mr. Isaacs noted that working with Ms. Winters was fine once he understood her needs and while acknowledging she took a little more time enjoys his work with her and described it as follows:

> Helen is not difficult at all.  She takes more time and my opinion is its because of her anxiety disorder.  So I like to take the time with her. She likes to visit.  She's not a hard person to take care of by any means, in my opinion.

(P. Ex. 53, Dep. Isaacs, at T. 72)

…

Mr. Isaacs stated that as far as Ms. Winters:

> …if you take your time with her, things will go a lot smoother and if you don't have the time you would like to take, and you take the time to explain to her how much time you have, then she'll be a team player, in

> my experience…sometimes we can't get extra help.  Someone gets sick.
> Helen was anxious because I told her there were only two people.  I just
> told her, I said, Helen, we're going to take care of you.  We're going to
> take care of you.  It's going to be okay, and things went smooth the rest of
> the day.

(P. Ex. 53, Dep. Isaacs, T. 76)

Mr. Isaacs also confirmed that Ms. Winters talks loud its because she cannot hear

herself and that he has to talk louder to her and place himself directly in front of her.  (P.

Ex. 53, Dep. Isaacs, T. 102, 99)

When asked whether he viewed Ms. Winters as somewhat irritable, Mr. Isaacs

replied:

> I think that if you understand Helen, she's—no, I wouldn't. I think she's a
> wonderful person.

(P. Ex. 53, Dep. Isaacs, T. 117)

Clearly, there is evidence that suggests that what CSC claims is verbally abusive

behavior on the part of Ms. Winters is simply a hearing impaired individual complaining

about the inadequate care she is receiving from untrained staff.

CSC can show no factual connection between staff turnover and Ms. Winters

other than the fact that staff who did leave, were staff who should have left for other

reasons as well as difficulties with Ms. Winters.  For instance, Nurse Guderian was

disciplined, but only in part for her actions concerning Helen Winters.  (D. Ex. AW-1, at

62491, 62495).  Ms. Guderian was disciplined for a number of medication errors, and for

unprofessional behavior, including "snapping" at staff and speaking "inappropriately" to

family members.  (*Id,* at 62494).  Another staff person, Angel McKinley had already been

terminated when Ms. Winters called to make an oral complaint about her care of Ms.

Winters.  (P. Ex. 18)  CSC records document that, in fact, Angel McKinley was terminated for cause, after being rude to residents, failing to carry a walkie-talkie when working, leaving a resident who needed assistance eating and threatening to call in sick. (D. Ex. BL-1, at 60111-60180).

Thus, summary judgment on this issue would be inappropriate.

**C.    There is Substantial Evidence in Support of Ms. Winters' Claims of Retaliation.**

CSC argues that because there is no dispute as to whether it had valid grounds to terminate Ms. Winters' contract, and thus there is similarly no dispute with regard to whether its eviction notice was retaliatory.  However, as set-out above there is substantial evidence that supports Ms. Winters' claims that CSC had no legitimate basis for terminating her contract.   Since CSC lacked a legitimate basis for terminating Ms. Winters' contract, and since the termination letter came on the heels of the OLTCO investigation Ms. Winters' has set-out a prima facie case of retaliation.  *See, e.g. Hall v. Meadowood Limited Partnership*, 7 Fed. Appx. 687 (9th Cir. 2001).

**1.    The Undisputed Facts regarding the LTCO's Investigation and Ms. Winters' Letter of Termination.**

On July 8, 2005, Carol Winters contacted the OLTCO made a written complaint. (P. Ex. 28)  Among other items, Carol Winters complained that CSC's staff was abusive to her mother;[9] and that CSC's staff were not respecting her mother's dietary needs.[10]

---

[9] Staff were complaining that Ms. Winters took too much time and staff was "nasty."  Staff yelled at her mother, and suggested she was taking too much of their time, and told her she needed to do more on her own or she would have to go to a nursing home.  Staff also said she was "too fussy."  One told her to "do it yourself" in response to directions from Ms. Winters on how to care for her diapering needs.  When

In her letter of complaint, Ms. Carol Winters also noted that:

Even now mom is very upset that I am writing this because she is very afraid that they will throw her out or retaliate. Since they are thinking of throwing her out anyway I do not see that there is much to lose.

