IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| HELEN WINTERS, | ) | |
| through her power of attorney | ) | |
| Carol Winters, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CHUGIAK SENIOR CITIZENS, INC., | ) | |
| | ) | Case No. 3:06-cv-00083-TMB |
| Defendant. | ) | |
| _____ | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT: (COUNTS II, V, VI, VII)**

## I.    INTRODUCTION

Defendant Chugiak Senior Citizens, Inc. ("CSC") has moved for summary judgment on Plaintiff's disability discrimination claims. (Counts II, V, VI, VII). CSC's memorandum is a mish-mash of the applicable law, and a few pages of conclusory statements.  (Doc. 130, pg. 23-27).   Summary judgment must be denied. Plaintiff Winters is a qualified individual with multiple disabilities who has suffered disability discrimination by CSC.  Her simple requests for accommodation were ignored by CSC, despite the fact that such requests would not have been difficult to effectuate and do not fundamentally alter the nature of the services provided at CSC.  Without question, Ms. Winters' disability discrimination claims raise genuine issues of material fact, and as such summary judgment must be denied.  *Dark v. Curry*, 451 F. 3d 1078 (9th Cir. 2003).

## II.    STATEMENT OF THE CASE

CSC does not want residents at the Chugiak Senior Center (hereinafter "the Center" or the Facility") with multiple disabilities who request that CSC accommodate their

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

1

disabilities and insist on their rights being respected.  CSC refers to such persons as "heavy care" and believes that "such people" should "go to a smaller facility."  Staff are not trained about disabilities.  (P. Ex. 50, Dep. Hendrickson, T. T. 37, 40-42; P. Ex. 53, Dep. Isaacs, T.114).  Residents are not told how to request specific accommodations for their disabilities.[1]  (P. Ex. 50, Dep. Hendrickson, at T.32)  And, CSC's administrators have stated that CSC is usually successful at "getting rid of" individuals who are "heavy care."  (P. Ex. 35B, Dep. Dryer, T.149-150).  Unaware of CSC's anti-disability culture, and seeking the individualized attention that people with disabilities often need, Plaintiff Winters relied on such things as CSC's promise, through its brochure, to provide "24/7 licensed staff and *individualized* services plans," (P. Ex. 88) (emphasis added), when she entered her residential services contract with CSC and moved into the Center.

**A.    CSC Admitted Plaintiff Winters, Who has Multiple Disabilities, as the "Perfect Resident."**

Plaintiff Winters moved into the Center having been assured by CSC that she was the "perfect resident."  (P. Ex. 43, p. 1)  CSC had full opportunity to learn about Plaintiff Winters' multiple disabilities prior to admission.  Staff personally met Plaintiff Winters, and interviewed her. CSC was provided a release of information so that it could obtain any necessary medical records.  (Answer, Dkt. 19, Par. 11, P. Ex. 94, p. 18; P. Ex. 9)[2]  The pre-screening instrument of Sept. 7, 2004 shows that Ms. Winters had a care level of 26, well

---

[1] Ms. Hendrickson noted that employees are informed of how to request reasonable accommodations but she did not know of anything similar for residents.

[2] The release allowed CSC to obtain a wide variety of medical information about Helen Winters and is in effect indefinitely unless revoked.  (P. Ex. 9.)  Lynn Moser testified that it was routine to obtain the release, and acknowledged that a release was obtained from Ms. Winters.

below CSC's pre-established criteria of 56 for admission.[3]  (P.Ex. 5.)  All evidence shows that Ms. Winters' simply needs assistance with her activities of daily living (hereinafter "ADL's")(*i.e.* eating, dressing, bathing, toileting, transferring, walking) and instrumental activities of daily living (hereinafter "IADL's")(*i.e.* preparing meals, shopping, medication management, money management, using the telephone, doing housework, using transportation).  These are services that CSC provides to other CSC residents and committed to providing to Ms. Winters.  (P. Ex. 7, 8)

To assist CSC, as her mother was moving in, in late September 2004, Carol Winters made a written request to CSC which explained Plaintiff Winters' needs and requested simple accommodations to help her.  (P. Ex. 10).  Carol Winters told CSC that Plaintiff Winters was hard of hearing, such that she could not hear out of her left ear, only her right ear, could not hear if there was noise in the background or if the speaker was far away. Carol Winters told CSC that her mother had severe pain in her knees and thus had to be moved "slowly and gently."  (P. Ex. 10, p. 2)  She also explained to CSC that Ms. Winters had spinal osteoporosis which caused her extreme pain but that she had difficulty taking pain medications.  CSC was told that Plaintiff Winters had slept on the couch for years due to this and would need assistance with her pillows being placed but that Ms. Winters could explain to staff exactly how to place the pillows.  (P. Ex. 10, p. 2)  Carol Winters told CSC staff that Helen Winters had allergies to milk, and had a low salt diet, excluding pork and beef.  (P. Ex. 10, p. 2)  Finally, the Winters explained that Ms. Winters was somewhat anxious and that going to the assisted living facility had increased her anxiety. CSC staff was requested to help Ms. Winters, to wit:

---

[3] A care level of 56 would have precluded her admission, a questionable practice itself under the ADA's prohibition against exclusion on the basis of disability.  See, 42 USC 12182(b)(2)(A)(ii), and *see* (P. Ex. 95)

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment    3
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

"The staff could help mom by being patient, supportive, friendly and supportive during this transition period.  Mom responds best to organized, structured activities, and knowing that people really care about her.  A smiling face and positive attitude work well to calm her down when she is anxious."

CSC received this document requesting reasonable accommodations; the nurse noted it was in her file on September 23, 2004.  (P. Ex. 10)  Leases were not signed until the next day, September 24, 2004.  (P. Ex. 11, P. Ex. 12).  CSC fully admits that Ms. Winters' conditions were disclosed to it and that it got the September letter.  Answer, Dkt. 19, Par. 6.  CSC assured the Winters through both the Lease Agreement and the Resident Services Contract signed by the Winters at the time affirm it would provide care to Ms. Winters based upon her disclosed disabilities and consistent with the accommodations requested and the plan of care.  (P. Ex. 11, at 30334; Ex. 12, at 30337.)  At the time of admission, CSC did not express any reservations about providing services to Plaintiff Winters, the "perfect resident."

**B.    CSC's "Take it or Leave" Response to Reminders about Accommodations.**

Despite having been accepted as the "perfect resident," problems began almost immediately.  (P. Ex. 28, P. Ex. 43)  Lations on September 23, 2004.  (D. Ex. 10)

Then, on just the third day afturie Guderian, CSC's LPN, acknowledged receipt of the Winters' requests for accommodaer admission, Ms. Guderian, without apparently any reason, told Carol Winters that Ms. Winters "belonged in a nursing home."  (D. Ex., AW-1, P. Ex. 43, p. 1)  In October, 2004, Carol Winters complained to administrator Lynn Moser about staff attempting to have Helen Winters stand.  (P. Ex. 13)  In response, the Winters were told that perhaps Ms. Winters should look for a different facility.

In November and December of 2004, the Winters' made further subsequent oral complaints.  One involved the actions of worker Angel McKinley (subsequently fired) and

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

4

one involved concerns about the care received by LPN Guderian (subsequently disciplined and resigned). (P. Ex. 18; D. Ex. AW-1, at 62491, 62495, 62494).[4] Each time, the response was that Plaintiff Winters should move to a smaller facility. (P. Ex. 18, 20).[5]

In the early summer of 2005, as the Winters' complained again, this time, about staff leaving in the midst of a conversation, and Ms. Winters' request to be able to go to bed at a time of her choice being ignored, they were told again that Ms. Winters should go elsewhere. (P. Ex. 27)[6] In addition, this time, in response to the Winters' complaints, staff lashed out at Ms. Winters, fabricating a story about her calling staff "trailer trash." (P. Ex. 29) After Ms. Winters refuted this claim, CSC again suggested Ms. Winters leave. (P. Ex. 29).

## C.    Events after Ms. Carol Winters' Complaint to the OLTCO, July 2005.

In July 2005, Carol Winters on behalf of her mother complained to the Office of the Long Term Care Ombudsman ("OLTCO") about the care she was receiving. (P. Ex. 35A, at 198-207) Carol Winters alleged that staff was abusive and mishandled Plaintiff Winters. For example, staff complained that Ms. Winters took too much time and told her she should care for herself or go to a nursing home. When Plaintiff Winters declined a shower one day, she could not get one later as staff said she "had her chance." She was forced to go to bed

---

[4] One of the issues was a disagreement with Helen concerning a vitamin pill that was wrong in a pill box. Ms. Guderian was disciplined for a number of medication errors, and for unprofessional behavior, including "snapping" at staff and speaking "inappropriately" to family members. (D. Ex. AW-1, at 62491, 62494-62495)

[5] CSC records document that, in fact, Angel McKinley was terminated for cause on November 22, 2004. (D. Ex. BL-1, at 60111-60180). She had been written up on September 30, 2004 for being rude to residents, disciplined on October 21, 2004 for failing to carry a walkie-talkie when working, written up again on November 20th for leaving a resident who needed assistance eating, and threatened to call in sick on November 20th. (D. Ex. BL-1). Angel McKinley had no prior experience as a caregiver and had worked as a food demonstrator and at a garden shop before CSC. (D. Ex. BL-1).

