IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| HELEN WINTERS,<br>through her power of attorney<br>Carol Winters,<br><br>     Plaintiff,<br><br>vs.<br><br>CHUGIAK SENIOR CITIZENS, INC.,<br><br>     Defendant.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 3:06-cv-00083-TMB<br>)<br>) |

**PLAINTIFF'S OPPOSITION TO CSC'S MOTION
FOR SUMMARY JUDGMENT NO. 5**

**INTRODUCTION**

Through this memorandum Ms. Winters' opposes CSC's Motion for Summary Judgment No. 5.

**STANDARD OF REVIEW**

Summary judgment is only appropriate when a court finds that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits…show that there is not genuine issue as to any material fact and that the moving party in entitled to judgment as a matter of law." Fed. Rule 56(c). The Court must construe all evidence and draw all evidentiary inferences in favor of the non-moving party. 10 A Charles Alan Wright et al., Federal Practice & Procedure § 1717, R 349 & no. 5 (3ed 1998)(*citing Adickes v. S.H. Kress & Co*. 398 U.S. 144 (1970)).

A dispute over a "genuine" material fact exists if the evidence would allow a reasonable fact-finder to return a verdict for the non-moving party. *Anderson v. Liberty*

*Lobby, Inc*. 477 U.S. 242, 248 (1986).  The non-moving party may defeat a motion for summary judgment by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial.  *Celotex Corp. v. Catreet*, 477 U.S.  317, 322-23 (1986).

## STATEMENT OF FACTS

CSC knew that Helen Winters suffered from hypertension and congenital heart failure for which she had been hospitalized in 2001.  (P. Ex. 16, p. 4)  This information was included in her Service Plan that is required by statute for CSC to identify and provide the services Ms. Winters needs  (AS 47.33.005(4)).  Part of CSC's daily duty was to monitor Helen Winters' vital signs.  (P. Ex. 33, p. 2 )  Dr. Michael Jones, M.D. who was Helen Winters' treating physician at the time she was admitted to CSC wrote a letter in July 2005 specifically alerting CSC that she may suffer from a Generalized Anxiety Disorder and that any eviction "would be detrimental to her physical and mental health."  (P. Ex. 30)

Despite all of this information, CSC intentionally went about evicting Helen Winters and intentionally sent Ms. Winters a certified mail Notice of Termination from Assisted Living Program Director Jan Freels on January 5, 2006.  The Notice stated that she had to leave her home in 30 days. (P. Ex. 40)

That same day Helen Winters was rushed to the Providence Emergency Department due to her dangerously high blood pressure.  (P. Ex. 42)  At discharge, Ms. Winters was told to follow up with her primary physician.  At her follow-up, Dr. Jones increased her levels and added an additional blood pressure medication, and required CSC to check her blood pressure levels twice daily as well as fax the results to him for the next two weeks.  (P. Ex. 45-B)

## ARGUMENT

I.        **Pursuing a Lawful Remedy Does Not Apply**

Defendant first argues that, "A party obviously cannot commit intentional or negligent infliction of emotional distress by pursuing a lawful remedy", citing *Sands v. Living Word Fellowship,* 34 P.3d 955, 958-59 (Alaska 2001).  However, *Sands* actually held that conduct that not only lawful but is protected by the Constitution may not be the basis of infliction of emotional distress claims.  In *Sands,* the free exercise of religion clause of the 1st Amendment protected the practice of "shunning" an individual by a congregation, preventing the plaintiff's claims of infliction of emotional distress.

However, in Ms. Winters' case, CSC cites no constitutionally protected conduct on its part that would protect it from tort liability.

