Donna M. Meyers
Clay A. Young
Delaney Wiles, Inc.
1007 W. 3rd Avenue, Suite 400
Anchorage, Alaska 99501
PHONE: 907-279-3581
FAX: 907-277-1331
dmm@delaneywiles.com
cay@delaneywiles.com

Attorneys for Defendant
Chugiak Senior Citizens, Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| HELEN WINTERS, through her Power of Attorney Carol Winters, <br><br> Plaintiff, <br><br> v. <br><br> CHUGIAK SENIOR CITIZENS, INC., <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No. 3:06-cv-00083-TMB |

**DEFENDANT CHUGIAK SENIOR CITIZENS, INC.'S REPLY TO OPPOSITION TO MOTION FOR SUMMARY JUDGMENT NO. 1 RE: COUNT I**

**I.      Introduction**

Defendant Chugiak Senior Citizens, Inc. ("CSC") moved for summary judgment

on Count I of plaintiff Helen Winters' Amended Complaint. Count I involves plaintiff's

Defendant CSC's Reply to Opposition to
Motion for Summary Judgment No. 1 Re: Count I
*Winters v. CSC*/Case No. 3:06-cv-00083 (TMB)                    Page 1 of 22

claim that CSC violated the Alaska Assisted Living Homes Act ("ALHA").[1]   In her opposition, plaintiff does not dispute that CSC has evidence demonstrating that it was entitled to terminate her lease agreement and residential services contract and evict her.  *See* Opposition at 1-27.  Rather, plaintiff argues that because she has marshaled some evidence regarding CSC's alleged violation of the ALHA, there is a factual dispute regarding whether CSC violated the ALHA, and because there is a factual dispute, it is not appropriate to award CSC summary judgment.  *See id.*  Plaintiff's argument is legally incorrect.  As explained below, CSC is entitled to summary judgment because: (1) plaintiff's evidence does not obviate the fact ALHA does not provide plaintiff with a private right of action to sue CSC under the ALHA for an alleged violation of the ALHA; (2) even if plaintiff had a private right of action under the ALHA, the ALHA permits an assisted living home to involuntarily  terminate a residential services contract against a resident's will and it is undisputed CSC has evidence to support its decision to involuntarily   terminate    plaintiff's    contract    that    reflect    CSC's    legitimate, nondiscriminatory, statutorily permitted reasons for its decision.

**II.     CSC Is Entitled To Summary Judgment On Count I Because Plaintiff Does Not Have a Private Right of Action for Any Alleged Violation of the ALHA**

CSC moved for summary judgment on Count I, plaintiff's claim that CSC violated the ALHA.[2]  In her opposition, plaintiff attempts to defeat judgment for CSC by claiming she has marshaled some evidence that  she asserts  demonstrates CSC violated the ALHA.  *See* Opposition at 1-27.  Plaintiff argues that because she has marshaled some

---

[1]Dkt. No. 1, Ex. C at ¶¶ 23-24 (Amended Complaint).
[2]Dkt. No. 1, Ex. C at ¶¶ 23-24 (Amended Complaint).

Defendant CSC's Reply to Opposition to
Motion for Summary Judgment No. 1 Re:  Count I
*Winters v. CSC*, Case No. 3:06-cv-00083-TMB                                    Page 2 of 22

evidence regarding CSC's alleged violation of the ALHA, there is a factual dispute regarding whether CSC violated the ALHA, and because there is a factual dispute, CSC is not entitled to summary judgment. *See id.* The predicate problem with plaintiff's argument is that irrespective of the evidence plaintiff has, the evidence cannot support plaintiff's claim against CSC and preclude summary judgment in CSC's favor because the ALHA does not permit plaintiff to sue CSC for any alleged violation of the ALHA.

As explained in CSC's opposition to plaintiff's motion for summary judgment on Count I, and CSC's cross-motion for summary judgment on Count I, there is no private right of action for alleged violations of the ALHA.[3] Thus, the Court should grant CSC summary judgment on the alleged violations of the ALHA.

AS 47.33 *et seq.* is health and safety legislation governing assisted living homes. The purpose of the legislation is, in part:

> (1)    contribute to the development of a system of care by encouraging the establishment of assisted living homes that provide a home-like environment for elderly persons and persons with a mental or physical disability who need assistance with the activities of daily living;
>
> . . .
>
> (3)    establish standards that will protect residents of assisted living homes, while at the same time promoting an environment that will encourage resident growth and independence, without discouraging the establishment and continued operation of those homes.

---

[3]*See* Dkt 246 at 14-25 and 247 at 2-4. CSC's argument in its opposition to plaintiff's motion for partial summary judgment and cross-motion are expressly incorporated for completeness and ease of reference.

