IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| HELEN WINTERS, through her power of attorney Carol Winters,<br><br>    Plaintiff,<br><br>vs.<br><br>CHUGIAK SENIOR CITIZENS, INC.,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 3:06-cv-00083-TMB<br>)<br>) |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF RECONSIDERATION**

On August 17, 2007, the Court granted summary judgment to Defendants on Plaintiff's Claims at Count VIII (Intentional Infliction of Emotional Distress) and Count IX (Negligent Infliction of Emotional Distress). (Doc. No. 294, hereinafter, "08/17/07 Order"). On September 26, 2007, the Court granted summary judgment to Defendants on Plaintiff's Claims at Count II (Alaska Human Rights Act), Count V (Americans with Disabilities Act), Count VI (Section 504 of the 1973 Rehabilitation Act), and Count VII (Fair Housing Act). (Doc. No. 300, hereinafter, "09/26/07 Order"). Plaintiffs hereby move for reconsideration pursuant to FRCP 59 and 60, asking that the Court correct errors of both fact and law.[1]

**STANDARD FOR REVIEW**

FRCP 59(e) permits a Court to amend or alter a judgment when necessary to correct manifest errors of fact and law and to prevent manifest injustice. *See also* 11 Wright, Miller & Kane, Federal Practice and Procedure § 2810.1 (2d ed. 1995); *Transito Trujillo v. Board of Education of the Albuquerque Public Schools*, 470 F. Supp. 2d 1270 (D. Ct. NM 2005).

---

[1] The Court's 8/17/07 Order also granted summary judgment to Defendants on Plaintiffs' Count III Claim (Landlord-Tenant Act); Plaintiffs do not seek reconsideration on that Claim.

FRCP 60 permits the Court to hear a motion for reconsideration under like circumstances, and Rule 60(b)(6) permits relief from judgment for any other reason justifying relief from judgment and to further the interest of justice. *Latshaw v. Trainer Wortham & Co.*, 452 F.3d 1097, 1102 (9th Cir. 2006); *United States of American v. Washington*, 394 F.3d 1152 (9th Cir. 2005).

## ARGUMENT

Plaintiffs request that the Court reconsider its grant of summary judgment to Defendants on Counts V, VI, and VII (federal disability discrimination), Count II (Alaska Human Rights Act state disability discrimination), and Counts VIII and IX (state-law intentional infliction of emotional distress and negligence). These claims present genuine issues of material fact that should be tried to a jury.

In its two orders, the Court has incorrectly weighed the evidence and determined facts. A Court must not weigh the evidence or find the facts in reviewing a motion for summary judgment; such determinations are wholly the province of the jury. Rather, the Court's role is limited to narrowly determining whether a genuine issue exists as to material facts requiring a trial. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249 (1986). The burden is on the party seeking summary judgment to establish an absence of genuine issues of material fact. *Alaska Rent-A-Car, Inc. v. Ford Motor Co.*, 526 P.2d 1136 (Alaska 1976). The non-moving party, here Ms. Winters, simply is required to show specific facts, as opposed to general allegations, that present a genuine issue worthy of trial. 10A Wright, Miller & Kane, Federal Practice and Procedure § 2727 (2d. ed. 1998). Summary judgment is inappropriate where there are genuine factual issues that may reasonably be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc., supra*. In this case, CSC cannot

prevail since a reasonable jury could infer from Ms. Winters' evidence that she has stated a valid claim under the federal and state disability discrimination statutes and under Alaska's common-law standards for infliction of emotional distress.

I.  **PLAINTIFF'S FEDERAL DISABILITY-DISCRIMINATION CLAIMS PRESENT GENUINE ISSUES OF MATERIAL FACT AND SHOULD BE TRIED TO A JURY.**

In its orders, the Court has found that a principal reason CSC says it is evicting Ms. Winters is that she needs more care than CSC is suited to provide, even though it knew about her impairments when she entered the facility [09/26/07 Order at 7-8]; that there are genuine issues of material fact about the nature and degree of care Ms. Winters requires [09/26/07 Order at 8]; that, at a minimum, there is a genuine issue of material fact about whether she is a qualified individual with a disability [09/26/07 Order at 5-6]; and that there is a genuine issue of material fact about whether CSC's threatened eviction is a retaliation against Ms. Winters for asserting her rights to contact the Long Term Care Ombudsman to complain about the care she was receiving [08/17/07 Order]. These findings should have been more than enough to support a crucial additional more general finding: that there is a genuine issue of material fact about whether CSC's threatened eviction discriminates against Ms. Winters on the basis of her disability. *Dark v. Curry*, 451 F.3d 1078 (9th Cir. 2003) (reversing summary judgment on ADA employment claim where a genuine issue of fact existed as to whether termination was motivated, even in part, by animus based on plaintiff's disability or request for reasonable accommodation).