(P. Ex. 35C, at 205)

The OLTCO investigation continued from July 11, 2005 through and until the final report was issued on August 30, 2006. (P. Ex. 35C) During his investigation, Mr. Dreyer attempted to obtain information from both parties in the situation in order to conduct a thorough and fair investigation. Mr. Dreyer met jointly with the Winters and CSC staff at least four times, specifically, on July 15, 2006, July 29, 2005, January 9, 2006, and January 20, 2006. (P. Ex. 35C, at 2, 5, and 6). Mr. Dreyer also interviewed CSC staff privately. On September 5, 2005 he met with staff member "Lisa." (P. Ex. 35C, at 2). On September 7, 2005, he interviewed staff member "Fred." (P. Ex. 35C, at 2-3).

Notably, throughout the investigation process, Mr. Dreyer also kept in contact with CSC administrators, generally by email. On October 13, 2005, he received an email from Linda Hendrickson indicating she was considering a 30 day notice of eviction because Ms. Winters accused staff of not liking her. (P. Ex. 35A, Dreyer File, at 22; P. Ex. 35C, at 3) On October 18, 2005 Dreyer responded to Ms. Hendrickson stating that he wasn't convinced that CSC staff was trying hard enough to accommodate Helen Winters and that CSC may not be on solid grounds to issue a 30 day notice. (P. Ex. 35C, at 3; P.

she declined a shower one day, she could not get one later as staff said she "had her chance." She was forced to go to bed earlier than she wanted for staff convenience. (P. Ex. 35A, at 201, 202, 203)

[10] Ms. Winters needed a low salt, low sugar diet, and does not eat pork or beef. Staff would not accommodate this and so instead Carol Winters had to purchase food for her. (P. Ex. 35A, at 202)

Ex. 35A, Dreyer File, at 22).  In response, Ms. Hendrickson sent an email on October 19,

2005 disagreeing with Mr. Dreyer.  (P. Ex. 35C, at 3; P. Ex. 35A, Dreyer File, at 23).

Ms. Hendrickson stated that she has had grounds for some time and has "lots of

documentation to build her case" and that if Ms. Winters' behavior continues a 30 day

termination notice would be issued. In December, Ms. Hendrickson sent an email to Mr.

Dreyer complaining that Ms. Winters had slapped a staff member the prior weekend. (P.

Ex. 35C, at 3)

Dreyer spoke with Helen Winters concerning the "slapping" incident on

December 23, 2005 and met separately with a CSC nurse and three other staff members.

(P. Ex. 35C, at 4)  On December 30, 2005, Mr. Dreyer met with three staff members,

"Sheila," "Terri" and "Tom." (P. Ex. 35C, at 4.)

Coincidently, just one week after the Mr. Dreyer had visited and interviewed

staff, CSC served Helen Winters with the Termination Notice. The OLTCO was notified

after the fact.  (Ans, at ¶ 17-18; P. Ex. 35C, at 4)

> **2.  Ms. Winters' Has Set-Out a Prima Facie Case of Retaliation under the Alaska Assisted Living Homes Act and there are Facts Demonstrating that CSC's So- Called "Legitimate Reasons" for Eviction are Pre-textual.**

The undisputed facts as set-out in the preceding section, demonstrate that Ms.

Winters has set-out a prima facie case of retaliation.  Without question, Ms. Winters'

engaged in a protected activity, *i.e.* she complained to the OLTCO.  She suffered an

adverse housing consequence as a result, *i.e.* she was noticed with eviction.  She suffered

resulting damage, *i.e.* she was taken to the emergency room due to high blood pressure

after being served with the termination notice.

Despite this CSC claims that summary judgment on this count is appropriate, as CSC claims to have "legitimate reasons" for its decision to terminate Ms. Winters' contract. However, as set forth in great detail above there is substantial admissible evidence that refutes CSC's claims of having a legitimate basis for its action. Thus, summary judgment must be denied.

**D.    Ms. Winters' has Sufficient Evidence to Support Her Claims that CSC Otherwise Violated the Alaska Assisted Living Homes Act.**

Irrespective of whether this Court finds there is sufficient evidence to present Ms. Winters' claims for violation of the Assisted Living Homes Act to a jury based on CSC's illegal termination of the residential services contract and due to retaliation, there is certainly sufficient evidence to withstand summary judgment on the issue of whether CSC otherwise violated the Assisted Living Homes Act in its day to day operations.