[6] Helen Winters did not attend this meeting. Ms. Carol Winters attended along with Marla Nelson, Program Coordinator, and Kathy Huskey, state Care Coordinator.

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

5

earlier than she wanted for staff convenience.  (P. Ex. 35A, at 201, 202, 203).  Carol Winters further complained that CSC's refusal to honor Plaintiff Winters' low salt, low sugar diet, devoid of pork and beef. Since CSC staff would not accommodate her request and so instead Carol Winters had to purchase food for her mother.  (P. Ex. 35A, at 202).

OLTCO's Robert Dreyer met with Carol Winters regarding her concerns about Ms. Helen Winters' care at CSC and opened a case thereafter.  (P. Ex. 35A, p. 40, Intake Form, Notes from July 9, 2005 meeting).  Dreyer attended two meetings at CSC in July of 2005 to assist with the matter.   In early August, 2005, the OLTCO met again with CSC staff regarding another complaint of mistreatment; this time by an aide who did not want to assist Ms. Winters with the simple task of putting on her shoes and stockings.  (P. Ex. 35A, Dreyer File, at  302, P. Ex. 32)

The OLTCO continued to monitor the situation and also attempted to obtain information from both sides in the situation in order to conduct a thorough and fair investigation.  Mr. Dreyer met with the Winters, with CSC staff or administrators only and jointly with the Winters and CSC staff at least four times.  (P. Ex. 35C, at 2, 5, and 6).  Mr. Dreyer also interviewed CSC staff privately.  (P. Ex. 35C, at 2, 5, 6).

In late December, 2005, as the OLTCO investigation was pending, CSC falsely asserted that Plaintiff Winters had slapped a staff member.  (P. Ex. 35C, at 3)  In response, Dreyer visited the facility twice.  (P. Ex. 35C, at 4).  During the same time, Ms. Winters voiced another complaint about mistreatment and interference with her right to take communion. Dreyer was in contact with CSC administration and also interviewed three staff members; one regarding the communion issue and two regarding the slapping incident.  The

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment                                6
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

staff member supposedly "slapped" told Dreyer it was "no big deal" and she had forgotten all about it. (P. Ex. 35C, at 4.)

Just <u>one week</u> after the OLTCO had visited and interviewed staff, in December of 2005, CSC served Helen Winters herself with eviction, well aware that anxiety increased her blood pressure and potential heart problems. As a direct result, Plaintiff Winters was rushed to the hospital. (P. Ex. 35A, OLTCO File, at 159-160). CSC administrator Marla Nelson testified that CSC knew about Ms. Winters' anxiety and intentionally served Plaintiff Winters in their efforts to have her leave the facility. (P. Ex. 54, Dep. Nelson, T. 35-39)

The Winters opposed the eviction, citing numerous instances of CSC's failure to accommodate Plaintiff Winters' disabilities. (P. Ex. 43). Care Coordinator, Kathy Huskey, was so concerned that she filed a report of harm with the Adult Protective Services. (P. Ex. 64, at 50102-50105 ) Subsequently, two meetings were held in January of 2006 concerning the eviction. (P. Ex. 35A, Dep. Dreyer, at 136; P. Ex. 35C, at 5). During the first meeting, CSC Administrator Jan Freels stated that Helen Winters was a "difficult resident" and that she "requires heavier care than others." She also stated to the effect that "in the past they had been able to get rid of heavy care residents." (P. Ex. 35B, Dep. Dreyer, at 149). This concerned Robert Dreyer from OLTCO as other assisted living homes did deal with folks that had "heavy care" including those who needed full assists at times. (P. Ex. 35B, Dep. Dreyer, at 150) At the January 20th follow-up meeting, which Mr. Dreyer thought was to be a problem solving situation, Dreyer observed that it appeared CSC was just "going through the motions" and that it was going to "end up legal." (P. Ex. 35C, at 5-6, P. Ex. 35A, Dep. Dreyer, at 137). Although OLTCO offered training to the staff at CSC, suggesting that the staff needed to understand "where elders are coming from. Their point of view", CSC

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

7

declined.   (T. 140-141) CSC refused to cooperate with CSC in other ways after the attempted eviction.  In early February, the OLTCO issued a subpoena to CSC requesting information to complete its investigation.  (P. Ex. 35A, at 248; P. Ex. 35B, T. 146-148).  CSC objected to and delayed providing most of the information. (P. Ex. 35A, at 245, 247)[7] Out of concern that trauma would be detrimental to Plaintiff, on February 7, 2006, the OLTCO requested that CSC withdraw its notice of eviction of Helen Winters.  (P. 35A, Dryer File, at 423).  CSC refused.

The present lawsuit was filed to prevent CSC from eviction of Plaintiff Winters after all other informal efforts failed.  Four months after this lawsuit was originally filed in state court, the OLTCO issued its report concerning the events from July 2005 through January 20, 2006.  (P. Ex. 35C).  The OLTCO determined that CSC had repeatedly violated the Alaska Assisted Living Home Act in its treatment of Ms. Winters.  The OLTCO determined that Plaintiff Winters had suffered both verbal and mental abuse and was not treated with respect and dignity in accord with AS 47.33.330 and AS 47.33.350.  The OLTCO concluded that CSC did not comply with AS 47.33.220 by not considering Plaintiff Winters' preference for food and that this also lead to another violation, interference with her right to take communion because of delayed provision of food.  AS 47.33.300.  The OLTCO personally observed that other residents knew about Plaintiff Winters being accused of "slapping" a resident, thus leading to the logical conclusion that her privacy rights had somehow been

---

[7] After the intercession of the Department of Law, the OLTCO received a list of residents and some phone numbers but nothing else. (P. Ex. 35B, Dep. Dreyer at 148).  After various efforts and denials by CSC, the OLTCO decided not to pursue court enforcement to obtain all of the requested information.  (P. Ex. 35B, at 153-154).

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

8

compromised by the facility, again in violation of the law.  (P. Ex. 35C, Dreyer Report, 10-11).


## II.    STANDARD OF REVIEW ON SUMMARY JUDGMENT

Summary judgment is only appropriate when a court finds that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is not genuine issue as to any material fact and that the moving party in entitled to judgment as a matter of law."  Fed. Rule 56(c).  The Court must construe all evidence and draw all evidentiary inferences in favor of the non-moving party.  10 A Charles Alan Wright et al., Federal Practice & Procedure § 1717, R 349 & no. 5 (3ed 1998)(*citing Adickes v. S.H. Kress & Co*. 398 U.S. 144 (1970)).  A dispute over a "genuine" material fact exists if the evidence would allow a reasonable fact-finder to return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 248 (1986).  The non-moving party may defeat a motion for summary judgment by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial.  *Celotex Corp. v. Catreet*, 477 U.S. 317, 322-23 (1986).  CSC has the burden to establish the absence of genuine issues of material fact.  As the moving party, CSC bears the burden of informing the Court of the basis for its motion.  The moving party has the specific duty to identify "parts of the record" which it believes indicate an absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 91 L. Ex. 2d 265, 106 S. Ct. 2548 (1986); *Schultz v. Hemet Youth Pony League, Inc.,* 943 F. Supp. 1222 (C.D. Cal. 1996).

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment          9
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

CSC's memorandum does not set forth any statement of undisputed facts; in fact, it makes statements suggesting it is clear—even to CSC- that there are many genuine issues of material fact in dispute.

## III.    LEGAL ARGUMENT AND AUTHORITIES

This case is particularly unsuited to summary judgment because of the multiple genuine issues of fact in dispute concerning the disability discrimination claims, particularly as to CSC's ability to accommodate Ms. Winters and CSC's claim of undue hardship.  *See, Crowder v. Kitagawa*, 81 F. 3d 1480 (9th Cir. 1996).  In disability discrimination cases material issues of fact as to accommodation and undue hardship are questions best left to the jury.  *Phillips v. The City of Seattle,* 766 P. 2d 1099 (S. Ct. Wa. 1989) (holding in employment discrimination case that the nature of the inquiry as to whether a person was handicapped and whether reasonable accommodation was made by the employer were properly factual questions for the jury); *Kimbro v. Atlantic Richfield Co*., 889 F. 2d 869 (9th Cir. 1989)(whether a particular accommodation imposes an undue hardship on the employer is a question of fact; undue hardship is based on particularized facts in each situation); *Humphrey v. Memorial Hospital*, 239 F. 3d 1128 (9th Cir. 2001) (whether medical transcriptionist's disability of obsessive compulsive disorder could be accommodated by being allowed to work at home was a triable issue and jury could find a causal link between the disability and the employer's failure to allow work at home).