II.       **Severe Emotional Distress is a Question for the Jury**

Plaintiff agrees with the defendant that a plaintiff may only recover for "severe" or "serious" emotional distress.  But the very case cited by the defendant emphasizes that this is not a question to be decided in a summary judgment motion:

> Whether a plaintiff's alleged emotional distress satisfies this standard presents a question for the jury. While some jurisdictions have required claims of emotional distress to be "medically diagnosable or objectifiable," …we do not believe that such a limitation is necessary or desirable.
>
> > Jurors are best situated to determine whether and to what extent the defendant's conduct caused emotional distress, by referring to their own experience.  In addition, there will doubtless be circumstances in which the alleged emotional injury is susceptible of objective ascertainment by expert medical testimony.  To repeat: this is a matter of proof to be presented to the trier of fact.  The screening of claims on this basis at the pleading stage is … a usurpation of the jury's function.

> <u>Molien</u> 616  P.2d at 821. See also <u>Corgan</u> 574 N.E.2d at 609 ("this court has not lost its faith in the ability of jurors to fairly determine what is, and is not, emotional distress").  In some cases, the circumstances surrounding a claim

may be sufficient to persuade a jury that the plaintiff has actually suffered serious emotional trauma.

*Chizmar v. Mackie*, 896 P.2d 196, Alaska 1995) (footnotes omitted).  Particularly here, where Ms. Winters' claims are medically diagnosable and objectifiable, the jury should be entitled to decide the question of "severe emotional distress."

### III.    Whether CSC's Conduct was Intentional, Extreme, Outrageous or Indifferent is a Question for the Jury

In the case cited by defendant, *Ace v. Aetna Life Insurance,* 139 F.3d 1241 (9th Cir. 1998) the Court of Appeals reversed the district court's ruling that as a matter of law no reasonable jury could find by clear and convincing evidence that the defendant insurer had acted with malice, bad motives, or reckless indifference.  Factual proof regarding the defendant's motives, malice, and outrageous and Indifferent conduct in this case should likewise be left to the jury.

CSC was well-aware that Ms. Winters' daughter, Carol Winters, held a Power of Attorney.  (P. Ex. 1.)  CSC had on numerous occasions dealt directly and even only with Carol Winters with regard to matters involving her mother from her admission in September 2004 forward. Carol Winters was the sole signatory on the lease agreement and residential services contract by which Ms. Winters' was admitted to CSC.  (P. Ex. 11, ALP Lease Agreement, and P. Ex. 12, ALP Resident Services Contract)  Carol Winters signed for the Residents Rights Information.  (P. Ex. 24).  Carol Winters signed releases of information for her mother, and attended numerous care conferences for her and even without her from fall 2004 forward.  (P. Ex. 9, 14, 17, 18, 19, 20, 27, 29, 31).  It was Carol Winters who

responded to CSC's notice of eviction (P. Ex. 44). And tellingly, CSC sent its January 26, 2006 letter refusing to withdraw the eviction notice to Carol Winters. (P. Ex. 48).

Thus, the **only** critical legal document that CSC forwarded to Helen Winters appears to be the Notice of Eviction. (P. Ex. 40). CSC claims that the method by which CSC served Ms. Winters with the Notice of Eviction should not subject it to liability because CSC was *statutorily obligated* to serve Ms. Winters rather than her daughter. This argument is simply without merit. In fact, both Alaska's Assisted Living Home Act and the Uniform Residential Landlord Tenant Act would have permitted CSC to serve *either* the elderly Ms. Winters or her daughter. *See, e.g.* AS 49.45.100(c)(allowing service on lessee or person in possession) & AS 47.33.360(b)(allowing service on resident or resident's representative). Here, Carol Winters, as the POA, and not her mother, was the person who signed both the lease and residential services contract. Carol Winters was the lessee and the representative for Helen. There was certainly no statutory requirement that Helen Winters be served at all, let alone that Helen Winters be served before Carol Winters and in the manner in which it was done, which staff knew would be extremely upsetting to Ms. Helen Winters.