Defendant CSC's Reply to Opposition to
Motion for Summary Judgment No. 1 Re: Count I
*Winters v. CSC*, Case No. 3:06-cv-00083-TMB                                    Page 3 of 22

*See* AS 47.33.005. Courts uniformly hold that health and safety legislation does not create a private cause of action in the absence of explicit language to that effect.[4] Alaska Statute 47.33.005-.990 nowhere evidences an intent to create a private right of action. Although the ALHA provides for the protection of the public, nowhere does it establish civil liability when an assisted living facility involuntarily terminates a resident's contract.

In *Reed v. Municipality of Anchorage*, 782 P.2d 1155, 1157-58 (Alaska 1989), the Alaska Supreme Court declared that courts uniformly hold that health and safety legislation "does not create a private cause of action <u>in the absence of explicit language to that effect</u>." *Id.* at 1157 (emphasis in original). Alaska Statute 47.33.005-.990 plainly is health and safety legislation, and nowhere does AS 47.33.005-.990 create a private right of action for in involuntarily terminating a resident's contract. *See* AS 47.33.360.

It would be inappropriate to imply a private right of action even if AS 47.33.005-.990 was not health and safety legislation. *OK Lumber Co., Inc. v. Providence Washington Ins. Co.*, 759 P.2d 523 (Alaska 1988), is instructive in this regard. There, the plaintiff alleged that Providence Washington Insurance Co. violated the Unfair Claims Settlement Practices Act, AS 21.36.125, and that the statute impliedly created a private cause of action arising from the insurer's violation of that Act. In rejecting plaintiff's claim, the court declared:

---

[4]The Alaska Legislature was certainly cognizant of its ability to create private rights of actions when it so desired. For example, AS 18.13.020 authorizes private rights of action in the context of genetic testing.

Defendant CSC's Reply to Opposition to
Motion for Summary Judgment No. 1 Re: Count I
*Winters v. CSC*, Case No. 3:06-cv-00083-TMB                    Page 4 of 22

The director of insurance has authority to enforce chapter 36. AS 21.06.080. The director may conduct an investigation, institute proceedings, issue a stop order, impose a penalty, or revoke a license. AS 21.36.320. The director may also seek injunctive relief. AS 21.36.330. In addition, violation of a provision of title 21 or regulations promulgated thereunder constitutes a "fraudulent insurance act" and a class B misdemeanor.

The statute nowhere provides that a third party claimant has a private cause of action against the insurer for violation of the Unfair Claim Settlement Practices Act. Thus, the question before us is whether the statute contains such an implied private right of action.

In our view, there is much in the statute which suggests that the legislature did not intend to create a private right of action for damages. The statute prohibits acts committed so frequently as to become a trade practice; it does not readily lend itself to enforcement by a private cause of action arising from a single claim. [citations omitted.] Further, remedies for violations are set forth specifically and in detail, giving rise to an implication of exclusivity. [citations omitted.] Moreover, the list of acts prohibited is extensive, some violations may be relatively minor, and the standards for determining whether a prohibited act has been committed are often imprecise. These characteristics are balanced by the relatively modest monetary sanctions imposed for statutory violations. These limited sanctions stand in stark contrast to the potential compensatory and punitive damage awards which would be available in a private damage action.

Thus, although we acknowledge that the statute was enacted to benefit both insureds and third party claimants, and that implying a private cause of action could have the effect of deterring conduct which the statute seeks to deter, implying the private right of action here asserted nonetheless seems inconsistent with the statutory scheme. Allowing such damage actions would tend to upset the implicit legislative judgment that the broad proscriptions of the act are tolerable because of the limited sanctions imposed when violations occur. We therefore conclude that a third party claimant has no cause of action against an insurer under AS 21.36.125.

*OK Lumber Co.*, 759 P.2d at 526-27 (footnotes and citations omitted).

Defendant CSC's Reply to Opposition to
Motion for Summary Judgment No. 1 Re:  Count I
*Winters v. CSC*, Case No. 3:06-cv-00083-TMB                                    Page 5 of 22

Similar to AS 21.36.125, which was the statute at issue in *OK Lumber,* AS 47.32 et seq.,[5] and AS 47.33.005-.990 contains an elaborate enforcement system, giving rise to an implication of exclusivity.   The licensing agency has authority to enforce the regulations governing assisted living facilities.   AS 47.32.030.   The licensing agency may conduct an investigation, institute proceedings, revoke an assisted living home

---

[5]The prior enforcement system that applied solely to assisted living homes was codified in AS 47.33 et seq. was repealed by § 49 ch 57 SLA 2005.   The current enforcement system is codified in AS 47.32 et seq. and applies to numerous types of health care entities, including assisted living facilities.   *See* AS 47.32.010(b)(2).   Nowhere does AS 47.32 et seq. authorize a private right of action under facts similar to the situation involving Helen Winters and CSC.   The only potentially relevant statute, AS 47.32.090(c) states:

> (c) A licensed entity may not take retaliatory action against a person who files a complaint. Except as provided in AS 47.05.350 and AS 47.32.160, a complainant against whom a retaliatory action has been taken may recover treble damages in a civil action upon a showing that the action was taken in retaliation for the filing of a complaint.