It may be that the Court granted summary judgment because it believed that on Plaintiff's own evidence – specifically, Tom Isaacs' deposition testimony – Ms. Winters' care placed a "heavier load" on the facility than anyone else's care did, and so CSC could validly deny her its continuing services simply because she was more disabled than anyone

else. Before addressing more general disability-discrimination legal principles, the Court should reconsider the factual conclusion it apparently drew from Mr. Isaacs' testimony. Even if CSC would have the legal right to evict Ms. Winters simply because she needed more care than anyone else at CSC, in actual fact she needs less care than a number of other residents do – making it more likely that CSC is retaliating against her for complaining or otherwise discriminating against her on the basis of her type of disability.

> A. **Tom Isaacs' Testimony Did Not Establish That Ms. Winters Needs Care CSC is Unable to Provide.**

On page 8 of the 09/26/07 Order, the Court referred to the testimony of Mr. Tom Isaacs, one of the aides at CSC who worked directly with Ms. Winters, quoting Mr. Isaacs as saying Ms. Winters is a "heavier load. She takes more time and some of that is – I think a lot of that is because of her anxiety disorder."[2] It is possible that the Court believed that on Plaintiff's own evidence, Ms. Winters needs a level of care beyond that given to other residents and beyond CSC's ability to provide. This is not true. Mr. Isaacs' remark needs to be read in context – as the Court can read it in the attached Ex. A, which includes pages 72-75 of the deposition, P. Ex. 53. Especially when read in conjunction with the totality of Mr. Isaacs' deposition testimony, this passage demonstrates that Mr. Isaacs does not consider Ms. Winters to be more work than other residents.

Throughout Mr. Isaacs' hours-long deposition, he averred that in comparison to other individuals at CSC, Helen was **not** a heavier load. Mr. Isaacs testified he had to feed other residents; Helen does not require feeding.

> Q. You said you had to feed one resident. You have to actually spoon food into that person's mouth?

---

[2] The 09/17/07 Order does not give a citation for this quote, but the testimony quoted is at page 75 of Mr. Isaacs' deposition.

> A. Yeah (affirmative), and this resident gets fed two times a day, doesn't want breakfast, wants lunch and dinner, for a half hour….They're really physically not able to feed themselves…. (T. 54-55)

Mr. Isaacs testified he had four other residents who required oxygen. T. 56. Helen does not require oxygen. Mr. Isaacs testified there were residents who had catheters. T. 59, T. 61. Helen does not require a catheter. Mr. Isaacs testified there were residents who required prompting to brush their teeth or required staff to brush their dentures. T. 110. Helen is independent is her dental care. Mr. Isaacs testified there were other residents who had bladder incontinence and bowel incontinence. Nearly 25% had bladder incontinence, as does Helen, and those residents need to be prompted every two hours and sometimes twice at night. (T. 107-108). Mr. Isaacs testified there were at least two other residents who took as much time to transfer as Helen:

> Some people take almost no time to transfer, half a minute or something to a minute. Some people take more. Helen takes a little more. **There's another resident, however, who takes a fair amount of time too, as much time as Helen**. T. 66. (Emphasis added.)
>
> There's another resident who uses a walker and occasionally uses a wheelchair. Now, she can be time consuming getting up too. (T. 67)
>
> There's one resident who is in a wheelchair at all times… **There's another resident who takes a lot of time, on the same par with Helen, but he's not – he's ambulatory with assistance**." (T. 104). (Emphasis added.)
>
> There was a resident that requires turning every two hours due to skin problems. (T. 110-111).

Mr. Isaacs' testimony as a direct care giver as to whether Ms. Winters' needs and CSC's resources were compatible goes directly to the Court's conclusion that CSC was not attempting to evict Ms. Winters "because of her disability." A fact is material if it might affect the outcome of the case, *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). The factual premise leading to the Court's conclusion was that Ms. Winters needs a higher

level of care than other residents. Mr. Isaacs' remarks about Ms. Winters being a "heavier load," in context, simply do not establish that factual premise.

> **B.     Summary Judgment Against Plaintiff's Federal Disability-Discrimination Claims Would Not Have Been Proper Even If Ms. Winters Had Required More Care Than Anyone Else at CSC; The Real Questions Are Whether Accommodating Ms. Winters Would Have Been an Undue Hardship for CSC or Required a Fundamental Alteration of Its Services.**

The Court's summary judgment against Ms. Winters' disability-discrimination claims rests on the theory that CSC only has to provide a certain level of care and so cannot, by definition, discriminate on the basis of disability by evicting a resident whose disabilities require more care than it normally provides. Thus, the Court concluded that CSC did not attempt to evict Ms. Winters on the basis of her disability.