**1.    Bob Dreyers' Report Finding that CSC Repeatedly Violated Ms. Winters' Rights Under the Assisted Living Homes Act Demonstrates There are Genuine Issues of Material Fact For the Jury to Decide.**

The OLTCO issued its report concerning the events that transpired between Ms. Winters and CSC staff from July 2005 through January 20, 2006 on or about August 30, 2006. (P. Ex. 35C). After independently investigating the matter, Mr. Dreyer found that based upon the preponderance of the evidence, CSC had repeatedly violated Ms. Winters' rights under the Assisted Living Homes Act. The OLTCO's findings are summarized here for the Court:

**Allegation I:  Verbal and Mental Abuse**

It is the opinion of the OLTCO that this resident, based on the preponderance of the evidence, has been both "verbally and mentally abused" and "not treated with respect and dignity" by the staff of the Chugiak Senior Citizens" Inc. Assisted Living Home and thus the Home

has appeared to violate AS 47.33.330 and AS 47.33.350. The historical trend of the treatment of the resident by various staff members shows a lack of understanding and adequate training of the needs of this resident and elderly people in general:

a.    staff are abrupt with resident in July.
b.    Were insensitive when performing care in August,
c.    Don't accept resident's wishes to have her home in a certain order in September,
d.    Alleged other residents don't like the resident in September,
e.    Refused to assist resident in dressing in October
f.    Demeaned resident in December,
g.    Were insensitive when performing care in December,
h.    Caused mental anguish by threatening resident with eviction July 05-January 06,
i.    Caused mental trauma leading to hospitalization by issuing letter of eviction directly to resident rather than Power of Attorney in January,
j.    Refused to provide care when resident needed to attend to bodily functions in January; and
k.    Were insensitive in peforming personal care in January.

(P. Ex. 35C, at 6-7)

**Allegation No. 2: Refusal to offer choice in meals compatible with health needs**.

It is the opinion of the OLTCO that CSC has not appeared to comply with AS 47.33.220 in that it did not consider the resident's preference for food and AS 47.33.300 and 7 AAC 75.265 by not providing therapeutic meals that are consistent with health related restrictions of the resident. (P. Ex. 35C, at 8)[11]

**Allegation No. 4: The resident was deprived/restricted from practicing her religious beliefs.**

The OLTCO that CSC had not complied with AS 47.33.300 in that it did not accommodate the resident's request to eat at an appropriate time so she could have communion and thus practice her religion. (P. Ex. 35C, at 9-10)

---

[11] This finding was made by the OLTCO after Dreyer had direct conversations with Linda Hendrickson, Marla Nelson, and aide "Fred." (*Id.* at 7, 8)

**Allegation No. 5: The resident's right to privacy and confidentiality was not protected**.

The OLTCO found that CSC had violated AS 47.300 in that it failed to keep confidential care issues affecting the resident and failed to keep private conversations private by entering those conversations into an official record. (P. Ex. 35C, at 10-11).[12]

While Mr. Dreyer's report does not provide conclusive evidence as to CSC's liability for violating the Assisted Living Homes Act, its does demonstrate unequivocally that there is sufficient evidence of such violations to withstand CSC's present Motion for Summary Judgment.

## IV.     CONCLUSION

Ms. Winters has credible evidence to support her claims that CSC lacked legitimate grounds to terminate its residential services contract with Ms. Winters' and thus violated the Assisted Living Homes Act when it threatened her with eviction. Similarly, there is substantial evidence in support of Ms. Winters' claims that CSC's threats of eviction were retaliatory and violated the Assisted Living Homes Act.  Simply put, this isn't a matter that can be resolved on summary judgment, as there are numerous material factual disputes that must be decided by a finder of fact.

DATED: February 14, 2007          ALASKA LEGAL SERVICES CORPORATION
                                  Attorneys for Plaintiff Helen Winters
                                  through her power of attorney Carol Winters

                                  s/Sonja Kerr_____
                                  ALASKA LEGAL SERVICES
                                  1016 West 6th Avenue, Suite 200

---

[12] This was verified by the OLTCO by independent observation at the CSC, review of official Progress Notes kept by CSC, independent verification by discussion with two other residents. (P. Ex. 35C, at 10-11)

OPPOSITION TO DEFENDANT CSC'S MOTION                    Page 26 Of 27
 FOR SUMMARY JUDGMENT ON COUNT 1 –
VIOLATION OF THE ASSISTED
LIVING HOMES ACT

Anchorage, Alaska 99501
PHONE: (907) 274-9431
FAX: (907) 279-7417
E-mail: skerr@alsc-law.org
Alaska Bar No. 0409051

**Certificate of Service**

I hereby certify that on the 14th day of February, 2007, a copy of this document was served electronically:

Donna M. Meyers
Delaney, Wiles
1007 W. Third Avenue, Suite 400
Anchorage, AK 99501.

S/Sonja D. Kerr (0409051)