### A.    PLAINTIFF'S ADA AND SECTION 504 CLAIMS

The ADA is a national mandate to end discrimination against individuals with disabilities. *PGA v. Martin*, 532 U.S. 661 (2001) (necessity to accommodate golfer under Title III); *Olmstead v. L.C.,* 527 U.S. 581, at 588; 119 S. Ct. 2176, at 2181, 144 L. Ed. 2d

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment    10
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

540, 551 (1999) (ensuring integration for people with mental illness under Title II);
*Tennessee v. Lane*, 541 U.S. 509, 124 S. Ct. 1978, 158 L.Ed 2d 820 (2004) (requiring accommodation for individuals with impairments attempting to access a state court system).
*Crowder v. Yukio Kitagawa,* 81 F.3d 1480, at 1483-1484 (9th Cir. 1995) (prohibiting access requirements adversely affecting people with visual impairments and their guide dogs).  The ADA added more protection because Section 504, which had previously been the avenue to federal protection for the rights of people with disabilities was deemed insufficient.[8]
Summary judgment must be denied as to Plaintiff Winters' ADA and Section 504 claims, because Ms. Winters' has met the requisite test to present her prima facie ADA and Section 504 claims to a jury.

    In 2001, the United States Supreme Court held, in *PGA Tour v. Martin*, 532 U.S. 661 (2001) that Title III of the ADA, 42 U.S.C. 12182(b)(2)(A)(ii) requires reasonable accommodations by a place of public accommodation; namely, that the PGA had to let Martin, a golfer with an impaired leg, to use a golf cart on the tour.  Here, Plaintiff Winters, a multiply impaired elderly lady wants even simpler accommodations from CSC, the place

---

[8] Section 504 of the Rehabilitation Act was an earlier effort to prevent discrimination on the basis of disability, at least as to entities receiving federal aid.  The decisions of the Rehabilitation Act can be instructive but not necessarily determinative when deciding cases under the more expansive rights endowed by the ADA. *Olmstead*, supra; *Collings v. Longview Fibre Co.*, 63 F.3d 828, 832 n. 3 (9th Cir. 1995).  *See Laura F. Rothstein, Disabilities and the Law § 3.12 (1992)*.The historical significance of the differences between Sec. 504 and the ADA is important because Sec. 504 only went "so far" in addressing the rights of people with disabilities and it may be that assisted living homes operating in that time have not yet "caught up" with the changes in the ADA.  For example, had Ms. Winters claim been brought under only Sec. 504, there might well have been a question of whether CSC was liable for any disability discrimination as a private entity.  In *Glanz v. Vernick*, 756 F. Supp. 632 (D. Ma. 1991), decided just as the ADA began to hit the courts, the Court held that receipt of Medicaid/Medicare by a hospital did demand compliance with Sec. 504.  A strict rule of deference to medical opinion versus acceptance of the fact that discrimination was occurring in medical facilities was still a live issue under Sec. 504.  However, Title III of the ADA clearly applies to healthcare treatment decisions made in a nursing home.  *California Advocates for Nursing Home Reform v. Creekside Care Convalescent Hosp.,* 1998 U.S. App. LEXIS 3036 (9th Cir. 1998).

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment                    11
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

of public accommodation. A brief review of the record shows that Plaintiff Winters has made out her case for disability discrimination and that this matter should be set for trial.

Plaintiff Winters is a qualified individual with disabilities who disclosed her hearing loss, orthopedic impairment, and heart condition/blood pressure/anxiety condition to CSC prior to admission. She claims that CSC has failed to accommodate her disabilities, and responded to her repeated complaints about its failure to accommodate by telling her to leave and finally attempting to evict her. Plaintiff Winters has more than enough evidence to refute summary judgment on each of the claims.

To prevail on her Title III ADA claim, Plaintiff Winters must establish that she is 1) a qualified individual with a disability; 2) that CSC is a public accommodation under the ADA; and 3) that she has been denied the opportunity to participate in or benefit from services or accommodations on the basis of disability and reasonable accommodations can be made that do not result in a fundamental alteration. *PGA v. Martin*, 532 U.S. 661 (2001) (finding golfer with impaired leg met standards for Title III accommodation); *Carparts Distribution Center., Inc. v. Automotive Wholesaler's Association of New England, Inc*., 37 F. 3d 12, (1st Cir. 1994) (Title III claim applies to goods and services as well as physical structures.) Plaintiff Winters meets each of these elements as discussed below.[9]

---

[9] CSC repeatedly cites to *Appenfelder v. Deupree St. Luke*, 1995 WL 17137468 (S.D. Ohio). *Appenfelder* is not dispositive of the issues concerning Ms. Winters. This unreported and old[9] district level decision involves an elderly citizen who needed to be spoon fed in a facility who offered to spoon feed her and the only question involved "where" in the facility due to an internal written policy within the facility. That is not the situation with Ms. Winters. Rather, Ms. Winters, who has multiple disabilities of hearing, orthopedic, heart disease/blood pressure and related anxiety has been refused reasonable accommodations. In response to patience and understanding about her hearing problems, CSC responded with complaints that she spoke "too loud" and used "selective hearing." In response to a request that she not be required to walk, and simply assisted if she needed to use the bathroom, CSC tried to push her to walk. In response to a request for a simple diet devoid of certain foods, CSC characterized her as "fussy." Moreover, after the Winters complained to the OLTCO, CSC refused to accept offered training from the OLTCO, stonewalled the investigation, and ignored OLTCO's suggestions to resolve the situation. The most frequent response to an oral concern of care, a request for accommodation or an oral complaint was simply "go elsewhere." In response to specific direction

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment                    12
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

Likewise, CSC is also subject to Section 504 as a recipient of federal Medical

assistance and yet has failed to accommodate Ms. Winters, excluding her from participation

in and denying her the full enjoyment of CSC. (Am. Compl. Count VI). Section 504 of the

Rehabilitation Act of 1973 (29 USC 794) provides:

> "No otherwise qualified individual with a disability…shall, solely by reason
> of her or his disability, be excluded from the participation in, be denied the
> benefits of, or be subjected to discrimination under any program or activity
> receiving Federal financial assistance…." 29 U.S.C. 794(a).

Thus, a plaintiff bringing suit under § 504 of the Rehabilitation Act must show (1)

she is an individual with a disability; (2) she is otherwise qualified to receive the benefit; (3)

she was denied the benefits of the program solely by reason of her disability; and (4) the

program receives federal financial assistance. *Duvall v. County of Kitsap*, 260 F. 3d 11254

(9th Cir. 2001). Plaintiff Winters meets each of these elements as further discussed below.

Because the ADA and Sec. 504 of the Rehabilitation Act have similar requirements they will

be discussed in tandem.

As set-out below, Ms. Winters is clearly a qualified individual with a disability.

CSC has apparently conceded that it is subject to the Americans with Disabilities Act; if not,

at least a genuine issue of material fact is present. Genuine issues of material fact exist as to

whether Ms. Winters has been denied the opportunity to participate in or benefit from

services or accommodations on the basis of her disabilities and CSC has failed to make

reasonable accommodation by modifying its policies, practices or procedures when such

modifications are necessary to afford such goods, services and accommodations to

individuals with disabilities and CSC has not put forth any evidence that such modifications

---

to rely on her daughter, Carol, a designated Power of Attorney, for legal matters due to her frail health, CSC
responded with purposely service Ms. Winters the notice of eviction. Such actions are discriminatory.

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment          13
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

would fundamentally alter the nature of the goods, services or accommodations its offers as an assisted living home.

### 1.    Ms. Winters is a Qualified Individual Pursuant to the ADA/504

CSC claims there is no evidence Ms. Winters has a disability.  (Doc. 130, at 23.) However, the record is replete with evidence that Plaintiff Winters suffers from a substantial hearing loss, severe orthopedic impairments, and a heart disease/blood pressure/anxiety problem, and that each of these disabilities impact major life activities, such as walking, communicating and hearing.  (P. Ex. 10, P. Ex. 18, Ex. 32, Letter Dr. Schabb; Ex. 30, 45, Letters of Dr. Jones).