That CSC chose to personally deliver this document to Helen Winters, an elderly resident with known heart, blood pressure and anxiety issues without the courtesy of informing her daughter and power of attorney is something the jury ought to be able to consider in evaluating Ms. Winters' claims that CSC intentionally, recklessly or negligently caused her emotional distress.[1]

---

[1]  Marla Nelson, Program Manager at CSC, testified that it was a deliberate choice of CSC to serve Helen Winters with the January 5, 2006 eviction letter:

    Q.     Do you have any knowledge of how this was delivered to Helen?
    A.     Yes.
    Q.     How?

Because of the way CSC handled the matter – a matter which was CSC's choice –
insofar as service – Ms. Winters landed in the Emergency Room because she became so
upset. (P. Ex. 42, 43, 45)

Specifically, the jury should be able to hear evidence demonstrating that all previous
legal issues had been handled between Carol Winters and CSC. The jury should be aware
that Carol Winters alone had signed the residential services contract and lease that admitted

---

| | |
|---|---|
| A. | Certified mail. |
| Q. | So the document was delivered certified mail from CSC to Helen Winters back at CSC? |
| A. | Correct. |
| Q. | Was it your intention as staff to send this directly to Helen? |
| A. | Yes. |
| Q. | Was the intention to send it directly to Helen even though you were aware that Carol Winters was her Power of Attorney? |
| A. | Yes. |
| … | |
| Q. | Did you discuss with Carol Winters whether you could send this to her Mother? |
| A. | No. |
| Q. | You were aware that getting this sort of letter would upset Helen Winters? |
| A. | Correct. |
| …. | |
| Q. | You took no steps to avoid upsetting her by sending this letter directly to her? |
| A. | No. |
| … | |
| Q. | You said it was your intent to give Helen this letter, right? |
| A. | Yes. |
| Q. | And you knew it would upset her to get this letter, right? |
| A. | Yes. |
| Q. | And you didn't take any steps to mitigate her being upset, right? |
| A. | No. |
| Q. | And you hoped that by her getting this letter, Helen and Carol would decide to leave, to have her leave the facility? |
| A. | It was asking her to leave the facility. |
| … | |
| Q. | At the time you made the arrangements for certified mail, you were aware of a fax number for Carol Winters, weren't you? |
| A. | Correct. |
| Q. | Did you take any steps to fax the letter to Carol before sending it to her mother? |
| A. | No. |
| Q. | Now, do you know if Helen received the January 5th letter before Carol did? |
| A. | I believe so. |

(P. Ex. 54, Dep. Marla Nelson, T. at 35-39)

her mother to CSC, (P. Ex. 11, and 12), and that Carol Winters had repeatedly previously been viewed and treated as the legal representative of Helen Winters by CSC. Only then will the Jury be able to fairly determine if it was intentional, reckless, outrageous, or indifferent of CSC to serve the January 5, 2006 notice of eviction document on the elderly Ms. Winters without even taking the precaution of first notifying her daughter.

### CONCLUSION

The Court must deny the motion. A jury could reasonably conclude that the emotional distress to Helen Winters resulting from CSC's intentional and outrageous efforts to evict her, including sending a certified mail document requiring her to leave her home within 30 days, is serious and severe and manifested by previously predicted medical changes. Ms. Winters respectfully requests that this Court deny CSC's motion for summary judgment and let these factual issues proceed to the jury.

DATED: February 14, 2007             ALASKA LEGAL SERVICES CORPORATION
                                     Attorneys for Plaintiff Helen Winters
                                     through her power of attorney Carol Winters

                                     s/Sonja Kerr
                                     ALASKA LEGAL SERVICES
                                     1016 West 6th Avenue, Suite 200
                                     Anchorage, Alaska 99501
                                     PHONE: (907) 274-9431
                                     FAX: (907) 279-7417
                                     E-mail: skerr@alsc-law.org
                                     Alaska Bar No. 0409051

### Certificate of Service

I hereby certify that on the 14th day of February, 2007, a copy of this document was served electronically:

Donna M. Meyers
Delaney, Wiles
1007 W. Third Avenue, Suite 400
Anchorage, AK 99501.

S/Sonja D. Kerr (0409051)