AS 32.090(c).  However, this statute could not authorize Helen Winters' action against CSC because it is undisputed that Helen Winters did not file a complaint against CSC with the Department of Health and Social Services prior to CSC notifying Helen Winters of its intent to terminate her lease in January 2006.  Consequently, there could be no retaliation for the filing of a non-existent complaint, and thus no grounds upon which a retaliatory suit would be authorized under the ALHA.  Plaintiff's argument that she has evidence that CSC violated the ALHA, *see* Opposition at 23-27, is irrelevant because plaintiff has no right to bring a retaliation claim under the ALHA.  Moreover, as explained in detail in Section III *infra*, even if the ALHA permitted a private right of action, and even if plaintiff made a prima facie case, plaintiff's claim still fails as a matter of law because CSC had legitimate reasons for terminating plaintiff's contract.  *See* Section III *infra* (explaining that independent experts Dr. Geeseman, Dr. Von Preyss-Friedman, and Ms. Panchot all concluded there is evidence plaintiff's needs for services and the quantity of time needed to provide those services is not compatible with CSC's staff to resident ratio, and at least two of CSC's experts concluded CSC was justified in terminating plaintiff's contract).   The third expert, Dr. Geeseman, did not directly address the question of whether CSC had legitimate reasons for terminating plaintiff's contracts.

Defendant CSC's Reply to Opposition to
Motion for Summary Judgment No. 1 Re:  Count I
*Winters v. CSC*, Case No. 3:06-cv-00083-TMB                                Page 6 of 22

license, deny renewal of an assisted home license, suspend operations of an assisted living home, suspend the ability of an assisted living home to take in new residents, place conditions on the ability of an assisted living home to take in new residents, restrict the type of services that an assisted living home may provide to residents, or assess an administrative fine.    AS 47.32.030; AS 47.32.090; AS 47.32.130; AS 47.32.140.

Additionally, similar to AS 21.36.125 which again was at issue in *OK Lumber*, the nature of the Assisted Living Homes legislation is not clear and precise, but is broad and general.  Moreover, the list of acts prohibited is extensive, some violations may be relatively minor, and the standards for determining whether a prohibited act has been committed are often imprecise.    *See, e.g.*, AS 47.33.300;[6] 47.33.330.[7]    These

---

[6]AS 47.33.300 recites nineteen 919) resident rights such as the right to live in a "safe and sanitary environment" and the right to "participate in and benefit from community services," which are obviously broad and general in nature. *See also* Dkt. 247 at 18-19 (listing all 19 resident rights).
[7]AS 47.33.330 states:

**Prohibitions.**  (a)  An assisted living home, including staff of the home, may not

(1)    deprive a resident of the home of the rights, benefits, or privileges guaranteed to the resident by law;

(2)    enter a resident's room without first obtaining permission, except . .

(3)    impose religious beliefs or practices upon a resident or require a resident to attend religious services;

Defendant CSC's Reply to Opposition to
Motion for Summary Judgment No. 1 Re:  Count I
*Winters v. CSC*, Case No. 3:06-cv-00083-TMB                                    Page 7 of 22

characteristics are balanced by the relatively modest monetary sanctions imposed for statutory violations.[8]  These relatively limited sanctions stand in stark contrast to the potential compensatory and punitive damage awards which could be available in a private damage action.  Just as in *OK Lumber*, large tort damage awards could upset the implicit legislative judgment that the broad prescriptions of the act are tolerable because of the limited sanctions imposed.  Additionally, existing remedies are adequate, and there is no need to create a private cause of action.  (Plaintiff has

---

(4)    place a resident under physical restraint unless the resident's own actions present an imminent danger to the resident or others;

(5)    place a resident under chemical restraint; this paragraph does not prevent a resident from voluntarily taking tranquilizers, or other medication, prescribed by a licensed physician;

(6)    compel a resident to perform services for the home, except as contracted for by the resident and the home or as provided for in the resident's assisted living plan; or

(7)    restrain, interfere with, coerce, discriminate against, or retaliate against a resident for asserting a right specified by this chapter or by other law.

(b)    An assisted living home may not physically restrain a resident unless the home has a written physical restraint procedure that has been approved by the licensing agency.  The home shall terminate the physical restraint as soon as the resident no longer presents an imminent danger.

(c)    An owner, administrator, employee, or agent of an assisted living home may not act as a representative of a resident.

[8]AS 47.32.140(f) (an administrative fine may not exceed $2,500 a day for each day that a violation continues, and may not exceed a total of $25,000 for a single violation).