But Ms. Winters was not required to establish that her disabilities were the "sole reason" CSC sought to evict her. In the employment context, the Ninth Circuit has firmly held that "because of a disability" requires only a showing that the disability is a "motivating factor" and a plaintiff need not establish the disability as the "sole reason" for termination. *Humphrey v. Mem'l Hosp. Ass'n*, 239 F.3d 1129, 1139-40 (9th Cir. 2001). Terminated disabled employees are only required to offer evidence that gives rise to an "inference of unlawful discrimination" *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994). This standard of 'mixed-motive' analysis is equally applicable to Ms. Winters. She was not required to establish that her disabilities were the "sole reason" CSC sought to evict her, so long as there was evidence that gave rise to an "inference of unlawful discrimination." This evidence Ms. Winters produced.

As shown above, the facts about the level of care Ms. Winters needs are, at worst, contestable. However, even if CSC had attempted to evict Ms. Winters based on an entirely

accurate belief that she needed a higher level of care than that provided to other residents, this attempted eviction would still have been action taken <u>on the basis of Ms. Winters' disabilities</u>. The eviction would simply have been an action that CSC could have defended on undue-hardship and fundamental-alteration grounds under the ADA, Section 504, and the Fair Housing Act. An entity subject to the ADA, Section 504, and the FHA is required to make "reasonable modifications in policies, practices, or procedures" when the modifications are necessary to avoid discrimination on the basis of disability, unless the entity can show that making those modifications would fundamentally alter the nature of the service, program or activity. 42 U.S.C. 12182(b)(2)(A)(ii); 28 C.F.R. 36.302; and *see also* the similar Title II regulation at 28 CFR 35.130(b)(7) (1998). *See,* Plaintiff's Opposition at 20-21 (anticipating the fundamental alteration defense) and 22-29 (anticipating the undue hardship defense). However, the Court's opinion does not focus on undue-hardship or fundamental-alteration defenses, which of course generally involve contested issues of material fact, and certainly would involve such issues in this particular case. *Id.* [3]

To the extent the Court believed that because most other residents of CSC are disabled, CSC's evicting Ms. Winters because of her disabilities could not be "discrimination" "on the basis" of her disabilities, this is an argument raised at great length in *Olmstead v. L.C.*, 527 U.S. 581, at 615-626, (1999) (Thomas, J., dissenting), and squarely

---

[3] In the 09/26/07 Order, n. 11, the Court referred to *Weinrech v. Los Angeles County Metropolitan Transportation Authority*, 114 F.3d 976 (9th Cir. 1997). That case does not stand for the proposition that an institution does not discriminate when it excludes a disabled individual from its program on the basis that her disability requires more care than it can provide. In *Weinrech*, there was serious doubt that the individual even had a disability and the Court held the exclusion was based not on the individual's disability, but on the fact that no one had certified that he was disabled in the first place. The Court has already concluded that, at a minimum, the question of whether Ms. Winters is a qualified individual with a disability is a genuine issue of material fact. 09/26/07 Order, at 6.

rejected by the majority, 527 U.S. at 597-98 & n. 10.  In *Olmstead*, the state argued that two people with disabilities seeking community placement could not "point to" any discrimination because discrimination requires uneven treatment of similarly situated individuals, and these individuals were more disabled than those meriting community placement.  The majority opinion found that incorrect, noting that Congress had adopted "a more comprehensive view of the concept of discrimination advanced in the ADA." *Id*. at 557.  The Court has found discrimination in other cases where there was no showing of uneven treatment, but rather looks to the type of discrimination alleged.  In *O'Connor v. Consolidated Coin Caterers Corp*., 517 U.S. 308 (1996), the Court held that that the Age Discrimination in Employment Act bans discrimination where the person was not protected "because" of his age.  Even when a sexual harasser is of the same sex, workplace harassment can violate Title VII"s prohibition against discrimination because of sex.  *Oncale v. Sundowner Offshore Services, Inc*., 523 U.S. 75, 76 (1998); *Jefferies v. Harris County Community Action Assn*., 615 F.2d 1025, 1032 (5th Cir. 1980).  *See*, *Alexander v. Choate*, 469 U.S. 287 (1985) (persons with disabilities to be protected from both "discriminatory animus" and discrimination arising out of "thoughtlessness," "indifference" or "benign neglect.")