Clearly, Ms. Winters has **multiple disabilities** and is a qualified individual as that term is defined pursuant to the ADA and Sec. 504. 42 U.S.C. 12102(2). 28 C.F.R. 36.104 defines disability as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment."  Each of Ms. Winters' disabilities is specifically listed and enumerated in the regulations.  Ms. Winters suffers from severe arthritis/osteoarthritis in her knees which is an orthopedic impairment identified in the regulation.  28 C.F.R. 36.104(iii).  Ms. Winters suffers from heart disease, another disability identified in the regulations, and which causes anxiety.  This was disclosed more than once to CSC. (P. Ex. 10, 30) 28 C.F.R. 36.104(iii).  Ms. Winters suffers from a severe bilateral hearing loss which was disclosed more than once to CSC**.**  (P. Ex. 10, 30, 92)28 C.F.R. 36.104(iii).  And, finally, during much of her time at CSC, CSC has "regarded" Ms. Winters as having a mental illness; regarding someone as having a mental illness allows the person protections under the ADA. 28 C.F.R. 36.104(ii).

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment          14
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

Ms. Winters' several disabilities substantially limit one or more major life activities. In fact, her plan of care indicates she needs assistance with all of her ADLs.[10]  Plaintiff Winters has severe arthritis and spinal osteoarthritis in her back.  Because of her orthopedic impairments, Ms. Winters needs assistance to care for herself.  She cannot get up to go to the bathroom at night. She needs someone to heat up her meals.  She needs assistance to shower or bath.  (P. Ex. 32, 33, 34, 38).  Her severe arthritis/osteoarthritis prevents her from standing or walking alone.  Walking is a major life activity.  *Casey Martin v. P.G.A.*, 204 F. 3d 994 (9th Cir. 2000) (golfer with congenital, degenerative disorder in a malformed leg was qualified individual with disability entitled to reasonable accommodation on pro golf circuit.)

Plaintiff Winters suffers from a severe bilateral hearing impairment.  (P. Ex. 10, P.Ex. 30, P. Ex. 92)  Even with hearing aids, Ms. Winters has difficulty communicating and her doctor characterizes her hearing loss as "severe."  (P. Ex. 30).  Hearing is a major life activity.  Even if her hearing at times is better and at times worse, her hearing loss affects her communication and as such she is a qualified individual with a disability.  *Bragdon v. Abbott*, 524 U.S. 624, 118 S. Ct. 2196, 141 L. Ed 540 (1998) (a major life function need not occur daily nor result in economic gain to be a major life function.)[11].

Finally, Plaintiff Winters has a history of heart problems, a stent, and high blood pressure which is impacted by anxiety.  (P. Ex. 30; P. Ex. 45, P. Ex. 52, Dep. Dr. Jones, T.

---

[10] The Supreme Court has relied upon regulations issued to implement the Rehabilitation Act in determining what is and what is not a major life activity.  42 U.S.C. 12201(a). T he Rehabilitation Act regulations provide a representative list, defining the term "major life activity" to include functions such as **caring for one's self,** performing manual tasks, **walking,** seeing, **hearing**, speaking, breathing, learning, and working. 45 C.F.R. 84.3(i)(2)(ii)(1997); 28 C.F.R. 41.31(b)(2)(1997).

[11] The Court recognized that nothing in the definition suggests that activities without a public, economic, or daily dimension may somehow be regarded as so unimportant or insignificant as to fall outside the meaning of the word "major."

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment                15
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

8-12, 23-27). Dr. Jones explained to CSC early on that both the anxiety and hearing problems contribute to Plaintiff Winters' difficulty in communication. (P. Ex. 30)

Ms. Winters' multiple disabilities impact various major life activities which means Ms. Winters is a qualified individual with a disability under the ADA and Section 504 of the Rehabilitation Act. *See, e.g. Denin v. Connecticut Interscholastic Athletic Conference, Inc.,* 913 F. Supp. 663, 669 (D. Conn. 1996) (qualified individual pursuant to Sec. 504 is also qualified pursuant to Title III of the ADA)

There is simply no factual or legal basis on which CSC can claim that Ms. Winters is not a qualified individual with a disability.

> **2.    A Genuine Issue of Material Fact Exists as to Whether CSC Discriminated   Against Ms. Winters By Failing to Accommodate Her Multiple Disabilities.**

Given the clear dispute between the parties as to whether CSC discriminated against Ms. Winters by failing to accommodate her disabilities of hearing, heart/disease/blood pressure, and severe orthopedics, this case must go to the jury. *Kimbro v. Atlantic Richfield Co.*, 889 F. 2d 869 (9th Cir. 1989)(whether a particular accommodation imposes an undue hardship on the employer is a question of fact; undue hardship is based on particularized facts in each situation.)

The Court must keep in mind that unlawful discrimination can be an accidental byproduct of a traditional way of thinking about someone.[12]  The Ninth Circuit, in *Crowder v. Yukio Kitagawa*, 81 F.3d 1480, at 1483-1484 (9th Cir. 1995) one of the first ADA cases decided by the Ninth Circuit, explained that Congress intended to prohibit both "outright discrimination, as well as those forms of discrimination which deny disabled persons

---

[12] See, e.g. *Alaska USA Federal Credit Union v. Fridriksson*, 642 P.2d 804 (AK 1982) (accidental byproduct of traditional way of viewing women in sex discrimination claim).

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment                    16
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

services disproportionately due to their disability."[13]   More than twenty years ago, the Supreme Court first concluded that pursuant to the Rehabilitation Act, Congress intended to protect persons with disabilities from discrimination arising out of  "both **discriminatory animus**" and discrimination arising out of "**thoughtlessness," "indifference" or "benign neglect."** *Alexander v. Choate*, 469 U.S. 287, 83 L. Ed. 2d 661, 105 S. Ct. 712 (1985).

Usually the type of discriminatory animus or indifference arises from lack of knowledge.  However, before admitting Plaintiff Winters, CSC administration clearly knew about her disabilities. CSC administrators had the opportunity to visit with, observe and assess Ms. Winters.   (P. Ex. 3, 4, 5, 6, 7, 8, 9)   Ms. Winters clearly requested accommodations for her hearing problem, a severe orthopedics problem, heart disease/anxiety/blood pressure.   (P. Ex. 10).   Carol Winters requested reasonable accommodations for Ms. Winters' various disabilities.  The requested accommodations were minimal and not difficult as a practical matter.  *Martin v. PGA, supra*.  Despite CSC's knowledge of Plaintiff Winters' disabilities, Plaintiff has adduced substantial evidence that CSC staff failed to accommodate her, and then essentially told her to leave whenever she complained.   Such harassment is "indefensible" under either the ADA or Section 504. *James v. Frank,* 772 F. Supp. 984, at 991 (S. D. Ohio 1991) (employee with disability who sought appropriate type of chair subjected to indefensible harassment by supervisors during 7 months wait for chair accommodation).  CSC apparently claims it has accommodated her, even while disputing whether or not Ms. Winters is a disabled individual.  Thus, there are genuine issues of material fact as to whether all CSC staff have accommodated each of Ms. Winters' disabilities and as to when they began to do so, if at all.

---

[13] While *Crowder* was a Title II case, the same premise holds for entities subject to Title III.

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment                17
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

## A. Genuine Issue of Fact Regarding Failure to Accommodate Ms. Winters' Hearing Impairment.

Plaintiff Winters notified CSC of her hearing impairment on admission.  (P. Ex. 10)  Throughout her stay at CSC, she has repeatedly expressed her concerns about it. (P. Ex. 43) Nonetheless, CSC claims that Plaintiff Winters engages in unnecessary yelling and verbal abuse.  (Doc. 130, at 25)  Carol Winters had explained in September of 2004 that Helen Winters was hard of hearing, such that she could not hear out of her left ear, only her right ear, and could not hear if there was noise in the background or if the speaker was far away. Dr. Jones reiterated her severe hearing loss in a letter to the facility on July 18, 2005 and reminded them it caused her difficulty with communication.  (P. Ex. 10, P. Ex. 38, P. Ex. 30) [14]

Notably, there is no cost to accommodate Ms. Winters' hearing loss. Staff must be informed and staff must be instructed.  That is all.  Sadly, even though the September 22, 2004 letter asks staff to accommodate Plaintiff Winters' hearing loss, even though Dr. Jones reminded CSC again in July of 2005, and again in January of 2006, there are pages and pages of CSC progress notes that complain about Ms. Winters talking too loudly.[15]  Staff complained that Ms. Winters spoke too loudly even when she told them she didn't hear well and that was why she talked so loudly.  When the OLTCO interviewed two staff, they

---

[14] Like most individuals who experience hearing impairments, Plaintiff Winters is not completely deaf in the traditional sense of that term. *Morton v. UPS*, 272 F. 3d 1249 (9th Cir. 2001); hearing impairment refers to any significant loss of hearing as shown by an audiologist.  It has been recognized for over 25 years that total deafness is actually quite rare.  Although identification of hearing loss is done by means of audiometry evaluation, the most important relevant assessment of hearing impairments is the manner in which a person functions in his or her daily life rather than technical description or specification of the extent of hearing loss. See, Burgdorf, Robert L., "The Legal Rights of Handicapped Persons" (Brookes 1980), at p. 32

[15] In fact, Carol Winters also suffers from a severe hearing loss, and thus communications between the Winters women can be misunderstood as "yelling."  The OLTCO disclosed Carol Winters' hearing loss to CSC in conversation with staff in December 2005.  (P. Ex. 35A, at 24.)  Carol Winters has also now self-disclosed.  (P. Ex. 93).  Helen Winters most recent audiological continues to show severe hearing loss. (P. Ex. 92).