Defendant CSC's Reply to Opposition to
Motion for Summary Judgment No. 1 Re:  Count I
*Winters v. CSC*, Case No. 3:06-cv-00083-TMB                    Page 8 of 22

asserted numerous other statutory, breach of contract, and common law claims against CSC that would provide her adequate protection and relief for the alleged unlawful acts committed by CSC.)   It is also noteworthy that the Honorable Morgan Christen, Presiding Judge of the Alaska Superior Court in Anchorage, in an unpublished disposition, explicitly rejected the same argument that plaintiff is making here, concluding that the Alaska Assisted Living Homes Act "does not create a private right of action[.]"[9]

The Wisconsin Court of Appeals in *Farr v. Alternative Living Services, Inc.*, 643 N.W.2d 841 (Wis. App. 2002), dismissed a similar claim alleging health and safety legislation created a private right of action.  *Id.* at 843.  There, Farr, an elderly woman suffering from dementia and other health problems, resided at Woven Hearts of Middleton, a community-based residential facility ("CBRF").[10]   Farr eloped from the Woven Hearts facility, wearing only a thin nightgown, on a winter morning when the

---

[9]Dkt. 261, Ex. C (Order, *Metcalf v. Chugiak Senior Citizens, Inc.*, 3AN-02-13137 CI). This order was not published, and was decided by a different court, so it has no binding or precedential effect on this Court.  *See* D. Ak. LR 7.1(c); *McCoy v. State*, 80 P.3d 757, 764 (Alaska App. 2002) (holding that unpublished decisions may not be cited as binding precedent, but may be relied upon by judges and lawyers "for whatever persuasive power those decisions might have").   However, the Order is appropriately cited for educational, informative, and persuasive purposes because it is a ruling from the only court that CSC is aware of that has addressed whether AS 47.33.005-.990 confers a private right of action.

[10]"'Community-based residential facility' means a place where 5 or more adults who are not related to the operator or administrator and who do not require care above intermediate level nursing care reside and receive care, treatment or services that are above the level of room and board but that include no more than 3 hours of nursing care per week per resident."  *Farr v. Alternative Living Services, Inc.*, 643 N.W.2d 841, 843 n. 2 (Wis. App. 2002).

Defendant CSC's Reply to Opposition to
Motion for Summary Judgment No. 1 Re:  Count I
*Winters v. CSC*, Case No. 3:06-cv-00083-TMB                                    Page 9 of 22

temperature was approximately twelve degrees. *Id.* at 843.  A passerby found her between 4:00 and 5:00 in the morning, walking away from the facility with her walker, barefoot on a frost-covered sidewalk.  *Id.*  She was returned to the facility and subsequently admitted to a hospital, where she was treated for frostbite injuries to both feet. *Id.*

Prior to Farr's elopement, the Department of Health and Family Services, Bureau of Quality Assurance, had investigated Woven Hearts in response to complaints of inadequate treatment. *Id.*  The investigation revealed that the facility had not complied with certain provisions of applicable statutes and regulations, and the Bureau ordered the facility not to admit any additional residents until the Department received plans of correction.  *Id.*  Following Farr's elopement, the Department again conducted an investigation that revealed the facility was still in non-compliance with the law.  *Id.*  With regard to Farr's elopement, the Department reported in its "Statement of Deficiencies" that the facility failed to report Farr's elopement as required; that the facility failed to meet Farr's treatment needs by waiting until two days after her elopement before seeking medical intervention for her injuries; that staff knew of her potential risk to elope from the facility; and that an exit door alarm was not functioning properly at the time of Farr's elopement thus failing to alert staff.  *Id.*

Farr commenced the action against Woven Hearts asserting negligence, seeking among other relief, punitive damages based upon the facility's alleged intentional disregard of her rights. *Id.* Farr later moved to amend her complaint, framing her cause

Defendant CSC's Reply to Opposition to
Motion for Summary Judgment No. 1 Re:  Count I
*Winters v. CSC*, Case No. 3:06-cv-00083-TMB                          Page 10 of 22

of action largely in terms of alleged violations of applicable statutes and regulations. *Id.* at 843-44.

In dismissing her claim based upon alleged violations of applicable statutes and regulations, the court in *Farr* held:

> Farr claims that she has a private right of action for violations of her rights as a resident of a CBRF as set forth in Wis. Stat. ch. 50 and Wis. Admin. Code § HFS 83. Whether a statute creates a private cause of action presents a question of statutory interpretation, subject to our de novo review, during which our goal is to "ascertain and give effect to the legislature's intent." [citations omitted.] <u>"[A] private right of action is only created when (1) the language or the form of the statute evinces the legislature's intent to create a private right of action, and (2) the statute establishes private civil liability rather than merely providing for protection of the public."</u> [citations omitted.]