There is ample evidence that CSC attempted to evict Ms. Winters because of grossly incorrect assumptions about the severity of her disabilities, *see* Plaintiff's Opposition at 2-3, 16-17, and 29-30, and to retaliate against her for requesting accommodations and complaining to the Long Term Care Ombudsman.  *See* Plaintiffs' Opposition at 4-7. (The Court has already found that Plaintiff has stated a retaliation claim under the Assisted Living Homes Act.  *See,* 08/17/07 Order, at 2-4.)

The Supreme Court has explained that retaliation against an individual who complains of discrimination is itself an act of discrimination. In a recent Title IX case, the Court explained that retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination. *Jackson v. Birmingham Board of Education,* 544 U.S. 167 (2005). Similarly, here, Ms. Winters complained of disability discrimination, voicing those complaints primarily to the CSC administrators and also the LTCO. Like sex discrimination under Title IX, CSC's failure to accommodate and attempt to evict Ms. Winters is disability discrimination because by definition the complainant is being subjected to differential treatment.

CSC's assertion that it is not discriminating on the basis of disability because it believes that Ms. Winters needs a higher level of care than it can provide, and that she has been abusive to staff, are really implicit concessions that it may be discriminating, but its discriminations are justifiable; justifiable because accommodating Ms. Winters' disabilities would be an undue hardship for CSC or work a fundamental alteration in its program, or justifiable because she poses a direct threat to staff and other residents of the facility. Seen in that way, these assertions raise obvious questions of material fact, already identified in the Court's orders.

For example, whether "undue hardship" exists is definitely a question of fact as undue hardship is based on the particularized facts of each situation and rarely suitable for resolution on summary judgment. *Morton v. UPS,* 272 F.3d 1249 (9th Cir. 2001); *Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869 (9th Cir. 1998). Additionally, the Court's statement that Ms. Winters "has failed to establish that CSC's decision to terminate her tenancy was based on her disabilities and was not based on CSC's perception that she was verbally and/or

physically abusive," 09/26/07 Order at 9, is probably contrary to the Court's finding that Ms. Winters' retaliation claim presents genuine issues of material fact for trial; but it is also the wrong statement to make in the context of summary judgment. Whether Ms. Winters poses a direct threat to CSC staff is a contested issue of material fact. Whether the eviction rests on a direct threat or on discrimination against someone who may need a level of care higher than the facility anticipated is another issue of contested material fact. Such issues ought to go to trial.

## II.    THE COURT ERRED IN GRANTING SUMMARY JUDGMENT ON PLAINTIFFS' ALASKA DISABILITY DISCRIMINATION CLAIMS.

Even if the federal antidiscrimination statutes could be read in the restricted way implied in the Court's 09/26/07 Order, the same would not be true of the Alaska Human Rights Act. The employment-discrimination provisions of that Act, AS 18.80.220, have been held to provide broader protections for workers than comparable federal civil rights statutes do, principally because of "the strong statement of purpose [footnote omitted] in enacting AS 18.80, and [the Legislature's] avowed determination to protect the civil rights of all Alaska citizens." *Loomis Elec. Protection v. Schaefer*, 549 P.2d 1341, 1343 (Alaska 1976). That strong statement of purpose, at AS 18.80.200(b), reads:

> (b) Therefore, it is the policy of the state and the purpose of this chapter to eliminate and prevent discrimination in employment, in credit and financing practices, in places of public accommodation, in the sale, lease, or rental of real property because of race, religion, color, national origin, sex, age, physical or mental disability, marital status, changes in marital status, pregnancy or parenthood. It is also the policy of the state to encourage and enable physically and mentally disabled persons to participate fully in the social and economic life of the state and to engage in remunerative employment.

The purpose applies just as much to the public-accommodation and housing sections of the Alaska Human Rights Act as it does to the employment section.

Memorandum in Support of Plaintiffs' Motion for Reconsideration
Case No. 3:06-cv-00083-TMB
Page 10 of 14

It is true, as the parties suggested while briefing the Human Rights Act claim on summary judgment, that Alaska courts often look to federal case law in interpreting that Act. However, the Court's conclusion that CSC was not discriminating against Ms. Winters on the basis of her disability does not rest on any federal court cases compelling such a conclusion, but on the Court's reading of the Assisted Living Homes Act and of the contract between CSC and Ms. Winters.[4]  We submit that when the Alaska Supreme Court said of the Alaska Human Rights Act, "[W]e believe that the legislature intended to put as many 'teeth' into this law as possible," *Loomis Electric*, 549 P.2d at 1343, it meant that people in Ms. Winters' position -- facing the loss of her residence due to an assisted living facility's alleged belief that she was a "heavier load" than it wanted to handle, facing retaliation for complaining to the appropriate authorities -- ought to find protection in the Alaska Human Rights Act, even if comparable federal laws did not provide it.