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment                18
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

claimed that they believed Ms. Winters to have "selective hearing" and discounted her hearing problem. (P. Ex. 35A, at 4) Staff were not provided any training about hearing loss. At least one staff, Tom Isaacs, finally recognized Plaintiff Winters' hearing problem as an issue and realized he needed to talk directly to her, and more loudly. (P. Ex. 53, Dep. Isaacs.) He explained the accommodation, thus:

> --Ms. Winters talks loud because she can't hear herself and that he has to talk louder to her and place himself directly in front of her. (P. Ex. 53, Dep. Isaacs, T. 102, 99) This costs CSC absolutely nothing. Because Mr. Isaacs now does this, he has not had any difficulty with Ms. Winters talking loudly for "months and months." (P. Ex. 53, Dep. Isaacs, T. 102, 99).

Clearly, Plaintiff Winters hearing loss can be accommodated – if CSC staff knows and chooses to do so. CSC has not established any "absence" of disputed facts on this point as required by *Celotex,* supra.

### B. Genuine Issue of Material Fact Exists Regarding Failure to Accommodate Ms. Winters' Orthopedic Impairment.

A genuine issue of material fact exists as to whether CSC failed to accommodate Plaintiff Winters physical disability of severe spinal and orthopedic problems. On admission, CSC was informed that Helen Winters had severe pain in her knees and thus had to be moved "slowly and gently." (P. Ex. 9, p. 2) CSC knew that Plaintiff Winters had spinal osteoporosis which caused her lots of pain but that she had difficulty taking pain medications. CSC knew Ms. Winters had slept on the couch for years due to this and would need assistance with her pillows being placed and that Ms. Winters could explain to staff exactly how to place the pillows. (P. Ex. 9, p. 2) Even though Ms. Winters complained that she was not able to ambulate and asked not to be made to do so, staff insisted on it until Dr. Schabb intervened asking them not to require her to ambulate. (P. Ex. 32)

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment                 19
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

Again, Mr. Isaacs explained that he can assist Plaintiff Winters by himself, but she does need assistance to get to and from the bathroom.  Once there, he can leave her at the bathroom to attend to other residents.  (P. Ex. 53, Dep. Isaacs).  Thus, once again, the issue is not "if" CSC can accommodate Plaintiff Winters' disability- but whether and if staff know to do so and choose to do so. [16]

### C. Genuine Issue of Material Fact Exists Regarding Failure to Accommodate Ms. Winters' Heart Disease/BP Disability.

Again, CSC fails to demonstrate the absence of disputed facts on Plaintiff Winters heart disease/blood pressure/anxiety disability.  (Doc. 130).  Throughout this dispute, CSC complained about Plaintiff Winters needing a special diet, basically no pork or beef.  A genuine issue of material fact exists as to whether CSC failed to accommodate Ms. Winters physical disability of heart condition and blood pressure problems.  Carol Winters told CSC staff that Helen Winters had allergies to milk, was used to a low salt diet without pork or beef.  (P. Ex. 9)  CSC has not shown any undue burden in cost to accommodate Ms. Winters' special diet.  When Ms. Winters complained about the food she was characterized as "too fussy" and staff ignored the hurtful comments of other residents who referred to her as "Queen."  The OLTCO suggested simply having an alternative item on the menu.  (P. Ex. 35A, at 7).  CSC refused.

Once Plaintiff Winters established that she requested the accommodations and that the accommodations were quite reasonable, as in the general sense of such requests, then CSC has the burden to prove that making the accommodation or modification would fundamentally alter the entirety of the CSC.  *Johnson v. Gambrinus Co./Spoetzel, Brewery*,

---

[16] Some staff have deliberately refused.  *See* notes, Theresa Forsyth, as to medication errors and being disrespectful to Ms. Winters, complaining about adjusting pillows.  Def. Ex. AR-1, 60378 (17 medication errors), and P. Ex. 81, at 20207, and Def. Ex. R, 40213.

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment                    20
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

109 F. 3d 1040 (5th Cir. 1997) (failure to allow a guide dog to accompany an individual with a visual impairment on a brewery tour).

### 3. A Genuine Issue of Material Fact as to Whether Accommodating Ms. Winters' Will Cause CSC Undue Hardship.

CSC is subject to Title III, 42 U.S.C. 12181-12189, of the ADA. CSC appears to concede this. (Doc. 130, at 23.) However, CSC also seems to be implying that its right to exclude individuals who may have disabilities somehow "trumps" the ADA. (Doc. 130, n. 11). The Court should not be confused by this argument. At minimum, a genuine issue of material fact exists on this point precluding summary judgment. CSC is a private non-profit entity but it offers its services to the public and thus it is still absolutely bound to comply with the ADA under Title III.[17] *Disabled Rights Action Comm. v. Las Vegas Events, Inc.* (9th Cir. 2004) (finding that Title III applied to nonprofit entities who rented a public center to hold rodeos.) Executive Director, Linda Hendrickson admitted in her deposition that CSC is subject to the ADA (P. Ex. 50, Dep. Hendrickson, T. 65-66, 87-88) CSC's non-profit status does not protect it from compliance with the ADA. *Martin v. PGA*, 204 F. 3d 994, n.2 (9th Cir. 2000). [18] CSC is also subject to the requirements of Sec. 504 because it receives federal medical assistance funding for Ms. Winters and many other residents. *Glanz v. Vernick*, 756 F. Supp. 632 (D. Ma. 1991).

---

[17] CSC's written non-discrimination policy fails to even mention disability. "This facility is non-discriminatory. Residency will not be denied to any person because of sex, race, religion or national origin." (P. Ex. 23, at 10479).

[18] Title III applies to private non-profits who offer public accommodations, including senior citizen centers that provide public accommodations. *See,* ADA Guidance Manual, Title III, Sec. 1.2000, category 11) Social service center establishments (e.g., day care centers, *senior citizen centers*, homeless shelters, food banks, adoption agencies); and *see also*, ADA Title III, Sec. 1.7000, Illustration No. 3. In addition, the Fair Housing Act applies to any portion of CSC that is non-public. 28 C.F.R. ch. I, pt. 36, app. B, at 623 (1999). The CSC structure is owned by the Municipality of Anchorage. As such, the Municipality is obligated to ensure compliance with Title II of the ADA while the nonprofit CSC, as manager, is required to ensure compliance with Title III. The Municipality's contract requires CSC to comply with Title III of the ADA as well as any other laws against discrimination.

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment    21
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

Undue hardship analysis is a fact-intensive inquiry, rarely suitable for resolution on summary judgment.  *See*, *Morton v. UPS,* 272 F.3d 1249 (9th Cir. 2001)  CSC claims that its inability to provide Ms. Winters the simple assistance she requires would be an undue hardship for the facility and suggests she needs to leave "for her own good."  However, CSC simply cannot meet the ADA/Sec. 504 requirements of undue hardship.

42 U.S.C. 12111(10) defines undue hardship:

(10) Undue hardship. (A) In general. The term "undue hardship" means an action requiring **significant difficulty or expense,** when considered in light of the factors set forth in subparagraph (B). (emphasis added)

(B) Factors to be considered. In determining whether an accommodation would impose an undue hardship on a covered entity, factors to be considered include--

(i) the nature and cost of the accommodation needed under this Act;

(ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

(iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

(iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

In *Easley by Easley v. Snider*, 36 F. 3d 297 (3d Cir. 1994), the Court explained there must be a factual basis in the record that accommodating the individual would require a fundamental modification or undue burden; in making this assessment, courts must review the individual's situation "as if" they had the reasonable accommodations.  CSC lacks any such a factual basis.  Indeed, according to Mr. Isaacs, he is able to assist Ms. Winters as to

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment                    22
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

the minor help she requires.  And, the help she needs is comparable to others in the facility; in fact less than some.  (P. Ex. 53, Dep. Isaacs.)