643 N.W.2d at 846 (emphasis added).

> The court in *Farr* went onto declare:

> The Department of Health and Family Services must, under Wis. Stat. § 50.02(2), "by rule . . . develop, establish and enforce regulations and standards for the care, treatment, health, safety, rights, welfare and comfort of residents in community-based residential facilities." The department has established these standards in Wis. Admin. Code § HFS 83 ("Community Based Residential Facilities"). Farr bases her entitlement to a private cause of action for violations of the statute and regulations on Wis. Stat. § 50.10 . .

> The plain language of Wis. Stat. § 50.10 demonstrates that the section applies only to residents of a "nursing home," which is different from a CBRF by statutory definition. Moreover, the private remedy under § 50.10 is limited to an action for mandamus or injunctive relief. Suits for monetary damages, such as the present one, are not mentioned. In short, we find no "clear indication" of a legislative intent in chapter 50 to permit CBRF residents to sue for compensatory and punitive damages based solely on alleged

Defendant CSC's Reply to Opposition to
Motion for Summary Judgment No. 1 Re: Count I
*Winters v. CSC*, Case No. 3:06-cv-00083-TMB                    Page 11 of 22

violations of the standards for CBRFs set out in the statutes or administrative code.

643 N.W.2d at 846-47. The court held Farr's only remedy for statutory violations appeared to lie in certain reporting requirements and a mandated grievance procedure. *Id.* at 847 n.5.

In accord with the Alaska Supreme Court's declaration that health and safety legislation "does not create a private cause of action in the absence of explicit language to that effect," *Reed*, 782 P.2d at 1157, absence of any provision under AS 47.33 et seq. (or any other Alaska statute) providing for a private right of action that would enable plaintiff to sue CSC for alleged violations of the Alaska Assisted Living Homes Act, and the reasoning in *Farr*, 643 NW2d at 846-47, plaintiff may not assert a private right of action against CSC for an alleged violation of the Alaska Assisted Living Homes Act. The Court should therefore grant CSC's motion for summary judgment on Count 1, plaintiff's claim for relief under the Alaska Assisted Living Homes Act.

## III. The ALHA Permits An Assisted Living Home To Involuntarily Terminate A Residential Services Contract Against A Resident's Will And CSC Has Evidence To Support Its Decision To Involuntarily Terminate Plaintiff's Contract

Even if plaintiff had a private right of action under the ALHA, CSC also moved for summary judgment because the ALHA permits an assisted living home to involuntarily terminate a residential services contract against a resident's will and it is undisputed that CSC articulated legitimate non-discriminatory reasons for its decision and has evidence to support its decision to involuntarily terminate plaintiff's contract. *See* Motion at 16-23. In her opposition, plaintiff argues that because she has marshaled some

Defendant CSC's Reply to Opposition to
Motion for Summary Judgment No. 1 Re: Count I
*Winters v. CSC*, Case No. 3:06-cv-00083-TMB                                    Page 12 of 22

evidence regarding CSC's alleged violation of the ALHA, there is a factual dispute regarding whether CSC violated the ALHA, and because there is a factual dispute, CSC is not entitled to summary judgment.  *See id.*  Plaintiff's argument is legally incorrect and is based on a fundamental misunderstanding of what is required for an assisted living facility to involuntarily terminate a contract.

Alaska Statute 47.33.360 allows a home to involuntarily terminate a residential services contract.  That section provides in pertinent part:

> **Sec. 47.33.360.  Involuntary termination of contract.**  (a) An assisted living home may not terminate a residential services contract with a resident of the home against the resident's will, except
>
> > (1)    for medical reasons:
> >
> > (2)    for engaging in a documented pattern of conduct that is harmful to the resident, other residents, or staff of the home;
> >
> > (3)    for violation of the terms of the residential services contract, . . .
> >
> > . . . .
> >
> > (6)    when the home can no longer provide or arrange for services in accordance with the resident's needs and the resident's assisted living plan.

Thus, AS 47.33.360 permits the <u>invo luntary</u> termination of a resident's service's contract if the assisted living home determines termination is warranted based on the evidence it possesses.  The fact that plaintiff disputes and objects to the basis for CSC's actions and cites some evidence in support of her desire to stay at CSC and to refute

Defendant CSC's Reply to Opposition to
Motion for Summary Judgment No. 1 Re:  Count I
*Winters v. CSC*, Case No. 3:06-c v-00083-TMB                                    Page 13 of 22

the basis of CSC's termination, is of no import and is even to be expected given the underlined involuntary nature of the termination.  However, AS 47.33.360 gives the assisted living home the unilateral discretion to involuntarily terminate the resident's contract "against the resident's will" under certain circumstances.   The fact that there is conflicting evidence regarding plaintiff's medical condition,  whether and why plaintiff engaged in a documented pattern of conduct that was harmful to herself and others,  the manner in which plaintiff violated the terms of the residential services contract, and whether CSC could no longer provide for plaintiff's services in accord with the resident's assisted living plan is irrelevant.  Alaska Statute 47.33.360 gives CSC the right to unilaterally and involuntarily terminate plaintiff's contract "against the resident's will."  The statutory provision allowing CSC to involuntarily terminate a resident's service contract does not require the home to demonstrate its reasons for terminating the contract are undisputed or that the home's evidence supporting those reasons must outweigh contrary evidence. There is no standard of proof at all required by the statute other than some evidence supporting the home's reasons for involuntarily terminating the contract.