Even if the Court does not vacate its summary judgment against Ms. Winters' federal antidiscrimination claims, it must still remand the Alaska Human Rights Act claim for a determination by the Alaska Superior Court as to whether Ms. Winters has made out a *prima facie* case under Alaska law.

### III. THE COURT ERRED IN GRANTING SUMMARY JUDGMENT ON THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS CLAIMS; THEY SHOULD BE REMANDED.

Plaintiffs' emotional distress claims are set forth at Claim VIII (IIED) and Claim IX (negligent infliction of emotional distress).  Ms. Winters alleged that she suffered emotional distress as a result of the manner in which CSC attempted to evict her.  In the 08/17/07

---

[4] *Weinrech v. Los Angeles County Metropolitan Transportation Authority*, 114 F.3d 976 (9th Cir. 1997), cited at note 11 of the 9/26/07 Order, is not a federal case on point.  *See* note 3 supra.

Order at 5-6, the Court dismissed both these claims and also granted a motion in limine at Doc. 140 concerning evidence about the process of eviction. Plaintiffs respectfully request the Court vacate these orders due to a clear error of law. Alaska law provides that such issues of negligence are ordinarily not susceptible of summary adjudication but, instead, must be resolved by a trial. *Lillegraven v. Tengs*, 375 P.2d 139 (Alaska 1962).

The Court's reference at p. 6 to *Bishop v. Municipality of Anchorage*, 899 P.2d 149, 155 (Alaska 1995) is inapposite. *Bishop* was an employment case, which also included a breach of contract claim and IIED claim. In that case, the Court held that since the Court had dismissed the breach of contract claim, it could dismiss the IIED claim. Here, the Court never dismissed the breach of contract claim. 09/26/07 Order at 12. Therefore, the reasoning in *Bishop* simply does not apply. *See*, also *Odsather v. Richardson*, 96 P.3d 521 (Alaska 2004) (remanding for determination of facts of independent contractor status). The citation of *Chizmar v. Mackie*, 896 P. 2d 196, 203-204 (Alaska 1995) is likewise inapposite. In that case, the Court specifically held that factual determinations of negligence are best resolved by the jury. The Court held that if reasonable jurors could differ as to whether the evidence adduced at trial would satisfy these elements, then the court must submit the IIED claim to the jury.

Here, reasonable jurors could differ. While CSC could send the eviction notice to Ms. Winters, the undisputed facts demonstrate that CSC knew and recognized Ms. Carol Winters as Ms. Helen Winters' POA/representative. Carol Winters signed the residential contract and lease. Carol Winters was the one contacted about care conferences. CSC foresaw emotional harm to Ms. Helen Winters by giving her the eviction notice. Ms. Marla Nelson testified she knew that the eviction notice would "upset" Ms. Helen Winters, and it is

undisputed Ms. Helen Winters had a history of high blood pressure and heart problems. Whether Ms. Winters' reaction and subsequent trip to the hospital was sufficient to establish serious mental distress is a jury question. Thus, the relationship between CSC and Ms. Helen Winters and Ms. Carol Winters is a matter for the jury to determine and is not a question of law. *Chizmar v. Mackie*, 896 P.2d 196, 203-204 (Alaska 1995).

The IEED and negligence emotional distress claims are so closely linked to Plaintiff's retaliation claim under the Assisted Living Homes Act, which the Court has remanded to state court, that the jury that should hear those claims is the same jury that hears the retaliation claim. Accordingly, they should be remanded to state court so they can be tried to a state jury.

## CONCLUSION

The Court should vacate the earlier summary judgments issued and at a minimum remand the Alaska Human Rights Act claim, and the Intentional Infliction of Emotional Distress and Negligent Infliction of Emotional Distress claims to state court.

DATED: October 11, 2007    ALASKA LEGAL SERVICES CORPORATION
Attorneys for Plaintiff Helen Winters
through her power of attorney Carol Winters


s/Sonja Kerr
ALASKA LEGAL SERVICES
1016 West 6th Avenue, Suite 200
Anchorage, Alaska 99501
PHONE: (907) 274-9431
FAX: (907) 279-7417
E-mail: skerr@alsc-law.org
Alaska Bar No. 0409051

Certificate of Service

I hereby certify that on the 11th day of October, 2007, a copy of this document was served electronically on:

Donna M. Meyers
Delaney, Wiles
1007 W. Third Avenue, Suite 400
Anchorage, AK 99501.

S/Sonja D. Kerr (0409051)