Whether Ms. Winters' needs are "too much" for CSC and cannot be accommodated is a material fact that must be decided by the jury.  *Kimbro v. Atlantic Richfield Co.*, 889 F. 2d 869 (9th Cir. 1989)(whether accommodations can be provided as a practical matter requires individualized analysis).  Here, the evidence shows that CSC administration has absolutely no specific idea of how much time staff spend with Ms. Winters or how much time her care takes.  Executive Director, Linda Hendrickson was completely unaware as to exactly how much time staff spend assisting Plaintiff Winters.   (P. Ex. 50, Dep. Hendrickson, T. 7, 126-128).  Lynn Moser, the prior CSC Program Director conducted the assessment of Ms. Winters. (P. Ex. 94, Dep. Moser, T. 17)  She admitted that she would have been the person to complete any new assessment necessary if Ms. Winters condition had changed and that did not occur while she was at CSC prior to April of 2005.  (P. Ex. 94, Dep. Moser, T. 51)  In June of 2005, Marla Nelson replaced Ms. Moser; from the time of the first care conference she attended to the development of the last service plan (P. Ex. 54, Dep. Nelson, T. 57, 59, 63-65), Nelson testified that there were no real changes to Ms. Winters' service plan.  In fact, Ms. Nelson verified that the October 2005 service plan was the service plan still in place in January of 2006 when CSC attempted to evict Ms. Winters. (P. Ex. 54, Dep. Nelson, T. 65; P. Ex. 38)

Also, there is the testimony of Dr. Michael Jones. Jones is Ms. Winters' primary care physician.  (P. Ex. 52, Dep. Jones, T. 79)  He treats Ms. Winters for hypertension, arthritis, and is aware of her severe hearing problem and noted her general anxiety disorder. (T. 56, 63, 79) Dr. Jones does not believe Ms. Winters needs skilled nursing care but does need

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment                    23
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

physical help.  (T. 77-78)  He testified that Ms. Winters medical problems in January of 2006 were not really any different than the problems she had in July of 2005.  (T. 80)  She needs assistance but it would not have to be a nurse; at night she needs help transferring. (T. 78)

Tom Isaacs, an aide at CSC that works with Plaintiff Winters every day and knows her very well, testified that Ms. Winters needs do not exceed the ability of CSC, although he concedes that Ms. Winters and another resident take a little more time than others.  (P. Ex. 53, Dep. Isaacs, T. 66, 72 ) Mr. Isaacs admits that initially he lacked knowledge about Ms. Helen Winters, and did not have sufficient training at first about how to work with Ms. Winters.  P. 53, Dep. Isaacs, T. 114)[19]   However, Mr. Isaacs described his working relationship with Ms. Winters as "fine" once he (1) understood her needs and (2) acknowledged she took a little more time:

> "Helen is not difficult at all.  She takes more time and my opinion is its because of her anxiety disorder.  So I like to take the time with her.  She likes to visit.  She's not a hard person to take care of by any means, in my opinion." (P. Ex. 53, Dep. Isaacs, at T. 72)

…

Isaacs testified that Plaintiff Winters does all of her hygiene by herself, that staff assist her minimally with her dressing.  (P. Ex. 53, Dep. Isaacs, T. 72-74.)  Finally, and contrary to CSC administrators, Mr. Issacs indicated that the amount of time spent with Helen is comparable to that of other residents.  (P. Ex. 53, Dep. Isaacs, T. 66, 72.)  Mr. Isaacs testified at length that Ms. Winters is comparable to the other residents.  In addition to Ms. Winters, there are at least two other residents that have difficulty ambulating or that use

---

[19] It was during this time that the incident concerning communion occurred.  (P. Ex. 53, Dep. Isaacs, T. 123-124.).

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB                                                      24

wheelchairs, one uses a cane, and four use a walker.  (P. Ex. 53, Dep. Isaacs, T. 66-68).
There have been residents in the past, other than Ms. Winters, for whom a two-person
transfer was needed.  (P. Ex. 53, Dep. Isaacs, T. 69-70).  Mr. Isaacs also explained that there
had been other residents with varying medical needs at CSC, including four other residents
who needed oxygen (T. 56), some in the past had required physical therapy (T. 57), there
was a person who needed regular injections (T. 56), some who used a catheter (T. 59-61[20]),
a resident who needed a spinometer due to respiratory distress and needing to have lungs
clear (T. 60), residents who have suffered a stroke  (T. 63-64).  Some residents, other than
Ms. Winters, suffer from depression.  (T. 105)   Other residents, not Ms. Winters, need
assistance with personal hygiene, including shaving (one resident), brushing teeth (three or
four).  About 25% of the people at CSC suffer from bladder incontinence.  (P. Ex. 53, Dep.
Isaacs, T. 107)  Some of them, other than Ms. Winters, need assistance every two hours.
(Id.)  There are at least five people eat in their rooms at CSC.  (P. Ex. 53, Dep. Isaacs, T.
39).

>          Mr. Isaacs noted that as far as Ms. Winters:
>
>          …if you take your time with her, things will go a lot smoother and if you
>          don't have the time you would like to take, and you take the time to explain
>          to her how much time you have, then she'll be a team player, in my
>          experience…sometimes we can't get extra help. Someone gets sick. Helen
>          was anxious because I told her there were only two people. I just told her, I
>          said, Helen, we're going to take care of you. We're going to take care of you.
>          It's going to be okay, and things went smooth the rest of the day." (P. Ex. 53,
>          Dep. Isaacs, T. 76)
>
>          Isaacs noted that he had to learn to improve his interactions with residents, including

Ms. Winters.  (P. Ex. 53, Dep. Isaacs, T. 83-87)  In response, he explained that it had been

---

[20] Catheter care includes emptying the catheter bag, document everything, observe to make sure the urine isn't
cloudy, clean the tubing.  This is done once per shift.  This takes about 10 minutes by itself.  (P. Ex. 53, Dep.
Isaacs, T. 61-63)

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment                    25
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

"**months and months**" since Ms. Winters had raised her voice to him and that he felt that when she did so, it was due to anxiety or old age and a patient response worked well.  (P. Ex. 53, Dep. Isaacs, T. 95-103) He noted that:

> "I have to say this going back to the anxiety; a big part of why people have problems, I think, that I've heard about relates to Helen's anxiety and I have to say this that if we would have gotten more training dealing with it, that things would have gone much smoother." (P. 53, Dep. Isaacs, T. 114)

Mr. Isaacs explained that Ms. Winters talks loud because she can't hear herself and that he has to talk louder to her and place himself directly in front of her.  (P. Ex. 53, Dep. Isaacs, T. 102, 99)  He explained that "I don't believe we were given a lot of direction on how to deal with Helen's situation."  (P. Ex. 53, Dep. Isaacs, T. 131)

Asked whether he viewed Ms. Winters as somewhat irritable, Mr. Isaacs replied:

> "I think that if you understand Helen, she's—no, I wouldn't. I think she's a wonderful person." (P. Ex. 53, Dep. Isaacs, T. 117)

Assuming arguendo that there is some impact on CSC for the simple accommodations provided to Plaintiff Winters, it becomes incumbent upon CSC to set forth factual details substantiating its claim that undue hardship exists by continuing to have Plaintiff Winters at CSC.  Clearly, CSC has not met that burden.

### A.    Nature and Cost of Accommodations.

A genuine issue of material fact exists as to whether there are any costs to the accommodations requested by Plaintiff Winters.  Other than asserting that CSC is a "non-profit" agency[21], the amount of its budget and the size of its workforce, CSC has not established <u>any</u> basis for its assumption that to provide Ms. Winters the accommodations she

---

[21]  Nonprofit status means nothing factually. Nonprofit entities, even small ones, are subject to the ADA/504. *Schultz v. Hemet Youth Pony League*, 943 F. Supp. 1222 (C.D. Cal. 1996) (preliminary injunction issued against nonprofit youth baseball league to admit youngster with physical impairment).

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment                26
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

seeks cost anything or would be difficult as a practical matter and would not fundamentally alter the nature of CSC.  Ms. Winters has not asked for accommodations that are difficult. She asks that staff and administrators understand, respect and accommodate her hearing problem by "talking to her left side" which is her better ear.  (P. Ex. 10.)  Other than suggesting that serving Ms. Winters "takes more time," the CSC has wholly failed to set forth <u>any</u> particular cost for the requests and accommodations requested by Ms. Winters. Given the opportunity to do so at her deposition, Executive Director could not even testify as to what was meant by "too much time" let alone costing out that statement.  That is because, as explained above, the requests and accommodations are minimal and not difficult as a practical matter.  *Martin v. PGA*, supra. Paying attention to how the aides are situated when interacting with Ms. Winters, giving her assistance in standing or moving, does not cause any fundamental alteration to CSC.  Contrary to the party line of the administrators, Mr. Isaacs deposition assures the Court that Ms. Winters' needs can be met at CSC without any difficulty as a practical matter and without any cost.