If plaintiff were able to contest and dispute the basis for CSC's decision, the predicate basis of the statute, *i.e.*, permitting an assisted living home to unilaterally terminate the contract against the resident's will would be abrogated.  Moreover, if the court were to construe AS 47.33.360 in accord with plaintiff's argument, every time an assisted living home involuntarily terminated a resident's contract against the resident's will, the resident could have a federal jury trial, even where, as here, the assisted living home has evidence to support is legitimate non-discriminatory reasons.  This would be

Defendant CSC's Reply to Opposition to
Motion for Summary Judgment No. 1 Re:  Count I
*Winters v. CSC*, Case No. 3:06-cv-00083-TMB                    Page 14 of 22

a complete abrogation of the statute which expressly authorizes and permits the assisted living home to engage in such actions.  Plaintiff is reading into the statute and placing burdens on the assisted living facility requirements that are belied by the language of the statute.

Moreover, there is abundant evidence to support CSC's termination based on CSC's legitimate non-discriminatory reasons.  As explained in CSC's motion, CSC terminated plaintiff's contract because plaintiff's medical needs exceeds the level of services CSC can provide, plaintiff had engaged in a documented pattern of conduct that was harmful to herself and others, and had violated the terms of the residential services contract.[11]  In support of its motion for summary judgment on Count I, CSC submitted the affidavit of CSC's Executive Director, Linda Hendrickson, establishing the basis for terminating plaintiff's RSC for the reasons stated in AS 47.33.360(a)(2), (3) and (6).  Dkt. 122 at 13, 19, and Ex. A, ¶¶ 5-6 (Affidavit of Linda Hendrickson).

Ms. Hendrickson's affidavit testimony is also supported by the opinions of three expert witnesses who have all reviewed the evidence and concluded that there is a mismatch between plaintiff's needs and the level of services CSC can provide.  Two of CSC's experts expressly concluded CSC was justified in terminating plaintiff's contracts.  For example, Dr. Geeseman not only performed an independent psychiatric evaluation of plaintiff in December 2006, she also reviewed extensive records that included progress notes from CSC starting from the date of plaintiff's admission to CSC, hospital records, communications from plaintiff's

---

[11]Ex. A at ¶¶ 5-6.

Defendant CSC's Reply to Opposition to
Motion for Summary Judgment No. 1 Re: Count I
*Winters v. CSC*, Case No. 3:06-cv-00083-TMB                                    Page 15 of 22

daughter, and medical records from plaintiff's health care providers.  Dkt. 231, Ex. A at 3, 18-19 (Dr. Geeseman's Report).  In her report, Dr. Geeseman notes "plaintiff is in need of assistance with daily living. . . and [d]ifficulties have arisen between Ms. Winters and the staff of Chugiak Senior Center (hereafter known as CSC) where she resides, in the provision of this assistance.   Ms. Winters needs assistance and desires this assistance be provided in the way she wants it done, sometimes in very specific ways." Dkt. 231, Ex. A at 3.  Dr. Geeseman further notes that "CSC records indicate tensions arising in interactions between CSC staff and Ms. Winters, quantities of time spent in assisting Ms. Winters that are apparently in excess of the average for care provision at CSC, and that two staff members are sometimes present when providing assistance to Ms. Winters which is not standard protocol for CSC provision of service."  *Id.*   Thus, Dr. Geeseman's assessment corroborates CSC's position that plaintiff's needs exceed the level of services CSC can reasonably provide without making unreasonable accommodations, straining staff, and potentially short changing other residents.