  **b.    Overall Financial Resources of CSC and Impact on CSC of Accommodation.**

  Presuming that there are any costs to accommodating Plaintiff Winters, a genuine issue of material fact exists regarding the impact of any purported costs for any accommodations for Ms. Winters and CSC's overall financial resources.  Ignoring the fact that it is remunerated at the rate of _____ per month by Medicaid, plus_____ per month rent by Plaintiff Winters, CSC contends that because it is a nonprofit agency with a small staff it cannot meet Ms. Winters' needs.  However, it fails to provide to the Court any information on the actual "expenses and resources or impact otherwise of such accommodation."  That is because administrators have not bothered to ascertain or

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment                                    27
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

determine in any way the purported cost of providing   Plaintiff Winters the simple accommodations she needs to live at CSC.  Executive Director Ms. Hendrickson did not know how much time was actually spent caring for Ms. Winters.  CSC cites to Dr. Geeseman's report, but ignores the obvious- the requests for accommodations are minimal. The amount of time spent with Ms. Winters is minimal.  In fact, if the Court reviews Ms. Winters description of her day, "My Daily Routine" which is an exhibit to Dr. Geeseman's report, it is clear that there is minimal assistance to Plaintiff Winters.  (Doc. 139, Geeseman Report, p. 9-10).

**c.    Overall Financial Resources of CSC, Size, Type of Entity and Workforce.**

A genuine issue of material fact exists as to whether the overall financial resources are somehow adversely impacted by Plaintiff Winters continued stay at CSC. CSC has set forth no credible evidence on this point.  Yet, astonishingly, CSC seems to suggest that Ms. Winters is the sole and singular cause of staff turnover at CSC.  (Doc. 130, T. 25-26).  In reality, CSC simply has substantial staff turnover due to poor employee selection, and lack of training. CSC can show no factual connection between staff turnover and Ms. Winters other than the fact that staff who did leave, were staff who should have left for other reasons as well as difficulties with Ms. Winters.  Nurse Guderian was disciplined, but only in part for her actions concerning Helen Winters.  (D. Ex. AW-1, at 62491, 62495).  Ms. Guderian was disciplined for a number of medication errors, and for unprofessional behavior, including "snapping" at staff and speaking "inappropriately" to family members.  (*Id*. at 62494).   Another staff person, Angel McKinley had already been terminated when Ms. Winters called to make an oral complaint about her care of Ms. Winters.  (P. Ex. 18)  CSC records document that, in fact, Angel McKinley was terminated for cause, after being rude

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment                    28
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

to residents, failing to carry a walkie-talkie when working, leaving a resident who needed assistance eating and threatening to call in sick.  (D. Ex. BL-1, at 60111-60180).

Again, CSC's actions hearken essentially to the "old days" when people with identified disabilities sought admission to homes and were rejected on the basis of their disabilities.  CSC has taken nearly the same stance. From nearly the minute she was admitted, CSC has claimed that Ms. Winters needs to leave CSC, essentially because she needs "more help" and  "for her own good."  This phrase is really just a nicer way of saying "because you have disabilities."  The Court would not accept such a statement from CSC.[22] This response is given to Carol or Helen Winters anytime that a complaint is raised. Initially, they suggested she had a "mental health problem" and that was the basis for her need to leave.  After Dr Geeseman, CSC's own expert, found no diagnosable mental health problem, CSC has now suggested that Ms. Winters is a "direct threat" to other residents and staff.  None of CSC's positions is legitimate.  Ms. Winters is not more work than other residents.  She does not need to leave CSC because of her medical conditions, which are the same as they were upon her arrival.  CSC's positions are simply euphemisms for its blatant refusal to attempt to understand and accommodate Ms. Winters' disabilities related to orthopedic difficulties/ambulation, heart disease/blood pressure, and hearing.  Upon any oral complaint by Ms. Winters or her daughter, Carol, CSC's response was essentially the same: "move to a smaller facility."  This "for your own good" attitude is discriminatory.  Ms.

---

[22] Nor should it.  In *Wagner v. Fair Acres Geriatric Center*, 49 F. 3d 1002, 1009 (3d Cir. 1995), the Court explained that: "Obviously, everyone that applies for admission to a nursing home does so because of his or her disabilities.  indeed, no one would be able to meet a nursing home's admissions requirements in the absence of some handicapping condition necessitating nursing home care.  Further, if the district court's analysis is taken to its logical extreme, no program, service or institution designed specifically to meet the needs of the handicapped would ever have to comply with section 504 because every applicant would seek access to the program or facility because of a handicap, not in spite of it.  This result would contradict both the statutory and regulatory framework of section 504."

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB                                              29

Winters had an absolute right to complain which was afforded to her by the Alaska Assisted Living Homes Act. Instead of recognizing the necessity of utilizing a fair complaint process, CSC just repeatedly told Ms. Winters – accept how we treat you or move. This is clearly discriminatory animus.

### 3.     Genuine Issues of Material Fact Exist Regarding "Direct Threat."

CSC claims that Plaintiff Winters is a "direct" threat to staff and other residents. (Doc. 130, p. 14-15).[23]  The ADA describes a direct threat, as used in 42 U.S.C.S. 12182(b)(3) to be a "significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services." This type of factual determination can only be made after a trial. In *Bragdon v. Abbott*, 524 U.S. 624 (1998), the United States Supreme Court reversed a motion for summary judgment on just this point. The plaintiff in *Bragdon* had HIV and wanted services from a dentist, which were refused. The Supreme Court concluded that no "direct threat" could be determined without an opportunity for trial to determine any actual risk to the dentist and remanded the case. CSC has much less here in terms of any evidence of "direct threat."

First, Ms. Winters was accused of and CSC insists on asserting that Ms. Winters, "struck" a staff member. CSC asserts that this is a key reason for its insistence that Ms. Winters leave. Ms. Winters claims she was attempting to keep herself from falling and reached out. (P. Ex. 10, P. Ex. 53C). OLTCO investigated and reported that the staff person involved described it as "no big deal." If Ms. Winters did as CSC claims, surely the staff

---

[23] 42 U.S.C. 3604(f)(9)  Nothing in this subsection requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others.

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment                          30
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

person directly involved would not construe it as "no big deal." Even assuming *arguendo,* that Ms. Winters did what CSC claims (a fact not proved at this juncture), it was an isolated incident, and the facts surrounding it must be heard to determine if it is merely a pretextual defense to another situation of denial of accommodation.

A second basis for the apparent claim of "direct threat" is CSC's claim that Plaintiff Winters verbally abuses staff. Again, this factual issue should be heard at trial. Ms. Winters was wrongfully accused of calling some one "trailer trash" even though she did not know what the term meant. Ms. Winters again denies this allegation. CSC has no proof of this event. Contrary to CSC administration, CSC aide, Tom Isaacs describes Plaintiff Winters as "…she's a sweet old lady." (P. Ex. 53, Dep. Isaacs at ) The claim of "direct threat" is meritless and is a smoke-screen effort by CSC to divert the Court's attention from whether CSC has fully accommodated Plaintiff Winters. CSC concedes that it is required to "either reasonably accommodate a tenant's disabilities or show that no reasonable accommodation will eliminate or acceptably minimize the purported risk posed." CSC cites to *Arnold Murray Construction, LLC v. Hicks,* 621 N.W.2d 171, 174 (S.D. 2001). CSC has consistently failed to accommodate Plaintiff Winters and as such, the present situation is completely different than the Murray Construction case. To avoid either of the alleged "problems" by Plaintiff Winters, CSC should have and could have offered accommodations; failing to do so, it cannot now rely upon a smoke screen of "direct threat." CSC puts forth no substantive evidence that Plaintiff Winters is a direct threat to anyone.

## B. Plaintiff's Fair Housing Act Claims

CSC has discriminated against Ms. Winters by its lease requirements as well as failing to accommodate her at CSC. (Am. Compl. Count VII). CSC repeatedly relies upon its lease to

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment                31
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

claim that it has the right to evict Plaintiff Winters. It ignores the law.  The Fair Housing Act

of 1998, which incorporates certain provisions of the ADA, states at 47 U.S.C. 3604(f)(3),

> "…it shall be unlawful:
>   (2) To discriminate against any person in the **terms**, conditions, or
> privileges of sale or rental of a dwelling, or in the provision of services or
> facilities in connection with such dwelling, because of a handicap of--
>     (A) that person; ….

There are two central claims.  First, CSC's lease and residential services agreement and

other policies apparently give CSC the "final say" of when a resident should move based

upon a resident's needs, i.e. disabilities, which is contrary to the FHA.  In addition, as under

the ADA/504 claim, CSC failed to fully accommodate Plaintiff Winters disabilities and in

response to requests to accommodate told her to leave and finally attempted to unlawfully

evict her because of insistence on her rights through complaint to the OLTCO.  Each of

these claims is clearly a question of material fact.