Dr. Geeseman also drew conclusions from her document review and evaluation that are directly relevant to whether CSC had grounds to terminate plaintiff's RSC based on plaintiff's need for mental health services.  For example, Dr. Geeseman concluded that by plaintiff's own self-reporting, she has "obsessive-compulsive personality traits" and "[u]nder stress, duress or fear, obsessive-compulsive characteristics may become exacerbated as the individual attempts to gain control over a situation that is not

Defendant CSC's Reply to Opposition to
Motion for Summary Judgment No. 1 Re:  Count I
*Winters v. CSC*, Case No. 3:06-cv-00083-TMB                                    Page 16 of 22

comfortable to them." *Id.* at 8.  Dr. Geeseman further noted that it appeared from the records plaintiff "demonstrates this perfectionistic characteristic" and [her] directions for specific steps to be performed when staff are assisting her, appear to fall into this phenomenon of exacerbation and do not appear to be secondary to an obsessive-compulsive disorder, which is a ritualized disorder distinct from obsessive-compulsive personality disorder." *Id.* at 8.  Dr. Geeseman also concluded:

> In reviewing both the statements of Ms. Winters' daughter and the staff notes, it appears that there is a mismatching of the resident's needs and the facility's service.  Ms. Winters does have needs for assistance in many areas by virtue of her many medical conditions.  The needs and the quantity of time needed to meet those needs does not appear to be compatible with the staff:resident ratio that exists at CSC.  It appears that both sides have had a difficult time trying to make the situation a workable one.  It appears that when the mismatches arise, that Ms. Winters may become more uncomfortable either physically and/or emotionally and she again attempts to give directions to bring her world back into a state of comfort.  However, these directions seems to complicate the situation further.  There appears to be a disparity between Ms. Winters' needs (real or perceived) and the staff's availability and limitations for meeting those needs.

*Id.* at 9.

In terms of plaintiff's mental health, Dr. Geeseman did find evidence of "some cognitive impairment", and noted "[m]ore formal psychological testing could be performed to evaluate the extent of the impairment." *Id.* at 8.  Clearly, Dr. Geeseman identified "the primary issue in the current difficult situation is in creating and/or finding a good match of assistance provision for Ms. Winters' needs." *Id.* at 10.

Defendant CSC's Reply to Opposition to
Motion for Summary Judgment No. 1 Re:  Count I
*Winters v. CSC*, Case No. 3:06-cv-00083-TMB                                    Page 17 of 22

CSC's expert in geriatric medicine and long term care, Dr. Sabine von Preyss-Friedman, also provided an expert report supporting CSC's reasons for terminating plaintiff's RSC.  Based upon Dr. von Preyss-Friedman's review of numerous records, her site visit to CSC, interviews with CSC staff, tours of other similar facilities in the Anchorage area, and her consultation with Dr. Geeseman and review of Dr. Geeseman's report, Dr. von Preyss-Friedman concluded the following:

### Can CSC meet the care needs of Helen Winters?

Looking at the mere physical capabilities of this patient it appears that admitting her to CSC in September of 2004 appeared reasonable as she had previously been independently living in the community and had increased disability due to a right arm fracture, that was expected to heal. However, after admission it became known to the CSC staff what was previously not known: that the patient's care needs were not primarily determined by her physical abilities but by the patient's psychological need to engage other people in control of her environment.  Likely, due to the patient's losses that she has experienced as a consequence of old age and disability, the patient is apparently only able to cope with responding to her loss of control with a need to control her caregivers and engage them in ritualistic appearing caregiving demands.  The patient's records at CSC document in detail the patient's time consuming needs for staff attention.

I have extensive experience in discharging patients to assisted living facilities and evaluating them for appropriateness of assisted living facilities as well as in the care of frail, elderly, and debilitated patients.  It is my experience as a geriatrician who takes care of frail, elderly and debilitated patients, that assisted living facilities are usually overwhelmed by patients who need more than one person assist and care over an extended period of time as Ms. Winters does.  On a more probable than not basis, the timing demands for toileting and showering also do exceed

Defendant CSC's Reply to Opposition to
Motion for Summary Judgment No. 1 Re:  Count I
*Winters v. CSC*, Case No. 3:06-cv-00083-TMB                                    Page 18 of 22

that what is usually provided in assisted living facilities.

It is unfortunate that Ms. Winters' need for control of her environment has escalated to the point of verbal abuse of staff as well as physical aggression towards staff as documented above. Further, the needs of Ms. Winters have affected the ability of staff to provide optimal care for other patients residing at Chugiak Senior Citizens, Inc.

The lease agreement signed by Carol Winters, POA, on September 24, 2004, specifies on page 4 that termination by management against the resident's will is agreed upon if the level of care is no longer available at the facility and for engaging in a documented pattern of conduct that is harmful to the resident, other residents or staff of the home.

*In regard to the level of care, again, consistent need for two-person care as well as lengthy toileting and grooming procedures, felt necessary* by Ms. Winters, exceed the level *of care at CSC.*

*As already outlined above, the patient unfortunately has acted verbally and physically abusive as well as socially inappropriate, placing significant stress on staff as well as other individuals in the facility.*

On a more probable than not basis, the patient's loss of hearing is not a major barrier to communication between staff and the resident and the care delivered to Ms. Winters. The staff during my interviews had appropriate knowledge on how to communicate with patients with hearing impairments such as Ms. Winters. Significant hearing impairment is not an unusual occurrence in the care of elderly patients, and there are other residents at CSC with similar hearing impairments. Also, in my experience treating numerous patients with severe hearing deficits, there is a distinct difference between speaking loudly because of hearing problems and an angry, raised voice and affect.