The Fair Housing Act is codified at 42 U.S.C. 3601-3619 and specifically protects

individuals with disabilities in the housing arena.  The Supreme Court repeatedly ruled that

the FHA must be given a "generous construction" in order to carry out a "'policy that

Congress considered to be of the highest priority."  *Trafficante v. Metropolitan Life Ins. Co.,*

409 U.S. 205 (1972); *see also Havens Realty Corp. v. Coleman*, 484 U.S. 860 (1987).  The

Ninth Circuit has adopted this "generous construction" of the FHA.  *U.S. v. Gilbert*, 813 F.

2d 1523, 1526-27 (9th Cir.), cert denied, 484 U.S. 860 (1987).  Courts have been strident in

insisting on the protection of people with disabilities in the housing arena.  *Giebeler v. M &*

*B Assoc.,* 343 F. 3d 1143 (9th Cir. 2003).  This makes sense because the FHA has been

interpreted generously with respect to other disenfranchised member of society and people

with disabilities should be accorded the same vibrant protection.  *See, U.S. v. Gilbert*, 813 F.

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment                    32
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

2d 1523, 1526-27 (9th Cir., cert denied, 484 U.S. 860 (1987) (generous reading of FHA in respect to racial claim), Plaintiff Winters has set forth a prima facie case on her FHA claim. Genuine issues of material fact wholly preclude summary judgment for Ms. Winters FHA housing discrimination claim.

To present a prima facie case on the FHA, Ms. Winters need only establish that 1) she is a qualified person with a disability, and 2) CSC has refused to make reasonable accommodations for her in the housing scenario. The Fair Housing Act makes it illegal to "refuse[e] to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a person with a disability] equal opportunity to use and enjoy a dwelling." 42 U.S.C. 3604 (f)(1)(B). Reasonable accommodations are changes in rules, policies, practices or services so that a person with a disability can participate as fully in activities related to housing as person without a disability could.

Clearly, Ms. Winters, through her daughter and POA, Carol Winters, made various requests for changes primarily in practices and services at CSC. Absent CSC's ability to demonstrate that providing the accommodations would impose an undue burden or constitute a fundamental alteration – i.e. something that would be difficult as a practical matter – then the landlord must provide the accommodation. *See*, *Casey v. Martin*, supra, for discussion of an accommodation as a practical matter. CSC's refusal that it doesn't serve "heavy care" residents, and that it has been able to get those individuals to move in the past, is not a sufficient reason to refuse Ms. Winters' accommodations. CSC concedes that it must either reasonably accommodate Plaintiff Winters or show that no reasonable

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment                    33
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

accommodation is possible.   (Doc. 130, at  5).   Having clearly failed to accommodate Plaintiff Winters, as already described, CSC cannot require her to move.

The accommodations that Plaintiff Winters has requested are completely reasonable within the FHA.  Case law under the FHA is replete with considering whether there was, in essence, any "real burden" to the landlord.  In *Giebeler v. M & B Assoc.,* 343 F. 3d 1143 (9th Cir. 2003) held that a landlord refusing a co-signer as a reasonable accommodation was in violation of the FHA.  Recognizing that this essentially posed no real burden to the landlord was significant to the case.  Similarly, the types of requests and accommodations that Ms. Winters has requested pose no real burden to CSC.  It costs nothing for Tom Isaacs to accommodate Ms. Winters' hearing problem now that he understands about it.  Moreover, CSC has not even estimated or provided any indication that the reasonable accommodations requested by Ms. Winters will cost anything.

Assuming *arguendo* that there is some modest cost to CSC for accommodating Plaintiff Winters, such modest costs are to be absorbed by landlords.  For example, in *Shapiro v. Cadman Towers,* 51 F. 3d 318 (2d Cir. 1995), a state-subsidized housing landlord was required to modify its 'first-come-first-served policy" as to parking spaces and to grant her name on the waiting list for a suitable parking space.  A tenant who was deaf was entitled to his hearing dog as a reasonable accommodation notwithstanding a landlord's "economic or aesthetic concerns" as expressed in a no-pets policy.  *Bronk v. Ineichen*, 54 F. 3d 425 (7th Cir. 1995).  By adding 42 U.S.C. 3604(f)(3)(B),  Congress recognized that discrimination against disabled persons included not only outright invidious discrimination, but also included failure by landlord to take affirmative steps to ensure that disabled tenants

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment                                     34
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

enjoy use of facility to same extent as non-disabled individuals. Secretary on behalf of Andrew Rusinov v Jankowski Lee & Associates, *et al*. (6/30/95) HUDALJ 05-93-0517-1.

CSC has contended that it has "tried" and nothing will work to assist or accommodate Ms. Winters. Factually, that is incorrect, which is why a trial is needed. However, it is also legally incorrect because CSC inappropriately presumes that eviction was permissible before demonstrating that no reasonable accommodation would eliminate or minimize any risk posed by an individual with a perceived mental illness before trying to evict Ms. Winters on the pretext that this 91 year old frail lady with multiple disabilities is a threat to staff or other residents. *Roe v. Housing Authority*, 909 F. Supp. 814 (D. Colo. 1995). Some of the efforts of Ms. Winters and her POA Carol Winters, have merely been to provide for her. For example, CSC seems to object that Ms. Carol Winters provided Ms. Winters with simple breakfast and lunches that could be cooked in her room when problems developed in the dining hall due to Ms. Winters' hearing problems. This is totally inappropriate. *United States v. Freer*, 864 F. Supp. 324 (W.D.N.Y. 1994) (court issuance of preliminary injunction requiring mobile home park to approve tenant's request for consent to install a wheelchair ramp outside her home); *HUD v. Twinbrook Village Apartments*, 2001 WL 1632533 (HUD ALJ Nov. 9, 2001) (a private landlord could not require renter's insurance to indemnify the landlord against injury when three tenants wanted to construct wheelchair ramps.) Because CSC has absolutely failed to meet its burden to show any absence of genuine issues of material facts, summary judgment must be denied on the disability housing discrimination claims that Plaintiff Winters has. These matters should go to the jury.

### D. Ms. Winters' Alaska Human Rights Act Claim

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment      35
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

Finally, CSC has violated the Alaska Human Rights Act.  It failed to accommodate Plaintiff Winters disabilities and then when she complained of such failure, told her to leave, and when she did not "take the hint" by repeated failures to accommodate, CSC attempted to evict Plaintiff Winters.  (Am. Complaint. Count II).  AS 18.80.200 mandates:

> (b)     Therefore, it is the policy of the state and the purpose of this chapter to eliminate and prevent discrimination in …places of public accommodation, in the sale, lease, or rental of real property because of … physical or mental disability….
>
> And, at Sec. 18.80.240, the statute provides:
>
> It is unlawful for the owner, lessee, manager, or other person having the right to sell, lease, or rent real property…  (1) to refuse to sell, lease, or rent the real property to a person because of …., physical or mental disability…;
>
>  (2) to discriminate against a person because of … physical or mental disability …in a term, condition, or privilege relating to the use, sale, lease, or rental of real property….

The Alaska Human Rights Act, AS 18.80.200-.295 was initially enacted in the 1960's.  (Sec. 1, Ch. 15 SLA 1963).  Alaska courts early on, with regard to other historically disenfranchised groups, i.e. women, held that the statute should be "should be broadly construed to further the goal of eradication of discrimination."  *Alaska Fed. C. Union v. Fridrikson,* 642 P. 2d 804 (Ak 1982).  When, as here, there are clearly genuine issues of fact in dispute as to whether CSC failed to accommodate Plaintiff Winters' various disabilities and then attempted to evict her because of those same disabilities, the case should proceed to the jury to meet the goal of eradication of discrimination.

## IV.    CONCLUSION

Substantial issues of material fact exist precluding summary judgment on Plaintiff's claims pursuant to disability discrimination pursuant to the ADA, Section 504 of the

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment    36
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB

Rehabiliation Act, the Alaska Human Rights Act and the Fair Housing Act. The Court must

deny the motion.

  DATED: February 14, 2007      ALASKA LEGAL SERVICES CORPORATION
                                    Attorneys for Plaintiff Helen Winters
                                    through her power of attorney Carol Winters

                                    s/Sonja Kerr_____
                                    ALASKA LEGAL SERVICES
                                    1016 West 6th Avenue, Suite 200
                                    Anchorage, Alaska 99501
                                    PHONE: (907) 274-9431
                                    FAX: (907) 279-7417
                                    E-mail: skerr@alsc-law.org
                                    Alaska Bar No. 0409051

### Certificate of Service

I hereby certify that on the 14th of February, 2007, a copy of this document was served electronically on:

Donna M. Meyers
Delaney, Wiles
1007 W. Third Avenue, Suite 400
Anchorage, AK 99501.

S/Sonja D. Kerr (0409051)

Plaintiff's Opposition in Response to Defendant's Motion for Summary Judgment    37
on Counts II, V, VI, and VII.
Winters v. CSC, Case No. 3:06-cv-00083-TMB