In summary, Ms. Winters is a 91-year-old female with multiple physical limitations that have been stable to improving after admission to Chugiak Senior Citizens, Inc. in September 2004. *However, her care needs are in excess of what the facility can provide due to the patient's expressed*

Defendant CSC's Reply to Opposition to
Motion for Summary Judgment No. 1 Re: Count I
*Winters v. CSC*, Case No. 3:06-cv-00083-TMB                    Page 19 of 22

*need to control her environment and caregivers beyond her mere physical restrictions. This has led to a burden on staff and other residents. Therefore, the facility has the right to terminate service to Ms. Winters according to Alaska State Statutes governing assisted living facilities and the agreed upon lease and service agreement at the time of Ms. Winters' admission.*

Dkt. 233, Ex. B, p. 4 and 56-57 (emphasis added).

Similarly, CSC also retained the services of Theresa Panchot, an expert with experience, training and knowledge as a direct caregiver and administrator of an assisted living facility. Ms. Panchot is familiar with the statutes and regulations pertaining to assisted living homes in Alaska, and currently she is the administrator for Marlow Manor Assisted Living Facility, one of the larger facilities in the Anchorage area. Ms. Panchot's review of documents, including the progress notes and telephonic and written correspondence, led her to reach a conclusion similar to those reached by Dr. Geeseman and Dr. von Preyss-Friedman. Ms. Panchot also concluded that there was a disparity between the services CSC could offer Ms. Winters, and Ms. Winters' apparent needs, demands and expectations. Dkt. 235, Ex. B at 69-80.

In sum, AS 47.33.360 permits CSC to involuntarily terminate plaintiff's contract against her will. As explained above, CSC has substantial evidence upon which it based its decision which reflect CSC's legitimate, nondiscriminatory, statutorily permitted reasons for its decision. *See* Ex. G (*Hall v. Meadowood Limited Partnership*, 7 Fed.Appx. 687, 689-90 (9th Cir. 2001) (affirming the district court's grant of summary judgment with respect to plaintiff's claim for unlawful retaliation where defendant proffered a legitimate, nondiscriminatory reason for its actions)).

Defendant CSC's Reply to Opposition to
Motion for Summary Judgment No. 1 Re: Count I
*Winters v. CSC*, Case No. 3:06-cv-00083-TMB                                    Page 20 of 22

Specifically, as Dr. Geeseman, Dr. Von Preyss-Friedman, Ms. Panchot and Ms. Hendrickson noted, CSC terminated plaintiff's contract because of plaintiff's medical condition, because plaintiff engaged in a documented pattern of conduct that was harmful to herself and others, for violating the terms of the residential services contract, and because CSC could not longer provide for plaintiff's services in accord with the resident's assisted living plan.  CSC is therefore entitled to summary judgment on Count I.

## IV.   Conclusion

For the reasons set forth above, CSC requests the Court enter partial summary judgment on the claims in Count I of the Amended Complaint, with prejudice.

DATED at Anchorage, Alaska, this 27th day of February, 2007.

DELANEY WILES, INC.
Attorneys for Chugiak Senior Citizens, Inc.

s/Donna M. Meyers and Clay A. Young
Delaney Wiles, Inc.
1007 W. Third Avenue, Suite 400
Anchorage, Alaska  99501
Phone:      907-279-3581
Fax:          907-277-1331
E-mail:      dmm@delaneywiles.com
E-mail:      cay@delaneywiles.com
Alaska Bar Assoc. No. 9006011 (DMM)
Alaska Bar Assoc. No. 7410117 (CAY)

Defendant CSC's Reply to Opposition to
Motion for Summary Judgment No. 1 Re:  Count I
*Winters v. CSC*, Case No. 3:06-cv-00083-TMB                          Page 21 of 22

**CERTIFICATE OF SERVICE**

I hereby certify that on 27th day
of February, 2007, a copy of foregoing
**Defendant's Reply to Opposition to**
**Motion for Summary Judgment No.**
**1 Re:  Count I** was served electronically on:

Jim Davis, Jr./Barbara Brink/
Nikole M. Nelson/Sonja Kerr
Alaska Legal Services Corporation
1016 West 6th Avenue, Suite 200
Anchorage, AK  99501


s/Donna M. Meyers and Clay A. Young
(127707)

Defendant CSC's Reply to Opposition to
Motion for Summary Judgment No. 1 Re:  Count I
*Winters v. CSC*, Case No. 3:06-cv-00083-TMB                Page 22 of 22